---

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

SEAFREEZE SHORESIDE, INC.; LONG ISLAND COMMERCIAL FISHING ASSOC., INC.; XIII NORTHEAST FISHERY SECTOR, INC.; HERITAGE FISHERIES, INC.; NAT. W., INC.; OLD SQUAW FISHERIES, INC.,

*Plaintiffs - Appellants,*

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; THE HONORABLE DEB HAALAND, in her official capacity as Secretary of the Department of the Interior; BUREAU OF OCEAN ENERGY MANAGEMENT; LIZ KLEIN, in her official capacity as the Director of the Bureau of Ocean Energy Management; LAURA DANIEL-DAVID, in her official capacity as Principal Deputy Assistant Secretary, Land and Minerals Management; UNITED STATES DEPARTMENT OF COMMERCE; THE HONORABLE GINA M. RAIMONDO, in her official capacity as the Secretary of the Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, NATIONAL MARINE FISHERIES SERVICE; CATHERINE MARZIN, in her official capacity as the Deputy Director of the National Oceanic and Atmospheric Administration; UNITED STATES DEPARTMENT OF DEFENSE; THE HONORABLE LLOYD J. AUSTIN, III, in his official capacity as the Secretary of the Department of Defense; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GEN. SCOTT A. SPELLMON, in his official capacity as the Commander and Chief of Engineers of the U.S. Army Corps of Engineers; COLONEL JOHN A. ATILANO, II, in his official capacity as the District Engineer of the New England District of the U.S. Army Corps of Engineers; VINEYARD WIND 1, LLC,

*Defendants - Appellees.*

---

On Appeal from the United States District Court for the District of Massachusetts, No. 1:22-CV-11091-IT – Hon. Indira Talwani

---

# OPENING BRIEF OF APPELLANTS
# SEAFREEZE SHORESIDE, INC., ET AL.

*Counsel listed on inside cover*

ROBERT HENNEKE
rhenneke@texaspolicy.com
CHANCE WELDON
cweldon@texaspolicy.com
THEODORE HADZI-ANTICH
tha@texaspolicy.com
CONNOR W. MIGHELL
cmighell@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:  (512) 472-2700
Facsimile:   (512) 472-2728

*Counsel for Appellants*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26(1), Appellants submit the following Corporate Disclosure Statement.

Appellant Seafreeze Shoreside, Inc. ("Seafreeze") states that it has one parent company, namely Yoplant LLC, which holds 100 percent ownership interest in Seafreeze. There are no other publicly held companies that have a 10 percent or greater ownership interest in Seafreeze.

Appellant Long Island Commercial Fishing Association, Inc. ("LICFA") states that it has no parent companies and there are no publicly held companies that have a 10 percent or greater ownership interest in LICFA.

Appellant XIII Northeast Fishery Sector, Inc. ("XIII Northeast") states that it has no parent companies and there are no publicly held companies that have a 10 percent or greater ownership interest in XIII Northeast.

Appellant Heritage Fisheries, Inc. ("Heritage") states that it has no parent companies and there are no publicly held companies that have a 10 percent or greater ownership interest in Heritage.

Appellant Nat W., Inc. ("Nat W.") states that it has no parent companies and there are no publicly held companies that have a 10 percent or greater ownership interest in Nat W.

Appellant Old Squaw Fisheries, Inc. ("Old Squaw") states that it has no parent companies and there are no publicly held companies that have a 10 percent or greater ownership interest in Old Squaw.

Dated the 11th day of December, 2023.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH
Attorney of Record for Appellants

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ..................................... iii

TABLE OF AUTHORITIES ............................................................... vii

GLOSSARY OF ABBREVIATIONS .................................................... xiv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ......................... xv

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 1

STATEMENT OF THE CASE ............................................................... 3

SUMMARY OF ARGUMENT ............................................................. 16

ARGUMENT ............................................................................... 17

I.      STANDARD OF REVIEW ...................................................... 17

II.     THE DISTRICT COURT ERRED BY HOLDING THAT THE
        COMMERCIAL FISHERMEN'S ESA CLAIMS FAIL ........................... 18

        A.      The Commercial Fishermen Have Standing To Bring Their
                ESA Claims ............................................................ 18

        B.      The Commercial Fishermen's ESA Claims Were Not Mooted
                And The 2020 BiOp Violated ESA In Multiple Ways ................. 25

        C.      The District Court Erred In Holding That The Commercial
                Fishermen Waived Certain ESA Arguments ......................... 28

III.    THE DISTRICT COURT ERRED BY HOLDING THAT THE
        COMMERCIAL FISHERMEN'S NEPA CLAIMS FAIL ........................ 31

        A.      The Commercial Fishermen Have Standing To Bring Their
                NEPA Claims .......................................................... 31

B.     The Commercial Fishermen Demonstrated That The NEPA Process Was Fatally Flawed......................................................34

IV.    THE FEDERAL DEFENDANTS' APPROVAL OF THE COP VIOLATED OCSLA .........................................................................42

A.     By Failing To Apply The Traditional Rules Of Statutory Construction, The District Court Erred And Misread OCSLA .......................................................................................42

B.     The District Court Erred By Impermissibly Discounting Commercial Fishermen's Substantial Evidence Of Safety And Environmental Harms.....................................................50

C.     The District Court Erred By Finding That Commercial Fishermen Lack Standing To Bring Environmental Claims Under OCSLA .....................................................................57

V.     THE COURT SHOULD REVERSE AND VACATE WITHOUT REMAND, BUT IF REMAND IS ORDERED, THE COURT SHOULD PROVIDE RELIEF TO THE COMMERCIAL FISHERMAN UNDER 5 U.S.C. § 705 ........................................58

CONCLUSION.............................................................................................63

CERTIFICATE OF SERVICE ..................................................................65

CERTIFICATE OF COMPLIANCE........................................................66

# TABLE OF AUTHORITIES

*Cases:*                                                                      *Page(s):*

*Alabama v. North Carolina,*
    560 U.S. 330 (2010)....................................................................................45

*All. for Hippocratic Med. v. United States Food & Drug Admin.,*
    78 F.4th 210 (5th Cir. 2023)..................................................................59, 61

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998).............................................................................43, 48

*Am. Postal Workers Union v. Frank,*
    968 F.2d 1373 (1st Cir. 1992)......................................................................20

*Am. Trucking Ass'ns, Inc. v. Frisco,*
    358 U.S. 133 (1958)....................................................................................53

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987)....................................................................................63

*Ashley Creek Phosphate Co. v. Norton,*
    420 F.3d 934 (9th Cir. 2005) ........................................................24, 33, 57

*Associated Fisheries v. Daley,*
    127 F.3d 104 (1st Cir. 1997)...................................................................17, 8

*Bennett v. Spear,*
    520 U.S. 154 (1997)....................................................................................42

*Boston Duck Tours, LP v. Super Duck Tours, LLC,*
    531 F.3d 1 (1st Cir. 2008)...............................................................58, 59, 61

*Boston Parent Coal. for Academic Excellence Corp v. Sch. Comm. of Boston,*
    996 F.3d 37 (1st Cir. 2021).........................................................................62

*Cal. Wilderness Coalition v. United States DOE,*
    631 F.3d 1072 (9th Cir. 2011) ....................................................................40

*Carcieri v. Salazar*,
    555 U.S. 379 (2009)..................................................................44

*Chemical Mfrs. Ass'n v. Nat. Res. Def. Council, Inc.*,
    470 U.S. 116 (1985)..................................................................46

*Chickasaw Nation v. United States*,
    534 U.S 84 (2001)................................................................43, 44

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020)......................................................39

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987)............................................................24, 33

*Ctr. for Bio. Div. v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017)................................................23

*Del. Riverkeeper Network v. FERC*,
    753 F.3d 1034 (D.C. Cir. 2014)..............................................41

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)..............................................................18

*Dubois v. U.S. Dep't of Agric.*,
    102 F.3d 1273 (1st Cir. 1996)............................................36, 37

*Duncan v. Walker*,
    533 U.S. 167 (2001)............................................................44, 46

*Gozlon-Peretz v. United States*,
    498 U.S. 395 (1991)..................................................................48

*Humane Soc'y of United States v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988)..................................................33

*In re Steinmetz*,
    862 F.3d 128 (1st Cir. 2017)..............................................59, 60

*In re Watson*,
    161 F.3d 593 (9th Cir. 1998) .........................................................46

*Jimenez-Portillo v. Garland*,
    56 F.4th 162 (1st Cir. 2022) .........................................................17

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986).........................................................28, 39, 45

*Lopez v. Davis*,
    531 U.S. 230 (2001).........................................................43

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).........................................................22, 24

*Madsen v. Women's Health Ctr.*,
    512 U.S. 753 (1994).........................................................60

*Marasco & Nesselbush, LLP v. Collins*,
    6 F.4th 150 (1st Cir. 2021) .........................................................18

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892).........................................................49

*Massachusetts v. Andrus*,
    594 F.2d 872 (1st Cir. 1979).........................................................46

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).........................................................32, 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).........................................................36, 39, 42, 45, 46

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007).........................................................40, 43, 49

*Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*,
    142 S. Ct. 661 (2022).........................................................45

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ..........................................................60

*Nken v. Holder*,
    556 U.S. 418 (2009)..........................................................................62

*NRDC v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ..........................................................36

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
    503 F.3d 18 (1st Cir. 2007)........................................................24, 57

*Patterson v. Alabama*,
    294 U.S. 600 (1935)..........................................................................60

*Papetti v. Doe*,
    691 F. App'x 24 (2d Cir. 2017) ......................................................20

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ..........................................................40

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)..........................................................................44

*Russello v. United States*,
    464 U.S. 16 (1983)............................................................................47

*Shinyei Corp. of Am. v. United States*,
    355 F.3d 1297 (Fed. Cir. 2004) ......................................................60

*S. Ottawa v. Perkins*,
    94 U.S. 260 (1876)............................................................................21

*St. Louis Consol. Coal Co. v. Illinois*,
    185 U.S. 203 (1902)..........................................................................49

*Tenn. Valley Authority v. Hill*,
    437 U.S. 153 (1978)..........................................................................26

*Texas v. United States,*
 50 F.4th 498 (5th Cir. 2022) ...........................................................59

*Trump v. Hawaii,*
 138 S. Ct. 2392 (2018)...................................................................63

*Town of Weymouth v. Mass. Dep't of Envtl. Prot.,*
 961 F.3d 34 (1st Cir. 2020)............................................................59

*Town of Winthrop v. FAA,*
 535 F.3d 1 (1st Cir. 2008)..............................................................23

*United States v. Lachman,*
 387 F.3d 42 (1st Cir. 2004)......................................................44, 48

*West Virginia v. EPA,*
 142 S. Ct. 2587 (2022)............................................................27, 28

### Rules:

FED. R. APP. P. 4(a) .........................................................................1

FED. R. CIV. P. 12(h)(3) ..................................................................20

FED. R. EVID. 201(b).......................................................................21

FED. R. EVID. 201(c)(2) ..................................................................21

FED. R. EVID. 201(d).......................................................................20

### Statutes:

5 U.S.C. § 701...................................................................................1

5 U.S.C. § 702...................................................................................1

5 U.S.C. § 703...................................................................................1

5 U.S.C. § 704...................................................................................1

5 U.S.C. § 705 .......................................................................1, 14, 61, 64

5 U.S.C. § 706 .........................................................................................1

5 U.S.C. § 706(2)(C) ..........................................................................39, 59

16 U.S.C. § 1536(a)(2) ..............................................................................27

16 U.S.C. § 1540(g)(1)(A) .........................................................................1

16 U.S.C. § 1540(g)(1)(C) .........................................................................1

16 U.S.C. § 1540(g)(2)(A) .........................................................................1

16 U.S.C. § 1540(g)(2)(B) .........................................................................1

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 2201 ......................................................................................1

43 U.S.C. § 1332(2) .............................................................................47, 52

43 U.S.C. § 1334 ....................................................................................47

43 U.S.C. § 1337(p)(1)(C) ........................................................................42

43 U.S.C. § 1337(p)(4) ...................................................................42, 43, 48

43 U.S.C. § 1337(p)(4)(K) ........................................................................39

43 U.S.C. § 1349(a)(2)(A) .........................................................................1

**Regulations:**

30 C.F.R. § 585.621(c) ..............................................................................46

30 C.F.R. § 585.626 ................................................................................39

40 C.F.R. § 1500.2(d) .............................................................................39

40 C.F.R. § 1501.3(b) .................................................................27

40 C.F.R. § 1502.2(f) .................................................................37

40 C.F.R. § 1502.14(a) ...............................................................36

40 C.F.R. § 1508.7 .....................................................................41

40 C.FR. § 1508.25(a)(2)-(3) ......................................................41

50 C.F.R. § 402.14(g)(3) .............................................................26

50 C.F.R. § 402.14(g)(5) .............................................................26

86 Fed. Reg. 12495 (Mar. 3, 2021) .............................................38

88 Fed. Reg. 27839 (May 3, 2023) ..............................................13

**Other Authorities:**

*Ensure*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ............44

*Report of the Effect on Radar Performance of the Proposed Cape Wind Project and Advance Copy of USCG Findings and Mitigation*, U.S. DEPT. OF THE INTERIOR MINERALS MANAGEMENT SERVICE (Dec. 16, 2008), https://www.boem.gov/renewable-energy/studies//uscg-radar-study-findings-and-mitigation ......................................................56

# GLOSSARY OF ABBREVIATIONS

AIS — Automatic Identification System

APA — Administrative Procedure Act

BiOp — Biological Opinion

BOEM — Bureau of Ocean Energy Management

COP — Construction and Operations Plan

CWA — Clean Water Act

EIS — Environmental Impact Statement

ESA — Endangered Species Act

GW — Gigawatt

MMPA — Marine Mammal Protection Act

MW — Megawatt

NARW — North Atlantic Right Whale

NEPA — National Environmental Policy Act

NMFS — National Marine Fisheries Service

OCSLA — Outer Continental Shelf Lands Act

OCS — Outer Continental Shelf

PPA — Power Purchase Agreement

ROD — Record of Decision

USACE — United States Army Corps of Engineers

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Oral argument will assist the Court in deciding the complex issues of first impression presented by this case. It is an appeal of the lower court's denial of Appellants' motion for summary judgment seeking to halt the construction of the first federally-approved, commercial-scale offshore wind energy project in the nation on the Outer Continental Shelf. Appellants are members of the commercial fishing industry whose livelihoods are threatened by the continuing construction activities and future operations of the project in one of their prime fishing areas.

# STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 5 U.S.C. §§ 701-706 (Administrative Procedure Act), 28 U.S.C. § 2201 (Declaratory Judgment Act), 43 U.S.C. § 1349(a)(2)(A) (OCSLA citizen suit provision), and 16 U.S.C. §§ 1540(g)(1)(A) and (C) and (g)(2)(A) and (B) (ESA citizen suit provisions). *See* Add. at 00050–55, 70–71, 74, 93.

The district court's order of October 12, 2023, denied Appellants' Motion for Summary Judgment and disposed of all parties' claims. Add. at 00001–47; D. Mass. Doc. No. 138. Appellants (the "Commercial Fishermen") timely filed their notice of appeal on October 16, 2023. Appx. at 01042–01044; D. Mass. Doc. No. 140. *See* Add. at 00117–21; Fed. R. App. P. 4(a). This Court has jurisdiction over appeals of final decisions of district courts under 28 U.S.C. § 1291. *See* Add. at 00073.

# STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The issues presented are addressed in the following two buckets. First, whether the district court committed error when it denied the Commercial Fishermen's[1] motion for summary judgment by:

---

[1] Five of the six Appellants, namely Long Island Commercial Fishing Association, Inc. ("LICFA"), XIII Northeast Fishery Sector, Inc., Heritage Fisheries, Inc., Nat W., Inc., and Old Squaw Fisheries, Inc., are commercial fishing companies or associations of commercial fishermen. The sixth Appellant, Seafreeze Shoreside, Inc., is a shoreside business that processes fish product purchased from commercial fishermen and also owns and operates two commercial fishing boats.

1. finding that the Commercial Fishermen did not have standing to bring environmental claims under the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), or the Outer Continental Shelf Lands Act ("OCSLA");

2. misreading the relevant provisions of ESA, NEPA, and OCSLA;

3. finding that Federal Defendants did not violate ESA, NEPA, or OCSLA in approving the Construction and Operations Plan ("COP") for the first full-scale, commercial wind energy project on the Outer Continental Shelf ("OCS") (the "Vineyard Wind Project" or the "Project");

4. denying the Commercial Fishermen's motion to strike certain documents from the certified administrative record (the "AR");

5. refusing to take judicial notice of the articles of incorporation of Appellant Long Island Commercial Fishing Association; and

6. ignoring or minimizing competent, sworn testimony proffered by the Commercial Fishermen.

Second, whether this Court should:

1. declare that the Commercial Fishermen have standing to bring their ESA, NEPA and OCSLA claims and that the Federal

Defendants violated multiple provisions of ESA, NEPA and OCSLA in approving the COP;

2.      reverse without remand the decision of the district court;

3.      vacate without remand the Federal Defendants' approval of the COP;

4.      enjoin further construction of the Vineyard Wind Project under the COP; and

5.      order Vineyard Wind 1, LLC (the "Project Developer") to remove all materials, equipment, and structures installed in connection with the Project.

## STATEMENT OF THE CASE

*Background*

On May 10, 2021, Appellees United States Department of the Interior, et al. (the "Federal Defendants") issued a Record of Decision ("ROD") under NEPA approving the Vineyard Wind Project. Appx. at 00055; D. Mass. Doc. No. 1 at 32. The Project is located in one of the prime fishing areas used by the Commercial Fishermen and it threatens their livelihoods. Appx. at 00235–00273; D. Mass. Doc. No. 66 Exhibits 1–4 (declarations of Commercial Fishermen).

On June 15, 2021, Appellee Bureau of Ocean Energy Management ("BOEM") deferred the requirement that the Project Developer provide financial

assurance for the costs of decommissioning the Vineyard Wind Project "until 15 years after construction." Appx. at 01240; BOEM 0077110.

On September 17, 2021, the Commercial Fishermen filed a 60-day notice letter with the Federal Defendants informing them of the alleged violations of federal law in connection with Project approval. Appx. at 00033–34; D. Mass. Doc. No. 1 at 10–11.

On December 15, 2021, the Commercial Fishermen filed their complaint, which includes 33 counts alleging that, in approving the COP for the Project, the Federal Defendants violated multiple provisions of ESA, NEPA, OCSLA, the Clean Water Act ("CWA"), the Marine Mammal Protection Act ("MMPA"), and the Administrative Procedure Act ("APA"). Appx. at 00024–108; D. Mass. Doc. No. 1. The Project Developer intervened in the action as a respondent. Appx. at 00547; D. Mass. Doc. No. 68 at ¶ 150.

*The Administrative Record ("AR")*

The AR in the case exceeds 290,000 pages and was certified by the Federal Defendants on April 11, 2022. Appx. at *id.*; D. Mass. Doc. No. 68 at ¶ 152.

Two documents prepared after the ROD was issued were added to the AR by the Federal Defendants: (1) a "Correction of Clerical Error and Clarification," dated January 14, 2022 (the "January 2022 Supplement"), which was added to the AR approximately one month after the Commercial Fishermen filed their compliant and

(2) a revised Biological Opinion issued by Appellee National Marine Fisheries Service ("NMFS"), dated October 18, 2021 (the "2021 BiOp"), which was added to the AR approximately one month after the Commercial Fishermen sent their 60-day notice letter. The Commercial Fishermen filed a motion to strike those documents from the AR on the ground that they were created by the Federal Defendants after final agency action was taken. The Commercial Fishermen alleged that the January 2022 Supplement was prepared in response to the complaint while the 2021 BiOp was prepared in response to the 60-day notice letter. Appx. at 00213–27; D. Mass. Doc. No. 57 at 6–20.

The ROD states that "due to the placement of the turbines [in the Project area] it is likely that the entire 75,614-acre area will be abandoned by commercial fisheries due to the difficulties with navigation." Appx. at 00218; D. Mass. Doc. No. 57 at 11. In the January 2022 Supplement, the Federal Defendants purport to "clarify" that statement in the ROD by asserting that what they meant to write was "according to comments submitted by interested parties" the entire area will likely be abandoned by commercial fisheries. *Id.* In issuing the 2021 BiOp, the Federal Defendants purport to substitute it for the original Biological Opinion upon which the final agency action set forth in the ROD was based. Appx. at 00220–23; D. Mass. Doc. No. 57 at 13–16.

*The Cross Motions for Summary Judgment and Relevant Evidence*

The parties filed their cross motions for summary judgment, which contained hundreds of pages of briefing. The Commercial Fishermen included declarations of David Aripotch, the Owner and President of Appellant Old Squaw Fisheries, Inc. ("Old Squaw") and Captain of F/V Caitlin & Mairead, Old Squaw's sole fishing boat. Since 1974, for almost 50 years, Aripotch devoted his "entire adult life . . . to fishing in the Atlantic Ocean, including in the Vineyard Wind area." Appx. at 00240; D. Mass. Doc. No. 66 Exhibit 1 at 6. He filed several declarations describing the injuries to Old Squaw under OCSLA and NEPA, as well as his personal injuries under the ESA and NEPA, attributable to the Vineyard Wind Project.

With regard to environmental and economic injuries to Old Squaw under OCSLA and NEPA, Aripotch declared that, among other things:

(1)　"[E]nvironmental and ecological harms" from the Project will force Appellant Old Squaw "to stop fishing in the Vineyard Wind lease area;"

(2)　"The turbines will be pile-driven into the ocean bottom . . . producing high levels of low-frequency noise capable of injuring fish and marine mammals, and the continuous operation of the turbines will produce further noise, and electromagnetic energy emanating from the cables that will disturb marine life;"

(3)　The adverse impacts of the project include "throwing the local marine ecosystem out of balance and further impacting Old Squaw's ability to fish in the waters of the OCS in and around the Vineyard Wind lease area;"

(4)    "As a commercial fisherman, I know the fish aren't going to like the noise and sound from the turbines, especially when high winds make the turbines vibrate and it resonates from their bases onto the ocean floor during operation. [They] likely will be unable to spawn as they normally do. That will affect all the animals in the food chain . . . Plus, there are thousands of gallons of oil in each turbine . . . If a hurricane runs through the Vineyard Wind area it will be an environmental catastrophe;"

(5)    "[T]he Federal Defendants' actions in approving the project will result in harm, injury, and death to a diverse range of marine species, including whiting, squid, the endangered [North Atlantic Right Whale], and horseshoe crabs, plus destruction of their habitats, and the destabilization of the delicate marine ecosystem;" and

(6)    "[T]he Vineyard Wind project . . . would endanger the ocean's ecological health, diversity, and rich resources."

Appx. at 00656–57; D. Mass. Doc. No. 90 at 12–13; *see also* Appx. at 00235–46; D. Mass. Doc. No. 66 Exhibit 1 at 1–12.

With regard to his personal environmental injuries under NEPA, ESA, and OCSLA, Aripotch declared:

(1)    "Whenever I go to the Vineyard Wind lease area, I try to bring my camera with me. It is an area of amazing wildlife . . . [i]t is one of the most alive places I've ever fished. I love seeing the North Atlantic right whales ("NARWs"), the fin whales, and the pilot whales that are in the Vineyard Wind lease area. Plus it is a delight to see the tunas, swordfish, skipjack tunas, all jumping, and the sea birds working the bait fish;"

(2)    "At night, when we go further down in the lease area to go whiting fishing . . . before we set the net and stop the boat, the bait fish are just exploding for acres in the water in all directions. All kinds of bait fish, squid, silversides, sand eels, millions of them, more than anywhere else I've ever fished, it's magical."

(3) "Commercial fishing is rarely easy, but there is also a true feeling of calm and solitude in being able to work in an environment where you get to see and experience the beauty of nature daily. … Watching the endangered NARWs with their young skim-feeding is an amazing experience, and I have been fortunate to be a part of it, seeing a first-hand view of the nature and the sea on the Outer Continental Shelf, something few people on earth can say they have done.  I believe all of this construction and operation will also send the NARWs away from the area and that frightens me … I believe they will be put in harm's way because the wind farms will make them change the habits they've had for millennia . . . The construction and operation of the Vineyard Wind project will deprive me of the aesthetic and spiritual pleasures I derive from viewing NARWs in the area;"

(4) "I plan to continue to fish in the Vineyard Wind lease area and observe the NARW and all the other whales and animals that congregate in that area through the foreseeable future if the Vineyard Wind . . . COP [is] vacated.  It is my understanding that the . . . approval of the COP will harm the NARW  . . . as the sand shoal bottom laden with copepods, its main feeding source, will be destroyed via pile driving and jet plowing creating a hard bottom strewn with cables spewing electromagnetic frequency and constant low-frequency noise from the operation of the wind farm;" and

(5) "It is my understanding that the Federal Defendants' actions will result in harm, injury, and death to a diverse range of marine species, including whiting, squid, the North Atlantic Right Whale, and horseshoe crabs, plus destruction of their habitats, and the destabilization of the delicate marine ecosystem that I enjoy as the Owner and President of Old Squaw and the Captain of the F/V Caitlin & Mairead."

Appx. at 00242–46; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 25–29.

The AR confirms Aripotch's testimony that the Vineyard Wind project will

(1) harm the endangered North Atlantic Right Whale, Appx. at 01194, 01213,

01243–45; BOEM_0068510, 0068617, 0110388–0110390, and (2) make the Project area unfishable because of the adverse environmental impacts of the Project's construction and operation. Appx. at 01204–05, 01210, 01213; BOEM_0068583–84, 0068592, 0068617 (pile driving and other construction activity will harm, displace, and kill marine species); Appx. at 01219, 01228; BOEM_0068717, 0068749 (Vineyard Wind project will increase risk of vessel collisions and interfere with navigation); Appx. at 01192–93, 01205, 01224; BOEM_0068492, 0068497, 0068584, 0068722 (turbines are untested in wind speeds over 112 mph and resulting turbine failure will harm the environment); Appx. at 01224; BOEM_0068722 (scour protection for cabling will displace squid from any location where it is placed); Appx. at 01196; BOEM_0068531 (construction activities will affect horseshoe crab spawning); Appx. at 01197–1209, 01211, 01212; BOEM_0068546, 0068549, 0068578–88, 0068606, 0068608 (construction will harm project area's natural resources, including fish and endangered species); Appx. at 01229–30; BOEM_0068755–56 (wind turbines will interfere with military radar); *see also* Appx. at 01280–81; MSJ Hearing Transcript at 29–30; Appx. at 01223–27; BOEM_0068729–0068733 (impact of the Project on bottom-trawl fishermen like Commercial Fishermen will be "moderate" to "major").

Aripotch also declared that Appellant Old Squaw is a member of Appellant Long Island Commercial Fishing Association ("LICFA"). Appx. at 00235; D. Mass.

Doc. No. 66 Exhibit 1 at 1. In turn, Bonnie Brady, Executive Director of LICFA, declared that "Old Squaw is a member of LICFA." Appx. at 00284; D. Mass. Doc. No. 66 Exhibit 6 at 2. The Brady declaration also states, "Since its inception, LICFA and its members have supported and advocated for clean, fishable waters free from pollution and navigational obstructions so that LICFA members can pursue their livelihoods and life-callings as fishermen." Appx. at 00283–84; *id.* at 1–2.

Aripotch additionally declared that he is personally a member of LICFA in his "individual capacity," and that his individual "economic and environmental interests as a commercial fisherman are represented by LICFA." Appx. at 00712; D. Mass. Doc. No. 90 Exhibit 1 at 1. Brady confirmed that Aripotch is a member of LICFA in his individual capacity and that, accordingly, LICFA represents his individual economic and environmental interests in the Vineyard Wind Project area. Appx. at 00714; D. Mass. Doc. No. 90 Exhibit 2 at 1.

On the issue of economic injury, in its "Additional Statement of Undisputed Facts," filed in connection with the MSJ briefing, Project Developer submitted a declaration from a Dr. R. Douglas Scott asserting that, according to certain AIS[2] data, F/V Caitlin & Mairead, Old Squaw's sole fishing vessel, was spotted only occasionally in the Vineyard Wind Project area. Appx. at 00633; D. Mass. Doc. No.

---

[2]     AIS is the Automatic Identification System, which tracks data gathered from certain vessels.

88 at 77 (describing Scott's work). In response, Aripotch filed a declaration stating that F/V Caitlin & Mairead is not required to use AIS technology in the Vineyard Wind Project area because his fishing boat, the F/V Caitlin & Mairead, is under 65 feet in length and the Project area is located 14 nautical miles from shore, while AIS technology is only required on vessels over 65 feet in length sailing within 12 nm of shore. Aripotch further declared that, while he has chosen to install an inexpensive form of AIS on his boat, he frequently turns it off when further from 12 nm from shore so that other commercial fishermen cannot observe his fishing activity. Accordingly, Aripotch declared that any estimate of his commercial fishing activity in the Project area using AIS technology will understate his actual fishing activity in the area. Appx. at 00716–19; D. Mass. Doc. No. 90 Exhibit 3; *see also* Appx. at 00720–23; D. Mass. Doc. No. 90 Exhibit 4 (declaration of Thomas E. Williams, Sr.); Appx. at 00707–09; D. Mass. Doc. No. 90 at 63–65.

### *The Hearing on the Cross Motions for Summary Judgment*

The hearing on the cross motions for summary judgment was scheduled for April 3, 2023. Thirteen days before the hearing, on March 21, 2023, the Commercial Fishermen filed a motion for judicial notice of Appellant LICFA's articles of incorporation in order to support LICFA's associational standing to bring the economic and environmental claims of its individual member, David Aripotch.

Appx. at 00756–70; D. Mass. Doc. No. 98.  In relevant part, LICFA's articles of incorporations states that LICFA's purpose is:

> [t]o create, [form] and establish an association for the preservation and maintenance of the saltwater fisheries in Suffolk County and its environs; . . . to clean up, improve, protect, and preserve the saltwater fisheries; to increase, further, and enhance public interest and activism for the welfare of the environment; . . . and generally to endeavor to promote the preservation and maintenance of the saltwater fisheries for future generations.

Appx. at 00757; D. Mass. Doc. No. 98 at 2.  The district court refused to take judicial notice of the publicly-available LICFA articles of incorporation, Appx. at 00775–76; D. Mass. Doc. No. 108, even though the articles are filed with and were obtained from the Secretary of State of New York.

At the MSJ hearing, the district court summarily denied from the bench the Commercial Fishermen's motion to strike from the AR the January 2022 Supplement and the 2021 BiOp, and issued a written order denying the motion over five months later.  *See* Appx. at 01287; MSJ Hearing Transcript at 36 ("I'm denying your motion to strike."); Appx. at 01019–41; D. Mass. Doc. No. 137 (order denying motion to strike).

At the hearing, the district court observed that the extensive summary-judgment filings were of substantial size, Appx. at 01257–58, 01261; MSJ Hearing Transcript at 6-7, 10, stating she would "make [her] way through it," giving no indication of how long the process might take.  Appx. at 01312; *id.* at 61.

*Events After the Hearing on the Cross Motions for Summary Judgment*

After the hearing, the Commercial Fishermen contacted the Project Developer to determine the extent to which it would refrain from conducting construction activities pending the district court's resolution of the cross motions for summary judgment. The Project Developer responded by stating that it was contractually obligated by its power purchase agreements and supplier contracts to conduct construction activities through the middle of 2024 and, consequently, would not await the district court's decision. The Project Developer also told the Commercial Fishermen to avoid the area of construction activities due to safety risks. Appx. at 00822; D. Mass. Doc. No. 116 Exhibit 1 at 2; Appx. at 00846; D. Mass. Doc. No. 116 Exhibit 2 at 2. These communications occurred before the commencement of fishing season in the Vineyard Wind Project area. *See* Appx. at 00235–00273; D. Mass. Doc. No. 66 Exhibits 1–4 (declarations of Commercial Fishermen); *see also* Appx. at 00782; D. Mass Doc. No. 115 Exhibit 1 at ¶ 5.

On May 3, 2023, a month after the hearing date, the United States Coast Guard ("USCG") established 63 exclusion zones in the Project's construction area, finding that the construction was "unusually hazardous," Add. at 00129–65; 88 Fed. Reg. 27839 (May 3, 2023), and excluding maritime vessels from those areas through May 2024, thereby making it impracticable for the Commercial Fishermen to use the areas for fishing purposes for the foreseeable future.

*The Commercial Fishermen File Their Motion for Temporary Relief*

On May 10, 2023, the Commercial Fishermen filed their motion for stay, or in the alternative, for preliminary injunction, asking the district court to temporarily suspend the Federal Defendants' COP approval pending the court's final decision on the cross motions for summary judgment. *See* Appx. at 00777–93; D. Mass. Doc. No. 115 (motion); Appx. at 00794–865; D. Mass. Doc. No. 116 (memorandum in support). Given the scope, breadth, and complexity of the 33 claims in the complaint, as well as the over 290,000 pages of the AR, the Commercial Fishermen chose to frame their motion for temporary relief based on a limited number of claims under OCSLA and NEPA. At the evidentiary hearing on the motion, held on May 23, 2023, the district court refused to allow the Commercial Fishermen to introduce evidence to support their standing to bring their NEPA claims and did not permit two of their three witnesses present at the hearing to testify in support of the motion. *See* Appx. at 01320–25; Stay/PI Hearing Transcript at 7–12.

Within two days of that hearing, the district court issued its opinion denying the motion for temporary relief. *See* Appx. at 01015; D. Mass. Doc. No. 128 at 15.

*The Interlocutory Appeal*

In an interlocutory appeal, the Commercial Fishermen asked this Court to reverse the decision of the district court regarding temporary relief and to issue a stay under 5 U.S.C. § 705 postponing the effective date of the Federal Defendants'

approval of the COP or, in the alternative, to enjoin said approval until the underlying case has been fully adjudicated.  Appx. at 01114; D. Mass. Doc. No. 143 Exhibit 1 at 54.  On September 26, 2023, this Court scheduled oral argument on the interlocutory appeal for November 9, 2023.  *See* Appx. at 01159–01161; 1st Cir. Case No. 23-1473 Document 00118056370.

### *The District Court Rules on the Cross Motions for Summary Judgment*

On October 12, 2023, approximately one month before the scheduled hearing date on the interlocutory appeal, the district court ruled that Commercial Fishermen had "not shown that Defendants acted arbitrarily, capriciously, or otherwise unlawfully," granted summary judgment to Federal Defendants and Project Developer, and denied Commercial Fishermen's motion for summary judgment. Add. at 00047; D. Mass. Doc. No. 138 at 47.  Because the district court entered an order disposing of all claims and entered judgment, the interlocutory appeal was mooted and the parties entered into a stipulated voluntary dismissal of the interlocutory appeal without prejudice on October 19, 2023.  Appx. at 01157–58; D. Mass. Doc. No. 144.  Accordingly, this Court dismissed the interlocutory appeal, *id.*, which led to this appeal of the district court's final disposition of the case.  This appeal is limited to the specific issues addressed here under the ESA, NEPA, OCSLA, and APA.

Meanwhile, the Project Developer continues construction activities at the Vineyard Wind Project site, giving no indication that it plans to stop such construction during the pendency of this appeal.

## SUMMARY OF ARGUMENT

For five reasons, the district court's decision should be reversed and the Federal Defendants' approval of the COP should be vacated. First, Appellant LICFA has associational standing to represent its member, David Aripotch, in connection with his personal injuries resulting from the environmental harms to the Vineyard Wind Project area attributable to the Federal Defendants' approval of the COP in violation of the ESA, NEPA and OCSLA, because (1) David Aripotch's injuries are particularized and concrete, (2) protecting against those injuries are germane to LICFA's purposes, (3) those injuries can be remedied by the relief requested, and (4) they are within the zone of interests protected by those statutes.

Second, the Commercial Fishermen have standing to bring their claims under NEPA and OCSLA because (1) they have suffered particularized and concrete injuries resulting from the Federal Defendants' approval of the COP in violation of those statutes, (2) their injuries can be remedied by the relief requested, and (3) they are within the zone of interests protected by those statutes.

Third, the Federal Defendants violated multiple provisions of the ESA by, among other things, preparing a substantively and procedurally defective biological opinion addressing threats to the NARW.

Fourth, the Federal Defendants violated NEPA by (1) failing to consider a reasonable range of alternatives in the final Environmental Impact Statement ("EIS"), (2) basing the EIS on impermissible purposes, and (3) purporting to amend the EIS and ROD after the completion of final agency action.

Fifth, in approving the COP, the Federal Defendants violated OCSLA by failing to ensure (1) safety, (2) protection of the environment, (3) conservation of natural resources, (4) protection of correlative rights, and (5) prevention of interference with reasonable uses. Furthermore, the Federal Defendants failed to properly consider the sea or seabed for uses as a fishery, a sealane, and for navigation. Finally, in holding that the Federal Defendants did not violate OCSLA the district court erred by neglecting to apply the traditional rules of statutory construction and thereby misreading the plain language of OCSLA.

## ARGUMENT

## I. STANDARD OF REVIEW

Questions of law are determined de novo by appellate courts. *See Jimenez-Portillo v. Garland,* 56 F.4th 162, 166 (1st Cir. 2022); *see also Associated Fisheries v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (holding that "when reviewing agency

action, we apply the same legal standards that pertain in the district court and afford no special deference to that court's decision").

With regard to questions of fact, in administrative law cases courts must determine whether the agency action was arbitrary and capricious by "requiring agencies to engage in reasoned decisionmaking . . . ." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (citation omitted). An agency action is arbitrary and capricious if the agency "relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Associated Fisheries*, 127 F.3d at 109. An agency action that is arbitrary and capricious "ordinarily will not survive" judicial review. *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 172 (1st Cir. 2021).

## II. THE DISTRICT COURT ERRED BY HOLDING THAT THE COMMERCIAL FISHERMEN'S ESA CLAIMS FAIL

### A. The Commercial Fishermen Have Standing To Bring Their ESA Claims.

The district court's finding that the Commercial Fishermen lacked Article III standing to bring environmental claims under the ESA is erroneous as a matter of law. Add. at 00026–29; D. Mass. No. 138 at 26–29. Among the errors made by the

district court is its refusal to consider the articles of incorporation of Appellant LICFA on the issue of associational standing.

LICFA's articles of incorporation, which are publicly available in the Office of the Secretary of State of New York, provide, in part, that LICFA's purpose is

> [t]o create, [form] and establish an association for the preservation and maintenance of the saltwater fisheries in Suffolk County and its environs; . . . to clean up, improve, protect, and preserve the saltwater fisheries; to increase, further, and enhance public interest and activism for the welfare of the environment; . . . and generally to endeavor to promote the preservation and maintenance of the saltwater fisheries for future generations.

Appx. at 00757; D. Mass. Doc. No. 98 at 2.

LICFA member David Aripotch filed a declaration stating that he "routinely fishes . . . within the Vineyard Wind lease area," Appx. at 00236; D. Mass. Doc. No. 66 Exhibit 1 at ¶ 7, which is approximately 65 miles from his home base in Suffolk County, Long Island, and is therefore well within the saltwater fisheries environs LICFA seeks to protect. Appx. at 00772; D. Mass. Doc. No. 100 at 2; *see also* Appx. at 01138–40; D. Mass. Doc. No. 143 Exhibit 2 at 22–23. Accordingly, because LICFA's purposes include protection, preservation, and maintenance of saltwater fisheries on behalf of its members, as well as furthering the welfare of the environment, LICFA may stand in Aripotch's shoes and assert his individual environmental harms under the ESA as its own. Appx. at 00714; D. Mass. Doc. No. 90 Exhibit 2 at ¶ 4 ("LICFA, as an association of commercial fishermen, represents

the economic and environmental interests of David Aripotch in his capacity as a member of LICFA.")[3]; *see also Am. Postal Workers Union v. Frank,* 968 F.2d 1373, 1375 (1st Cir. 1992) (association has standing when "at least one of its members possesses standing to sue . . . [,] the interests the suit seeks to vindicate are germane to its purpose[,] and . . . neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit").

The district court refused to take judicial notice of LICFA's articles of incorporation. Appx. at 00775–76; D. Mass. Doc. No. 108 (denying motion for judicial notice as "untimely"). However, no timeliness requirement exists for matters of judicial notice pertaining to standing, as jurisdictional rules like standing may be raised "at any time." Add. at 00124; FED. R. CIV. P. 12(h)(3); *see also Papetti v. Doe*, 691 F. App'x 24, 25 n.1 (2d Cir. 2017) (finding that "any party or the court *sua sponte*, at any stage of the proceedings, may raise" jurisdictional questions (cleaned up)). As standing can be raised at any time, it makes little sense to find that a motion for judicial notice regarding a document establishing standing is "untimely." *See* Add. at 00125; FED. R. EVID. 201(d) ("The court may take judicial notice at any stage of the proceeding.").

---

[3] The district court selectively omitted the words "and environmental" when quoting from Brady's declaration in its opinion. Add. at 00021; D. Mass. Doc. No. 138 at 21.

LICFA's articles of incorporation were held at the office of the Secretary of State of New York, and therefore could be obtained "from sources whose accuracy cannot reasonably be questioned." Add. at 00125; FED. R. EVID. 201(b); *see also S. Ottawa v. Perkins,* 94 U.S. 260, 273 (1876) (judicially noticing documents "found in the office of the Secretary of State"). In fact, a court "*must* take judicial notice if a party requests it and the court is supplied with the necessary information." Add. at 00125; FED. R. EVID. 201(c)(2) (emphasis added). The district court ignored the Federal Rules of Evidence and therefore erred when it failed to judicially notice LICFA's articles of incorporation.

Thanks to this error, the district court found that LICFA lacked standing to sue based on environmental harms to its member David Aripotch. Add. at 00023–29; D. Mass. Doc. No. 138 at 23–29. Specifically, the district court found that "LICFA has not demonstrated that the interests at stake . . . are germane to LICFA's purpose of supporting fisheries management." *Id.* at 26. But LICFA's articles of incorporation clearly state that its purposes include protection, preservation, and maintenance of saltwater fisheries and furthering the welfare of the environment on behalf of its members. Accordingly, the environmental interests of its members in saltwater fisheries such as the Vineyard Wind Project area are germane to LICFA's organizational purposes. *See* Appx. at 00757; D. Mass. Doc. No. 98 at 2. The district

court improperly avoided considering the articles of incorporation by denying Commercial Fishermen's motion for judicial notice.

Furthermore, LICFA member Aripotch provided testimonial evidence of his concrete plans to observe NARWs and other marine species in the Vineyard Wind project area for aesthetic purposes. *See* Appx. at 00240–44; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 21–29; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) ("Of course, the desire to *use or observe* an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."(emphasis added)). LICFA member Aripotch's declaration demonstrates his keen interest in the endangered NARW in connection with his trips to the Project area. Therefore, LICFA may stand in Aripotch's shoes because he is a member of LICFA in his personal capacity and LICFA's purposes include protecting his environmental interests in the Vineyard Wind Project area. Appx. at 00757; D. Mass. Doc. No. 98 at 2. Accordingly, LICFA has standing under Article III to raise claims of environmental harm on behalf of its member Aripotch.

The AR confirms that the Vineyard Wind Project will harm the NARW. *See* Appx. at 01194, 01213, 01243–45; BOEM_0068510, 0068617, 0110388–0110390. And Commercial Fishermen noted that Federal Defendants failed "to fully account for the cumulative effects [of the Vineyard Wind Project] on endangered species," specifically referencing the NARW. Appx. at 00504; D. Mass. Doc. No. 67 at 53

(detailing BiOp's failures regarding the NARW). Yet, contra-factually, the district court found Commercial Fishermen "have shown no noneconomic harm" and "have not demonstrated their particularized injury is in any way connected to the Project's impact on any endangered species." Add. at 00027; D. Mass. Doc. No. 138 at 27.

The district court observed that, even if Commercial Fishermen did show that the Vineyard Wind Project's approval process was procedurally deficient, they "have not shown their alleged procedural deficiencies were connected to . . . any substantive result . . . ." Add. at 00029; D. Mass. Doc. No. 138 at 29. This led the district court to find that Commercial Fishermen failed to establish procedural injury sourced from the 2020 BiOp that would grant them standing to bring environmental claims under the ESA or, for that matter, under NEPA. In doing so, the district court relied solely on *Ctr. for Bio. Div. v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017), which by its own terms states "the party seeking to establish standing need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result." *Id.*

"To establish injury-in-fact in a procedural injury case . . . petitioners must show that the government act performed without the procedure in question . . . will cause a distinct risk to a particularized interest of the plaintiff." *Town of Winthrop v. FAA*, 535 F.3d 1, 6 (1st Cir. 2008). Commercial Fishermen made this showing by pointing out the harms to the ocean environment and NARW that the Vineyard Wind

project would cause, as detailed *supra* in the Statement of the Case and *infra* in Sections II.C–D and III.B. Yet the district court's' opinion did not squarely address these substantive harms.

With regard to prudential standing, as indicated *supra* in this Section II.A., LICFA's interest in protecting Aripotch's enjoyment of viewing the endangered NARW is germane to its organizational purposes of protecting, preserving, and maintaining saltwater fisheries, as well as furthering the welfare of the environment, and therefore is sufficient to place LICFA's Commercial Fishermen within ESA's zone of interests. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) ("the desire to . . . observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing"). The zone of interests test is neither especially demanding nor onerous. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005). And as set forth in Section II.B. and C., *infra,* there is a clear "geographic nexus" between LICFA member Aripotch's' injuries and the Vineyard Wind project's adverse impacts on the NARW sufficient to place LICFA within ESA's zone of interest. *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27–28 (1st Cir. 2007).

Accordingly, LICFA has both Article III and prudential standing to bring claims under the ESA on behalf of its member David Aripotch.

**B.  The Commercial Fishermen's ESA Claims Were Not Mooted And The 2020 BiOp Violated ESA In Multiple Ways.**

For five reasons, the district court's erred by failing to recognize the multiple ESA violations committed by the Federal Defendants.  First, the district court found that Commercial Fishermen's claims challenging the 2020 BiOp of Federal Defendant NMFS were mooted because the 2020 BiOp was supposedly "superseded."  Add. at 00027–28; D. Mass. Doc. No. 138 at 27–28 n.19.  But the Federal Defendants based their ROD approving the Vineyard Wind project on the 2020 BiOp and not on the subsequent 2021 BiOp.  *See* Appx. at 00504; D. Mass. Doc. No. 67 at 53 n.2; Appx. at 00705; D. Mass. Doc. No. 90 at 61. Accordingly, Commercial Fishermen moved to strike the 2021 BiOp from the record.  *See* Appx. at 00220–23; D. Mass. Doc. No. 57 at 13–16.  The arguments set forth in that motion are incorporated here by reference.

Incontrovertibly, the 2020 BiOp was the only NMFS biological opinion in effect at the time the ROD was published on May 10, 2021.  *See* Appx. at 00504; D. Mass. Doc. No. 67 at 53 n.2; Appx. at 00705; D. Mass. Doc. No. 90 at 61.  But the district court found that the 2021 BiOp, which was issued five months later on October 18, 2021, was the one "from which all agency actions flowed."  Add. at 00029; D. Mass. Doc. No. 138 at 29.  That cannot be because the 2021 BiOp was issued after the final agency action approving the COP (as set forth in the ROD) had

25

been completed.  Accordingly, contrary to the district court's finding, it is the 2020 BiOp "from which all agency actions flowed."

Second, the 2020 BiOp impermissibly failed to account for the cumulative effects of all planned offshore wind leasing activity on NARWs.  Add. at 00110; *see* 50 C.F.R. § 402.14(g)(3) (setting forth NMFS's responsibility to analyze "cumulative effects on the listed species or critical habitat").

Third, because the 2020 BiOp concluded that individual NARWs will "occur year round in the action area," Appx. at 01249; BOEM_0208170, Appellee NMFS should have provided Appellee BOEM with sufficient reasonable and prudent alternatives that would avoid the destruction of NARWs or their habitat.  *See* Add. at 00110–11; 50 C.F.R. § 402.14(g)(5) (requiring review of "reasonable and prudent alternatives").  NMFS did not do that, and only stated that Project Developer should minimize effects to the NARW "during pile driving . . . and documented during all phases of the proposed action."  Appx. at 01250; BOEM_0208364.  This does not satisfy the ESA because it does not prevent NARW takings or jeopardy.  *See Tenn. Valley Authority v. Hill*, 437 U.S. 153, 184–85 (1978) (ESA directs agencies to utilize "*all methods and procedures which are necessary*" to preserve endangered species (emphasis in original, cleaned up)).

Fourth, the ROD approving the Vineyard Wind COP was arbitrary and capricious because the Federal Defendants admitted that the 2020 BiOp was

inadequate. *See* Appx. at 01236; BOEM_0076721 (BOEM reinitiating consultation with NMFS because "the potential impacts from monitoring surveys to be conducted if the [COP] is approved were not fully assessed" in the 2020 BiOp and because "new information regarding the status of the [endangered NARW]" became available). Without waiting for a new BiOp, BOEM approved Project Developer's COP by issuing the ROD, thereby violating the ESA. *See* Add. at 00056; 16 U.S.C. § 1536(a)(2) (requiring biological opinions to contain "the best scientific and commercial data available"); *see also* Add. at 00102, 40 C.F.R. § 1501.3(b) (2020)[4] (NEPA regulations requiring agencies to fully consider affected area's "resources, such as listed species . . . under the Endangered Species Act"). Congress never authorized Federal Defendants to issue a ROD based on incomplete environmental analysis. This is especially concerning because this case involves the first COP approval of a renewable wind energy project on the OCS in the context of dozens of such projects slated for the Atlantic, Pacific and Gulf Coasts pursuant to a major national initiative to develop renewable energy resources for the United States. Appx. at 01177, 1247–48; BOEM_0057971, 0181688, 0181748 (maps showing extent of Atlantic offshore wind development); *see also West Virginia v. EPA*, 142

---

[4] All citations to the Code Of Federal Regulations implementing NEPA are to the regulations as they existed in 2020, as proffered in the Addendum, which were in effect when the ROD was issued as final agency action. *See* Appx. at 00507–08; D. Mass. Doc. No. 67 at 56–57.

S. Ct. 2587, 2609 (2022) (requiring "clear congressional authorization" for agency action on major policy questions).

Fifth, Appellee United States Army Corps of Engineers ("Corps of Engineers") stated in the ROD that its approval was conditioned on Project Developer's compliance with "any future [BiOp] that replaces" the 2020 BiOp. The district court's found this statement legally sufficient. Add. at 00028; D. Mass. Doc. No. 138 at 28 (referencing Appx. at 01251; USACE_AR_012636). But the Corps of Engineers cannot make decisions under the ESA based on admittedly incomplete or inadequate environmental analysis. *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

## C. The District Court Erred In Holding That The Commercial Fishermen Waived Certain ESA Arguments.

The district court notes that Commercial Fishermen failed to brief certain ESA claims, and that they are therefore waived. But Commercial Fishermen briefed those claims:

- Sixth Claim: The Federal Defendants violated the ESA by ignoring its mandate to conserve endangered and threatened species (violation of 16 U.S.C. § 1536(a)(1); 5 U.S.C. § 706(2)).

  - Briefed at Appx. at 00475, 00504; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 53 (detailing Federal Defendants' failure to adopt reasonable alternatives that would conserve endangered species);

Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- Seventh Claim: Defendants BOEM and NMFS followed unlawful regulatory standards that tainted the Vineyard Wind ESA Consultation Process (violation of 16 U.S.C. § 1536(a)(1); 5 U.S.C. § 706(2)).

  o Briefed at Appx. at 00475, 00502–03; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 51–52 (noting that "Federal Defendants impermissibly downplayed adverse impacts to endangered species" and "mishandled the ESA consultation process"); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- Eighth Claim: BOEM, NMFS, and the Corps of Engineers violated the ESA by failing to seek an exemption for the Vineyard Wind Project (violation of 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)).

  o Briefed at Appx. at 00475, 00502–03; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 51–52 (noting that "Federal Defendants impermissibly downplayed adverse impacts to endangered species" and "mishandled the ESA consultation process"); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- Eleventh Claim: NMFS violated the ESA by issuing a flawed [2020 BiOp] (violation of 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)).

  o Briefed at 00475, 00503–04; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 52–53 (discussing NMFS's flawed BiOp); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- Twelfth Claim: BOEM violated the ESA by relying on NMFS's flawed [2020 BiOp] (violation of 50 C.F.R. § 402.14(h); 5 U.S.C. § 706(2)).

- Briefed at Appx. at 00475, 00480, 00497–98; D. Mass. Doc. No. 67 at 24, (incorporating complaint by reference); 29 (incorporating arguments in Responsible Offshore Dev. All. v. U.S. Dep't of the Interior, Case No. 1:22-cv-11172-IT, Mem. of Points and Authorities at § 3(A)); 46–47 (discussing BOEM's reliance on flawed BiOp when issuing ROD); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- **Thirteenth Claim:** BOEM's failure to reinitiate consultation with NMFS after receiving new scientific studies violated federal law (violation of 50 C.F.R. § 402.14, 402.16; 5 U.S.C. § 706(2)).

  - Briefed at Appx. at 00475, 00503–04, 00506; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 52–53, 55 (discussing failure to consult); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- **Fourteenth Claim:** BOEM violated its own ESA regulations by failing to reinitiate consultation after Vineyard Wind selected prototype wind turbines (violation of 50 C.F.R. § 402.14, 402.16; 5 U.S.C. § 706(2)).

  - Briefed at Appx. at 00475, 00503–04, 00506; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 52–53, 55 (discussing failure to consult); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- **Fifteenth Claim:** BOEM violated the ESA and its attendant regulations by failing to consider the impact of likely catastrophic weather events (violation of 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)).

  - Briefed at Appx. at 00475, 00491; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 40 (detailing record evidence regarding severe weather's impact on turbines); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

- Sixteenth Claim: BOEM violated the ESA by failing to reopen the EIS and ROD to address NMFS's revised Biological Opinion after BOEM approved the COP (violation of 50 C.F.R. § 402.14(h); 5 U.S.C. § 706(2)).

  ○ Briefed at Appx. at 00475, 00497–98, 00503–04; D. Mass. Doc. No. 67 at 24 (incorporating complaint by reference); 46–47 (discussing BOEM's reliance on flawed BiOp when issuing ROD); 52–53 (discussing NMFS's flawed BiOp); Appx. at 00706–07; D. Mass. Doc. No. 90 at 62–63 (detailing violations of ESA).

A careful reading of the Commercial Fishermen's entire ESA briefing and materials incorporated by reference therein shows that the Commercial Fishermen demonstrated that their Sixth, Seventh, Eighth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, and Sixteenth claims are meritorious.

## III. THE DISTRICT COURT ERRED BY HOLDING THAT THE COMMERCIAL FISHERMEN'S NEPA CLAIMS FAIL.

### A. The Commercial Fishermen Have Standing To Bring Their NEPA Claims.

The district court stated that it "considers the challenges to standing under NEPA . . . as a zone-of-interests question."  Add. at 00023; D. Mass. Doc. No. 138 at 23.  It does not address the Commercial Fishermen's Article III standing. Nevertheless, for the reasons set forth in Section II.A., *supra,* in connection with Article III standing under the ESA, the Commercial Fishermen have Article III standing under NEPA because, among other things, LICFA has associational standing to bring procedural environmental claims under NEPA on behalf of its

identified member, Aripotch, because such claims are germane to LICFA's organizational purposes.

Furthermore, in the NEPA context, the Supreme Court held that economic injury does not negate prudential standing if the injury "has an environmental as well as an economic component." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010) ("[t]he mere fact that respondents also seek to avoid certain economic harms . . . does not strip them of prudential standing"). The Commercial Fishermen demonstrated specific environmental and economic harms resulting from threats posed by the Project, while providing detailed quantification of the economic injuries. Appx. at 00237, 249, 259, 268; D. Mass. Doc. No. 66 Exhibit 1 at ¶ 12; Exhibit 2 at ¶ 17–18; Exhibit 3 at ¶ 12–13; Exhibit 4 at ¶ 12. These amounts were not directly controverted, yet the district court deemed them "unquantified." Add. at 00015, 22, 28; D. Mass. Doc. No. 138 at 15, 22, 28. Aripotch's third declaration answered the Project Developer's purported evidence regarding AIS data by showing that such data is not relevant to Old Squaw's extensive fishing activities in the Vineyard Wind Project area. Appx. at 00716–19; D. Mass. Doc. No. 90 Exhibit 3 at 1–4; *see also* Appx. at 00707–09; D. Mass. Doc. No. 90 at 63–65.

Furthermore, the district court's attempt to distinguish *Monsanto* only strengthens Commercial Fishermen's prudential standing argument. *See* Add. at 00031; D. Mass. Doc. No. 138 at 31. The district court observed that, in *Monsanto*,

the Supreme Court ruled that alfalfa farmers had standing under NEPA because the farmers claimed an environmental harm (genetic mutation caused by Monsanto's products) caused them economic injury by devastating their crops, thereby injuring their livelihoods. *Monsanto,* 561 U.S. at 155. Likewise here, Commercial Fishermen have standing under NEPA because they claim that environmental harms (degradation of the Project area) will make the area unfishable, causing them economic harm by injuring their livelihoods. *See* Appx. at 00236–37, 240–45, 249–55, 259–64, 268–72; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 7–9, 12–13, 21, 24, 27–28, 30–31, 33–34; Exhibit 2 at ¶¶ 19–25, 29–33; Exhibit 3 at ¶¶ 14–22, 27–32; Exhibit 4 at ¶¶ 13–19, 23–27. Seeking to avert the risk of environmental contamination to crops is not fundamentally different from seeking to avert the risk of environmental contamination to fishing grounds. Accordingly, contrary to the district court's ruling, Commercial Fishermen have prudential standing under NEPA to bring claims based on the environmental harms posed by the Project.

As indicated, the "zone of interests" test is neither especially demanding nor onerous. *See Clarke*, 479 U.S. at 399; *Ashley Creek*, 420 F.3d at 940. And for purposes of LICFA's associational standing on behalf of Aripotch, the "germaneness" condition requires only "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of United States v. Hodel,* 840 F.2d 45, 58 (D.C. Cir. 1988) (declaring this prong "undemanding"). Accordingly, the

Commercial Fishermen have prudential standing to bring their environmental claims under NEPA, either on their own behalf or, in LICFA's case, on behalf of its member, Aripotch. Finally, the district court erroneously concluded Commercial Fishermen failed to demonstrate environmental injury "where the competent proffered evidence relates to the interests of their owners and not to the Commercial Fishing Entities themselves." Add. at 00017; D. Mass. Doc. No. 138 at 17. This statement ignores the injuries to LICFA member Aripotch, as demonstrated in Aripotch's second declaration and Brady's second declaration, described in Section II.A., *supra*.

**B.    The Commercial Fishermen Demonstrated That The NEPA Process Was Fatally Flawed.**

Project Developer signed power purchase agreements ("PPAs") with Massachusetts electric companies to "deliver 800 MW of power" *before* the Federal Defendants prepared an EIS under NEPA, and compliance with those agreements became the governing purpose of the Project. Appx. at 01166; BOEM_0038223 (stating "Vineyard Wind's sole project purpose is to fulfill its obligations under the [PPAs] . . . ."). Project Developer informed commercial fishermen and BOEM that the PPAs bound them to deliver power "in less than 38 months" and that "any delay in BOEM's approval process will have a domino effect and will most likely be fatal to the project." Appx. at 01168; BOEM_0038225.

In response, the Federal Defendants, rather than conducting independent environmental review as NEPA requires, acquiesced to Project Developer's self-imposed schedule in at least three ways that violated NEPA's procedural requirements. First, the Federal Defendants failed to consider reasonable alternatives to the Vineyard Wind Project. Appx. at 01162, 1238; BOEM_0034752 (initially rejecting wind turbine alignment proposal because it would "create permitting delays . . . due to the need for additional surveys for some or all of the Project area, which . . . could impact the proposed Project's ability to meet the requirements of its power purchase agreements"); BOEM_0076823 (failing to consider reasonable alternatives because it would require further work for Project Developer "and, therefore . . . would not meet the project purpose and need"). After BOEM disqualified these reasonable alternatives in the Draft EIS, NMFS refused to concur with BOEM's analysis, finding BOEM's decisionmaking "concerning." Appx. at 01164; BOEM_0037623. NMFS also found a "lack of adequate analysis" throughout the Draft EIS. Appx. at 01163; BOEM_0037620. Project Developer emailed BOEM shortly thereafter to stress the urgent need for their permits due to their prematurely-signed PPAs. Appx. at 01165; BOEM_0038212.

In the Supplemental Draft EIS, the Federal Defendants again failed to analyze reasonable alternatives proposed by commercial fishermen that would limit these impacts because they would not meet "the purpose and need of the proposed

[p]roject." Appx. at 01174–76; BOEM_0057320–0057322. The Federal Defendants thus continued to allow Vineyard Wind's contractual obligations under their PPAs to determine the course of their environmental analysis, thereby violating NEPA. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider").

The Federal Defendants also impermissibly limited consideration of reasonable alternatives to only those within the lease area. Appx. at 01189–91, 1231–35; BOEM_0068472–0068474, 0069186–0069190. NEPA's regulations in effect at the time of the Project's consideration instructed agencies to "rigorously explore and objectively evaluate all reasonable alternatives to proposed actions." 40 C.F.R. § 1502.14(a) (2020); *see also NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) (duty to "[r]igorously explore and objectively evaluate all reasonable alternatives . . . is the heart of an EIS") (quoting 40 C.F.R. § 1502.14(a) (2020)). Agencies also must "not commit resources prejudicing selection of alternatives before making a final decision." Add. at 00103; 40 C.F.R. § 1502.2(f) (2020). By limiting the universe of reasonable alternatives only to those that would permit Project Developer to meet its contractual obligations, the Federal Defendants violated NEPA. *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1286–1288 (1st Cir. 1996) *(*full consideration of reasonable alternatives is "the heart of the EIS" and

agency's failure to "rigorously explore . . . reasonably thoughtful" alternatives violated its "obligation under NEPA").

Second, the Federal Defendants violated NEPA by terminating and then impermissibly reviving the EIS process. Project Developer withdrew the Vineyard Wind COP from review in order to better understand the proposed prototype 13 MW turbines it planned to use for the project. Appx. at 01178; BOEM_0067649; *see also* Appx. at 01179; BOEM_0067665 (noting that "NEPA does not allow for a project proponent to simply withdraw and resubmit its application at will during the time period in which the agency conducts its review . . . ."). Accordingly, BOEM stated "your previous COP has been withdrawn from further review and decision-making," and "there is no longer a proposal for a major federal action awaiting technical and environmental review, nor is there a decision pending before BOEM." Appx. at 01180; BOEM_0067677. BOEM further stated that "the preparation of an [EIS] . . . for this project is no longer necessary, and the process has been terminated." *Id*; *see also* Appx. at 01181–82; BOEM_0067694–0067695 (Federal Register notice). BOEM noted that Project Developer could "submit a *new* COP at any time." Appx. at 01180; BOEM_0067677 (emphasis added).

But once a new administration entered office, BOEM's position suddenly changed. Two days after Inauguration Day in 2021, Project Developer sent BOEM a letter purporting to unilaterally "rescind Vineyard Wind's temporary withdrawal"

of its COP on the grounds that "no changes to the COP are necessary to accommodate" the prototype 13 MW turbines. Appx. at 01183; BOEM_0067698. Project Developer did not back this assertion, merely offering a diagram showing the size of the turbines and incorrectly stating "there are no legal or regulatory limitations to resuming this review." Appx. at 01184; BOEM_0067701. BOEM responded with a single-page memo concluding, without substantive analysis, that these turbines were acceptable. Appx. at 01185; BOEM_0067702. It then notified the other Federal Defendants that Project Developer had "resubmitted its Construction and Operations Plan for review," stating BOEM could "resume its review" of the terminated COP. Appx. at 01186–87; BOEM_0067709, 0067712. BOEM published notice of its resumed review (but not opportunity for comment) in the Federal Register, stating that "[b]ecause Vineyard Wind has indicated that its proposed COP is a 'decision pending before BOEM,'" BOEM could resume review. Add. at 00126–28; 86 Fed. Reg. 12495 (Mar. 3, 2021). In fact, the terminated COP was no longer "a decision pending before BOEM." *Id.*

Allowing Project Developer to unilaterally raise its own COP from the dead after it had been "terminated" violates NEPA and OCSLA by failing to provide notice and opportunity for comment. *See* Add. at 00091, 00101, 00098–100; 43

U.S.C. § 1337(p)(4)(K); 40 C.F.R. § 1500.2(d) (2020); 30 C.F.R. § 585.626 (2020)[5];

see also *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Additionally, neither NEPA nor

OCSLA provides BOEM with authority to resume review of a terminated COP, and

its decision to do so was therefore ultra vires.  *City of Providence v. Barr*, 954 F.3d

23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of its

statutory authority is ultra vires."); *see also* Add. at 00055; 5 U.S.C. § 706(2)(C)

(instructing courts to set aside actions exceeding "statutory jurisdiction, authority,

or limitations").

When analyzing this claim, the district court incorrectly stated that BOEM

restarted review of the COP "after *suspending* it . . . ."  Add. at 00046; D. Mass. Doc.

No. 138 at 46 (emphasis added).  It then found Commercial Fishermen's arguments

that BOEM lacked authority "to suspend review and resume it" were

"unpersuasive[,]" and that even if BOEM erred, the error was harmless because "the

changes made by [Project Developer] were within the parameters already

contemplated and reviewed as part of the NEPA process."  This reasoning flies in

the face of Supreme Court precedent.  "[A]n agency literally has no power to act . .

. unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n*, 476

U.S. at 374.  Congress never gave BOEM the authority to grant project sponsors the

---

[5]     All citations to the Code of Federal Regulations implementing OCSLA are to
the regulations in effect when the Federal Defendants issued the Final EIS and ROD
in 2021.

ability to unilaterally resurrect a terminated NEPA review process. Furthermore, BOEM relied exclusively on Project Developer's assertion that the 13 MW turbines would meet the legal requirements of the Project without carefully and independently reviewing that assertion in light of NEPA's procedural duties. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 658 (2007) (stating it is arbitrary and capricious for agency to base its decision "on factors Congress did not wish it to consider"). Moreover, merely asserting harmless error does not make it so. *See Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005) (finding that courts "must exercise great caution in applying the harmless error rule in the administrative rulemaking context"), *see also Cal. Wilderness Coalition v. United States DOE*, 631 F.3d 1072, 1092 (9th Cir. 2011) ("a finding of harmless error requires a determination that the error had no bearing on the procedure used or the substance of the decision reached") (cleaned up).

Third, when BOEM's Supplemental Draft EIS was published in June 2020, it confirmed the Project's adverse impacts on the natural and human environment. Appx. at 01171–73; BOEM_0057214, 0057220, 0057226. BOEM found "the overall cumulative impacts on navigation and vessel traffic would be major, due primarily to the increased loss of life due to maritime incidents . . . ." Appx. at 01169; BOEM_0057090; *see also* Appx. at 01170; 0057104 (finding major

cumulative impacts to scientific research, surveys, endangered species monitoring, fishery stock assessment, and "fishery participants and communities").

Without explanation, at the Final EIS stage, the Federal Defendants gutted the core of the cumulative impacts analysis set forth in the Supplemental Draft EIS by removing much of it from the Final EIS, thereby violating NEPA's regulations. *See* Add. at 00106–07; 40 C.F.R. § 1508.25(a)(2)–(3) (2020). In so doing, the Federal Defendants failed to account for "the incremental impact of [the Vineyard Wind Project] when added to . . . reasonably foreseeable future actions" as required by NEPA. Add. at 00105; 40 C.F.R. § 1508.7 (2020); *see also* Appx. at 01189; BOEM_0068469 (setting 22 GW as reasonably foreseeable offshore wind development); *but see* Appx. at 00169–70; D. Mass. Doc. No. 19 at 10–11 (detailing Biden Administration goal of "deploy[ing] 30 gigawatts (GW) of offshore wind in the United States by 2030 . . . [and] 110 GW by 2050"). In addition, by undercounting reasonably foreseeable offshore wind development outside of the lease area the Federal Defendants improperly segmented their NEPA analysis. *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (faulting federal agency for "divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration").

These choices by the Federal Defendants all violated NEPA. The issuance of the ROD based on such a faulty EIS shows that there is no "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Furthermore, "[i]t is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. 154, 172 (1997). The Federal Defendants repeatedly did so, to the detriment of Commercial Fishermen.

## IV. THE FEDERAL DEFENDANTS' APPROVAL OF THE COP VIOLATED OCSLA.

### A. By Failing To Apply The Traditional Rules Of Statutory Construction, The District Court Erred And Misread OCSLA.

OCSLA gives Appellee Secretary of the Interior authority to grant leases and approve or deny construction and operations plans for renewable energy activities in the OCS. Add. at 00089–90; 43 U.S.C. § 1337(p)(1)(C). That authority is specifically conditioned upon the Secretary's compliance with 43 U.S.C. § 1337(p)(4), which states in relevant part:

> "*Requirements*. The Secretary *shall ensure* that *any* activity under this subsection is carried out in a manner that provides for (A) safety; (B) protection of the environment; . . . (D) conservation of the natural resources of the Outer Continental Shelf; . . . (F) protection of the national security interests of the United States; (G) protection of correlative rights in the Outer Continental Shelf; . . . (I) prevention of

> interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas . . .[6]

Add. at 00090–91; 43 U.S.C. § 1337(p)(4)(A)–(B), (D), (F)–(G), (I) (emphasis added). This Court has not yet interpreted this statutory language.

As set forth in the Commercial Fishermen's briefing in the district court, the use of the term "Requirements" as the heading of 43 U.S.C. § 1337(p)(4)(A)–(I) signifies that the Secretary must perform the duties set forth in the section. *See Almendarez-Torres v. United States,* 523 U.S. 224, 234 (1998) (explaining that a statute's titles and headings may indicate its meaning); *see also* Appx. at 00673; D. Mass. Doc. No. 90 at 29. In turn, the use of the word "shall" in the introductory clause makes it mandatory for the Secretary to "ensure" that "any" activity covered by Section 1337(p)(4)(A)-(I) provides for all of the protected interests listed therein. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661-62 (2007) (gathering cases demonstrating that "shall" imposes a mandatory duty). Accordingly, the duties of the Secretary to meet the substantive requirements of section 1337(p)(4)(A)–(I) are not discretionary, *See Lopez v. Davis,* 531 U.S. 230, 241 (2001) (explaining that Congress uses "a mandatory 'shall" . . . to impose discretionless obligations" when drafting statutes). Furthermore, "every clause and word of a statute should, if possible, be given effect." *Chickasaw Nation v. United*

---

[6] For a discussion of the function of 43 U.S.C. 1337(p)(4)(J) in the statutory scheme, *see* n. 7, *infra*.

*States*, 534 U.S. 84, 93, 2001 (cleaned up).  Moreover, an interpretation that renders a term meaningless should be avoided.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

When determining whether a statute's language is plain or ambiguous, courts look to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (cleaned up).  If the statute's language is plain, the court "must apply the statute according to its terms."  *Carcieri v. Salazar,* 555 U.S. 379, 387 (2009).  The term "ensure" is not defined in OCSLA.  In such circumstances, "[d]ictionaries of the English language are a fundamental tool in ascertaining . . . plain meaning."  *United States v. Lachman*, 387 F.3d 42, 51 (1st Cir. 2004).

Merriam-Webster defines "ensure" as "to make sure, certain, or safe, guarantee."  *Ensure*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).  Applying this definition of "ensure" to section 1337(p)(4)(A)–(I), the Secretary is required to "make sure. . . . or guarantee" that her "activity" in approving a construction and operations plan in fact "provides for," e.g., "safety" and "protection of the environment."  As set forth in more detail in Section IV.B., *infra*, the Secretary failed to do so when approving the Vineyard Wind COP.

Because this duty to "ensure" is mandatory, it is impermissible for the Secretary to employ a "reasonableness" or "balancing" test to determine when the duty applies.  Yet the district court decided to insert the word "reasonably" into the

statutory text to allow the Secretary to ostensibly "balance" her mandatory duties under Section 1337(p)(4) against other considerations. *See* Appx. at 01072–73; D. Mass. Doc. No. 143 Exhibit 1 at 25–26 (referencing Solicitor's M-Opinion incorrectly interpreting OCSLA); Add. at 00042–46; D. Mass. Doc. No. 138 at 42–46 (district court finding in favor of Federal Defendants on OCSLA claims). The district court did so without reference to caselaw or statute to back its opinion that "[t]he Secretary still retains some discretion in considering whether the enumerated statutory criteria have been satisfied, even where the statute does not state so expressly." Add. at 00044; D. Mass. Doc. No. 138 at 44.

By adopting an interpretation of OCSLA that appends words to its plain text, the district court erred. *Alabama v. North Carolina,* 560 U.S. 330, 352 (2010) ("We do not — we cannot — add provisions to a federal statute."). The statute's text does not allow the Secretary to balance her authority to authorize renewable energy projects — or worse, her own policy preferences — against Section 1337(p)(4)'s express limitations on that authority. *La. Pub. Serv. Comm'n*, 476 U.S. at 374 (1986) (finding that "an agency literally has no power to act . . . unless and until Congress confers power upon it"); see also *Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661, 665 (2022) (per curiam) (holding that because "[a]dministrative agencies are creatures of statute, [t]hey accordingly possess only the authority that Congress has provided"); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (1983) ("Normally, an

agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . .").  Accordingly, the district court wrongly read the word "reasonably" into Section 1337(p)(4) because adding a reasonableness requirement to Section 1337(p)(4) impermissibly dilutes the operative effect of the statutory term "shall . . . ensure."  *See Duncan*, 533 U.S. at 174; *see also* Appx. at 01071–75; D. Mass. Doc. No. 143 Exhibit 1 at 24–28.

Neither can the district court's interpretation be justified by citing BOEM's regulations stating approved projects should "not unreasonably interfere with other uses" of the Outer Continental Shelf.  *See* Add. at 00096; 30 C.F.R. § 585.621(c) (2020).  That BOEM regulation impermissibly adds the modifier "unreasonably" to Section 1337(p)(4)'s language, thereby conflicting with the statute.  "A federal regulation in conflict with a federal statute is *invalid* as a matter of law."  *In re Watson,* 161 F.3d 593, 598 (9th Cir. 1998) (emphasis in original) (citing *Chemical Mfrs. Ass'n v. Nat. Res. Def. Council, Inc*., 470 U.S. 116, 126 (1985)).

The district court relies heavily on *Massachusetts v. Andrus,* 594 F.2d 872 (1st Cir. 1979) to support its interpretation of Section 1337(p)(4).  Add. at 00044–46; D. Mass. Doc. No. 138 at 44–46.  But that decision dealt with 43 U.S.C. § 1332(2), an entirely different section of OCSLA which addresses oil and gas exploration and development on the Outer Continental Shelf.  *Andrus*, 594 F.2d at 889 (observing that Section 1332(2) "places the Secretary under a duty to see that *gas and oil*

*exploration and drilling* is conducted without unreasonable risk to the fisheries" (emphasis added)). That language regarding reasonableness has nothing to do with the specific limitations on renewable energy development set forth in Section 1337(p)(4). Additionally, the language of 43 U.S.C. § 1334 governing oil and gas leasing instructs the Secretary to strike a "proper balance" between the potential for environmental damage and the potential for oil and gas discovery. *Andrus*, 594 F.2d at 889 (interpreting 43 U.S.C. § 1334). Section 1337, governing renewable energy leasing, contains *no such language*. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (finding that when Congress includes particular language in one section of the statute but not another, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (quotation omitted)).

Furthermore, *Andrus* found "no evidence that Congress sanctioned the destruction of a fishery as an acceptable price for oil and gas development." *Andrus*, 594 U.S. at 889. The ROD explicitly stated the Vineyard Wind lease area would "likely . . . be abandoned by commercial fisheries" due to navigational difficulties if the Vineyard Wind project moved forward. Appx. at 01239; BOEM_0076837. And Congress specifically limited BOEM's general authority to permit renewable energy development by imposing upon BOEM the nondiscretionary duties found in Section

1337(p)(4)(A)–(I).[7] *Gozlon-Peretz v. United States,* 498 U.S. 395, 407 (1991) ("A specific provision controls one of more general application.").

Moreover, contrary to the district court's statements, the caselaw Commercial Fishermen cite in support of their OCSLA claims does indeed "direct the result" they seek. See Add. at 00043; D. Mass. Doc. No. 138 at 43. The Supreme Court ruled in *Almendarez-Torres*, 523 U.S. at 234, that statutory titles and headings "are 'tools available for the resolution of a doubt' about the meaning of a statute." The district court downplayed that Supreme Court precedent, stating that the real question was "how the agency determines whether each of the enumerated 'Requirements' is satisfied . . . ." Add. at 00044; D. Mass. Doc. No. 138 at 44. The statutory text provides a ready answer. Section 1337(p) uses the words "shall . . . ensure" to denote when a "requirement" is met, meaning that the Secretary fulfills the requirement when she "makes sure [or] certain" that her actions affirmatively provide for, *e.g.,* "safety" and "protection of the environment." Add. at 00166; *see also Lachman*, 387 F.3d at 51.

---

[7]    In turn, 43 U.S.C. § 1337(p)(4)(J)(ii) states that the Secretary shall "ensure . . consideration of . . . any other use of the sea or seabed, including use for a fishery . . . a sealane, . . . or navigation." Add. at 00091. That provision sets forth examples of the types of issues the Secretary must consider. It does not modify the Secretary's nondiscretionary duty to ensure that any action she takes in authorizing renewable energy projects provides for e.g., "safety" or "protection of the environment," as required by 43 U.S.C. § 1337(p)(4)(A)–(I). *See* Add. at 00090–91.

In an effort to distinguish *Nat'l Ass'n*, 551 U.S. 644 (2007), the district court points to language that "the EPA may exercise some judgment" in making agency determinations under the Clean Water Act. *Id.* at 671. However, the Supreme Court notes in the same sentence that this judgment "does not grant [EPA] the discretion to add" language to the Act's "enumerated statutory criteria . . . ." *Id.* Here, the district court impermissibly added a reasonability standard to and inserted a balancing test in Section 1337(p)(4)'s factors, contrary to OCSLA's plain language and the Supreme Court's decision in *Nat'l Ass'n.* *Id.* at 658 (holding that agency action should be vacated where agency "relied on factors which Congress had not intended it to consider . . .").

"That Congress cannot delegate legislative power to [executive agencies] is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *see also St. Louis Consol. Coal Co. v. Illinois*, 185 U.S. 203, 210 (1902) (finding "legislative power cannot be delegated to the courts or to the executive"). Congress gave no power to BOEM — or to the district court — to rewrite OCSLA and thereby act as a legislature. Yet the district court did just that. *See* Add. at 00045; D. Mass. Doc. No. 138 at 45. This Court should reverse that legal error.

**B.    The District Court Erred By Impermissibly Discounting Commercial Fishermen's Substantial Evidence Of Safety And Environmental Harms.**

The district court stated that Commercial Fishermen did not demonstrate safety or environmental harms. *See, e.g.* Add. at 00017, 19, 26, 27, 43; D. Mass. Doc. No. 138 at 17, 19, 26, 27, 43.   But Commercial Fishermen demonstrated specifically how the Final EIS detailed safety and environmental harms.  *See e.g.,* Appx. at 01204–05, 01210, 01213; BOEM_0068583–84, 0068592, 0068617 (pile driving and other construction activity will harm, displace, and kill marine species); Appx. at 01219, 01228; BOEM_0068717, 0068749 (Vineyard Wind project will increase risk of vessel collisions and interfere with navigation); Appx. at 01192–93, 01205, 01224; BOEM_0068492, 0068497, 0068584, 0068722 (turbines are untested in wind speeds over 112 mph and resulting turbine failure will devastate the environment); Appx. at 01224; BOEM_0068722 (scour protection for cabling will displace squid from any location where it is placed); Appx. at 01196; BOEM_0068531 (construction activities will affect horseshoe crab spawning); Appx. at 01197–1209, 01211, 01212; BOEM_0068546, 0068549, 0068578–88, 0068606, 0068608 (construction will devastate project area's natural resources, including fish and endangered species); Appx. at 01229–30; BOEM_0068755–56 (wind turbines will interfere with military radar); *see also* Appx. at 01280–81; MSJ Hearing Transcript at 29–30.  As indicated in Section III, *supra,* the Supplemental

Draft EIS confirmed, among other things, the Project's adverse impacts on the natural and human environment, Appx. at 01171–73; BOEM_0057214, 0057220, 0057226, and BOEM found "the overall cumulative impacts on navigation and vessel traffic would be major, due primarily to the increased loss of life due to maritime incidents," Appx. at 01169; BOEM_0057090, while also finding major cumulative impacts to scientific research, surveys, endangered species monitoring, fishery stock assessment, and "fishery participants and communities."  Appx. at 01170; BOEM_0057104.  The Final EIS, without explanation, deleted much of this analysis and concluded that the impact of the Vineyard Wind project on bottom-trawl fishermen like Commercial Fishermen will be "moderate" to "major."  Appx. at 01223–27; BOEM_0068729–0068733.

Furthermore, Commercial Fishermen offered copious declaratory evidence speaking directly to the safety and environmental injuries from the Vineyard Wind project that will injure their livelihoods.  *See* Appx. at 00236–37, 240–45, 249–55, 259–64, 268–72; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 7–9, 12–13, 21, 24, 27–28, 30–31, 33–34; Exhibit 2 at ¶¶ 19–25, 29–33; Exhibit 3 at ¶¶ 14–22, 27–32; Exhibit 4 at ¶¶ 13–19, 23–27.

Moreover, the ROD states that "due to the placement of the turbines it is likely that the entire [Vineyard Wind lease] area will be abandoned by commercial fisheries due to difficulties with navigation."  Appx. at 01239; BOEM_0076837.

Based on this conclusion, the Federal Defendants should not have approved the Vineyard Wind project. *See* Add. at 00091; 43 U.S.C. § 1337(p)(4)(I) (requiring BOEM to "ensure" the prevention of "interference with reasonable uses . . . of . . . the high seas" when approving renewable energy projects); (J) (including "use of the sea or seabed . . . for a fishery . . . sealane . . . or navigation"); Add. at 00075, 43 U.S.C. § 1332(2) (stating "the right to navigation and fishing . . . shall not be affected"). However, once Commercial Fishermen noted this statement in their complaint, BOEM issued a purported supplement to the ROD attributing the statement to commenters rather than its own decisionmakers, without evidence or sworn testimony establishing that its prior ROD statement was a scrivener's error. *See* Appx. at 00213; D. Mass. Doc. No. 57 at 6. Commercial Fishermen sought to strike this deceptive supplement from the administrative record. *See* Appx. at 00202–30; D. Mass. Doc. Nos. 56–57. But the district court denied Commercial Fishermen's motion from the bench during the MSJ hearing on April 3, 2023. *See* Appx. at 01287; MSJ Hearing Transcript at 36 ("I'm denying your motion to strike."). The district court then waited until September 25, 2023 to issue an order denying Commercial Fishermen's motion to strike. *See* Appx. at 01019–41; D. Mass. Doc. No. 137. In the opinion denying that motion, the district court stated that "nothing before the court suggests that the [supplement] amount[s] to more than mere corrections or clarifications . . . and the clarifications do not reflect some

fundamental change in either the decision-making process or the information considered." Appx. at 01038; *id.* at 20; *see also* Add. at 00045; D. Mass. Doc. No. 138 at 45 (referring to statement as "mere clerical error").

But agencies cannot substantively edit their own final actions after being served with an inconvenient complaint. *See Am. Trucking Ass'ns, Inc. v. Frisco*, 358 U.S. 133, 146 (1958) (agencies cannot purport to correct alleged ministerial errors "as a guise for changing previous decisions"). That is precisely what the Federal Defendants did here by substantively altering their ROD after Commercial Fishermen filed their complaint. The timing of Federal Defendants' edit certainly warrants explanation, but the Federal Defendants provided none and the district court asked for none. The Federal Defendants' edit also contradicts other aspects of the existing administrative record, including their own environmental impact statements, which demonstrate formidable navigational difficulties. *See, e.g.* Appx. at 00468, 492, 501; D. Mass. Doc. No. 67 at 17, 41, 50 (mentioning Supplemental Draft EIS and Final EIS quotes detailing harms to navigation and safety).

In addition, the Commercial Fishermen presented sworn testimony in the district court explaining the navigational difficulties the Vineyard Wind project will cause. *See* Appx. at 00249–51; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 16–23 (declaration of David Aripotch), *see also* Appx. at 01334–75; Stay/PI Hearing Transcript at 21–62 (testimony of David Aripotch). Contrary to the district court's

statement, the Commercial Fishermen need not offer "evidence of the complete destruction of fisheries in the OCS" to succeed in showing that the Vineyard Wind Project will create safety risks to navigation that will cause commercial fishermen to abandon the Project area. *See* Add. at 00046; D. Mass. Doc. No. 138 at 46. This artificially high standard of proof is unsupportable.

The district court claims David Aripotch, as well as the presidents of several other commercial fishing groups that comprise Commercial Fishermen, are not competent to testify to environmental harms due to their lack of expertise. *See, e.g.* Add. at 00012, 13, 16; D. Mass. Doc. No. 138 at 12 n.12, 13 n.13, 16 n.15–16. But Aripotch is a longtime, successful commercial fishermen and possesses extensive knowledge of both the areas he fishes (including the Project area) and marine species behavior within those areas. Appx. at 00235–37; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 5–12 (describing fishing process and revenues). The other Commercial Fishermen whose testimony the district court likewise spurns have similar qualifications. Appx. at 00247–49, 257–59, 266–68; D. Mass. Doc. No. 66 Exhibit 2 at ¶¶ 4–18; Exhibit 3 at ¶¶ 2, 5–13; Exhibit 4 at ¶¶ 2, 5–12. These Commercial Fishermen are successful precisely because they know how marine life reacts to environmental changes, and they testify that the Vineyard Wind Project will displace marine life and destabilize the ecosystem, causing them economic harm and a loss of aesthetic pleasure from fishing in the pristine waters of the Vineyard Wind Project

area. *See, e.g.* Appx. at 00237, 240, 243–44, 249–54, 259–61, 263, 268–71; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 13, 20, 27–29; Exhibit 2 at ¶¶ 19, 24–25, 28–29; Exhibit 3 at ¶¶ 14, 19–21, 26–27; Exhibit 4 at ¶¶ 13, 18–19, 23. Project Developer's own witnesses at the hearing for temporary relief acknowledged that impacts from the Vineyard Wind Project would harm fishermen. *See* Appx. at 01376–80, 1391–94; Stay/PI Hearing Transcript at 63–67 (Jill Rowe testimony); 78–81 (Larry Wise Testimony). And Commercial Fishermen's testimony is consistent with the Final EIS's pronouncement that the Vineyard Wind Project would have at least "moderate" to "major" impacts on commercial fishing. Appx. at 01223–27; BOEM_0068729–0068733.

Moreover, as the district court recognizes, "[t]rawl fishing involves pulling a net towed by steel wires and spread open by steel doors to harvest squid and other fish at the ocean bottom." Add. at 00011; D. Mass. Doc. No. 138 at 11 n.10. The Vineyard Wind project will add considerable structure — *e.g.*, turbine foundations, scour protection, cabling — to the normally sandy ocean floor, transforming it into a hard-bottom environment with multiple irregularities. *See* Appx. at 01195, 1243–45; BOEM_0068511, 0110388–0110390. If a boat trawls a net along an ocean floor littered with immovably large objects, common sense dictates it will likely snag, causing gear loss and potential wrecks and risks to life. *See, e.g.* Appx. at 00237–39; D. Mass. Doc. No. 66 Exhibit 1 at ¶¶ 15–18.

Aripotch additionally testifies that the turbines will interfere with his ability to navigate using radar. Appx. at 00237; *id.* at ¶ 15. This testimony agrees with scientific studies and data found in the AR. *See* Appx. at 01219, 1228, 1239, 1242, 1246; BOEM_0068717, 0068749, 0076837, 0110382, 0111225; *see also* Add. at 00167–82; *Report of the Effect on Radar Performance of the Proposed Cape Wind Project and Advance Copy of USCG Findings and Mitigation*, U.S. DEPT. OF THE INTERIOR MINERALS MANAGEMENT SERVICE (Dec. 16, 2008), https://www.boem.gov/renewable-energy/studies/uscg-radar-study-findings-and-mitigation. Given the reliability of Aripotch's testimony regarding environmental and safety harms from the Vineyard Wind Project, the district court erred in disregarding it. Other reliable declarants likewise testify that the Vineyard Wind project will hamper navigation and safety. *See* Appx. at 00982–84; D. Mass. Doc. No. 124 Exhibit 1 at ¶¶ 19–23.[8]

The district court also credulously gives weight to Project Developer's argument that, based on AIS data, Aripotch does not fish very much in the Vineyard

---

[8] The district court did not allow Commercial Fishermen to file the Lapp declaration because "any affidavit supporting a motion must be served with the motion" and "much of the proffered affidavit[] is not evidence but additional argument." Appx. at 00999–1000; D. Mass. Doc. No. 126 (electronic order). But Lapp's affidavit was not proffered to support Commercial Fishermen's prior motion. It was offered to counter four expert declarations of Project Developer in connection with the Commercial Fishermen's interlocutory motion. On its face, the Lapp declaration contains testimony steeped in personal knowledge, and this Court should examine Lapp's declaration on its own merits.

Wind Project area. *See* Add. at 00014–15, 00022–23; D. Mass. Doc. No. 138 at 14–15, 22–23. Commercial Fishermen explained that AIS data does not accurately measure the Commercial Fishermen's fishing activity because the types of boats they pilot are not required to turn on AIS transponders within the Vineyard Wind Project area. *See* Appx. at 00707–09; D. Mass. Doc. No. 90 at 63–65 (MSJ Reply Brief). Yet the district court failed to acknowledge these facts. *See* Add. at 00014–15, 00022–23; D. Mass. Doc. No. 138 at 14–15, 22–23.

### C. The District Court Erred By Finding That Commercial Fishermen Lack Standing To Bring Environmental Claims Under OCSLA.

The district court opined in a single footnote that the Commercial Fishermen "have not established standing" with regard to OCSLA's requirement that BOEM must ensure "protection of the environment" and "conservation of natural resources." Add. at 00043; D. Mass. Doc. No. 138 at 43 n.32. As shown in Sections II.A. and III.A, *supra,* the Commercial Fishermen have satisfied the standing requirements for making their environmental claims. Specifically, Commercial Fishermen offered copious evidence of environmental harms from the Vineyard Wind Project that caused them palpable injuries, and demonstrated they had a "geographical nexus" with the Project — *i.e.*, that they use the Project area's waters for a purpose that the Project threatens: commercial fishing. *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d at 27–28 (1st Cir. 2007); *see also Ashley Creek*, 420 F.3d at 938 (9th Cir. 2005) ("plaintiffs who use the area threatened by a proposed

action . . . have little difficulty establishing a concrete interest" granting them standing).

## V. THE COURT SHOULD REVERSE AND VACATE WITHOUT REMAND, BUT IF REMAND IS ORDERED, THE COURT SHOUD PROVIDE RELIEF TO THE COMMERCIAL FISHERMEN UNDER 5 U.S.C. § 705.

In order to meet its contractual commitments to provide renewable energy to Massachusetts electric utility companies, the Project Developer has every incentive to complete construction of the Project as quickly as possible. No one has ever argued otherwise.

Reversal and/or vacatur coupled with remand to either the district court or to the Federal Defendants will not, of themselves, stop the construction activities. Given the erroneous decisions made by the district court and the Federal Defendants, it is unlikely that they will change their positions in connection with the issues leading up to and including the approval of the COP. Accordingly, it is appropriate for this Court at this time to reverse the decision of the district court and to vacate the Federal Defendants' approval of the COP without remand, while ordering Project Developer to permanently cease all construction activities and take immediate steps to remove any and all materials, equipment, and structures of any kind placed by Project Developer in or near the Project area, thereby providing the Commercial Fishermen with appropriate relief from the injuries they continue to suffer as a result of the Federal Defendants' COP approval. *See Boston Duck Tours, LP v. Super*

*Duck Tours, LLC*, 531 F.3d 1, 15 (1st Cir. 2008) ("[W]here the underlying facts are largely undisputed . . . [remand] would be a waste of judicial resources and incompatible with the urgency of the issue before us.").

The APA requires only that this Court "hold unlawful and set aside," or vacate, impermissible agency action. 5 U.S.C. § 706(2); *see also Town of Weymouth v. Mass. Dep't of Envtl. Prot.*, 961 F.3d 34, 58 (1st Cir. 2020) ("vacatur is the default remedy" under the APA). Given the Project's adverse effects on the marine and human environment, as detailed in the AR, it is unlikely that the Federal Defendants would be able to "substantiate [their] decision" to approve the existing Vineyard Wind COP upon remand. *All. for Hippocratic Med. v. United States Food & Drug Admin.*, 78 F.4th 210, 255 (5th Cir. 2023) (quoting *Texas v. United States*, 50 F.4th 498, 529-30 (5th Cir. 2022)) (discussing vacatur and remand). Upon vacatur of the Federal Defendants' approval of the Vineyard Wind COP, this Court, therefore, should permanently stay any further construction in the Vineyard Wind project area and require Project Developer to "submit a new COP" that remedies the current COP's flaws if it wishes to construct the Vineyard Wind project — as BOEM itself recognized was appropriate when a COP is terminated. Appx. at 01180; BOEM_0067677*; see also In re Steinmetz*, 862 F.3d 128, 136 (1st Cir. 2017) (finding that remand is unnecessary where "[an] injury . . . presents questions of law,

and the record, together with the initial and supplemental briefing on appeal, is sufficient").

Meanwhile, as an exercise of its equitable jurisdiction, the Court should order Project Developer to remove all things that have been placed in the Project area as a result of the Federal Defendants' impermissible approval of the COP. *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (equitable relief should issue as "necessary to provide complete relief to the plaintiffs" (quotation omitted)); *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1312 (Fed. Cir. 2004) (equitable relief is available to remedy unlawful agency action under the APA); *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (courts may "grant or deny injunctive or equitable relief" based on "principles of equity" when agencies commit unlawful action). It is well-established that "in the exercise of [its] appellate jurisdiction [reviewing courts] have power not only to correct error in the judgment under review but to make such disposition of the case as justice requires." *Patterson v. Alabama*, 294 U.S. 600, 607 (1935) (finding that "in determining what justice does require, the Court is bound to consider any change, either in fact or in law, which has supervened since the judgment was entered"). Since the district court's judgment, Vineyard Wind has continued its construction activities based on unlawful agency action, and the Court should take this into account when crafting "complete relief" that makes Commercial Fishermen whole. *Madsen*, 512 U.S. at 765.

Alternatively, this Court may decide to remand some but not all of the issues raised in this appeal. *See Boston Duck Tours,* 531 F.3d at 15. To the extent that the Court decides to remand any matter to the district court and/or the Federal Defendants, Commercial Fishermen request that this Court "issue all necessary and appropriate process to postpone the effective date of" Federal Defendants' approval of the Project Developer's COP pending the resolution of remand proceedings, as authorized by the APA. *See* 5 U.S.C. § 705; *see also All. for Hippocratic Med. v.* 78 F.4th at 241–42 (issuing such an order). A stay order is needed here to prevent irreparable injury from the Federal Defendants' unlawful approval of Vineyard Wind's defective COP during the pendency of any remand proceedings. *See* 5 U.S.C. § 705.

Such a stay is especially important in light of the fact that, without statutory authority, on June 15, 2021, BOEM deferred the fundamental requirement that the Project Developer provide financial assurance for the costs of decommissioning the Project "until 15 years after construction." Appx. at 01240; BOEM 0077110. The deferral directly contradicts BOEM's OCSLA Compliance Memorandum set forth in Appendix B of the ROD, which states that "Vineyard Wind is required to satisfy its decommissioning financial assurance obligations prior to the installation of any facilities authorized in the COP [and] said obligation will be included as a COP condition of approval." BOEM_0076922, 0076951. The deferral presents the risk

that the Project Developer will not be in a position to bear the costs of decommissioning for at least 15 years after the Project is fully built. The longer construction continues, the greater the likelihood that the costs of decommissioning will increase and that the Project Developer will default on its decommissioning obligations. Accordingly, a stay under Section 705 is appropriate.

The Court evaluates requests for such stays of agency action under the factors found in *Nken v. Holder*, 556 U.S. 418, 434 (2009). *See Boston Parent Coal. for Academic Excellence Corp. v. Sch. Comm. of Boston*, 996 F.3d 37, 44 (1st Cir. 2021) (applying *Nken* factors). The applicant must show that "it is likely to succeed on the merits," that it "will be irreparably injured absent a stay," that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding" and that "the public interest lies" in its favor. *Nken*, 556 U.S. at 434. The first two factors "are the most critical." *Id.* When the Federal Government is the opposing party, as here, factors three and four merge. *Id.* at 435.

For the reasons stated in Commercial Fishermen's interlocutory appeal briefing, *see* Appx. at 01085–1103, 1141–50; D. Mass. Doc. No. 143 Exhibit 1 at 38–56; Exhibit 2 at 24–33, Commercial Fishermen will be irreparably harmed by any continuing construction within the Vineyard Wind Project area absent a stay of agency action. Furthermore, the district court made multiple errors of law and fact respecting the merits of Commercial Fishermen's claims, as detailed *supra*, so

Commercial Fishermen are likely to succeed on the merits of their claims. And the equities and the public interest both favor a stay of judgment as further construction will harm the environment and degrade navigational and defense radar and adversely impact safety. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("the balance of harms will usually favor the issuance of an injunction to protect the environment"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2446 (2018) (preliminary relief is in the public interest when agency action "has deleterious effects . . . [on] national security").

## CONCLUSION

For the foregoing reasons, this Court should declare that:

1.    the Commercial Fishermen have standing to bring their ESA, NEPA and OCSLA claims, as set forth *supra*; and

2.    the Federal Defendants violated multiple provisions of ESA, NEPA and OCSLA in approving the COP, as set forth *supra*..

In addition, this Court should:

1.    reverse the decision of the district court;

2.    vacate the Federal Defendants' approval of the COP;

3.    permanently enjoin any further construction of the Vineyard Wind Project; and

4. order the Project Developer to remove all materials, equipment, and structures installed in or near the Vineyard Wind Project area under color of authority of the Federal Defendants' COP approval.

Finally, should the Court remand any issues to the district court or to the Federal Defendants for further consideration, the Court should provide the Commercial Fishermen with relief under 5 U.S.C. § 705 in the form of a stay of the Federal Defendants' approval of the COP pending completion of any such remand proceedings through final appeal.

DATE: December 11, 2023,      Respectfully submitted,

*/s/Theodore Hadzi-Antich*
ROBERT HENNEKE
rhenneke@texaspolicy.com
CHANCE WELDON
cweldon@texaspolicy.com
THEODORE HADZI-ANTICH
tha@texaspolicy.com
CONNOR W. MIGHELL
cmighell@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on December 11, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Theodore Hadzi-Antich
THEODORE HADZI-ANTICH

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2) and this Court's order of November 2, 2023, because, excluding the parts of the document exempted by the rule, it contains 15,536 words and has been prepared in a proportionally spaced typeface using Microsoft Office Word 2020 in 14-point Times New Roman font.

Date: December 11, 2023        */s/Theodore Hadzi-Antich*
                                            THEODORE HADZI-ANTICH

No. 23-1853

---

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

SEAFREEZE SHORESIDE, INC.; LONG ISLAND COMMERCIAL FISHING
ASSOC., INC.; XIII NORTHEAST FISHERY SECTOR, INC.; HERITAGE
FISHERIES, INC.; NAT. W., INC.; OLD SQUAW FISHERIES, INC.,
*Plaintiffs - Appellants*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; THE HONORABLE
DEB HAALAND, in her official capacity as Secretary of the Department of the
Interior; BUREAU OF OCEAN ENERGY MANAGEMENT; LIZ KLEIN, in her
official capacity as the Director of the Bureau of Ocean Energy Management;
LAURA DANIEL-DAVID, in her official capacity as Principal Deputy Assistant
Secretary, Land and Minerals Management; UNITED STATES DEPARTMENT
OF COMMERCE; THE HONORABLE GINA M. RAIMONDO, in her official
capacity as the Secretary of the Department of Commerce; NATIONAL
OCEANIC AND ATMOSPHERIC ADMINISTRATION, NATIONAL MARINE
FISHERIES SERVICE; CATHERINE MARZIN, in her official capacity as the
Deputy Director of the National Oceanic and Atmospheric Administration;
UNITED STATES DEPARTMENT OF DEFENSE; THE HONORABLE LLOYD
J. AUSTIN, III, in his official capacity as the Secretary of the Department of
Defense; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GEN. SCOTT
A. SPELLMON, in his official capacity as the Commander and Chief of Engineers
of the U.S. Army Corps of Engineers; COLONEL JOHN A. ATILANO, II, in his
official capacity as the District Engineer of the New England District of the U.S.
Army Corps of Engineers; VINEYARD WIND 1, LLC,
*Defendants - Appellees*.

---

On Appeal from the United States District Court for the District of Massachusetts,
No. 1:22-CV-11091-IT – Hon. Indira Talwani

---

## ADDENDUM TO APPELLANTS' BRIEF

# INDEX

| | | |
|---|---|---|
| 1. | Memorandum & Order dated October 12, 2023 [Dkt. 138] | Add. 00001 – 47 |
| 2. | Judgment dated October 12, 2023 [Dkt. 139] | Add. 00048 – 49 |
| 3. | 5 U.S.C. §§ 701-706 | Add. 00050 - 55 |
| 4. | 16 U.S.C. § 1536 | Add. 00056 - 66 |
| 5. | 16 U.S.C. 1540 | Add. 00067 – 72 |
| 6. | 28 U.S.C. § 1291 | Add. 00073 |
| 7. | 28 U.S.C. § 2201 | Add. 00074 |
| 8. | 43 U.S.C. § 1332 | Add. 00075 - 76 |
| 9. | 43 U.S.C. § 1337(p) | Add. 00077 - 92 |
| 10. | 43 U.S.C. § 1349 | Add. 00093 - 95 |
| 11. | 30 C.F.R. § 585.621 | Add. 00096 - 97 |
| 12. | 30 C.F.R. § 585.626 | Add. 00098 - 100 |
| 13. | 40 C.F.R. § 1500.2 | Add. 00101 |
| 14. | 40 C.F.R. § 1501.3 | Add. 00102 |
| 15. | 40 C.F.R. § 1502.2 | Add. 00103 |
| 16. | 40 C.F.R. § 1502.14 | Add. 00104 |
| 17. | 40 C.F.R. § 1508.7 | Add. 00105 |
| 18. | 40 C.F.R. § 1508.25 | Add. 00106 - 107 |

| 19. | 50 C.F.R. § 402.14 | Add. 00108 - 114 |
|-----|---------------------|------------------|
| 20. | 50 C.F.R. § 402.16 | Add. 00115 - 116 |
| 21. | Fed. R. App. P. 4a | Add. 00117 - 121 |
| 22. | Fed. R. Civ. P. 12 | Add. 00122-124 |
| 23. | Fed. R. Evid. 201 | Add. 00125 |
| 24. | 86 Fed. Reg. 12495 *et. seq.* (Mar. 3, 2021) | Add. 00126 - 128 |
| 25. | 88 Fed. Reg. 27839 *et seq*. (May 3, 2023) | Add. 00129 - 165 |
| 26. | *Ensure*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) | Add. 166 |
| 27. | Report of the Effect on Radar Performance of the Proposed Cape Wind Project and Advance Copy of USCG Findings and Mitigation, U.S. DEPT. OF THE INTERIOR MINERALS MANAGEMENT SERVICE (Dec. 16, 2008) | Add. 00167 - 182 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SEAFREEZE SHORESIDE, INC., et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No. 1:22-cv-11091-IT |
| | * | |
| THE UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR, et al., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| VINEYARD WIND 1, LLC, | * | |
| | * | |
| Intervenor-Defendant. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| RESPONSIBLE OFFSHORE | * | |
| DEVELOPMENT ALLIANCE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 1:22-cv-11172-IT |
| | * | |
| UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR, et al., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| VINEYARD WIND 1, LLC, | * | |
| | * | |
| Intervenor-Defendant. | * | |

MEMORANDUM & ORDER

October 12, 2023

TALWANI, D.J.

Plaintiffs Seafreeze Shoreside, Inc. ("Seafreeze Shoreside"), Long Island Commercial

Fishing Association, Inc. ("LICFA"), XIII Northeast Fishery Sector, Inc. ("Sector XIII"),

Heritage Fisheries, Inc. ("Heritage Fisheries"), Nat. W., Inc. ("Nat. W.") and Old Squaw

Fisheries, Inc. ("Old Squaw") (collectively, the "Seafreeze Plaintiffs") and Plaintiff Responsible

Offshore Development Alliance ("Alliance") brought the above-captioned lawsuits challenging

actions taken by several federal agencies and associated officials in the approval of an offshore-

wind energy project to be constructed and operated by Intervenor-Defendant Vineyard Wind 1

LLC ("Vineyard Wind") in the Outer Continental Shelf off the coast of Martha's Vineyard and

Nantucket, Massachusetts (the "Vineyard Wind Project" or the "Project").[1]

Before the court in a consolidated proceeding are cross-motions for summary judgment in

Seafreeze, 1:22-cv-11091, see Plaintiffs' Motion for Summary Judgment, Doc. No. 66,

Defendants' Motion for Summary Judgment, Doc. No. 72, Vineyard Wind's Motion for

Summary Judgment, Doc. No. 86; and in Responsible, 1:22-cv-11172, see Plaintiff's Motion for

Summary Judgment, Doc. No. 52, Defendants' Motion for Summary Judgment, Doc. No. 59,

Vineyard Wind's Motion for Summary Judgment, Doc. No. 73. For the reasons that follow,

Plaintiffs' Motions for Summary Judgment are DENIED and Defendants' and Vineyard Wind's

Motions for Summary Judgment are GRANTED.

---

[1] Seafreeze Shoreside, Inc., et al. v. The United States Dept. of the Interior, et al., 1:22-cv-11091,
and Responsible Offshore Development Alliance v. United States Dept. of the Interior, et al.,
1:22-cv-11172, are referred to herein by their respective case numbers.

Two other challenges to the Project were filed in this District and are now on appeal. See Melone
v. Coit, et al., 1:21-cv-11171-IT, appeal docketed, No. 23-1736 (1st Cir. Sept. 8, 2023);
Nantucket Residents Against Turbines et al. v. U.S. Bureau of Ocean Energy Mgmt., 1:21-cv-
11390-IT, appeal docketed, No. 23-1501 (1st Cir. June 13, 2023), (together "the Related
Actions").

## I.     Background

### A.     Procedural Background

The Procedural Background is set forth in detail in the court's <u>Memorandum and Order</u>, 1:22-cv-11091, Doc. No. 137; 1:22-cv-11172, Doc. No. 104, denying Plaintiffs' <u>Motions to Strike Documents from and Supplement the Administrative Record</u>, 1:22-cv-11091, Doc. No. 56; 1:22-cv-11172, Doc. No. 43, and is incorporated by reference herein.

### B.     Background Concerning the Project

The Background Concerning the Project is also set forth in detail in the court's <u>Memorandum and Order</u>, 1:22-cv-11091, Doc. No. 137; 1:22-cv-11172, Doc. No. 104, and is incorporated by reference herein. The Background Concerning the Project is derived from the Administrative Record common to the pending challenges and the Related Actions.[2]

The following further background concerning the Project is also drawn from the Administrative Record, is specific to the pending challenges, and was not at issue in the Related Actions.

In considering Vineyard Wind's application for a permit under Section 404 of the Clean Water Act ("Section 404 Permit") pertaining to the discharge of dredged and fill materials that would occur along a 23.3 mile long corridor as part of Vineyard Wind's installation of the wind energy facility, electronic service platforms, connections between the wind turbine generators,

---

[2] Certified Indices of the Administrative Record and addenda were docketed electronically, <u>see</u> 1:22-cv-11091, Federal Defendants' Notices, Doc. Nos. 26, 30, 34, 36; 1:22-cv-11172, Federal Defendants' Notices, Doc. Nos. 17, 23; portions of the Administrative Record reflected in the parties briefing are docketed electronically as part of the parties' <u>Joint Appendices</u> filed in connection with the cross-motions for summary judgment, 1:22-cv-11091, Doc. Nos. 104, 105; 1:22-cv-11172, Doc. Nos. 97, 98.

service platforms, and export cables, the Army Corps of Engineers ("Corps") considered the practicability of the following alternatives to the proposed Vineyard Wind Project: (a) one no-action alternative; (b) a largely land-based alternative; (c) alternatives that would bring the cable on shore in a different location; (d) two off-site alternatives in other zones of the ocean; and (e) seven different on-site alternatives identified by Bureau of Ocean Energy Management ("BOEM") in the Environmental Impact Statement ("Final EIS"). Joint Record of Decision ("Joint ROD"), BOEM_0076799 at -6830-31.

The Corps stated that in order to consider an alternative "practicable," the alternative "must be available, achieve the overall project purpose (as defined by USACE) and be feasible when considering cost, logistics, and existing technology." Id.

In issuing the Section 404 Permit to Vineyard Wind, the Corps imposed certain "Special Conditions" on Vineyard Wind as the permittee, including compliance with all "mandatory terms and conditions to implement the reasonable and prudent measures that are associated with 'incidental take' that is also specified in the [Biological Opinion ('BiOp')]." The Permit further specified that the Permit is conditional on Vineyard Wind's "compliance with all of the mandatory terms and conditions associated with incidental take of the attached [BiOp], and any future [BiOp] that replaces it, which terms and conditions are incorporated by reference into this [P]ermit." Dep't of Army Permit, USACE_AR_012635 at -36.

### C.    Plaintiffs' Pending Claims

In reviewing the pending motions, the court considers the following claims asserted by Plaintiffs.

1. *Claims under the Administrative Procedure Act ("APA") for Violations of the Endangered Species Act*

Plaintiffs allege that Defendant National Marine Fisheries Service ("NMFS") violated Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, and attendant regulations by failing during the 2020 biological consultation process (i) to consider the cumulative effects of the proposed Project to endangered species or their habitat (1:22-cv-11091, 9th Claim for Relief), or (ii) to inform BOEM of alternatives to the proposed Project that would avoid harming endangered species (1:22-cv-11091, 10th Claim for Relief), and that Defendants violated the ESA and its implementing regulations by approving the Vineyard Wind Construction Operations Plan ("COP") and issuing the Section 404 Permit without a valid BiOp (1:22-cv-11172, Count 3).[3]

2. *Claims under the APA for Violations of the Clean Water Act*

Next, Plaintiffs allege that the Corps violated the Clean Water Act ("CWA"), 33 U.S.C. § 1251, et seq., and attendant regulations in issuing the Section 404 Permit pertaining to the dredge and fill activities associated with the Project by (i) failing to review practicable

---

[3] The Seafreeze Plaintiffs' ESA claims set forth in their 6th, 7th, 8th, 11th, 12th, 13th, 14th, 15th, and 16th Claims for Relief, 1:22-cv-11091, Complaint, Doc. No. 1, and portions of the Alliance's Count 3 asserting Defendants violated the ESA by (i) approving minimal mitigation measures to protect the safety of endangered species, and (ii) failing to rely on the best scientific and commercial data available, 1:22-cv-11172, Complaint, Doc. No. 1, are waived where neither the Seafreeze Plaintiffs nor the Alliance briefed these claims. And although Seafreeze Shoreside and the Alliance submitted 60-day notice of intent to sue letters as required under the ESA to commence a citizen-suit, 16 U.S.C. § 1540(g)(2)(A)(i), those letters did not assert any violations pertaining to the 2021 BiOp. Accordingly, Plaintiffs' ESA challenges to the BiOp are limited to the 2020 BiOp.

alternatives to the Project outside of the Lease Area[4] (1:22-cv-11091, 17th Claim for Relief; 1:22-cv-11172, Counts 2.2, 2.3), and (ii) failing to consider the cumulative effects of multiple similar projects in issuing the Section 404 Permit (1:22-cv-11172, Count 2.4).[5]

3.      *Claims under the APA for Violations of the Marine Mammal Protection Act*

Next, Plaintiffs allege that NMFS violated the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371, and attendant regulations in issuing the Incidental Harassment Authorization ("IHA") (i) by failing to provide evidence that the Project will only affect "small numbers," have a "negligible impact" on marine mammal species, or be completed within one year of issuance of the IHA (1:22-cv-11091, 22nd Claim for Relief), and (ii) by improperly relying on defects in the Corps' CWA review, rendering the issuance of the IHA arbitrary and capricious (1:22-cv-11172, Count 5).[6]

4.      *Claims under the APA for Violations of the National Environmental Protection Act*

Next, Plaintiffs allege that Defendants violated various provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and attendant regulations throughout the Project review process by:

---

[4] The Lease Area covers the 166,886 acres of the Outer Continental Shelf leased by BOEM to Vineyard Wind on April 1, 2015. See 1:22-cv-11172, Mem. & Order 5, Doc. No. 104.

[5] The Seafreeze Plaintiffs' CWA claims set forth in their 18th, 19th, and 20th Claims for Relief, 1:22-cv-11091, Complaint, Doc. No. 1, and the Alliance's CWA claims set forth in Counts 2.1, 2.5, and 2.6, 1:22-cv-11172, Complaint, Doc. No. 1, are also waived where neither the Seafreeze Plaintiffs nor the Alliance briefed these claims.

[6] The Seafreeze Plaintiffs' MMPA claim set forth in their 21st Claim for Relief, 1:22-cv-11091, Complaint, Doc. No. 1, is also waived where neither the Seafreeze Plaintiffs nor the Alliance briefed this claim.

(i)     defining the purpose of the Action in connection with the Vineyard Wind COP too narrowly (1:22-cv-11091, 23rd Claim for Relief; 1:22-cv-11172, Count 4.4);

(ii)    failing to properly consider a range of alternatives to the COP (1:22-cv-11091, 24th Claim for Relief; 1:22-cv-11172, Count 4.1);

(iii)   failing to comply with requirements for analyzing cumulative impacts of the Project (1:22-cv-11091, 25th Claim for Relief; 1:22-cv-11172, Count 4.2);

(iv)    failing to take reasonable steps considering the lack of information relevant to reasonably foreseeable significant adverse impacts (1:22-cv-11091, 26th Claim for Relief);

(v)     limiting the scope of the Final EIS to the Vineyard Wind Project Area (1:22-cv-11091, 27th Claim for Relief);

(vi)    failing to make diligent efforts to involve the public in the NEPA process (1:22-cv-11091, 28th Claim for Relief);

(vii)   inadequately addressing and disclosing comments submitted by the public (1:22-cv-11091, 29th, 30th Claims for Relief; 1:22-cv-11172, Count 4.5);

(viii)  failing to prepare an EIS prior to issuing the Lease (1:22-cv-11091, 31st Claim for Relief; 1:22-cv-11172, Count 4.6);

(ix)    improperly segmenting the NEPA analysis (1:22-cv-11091, 32nd Claim for Relief; 1:22-cv-11172, Count 4.6);

(x)     relying on outdated NEPA regulations (1:22-cv-11091, 33rd Claim for Relief; 1:22-cv-11172, Count 4.7);

(xi)    withdrawing the EIS and reinitiating it without supplementing to account for design changes (1:22-cv-11172, Count 4.3);

(xii)   failing to consider the impacts of climate change (1:22-cv-11172, Count 4.8).

5.      *Claims under the APA for Violations of the Outer Continental Shelf Lands Act*

Finally, Plaintiffs have asserted that Defendants have violated the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1337, in connection with the issuance of the Vineyard Wind Lease and review of the Vineyard Wind COP by (i) adopting and applying the "Smart from the Start" Initiative to the leasing process in violation of 43 U.S.C. § 1337(p)(4)'s requirement that BOEM consider a set list of criteria (1:22-cv-11091, 1st, 2nd, and 3rd Claims for Relief); (ii) resuming review of the COP after Vineyard Wind withdrew and resubmitted it in

7

January 2021 (1:22-cv-11091, 4th Claim for Relief); and (iii) adopting and approving the COP without considering and providing for the factors set forth in 43 U.S.C. § 1337(p)(4) (1:22-cv-11091, 5th Claim for Relief; 1:22-cv-11172, Counts 1.1, 1.2, 1.7).[7]

## II.     Standard of Review

Under Federal Rules of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Anderson, 477 U.S. at 250.

The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon the mere allegations or denials of [the] pleading[s]." Id. at 248. Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Id. When

---

[7] The Alliance's OCSLA claims set forth in Counts 1.3, 1.4, 1.5, 1.6, 1.8, 1:22-cv-11172, Complaint, Doc. No. 1, are also waived where neither the Seafreeze Plaintiffs nor the Alliance briefed these claims.

The Alliance has conceded its claim under the Jones Act. 1:22-cv-11172, Hearing Tr. 7:4-10, Doc. No. 101.

reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

A summary judgment motion has a "special twist in the administrative law context." Boston Redevelopment Auth. v. Nat. Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (quotations omitted). In an APA action, a motion for summary judgment serves as "a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." Id. (citing cases); see also 5 U.S.C. § 706(2)(A) ("The reviewing court shall…hold unlawful and set aside agency action…found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

Because the APA affords great deference to agency decision-making and agency actions are presumed valid, "judicial review [under the APA], even at the summary judgment stage, is

narrow." <u>Assoc'd Fisheries of Maine, Inc. v. Daley</u>, 127 F.3d 104, 109 (1st Cir. 1997) (citing <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415-16 (1971)). Courts should "uphold an agency determination if it is 'supported by any rational view of the record.'" <u>Marasco & Nesselbush, LLP v. Collins</u>, 6 F.4th 150, 172 (1st Cir. 2021) (quoting <u>Atieh v. Riordan</u>, 797 F.3d 135, 138 (1st Cir. 2015)). Even where an inquiring court disagrees with the agency's conclusions, the court cannot "'substitute its judgment for that of the agency.'" <u>Boston Redevelopment Auth.</u>, 838 F.3d at 47 (quoting <u>Assoc'd Fisheries</u>, 127 F.3d at 109). Rather, an agency's action should only be vacated where the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Nat'l Ass'n of Home Builders v. Defs. of Wildlife</u>, 551 U.S. 644, 658 (2007) (quotations omitted).

## III. Standing

Defendants challenge Plaintiffs' standing to bring claims under NEPA while Vineyard Wind challenges Plaintiffs' standing to bring claims under NEPA, ESA, and MMPA.[8] The court considers first the evidence in the record relating to Plaintiffs' standing, and then whether Plaintiffs have standing to bring their claims under each of the challenged statutes, addressing constitutional issues first and then statutory issues.

---

[8] Vineyard Wind also challenged the Seafreeze Plaintiffs' standing to bring a claim under the CWA but withdrew that argument at the summary judgment hearing. 1.22-cv-11091, Hearing Tr. 13:5-16, Doc. No. 112.

### A. Evidence Relating to Plaintiffs' Standing[9]

#### 1. *Old Squaw, Heritage Fisheries, and Nat. W.*

Seafreeze Plaintiffs Old Squaw, Heritage Fisheries, and Nat. W. (the "Commercial Fishing Entities") are each commercial fishing companies that engage in trawl fishing[10] for squid.

#### a. Evidence Offered as to Economic Injury

Declarant David Aripotch, the owner and president of Old Squaw and captain of its boat, the F/V Caitlin & Mairead, states that the F/V Caitlin & Mairead trawl fishes in the Atlantic Ocean off the coast of Massachusetts to the coast of North Carolina. 1:22-cv-11091, Aripotch Decl. ¶¶ 2, 5, 11, Doc. No. 66-1. Aripotch states that the F/V Caitlin & Mairead typically takes

---

[9] Vineyard Wind opposes numerous statements in Plaintiffs' Statement of Undisputed Material Facts, 1:22-cv-11091, Doc. No. 66. See Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts, Doc. No. 88. First, Vineyard Wind opposes many statements supported only by affidavits. See 1:22-cv-11091, Intervenor's Opening Mem. 28-31, Doc. No. 87 (disputing the admissibility of statements such as those concerning Seafreeze Shoreside's interests, goals, and purported injuries). Where Fed. R. Civ. P. 56(c)(4) permits affidavits or declarations "made on personal knowledge [that] set out facts that would be admissible in evidence, and [that] show that the affiant or declarant is competent to testify on the matters stated," the court considers the evidentiary weight of these submissions under this standard for purposes of standing, as discussed infra. Second, Vineyard Wind objects to Plaintiffs' numerous citations outside of the Administrative Record where Plaintiffs have not offered those materials through a motion to supplement the Record. Id. at 31-33. Here, the court does not consider statements relying on materials outside of the Administrative Record where Plaintiffs have not addressed these in any motion to supplement the Record or otherwise offered a basis for the court to consider extra-record material. Finally, Vineyard Wind asserts numerous statements of fact should be struck where Plaintiffs mischaracterize the Administrative Record. The court looks directly to the Administrative Record, as discussed in its Memorandum and Order, 1:22-cv-11172, Doc. No. 137, rather than the parties' characterizations of the Administrative Record.

[10] Trawl fishing involves pulling a net towed by steel wires and spread open by steel doors to harvest squid and other fish at the ocean bottom. 1:22-cv-11091, Decl. of David Aripotch ("Aripotch Decl.") ¶ 10, Doc. No. 66-1; 1:22-cv-11091, Decl. of Thomas E. Williams, Sr. ("Williams Sr. Decl.") ¶ 15, Doc. No. 66-2.

25-40 trips per year to the Lease Area for squid. Id. at ¶¶ 8-9. Aripotch states further that, in a typical year, Old Squaw generates $175,000-$350,000 in annual revenues from fishing expeditions for squid in the Lease Area and that this accounts for roughly 30% of Old Squaw's revenue in a given year. Id. at ¶ 12. Aripotch states that Old Squaw will lose this revenue if construction and operation of the Project go forward as contemplated by the COP. Id. at ¶ 19.

Aripotch states that the spacing of the Vineyard Wind turbines "will not allow for safe transit lanes in the Vineyard Wind area for the F/V Caitlin & Mairead" because one nautical mile of distance "is not enough room to risk getting through[.]" Id. at ¶ 14. Aripotch also states that the wind turbines, when operational, will interfere with marine radar. Id. at ¶ 15. Aripotch contends that commercial fishing will become untenable for his boat in the Lease Area because trawl fishing gear will become entangled. Id.[11] Finally, Aripotch states that the F/V Caitlin & Mairead will be unable to fish in the Wind Energy Area during the Project's construction because of the safety risks associated with certain construction activities, such as the installation of cables or installation of armoring with boulders, and that those safety risks will remain after the construction is complete and the Project is operational. Id. at ¶¶ 16-17.

Aripotch states that the risks posed to the F/V Caitlin & Mairead will also disrupt and displace squid in the Area and impact the marine ecosystem in ways that will further impact Old Squaw's ability to fish in the Lease Area. Id. at ¶ 20.[12] Aripotch states that, because of the Lease

---

[11] Aripotch relies on the Final EIS Vol. 1, BOEM_0068434 at -717, -18, -22, --224, -225, which states that entanglement is a possibility that could impact fishing businesses.

[12] Additionally, Aripotch states that it is his understanding that the Vineyard Wind Project will result in environmental and ecological harms to numerous marine species. Id. at ¶¶ 29-30. Aripotch's declaration does not show, however, that he is competent to testify to this assertion.

**Add. 00012**

issuance and COP approval, Old Squaw will no longer be able to fish for squid in the Lease Area and will lose approximately 30% of its revenue as a result. Id. at ¶ 19.

Declarant Thomas E. Williams, Sr., the owner and President of Heritage Fisheries and Nat. W., states that, in a typical year, Heritage Fisheries, which owns and operates the F/V Heritage, generates $290,000 in annual revenues from trawl fishing for squid in the Lease Area, accounting for approximately 30% of Heritage Fisheries total annual revenues in any given year. 1:22-cv-11091, Williams Sr. Decl. ¶¶ 2, 4-5, 17, Doc. No. 66-2. Williams states further that Nat. W., which owns and operates the F/V Tradition, generates roughly $490,000 in annual revenues from trawl fishing for squid in the Lease Area, accounting for approximately 65% of Nat. W.'s total annual revenues in any given year. Id. at ¶¶ 5, 18. Like Aripotch, Williams states that his companies will be unable to engage in trawl fishing in the Lease Area because (i) the spacing of the turbines will not allow for safe passage, (ii) the turbines will interfere with vessel radar, making passage more dangerous for his companies' boats, and (iii) protections around cables and foundations will cause gear to become tangled. Id. at ¶¶ 20, 23. Williams states that the Vineyard Wind Project will cause both Heritage Fisheries and Nat. W. to lose out on the annual revenues attributable to fishing in the Lease Area. Id. at ¶ 22. [13]

---

[13] Williams also contends that the construction activities and operation of the turbines will affect the water quality in the Lease Area and beyond, which will displace not only squid, but other marine life, affecting the entire ecosystem and further impacting Heritage Fisheries and Nat. W.'s abilities to fish in the Lease Area. Id. at ¶ 24. Williams states this "impact" constitutes pollution of the waters and degradation of all living things in the waters. Id. Williams' declaration does not show, however, that he is competent to testify to these assertions.

Vineyard Wind disputes Plaintiffs' representations regarding the frequency and duration of fishing trips by Plaintiffs Old Squaw, Heritage Fisheries, and Nat. W. See 1:22-cv-11091, Intervenor's Opening Mem. 3 n.1, Doc. No. 87. Vineyard Wind offers the expert opinion of R. Douglass Scott, PhD., P. Eng., a Principal with W.F. Baird & Associates Ltd., reflecting, based on Automatic Identification System ("AIS") tracking data, that the total time between January 2016 and 2022 spent in the Lease Area by Old Squaw's vessel (the F/V Caitlin & Mairead) was 21.2 hours, by Heritage Fisheries' vessel (the F/V Heritage) was 0.4 hours, and by Nat. W.'s vessel (the F/V Tradition) was 6.2 hours, for a total time of 27.7 hours over six years. See 1:22-cv-11091, Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 100-102, Doc. No. 88; 1:22-cv-11091, Decl. of R. Douglas Scott in Supp. of Intervenor's Cross-Mot. for Summ. J. and in Opp'n to Pls. Mot. for Summ. J., Doc. No. 86-1.[14]

Defendants also dispute that the Project will result in the cessation of commercial fishing in the Lease Area. 1:22-cv-11091, Fed. Defs.' Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 9-11, Doc. No. 76 (citing BOEM Info. Mem. dated May 21, 2021, BOEM_0076922 at -942-44 (reflecting that "the navigational risk assessment prepared for the Project shows that it is technically feasible to navigate and maneuver fishing vessels and mobile gear through the WDA.") and Final EIS, Vol. 1 BOEM_0068434 at -68718 (discussing impacts in the WDA that may impact fishing activities) and BOEM_0068743-44 (acknowledging concerns from commercial fishing interests about the ability to safely navigate the WDA but

_____

[14] Plaintiffs dispute that AIS data is an accurate reflection of their fishing activities in the Lease Area where none of the Plaintiffs' vessels are required to carry or use AIS, and, instead, voluntarily use AIS, but typically not when fishing. See 1:22-cv-11091, Third Decl. of David Aripotch ¶¶ 4-6, Doc. No. 90-3; 1:22-cv-11091, Second Decl. of Thomas E. Williams, Sr. ¶¶ 8-9, Doc. No. 90-4.

14

**Add. 00014**

noting, "fishing vessels, including those involved in line, trawl, and drag fishing, would be able to work in the area; however vessel operators would need to take the [wind turbine generators] and [electrical service platforms] into account as they set their courses[.]"). Vineyard Wind states that the Lease Area was selected to minimize conflicts with commercial fishing and because it does not have high relative revenue as compared to nearby waters. See 1:22-cv-11091, Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 9-11, Doc. No. 88 (citing Final EIS, Vol. 1 for proposition that, during the leasing process, and in response to public comments, BOEM identified "high value fishing areas…and removed [them] prior to leasing." Final EIS Vol. 1, BOEM_0068434 at -725).

In sum, there is a dispute of material facts as to the extent of any economic harm that the Commercial Fishing Entities may suffer. For purposes of Defendants' and Intervenor's Motions for Summary Judgment, however, and considering the evidence in the light most favorable to the Commercial Fishing Entities, the court finds that the Commercial Fishing Entities have demonstrated that they trawl fish in the Lease Area and may lose an unquantified sum of the revenue attributable to their trawl-fishing activities in the Lease Area.

b.  Evidence Offered as to Non-Economic Injury

Aripotch states that, in addition to economic interests in the Lease Area, he also has environmental and aesthetic interests in the Lease Area. He states that the Project will impact the aesthetic and spiritual pleasures he derives from fishing in the Vineyard Wind Lease Area. 1:22-cv-11091, Aripotch Decl. ¶ 21, Doc. No. 66-1. In particular, while engaged in commercial fishing in the Vineyard Wind Lease Area, Aripotch tries to bring his camera to capture the wildlife. Id. at ¶ 25. He observes right whales and other marine life. Id. He plans to continue

fishing in the Lease Area, and observing marine mammals, "through the foreseeable future if the Vineyard Wind lease and COP are vacated." Id. at ¶ 28.[15]

Williams states that the impact the Vineyard Wind Project will have on the Vineyard Wind Lease Area will harm not only his business but also the aesthetic and emotional pleasures he derives from fishing. 1:22-cv-11091, Williams Sr. Decl. ¶ 25, 28, Doc. No. 66-2.[16] Williams' sons, who serve as captains of the F/V Heritage and the F/V Tradition, each likewise states that he takes pleasure in observing marine life, including right whales, while fishing in the Lease Area. 1:22-cv-11091, Decl. of Thomas H. Williams ¶ 25, Doc. No. 66-3; see 1:22-cv-11091, Decl. of Aaron Williams ¶ 27, Doc. No. 66-4.

Defendants dispute that statements of individual owners' aesthetic and emotional interests can be imputed to the Plaintiff corporations. See 1:22-cv-11091, Fed. Defs.' Opening Mem. 8, Doc. No. 73. Defendants also assert that the record directly conflicts these individuals' assertions where (i) NMFS has concluded there will be no adverse impacts to right whales other than temporary harassment of a small number of right whales due to exposure to pile driving noises, and (ii) that the Corps considered the Project's effects on food and fiber production as part of its public interest review and determined that the Project would have no effect on the food

---

[15] Aripotch also states that he fears the Project will destroy the area that his family, and many others, depend on for their food supply. Id. at ¶ 24. Aripotch's affidavit does not show that he is competent to testify as to the alleged destruction of the area.

[16] Williams also states that it is his understanding that the impacts of the Project "will result in a sizeable overall decrease in the food supply" that will negatively affect food availability for all Americans, including his family. 1:22-cv-11091, Williams Sr. Decl. ¶ 28, Doc. No. 66-2. Again, Williams' affidavit does not show that he is competent to testify to these assertions.

supply. 1:22-cv-11091, Fed. Defs.' Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 167, 120, Doc. No. 76.

The court concludes the Commercial Fishing Entities have not demonstrated any non-economic injury where the competent evidence proffered relates to the interests of their owners and not to the Commercial Fishing Entities themselves.

### 2. *Seafreeze Shoreside*

Plaintiff Seafreeze Shoreside is a seafood dealer located in Narragansett, Rhode Island. 1:22-cv-11091, Decl. of Arthur Ventrone ("Ventrone Decl.") ¶ 4, Doc. No. 66-7; see also 1:22-cv-11091, Decl. of Meghan Lapp ("Lapp Decl.") ¶ 3, Doc. No. 66-8.

#### a.   Evidence Offered as to Economic Injury

Declarant Arthur Ventrone, Seafreeze Shoreside's Treasurer, states that Seafreeze Shoreside purchases, sells, and processes fish product, primarily squid. 1:22-cv-11091, Ventrone Decl. ¶ 2, 4, Doc. No. 66-7. Ventrone states that Seafreeze Shoreside generates substantial revenue from squid seafood product brought in by commercial fishermen from the Lease Area and that, while revenues vary annually, catches from the Lease Area are "a consistently high percentage of [Seafreeze Shoreside's] total annual revenues year after year." Id. at ¶ 10. Ventrone states that, in 2016, 19% of Seafreeze Shoreside's total revenue, or $1.7 million, was attributable to catches in the "Vineyard Wind area." Id. Ventrone states that it is his understanding that commercial fishing in the Lease Area will "become untenable" as a result of the Vineyard Wind Project, and that, as a result, Seafreeze Shoreside will process less squid, and will experience a "substantial loss of revenues." Id. at ¶¶ 8-11. Ventrone also states that it is his understanding that squid will be displaced from the Lease Area as a result of the Project's impact

to squid habitat, and that, even if commercial fishermen could continue fishing in the Area, the catch would be "severely reduced or nonexistent." Id. at ¶ 9.[17]

Declarant Meghan Lapp, Seafreeze Shoreside's Fisheries Liaison and Assistant General Manager, states that the pile driving and operational noise from the Project will negatively impact the habitats longfin squid and other species, and thus impact Seafreeze Shoreside. 1:22-cv-11091, Lapp Decl. ¶¶ 2, 45-50, Doc. No. 66-8.

Defendants dispute that the construction and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in the Vineyard Wind Lease Area. 1:22-cv-11091, Fed. Defs.' Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶ 6, Doc. No. 76 (citing BOEM Info. Mem. dated May 21, 2021, BOEM_0076922 at -942-44, Final EIS, Vol. 1 BOEM_0068434 at -718 and -743-44). Defendants also dispute that the Project will have adverse impacts on the squid habitat where Plaintiffs' only support for this proposition are the statements of employee declarants, who Defendants contend offer opinions and understanding in lieu of expertise, and Seafreeze Shoreside's own comments in the Administrative Record. See id. at ¶ 166.

Vineyard Wind disputes that Seafreeze Shoreside derives substantial revenue from the Lease Area, stating that the Lease Area was selected to minimize conflicts with commercial fishing and because it does not have high relative revenue as compared to nearby waters. See 1:22-cv-11091, Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶ 6,

---

[17] Although Ventrone has not demonstrated that he is competent to testify as to any reduction in commercial fishing in the Lease Area, the Aripotch and Williams Sr. affidavits detailed above regarding their anticipated reduction in trawling for squid, are sufficient to allow the court to consider Ventrone's further statement that Seafreeze Shoreside will process less squid.

Doc. No. 88 (citing Final EIS, Vol. 1 for proposition that, during the leasing process, and in response to public comments, BOEM identified "high value fishing areas…and removed [them] prior to leasing." Final EIS Vol. 1, BOEM_0068434 at -725).

As above, there is a dispute of material facts as to the extent of any economic harm that Seafreeze Shoreside may suffer. For purposes of Defendants' and Intervenor's Motions for Summary Judgment, however, and considering the evidence in the light most favorable to Seafreeze Shoreside, the court finds that Seafreeze Shoreside has demonstrated that its suppliers trawl fish in the Lease Area and that Seafreeze Shoreside may lose an unquantified sum of the revenue attributable to the loss of its suppliers' trawl-fishing activities in the Lease Area.

      b.  Evidence offered as to Non-Economic Injury

Lapp states that "Seafreeze [Shoreside] has a keen interest in protecting the purity and cleanliness" of the Outer Continental Shelf, not only for economic reasons, but also because "environmental degradation" from the Vineyard Wind Project would take away "from Seafreeze [Shoreside] employees' aesthetic, psychological, emotional, and spiritual pleasures of working as part of a fishing community reliant on those waters." 1:22-cv-11091, Lapp Decl. ¶ 52, Doc. No. 66-8.

Vineyard Wind disputes that Plaintiffs have asserted any of its own legal rights and interests. See 1:22-cv-11091, Intervenor's Opening Mem. 4-5, Doc. No. 87.

As with the Commercial Fishing Entities, Seafreeze Shoreside has not shown that Seafreeze Shoreside, as opposed to its employees, have suffered any non-economic injuries where it has offered no evidence to that effect.

3.    *LICFA, Sector XIII, and the Alliance*

Seafreeze Plaintiffs LICFA and Sector XIII, and Responsible Plaintiff Alliance
(collectively, the "Associations"), are associations representing commercial fishing interests.

a.   Evidence Offered as to Associations' Membership and Purposes

LICFA represents over 150 fishing businesses, boats, and fishermen from multiple ports
on Long Island, New York. 1:22-cv-11091, Decl. of Bonnie Brady ("Brady Decl.") ¶ 3, Doc. No.
66-6. LICFA and its members "support extensive cooperative scientific research to better
understand the marine environment and fisheries management." Id. at ¶ 4.

Sector XIII is a private organization of commercial fishermen that monitors compliance
with fishing permits and supports the commercial fishing industry along the Atlantic Coast. 1:22-
cv-11091, Decl. of John Haran ("Haran Decl.") ¶ 3, Doc. No. 66-5.

Plaintiff Alliance is a not-for-profit trade association headquartered in Washington, D.C.,
comprised of fishing associations and fishing companies, whose members own and operate more
than 120 vessels and conduct business in more than 30 fisheries throughout the country. 1:22-cv-
11172, Joint SOF ¶ 1, Doc. No. 99; 1:22-cv-11172, Decl. of Anne Hawkins ("Hawkins Decl.")
¶ 2, Doc. No. 53-1. One of the Alliance's members is Town Dock, which is one of the largest
producers of squid in the United States. 1:22-cv-11172, Decl. of Katie Almeida ("Almeida
Decl.") ¶¶ 1-2, Doc. No. 77-2. The Alliance is committed to improving the compatibility of new
offshore development with its members' fishing-related businesses. 1:22-cv-11172, Hawkins
Decl. ¶ 2, Doc. No. 53-1. Hawkins states that Defendants' approval of the Vineyard Wind
Project has "frustrated the very purpose for which the Alliance was formed[.]" Id. at ¶ 8.

b.  Evidence offered as to Economic Injury

Each association offers as injury the economic injury of its members, primarily as detailed above. See 1:22-cv-11091, Brady Decl. ¶¶ 6, 19-22, Doc. No. 66-6 (the presence and good health of numerous species of marine life in the Lease Area is vital to LICFA members); 1:22-cv-11091, Second Decl. of David Aripotch ("2d Aripotch Decl.") ¶ 4, Doc. No. 90-1 (Aripotch and Old Squaw are members of LICFA and LICFA represents Aripotch's "economic . . . interests as a commercial fisherman"); see also 1:22-cv-11091, Second Decl. of Bonnie Brady ("2d Brady Decl.") ¶ 4, Doc. No. 90-2 ("LICFA, as an association of commercial fishermen, represents the economic . . . interests of David Aripotch in his capacity as a member of LICFA."); 1:22-cv-11091, Haran Decl. ¶¶ 3, 6, Doc. No. 66-5 (approximately 38 of Sector XIII's members operate their commercial fishing businesses in the Lease Area and the presence and good health of numerous species of fish and other marine life in the Lease Area are vital to the members of Sector XIII, who depend on the Lease Area for a substantial portion of their revenues); id. at ¶¶ 7, 20 (Plaintiffs Heritage Fisheries and Nat. W. are members of Sector XIII and Heritage Fisheries, Nat. W., and similarly situated Sector XIII members will experience "substantial economic adverse impacts" as a result of the Vineyard Wind Project); id. at ¶ 11 (stating that the Vineyard Wind Project would force Sector XIII members who operate trawl vessels to fish and travel outside of the "project area," thereby increasing vessel traffic and hazardous conditions outside of the Lease Area); id. at ¶ 18 (stating that the Vineyard Wind Project will preclude members from fishing in the Lease Area, due to (i) the risk of entanglement of trawl fishing gear, (ii) reduced navigational capabilities because of radar interference, and (iii) increased risk of collision when navigating through Project transit lanes); 1:22-cv-11172, Second Decl. of Anne Hawkins ("2d Hawkins Decl.") ¶¶ 4-7, Doc. No. 77-1 (Old Squaw, Sector XIII,

21

LICFA, and Seafreeze Shoreside are members of the Alliance and will be harmed in the ways identified by the Seafreeze Plaintiffs' declarants); see also 1:22-cv-11172, Almeida Decl. ¶¶ 1-2, 4-5, Doc. No. 77-2 (Alliance member Town Dock is dependent on longfin squid, the Lease Area is "on top of and adjacent to one of [Town Dock's] most productive spring and summer longfin squid grounds," Town Dock's vessels may be unable to tow their trawling gear through the Lease Area safely and efficiently, and the noise from the Project will negatively impact the longfin squid population, and ultimately, Town Dock's business) (citing letter offered as part of Town Dock's comments on an adjacent wind project which references a Woods Hole Oceanographic Institute study).

As discussed above, Defendants dispute that the Vineyard Wind Project will result in the cessation of fishing activities in the Lease Area. Vineyard Wind disputes that members of the Associations asserting "substantial" losses in revenue will experience such impacts where AIS data reflects that LICFA member Old Squaw and Sector XIII members Heritage Fisheries andNat. W. fished in the Lease Area for a collective 27.7 hours over six years.

Vineyard Wind also disputes that Alliance member Town Dock may have difficulty navigating through the Lease Area with gear where it previously submitted comments reflecting that Town Dock's boats will continue to work in the wind energy areas with one nautical mile of spacing between the turbines. See 1:22-cv-11172, Intervenor's Reply 4 n.2, Doc. No. 93.

As above, there is a dispute of material facts as to the extent of any economic harm that the Associations' members may suffer. For purposes of Defendants' and Intervenor's Motions for Summary Judgment and considering the evidence in the light most favorable to the Associations, the court finds that the Associations have demonstrated that their members may

Add. 00022

lose an unquantified sum of the revenue attributable to the loss of their or their suppliers' trawl-fishing activities in the Lease Area.

           c.   *Evidence Offered as to Non-Economic Injury*

Each association also offers as injury the non-economic injury of its members, primarily as detailed above. See 1:22-cv-11091, 2d Aripotch Decl. ¶ 4, Doc. No. 90-1 (LICFA represents Aripotch's "environmental interests as a commercial fisherman"); see also 1:22-cv-11091, 2d Brady Decl. ¶ 4, Doc. No. 90-2 ("LICFA, as an association of commercial fishermen, represents the . . . environmental interests of David Aripotch in his capacity as a member of LICFA."). Whether that non-economic injury may be asserted by the Associations is discussed further below.

**B.**      **Constitutional Standing**

Vineyard Wind challenges Plaintiffs' standing to bring their NEPA, ESA, and MMPA claims as a constitutional issue, and Defendants and Vineyard Wind also challenge the Associations' standing. The court considers the challenges to standing under NEPA and MMPA as a zone-of-interest question, which is addressed below. Here, the court considers first legal principles concerning constitutional standing generally, then questions of associational standing, and then Plaintiffs' standing under ESA.

           1.   *Applicable Law*

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. Art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016), <u>as revised</u> (May 24, 2016) (citing

<u>Defs. of Wildlife</u>, 504 U.S. at 560-61). Plaintiffs' injury must be "'concrete, particularized, and

actual or imminent; fairly traceable to the challenged action; and redressable by a favorable court

ruling.'" <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 409 (2013) (quoting <u>Monsanto Co. v.</u>

<u>Geertson Seed Farms</u>, 561 U.S. 139, 149 (2010)).

To establish the first element of standing, an injury-in-fact, a plaintiff must demonstrate

"an invasion of a legally protected interest" that is "concrete and particularized" and "actual or

imminent, not conjectural or hypothetical." <u>Defs. of Wildlife</u>, 504 U.S. at 560 (quotations

omitted). "The particularization element of the injury-in-fact inquiry reflects the commonsense

notion that the party asserting standing must not only allege injurious conduct attributable to the

defendant but also must allege that he, himself, is among the persons injured by that conduct."

<u>Hochendoner v. Genzyme Corp.</u>, 823 F.3d 724, 731-32 (1st Cir. 2016).

Moreover, standing is "ordinarily substantially more difficult to establish," where the

plaintiff is not the object of the action. <u>Defs. of Wildlife</u>, 504 U.S. at 562 (quotations omitted);

<u>compare</u> <u>Maine Lobstermen Assoc. v. Nat. Marine Fish. Serv.</u>, 70 F.4th 582, 592-93 (D.C. Cir.

June 16, 2023) (concluding that the plaintiff lobstermen have standing to challenge a biological

opinion considering NMFS' fishery licensing activities where they were the "object of the

action" and the biological opinion had "virtually determinative effect"). "The standing inquiry is

claim-specific: a plaintiff must have standing to bring each and every claim that she asserts."

<u>Katz v. Pershing, LLC</u>, 672 F.3d 64, 71 (1st Cir. 2012) (citing <u>Pagán v. Calderón</u>, 448 F.3d 16,

26 (1st Cir. 2006)).

Because standing is not a "mere pleading requirement[] but rather an indispensable part

of the plaintiff's case," standing must be supported "with the manner and degree of evidence

required at the successive stages of the litigation." <u>Defs. of Wildlife</u>, 504 U.S. at 561; <u>see also</u> <u>People to End Homelessness v. Develco Singles Apartments Assoc.</u>, 339 F.3d 1, 8 (1st Cir. 2003). While at the pleadings stage, "general factual allegations of injury" may suffice, and at summary judgment, such allegations must be supported by affidavits which will be taken to be true, where standing remains a controverted issue at trial, the specific facts establishing standing "must be 'supported adequately by the evidence adduced at trial.'" <u>Id.</u> (quoting <u>Gladstone</u> <u>Realtors v. Village of Bellwood</u>, 441 U.S. 91, 114, 115 n.31 (1979)).

       2.   *Associational Standing*

An association cannot establish standing to sue on behalf of its members unless (i) "at least one of [its] members possesses standing to sue in his or her own right," <u>United States v.</u> <u>AVX Corp.</u>, 962 F.2d 108, 116 (1st Cir. 1992), (ii) "the interests at stake are germane to the organization's purpose," and (iii) "neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." <u>Friends of the Earth, Inc. v. Laidlaw Envtl.</u> <u>Servs. (TOC), Inc.</u>, 528 U.S. 167, 169 (2000).

Here, despite an initial challenge,[18] there is no real dispute that the Associations may assert the economic injuries of its commercial fishing members.

---

[18] Defendants and Vineyard Wind initially asserted that the Alliance lacked standing to bring claims on behalf of its members where it had not identified any members with Article III standing. Defendants and Vineyard Wind withdrew this argument after the Alliance provided additional declarations identifying members who operate fishing vessels in the Vineyard Wind project area. <u>See</u> 1:22-cv-11172, Fed. Defs.' Reply, Doc. No. 92; 1:22-cv-11172, Intervenor's Reply 1, Doc. No. 93.

Defendants and Vineyard Wind also asserted that the Alliance lacked standing to bring claims on behalf of itself as a nonprofit trade organization. Where the Alliance has standing to raise the economic claims of its members and does not assert claims distinct from those asserted on behalf

Plaintiffs argue that Seafreeze Plaintiff LICFA can also bring claims of noneconomic injury on behalf of LICFA member David Aripotch. 1:22-cv-11091, Pls.' Opp'n 12-14, Doc. No. 90. Defendants and Vineyard Wind challenge LICFA's standing to assert the environmental injuries of its members where it has not demonstrated environmental issues are germane to its purpose. 1:22-cv-11091, Fed. Defs.' Opening Mem. 8, Doc. No. 73; Fed. Defs.' Reply 2, Doc. No. 93; Intervenor's Opening Mem. 6-7, Doc. No. 87.

Here, LICFA has not demonstrated that the interests at stake–Aripotch's interests in observing right whales and marine life–are germane to LICFA's purpose of supporting fisheries management. See Friends of the Earth, 528 U.S. at 169. Accordingly, LIFCA does not have associational standing to assert any of Aripotch's injuries based on the aesthetic and spiritual pleasures he derives from fishing.

### 3. ESA (Seafreeze, 9th, 10th Claims for Relief; Responsible Count 3)

Plaintiffs assert that Defendants violated the ESA, where (i) NMFS failed to consider the cumulative effects of the Project on endangered species or their habitat, 1:22-cv-11091, Complaint, 9th Claim for Relief, Doc. No. 1; (ii) NMFS failed to inform BOEM of alternatives to the approved Project that would avoid harming endangered species, id., 10th Claim for Relief; and (iii) Defendants violated the ESA by approving the COP and Corps' pollutant discharge permit without a valid biological opinion in place, 1:22-cv-11172, Complaint, Count 3, Doc. No. 1.

---

of its members, the court need not address whether the Alliance has standing based on its status as a nonprofit trade organization. See Horne v. Flores, 557 U.S. 433, 446-47 (2009).

The citizen-suit provision of the ESA grants "any person" the authority to commence a civil suit to enforce a violation of any provision of the ESA. 16 U.S.C. § 1540 (g)(1). But this "authorization of remarkable breadth," does not obviate Plaintiffs' obligations under Article III of the Constitution to establish standing. Bennett v. Spear, 520 U.S. 154, 162-164 (1997).

Taking Plaintiffs' claims in turn, the Seafreeze Plaintiffs allege that NMFS violated its obligations under Section 7 of the ESA and attendant regulations in issuing the 2020 BiOp without (i) considering the cumulative effects of the Project on endangered species, and (ii) without informing BOEM of alternatives that would avoid harming endangered species. Vineyard Wind asserts that Plaintiffs lack standing to bring claims against the superseded Biological Opinion where they have not demonstrated any injury flowing from it, let alone established causation or redressability. 1:22-cv-11091, Intervenor's Opening Mem. 8, Doc. No. 87. As discussed above, considering the evidence in the light most favorable to the Plaintiffs, Plaintiffs or their members may lose some revenue if the Commercial Fishing Entities (or Seafreeze Shoreside's suppliers) reduce their trawling for squid as a result of the construction and operation of the Project but they have shown no noneconomic harm. Plaintiffs have not demonstrated their particularized injury is in any way connected to the Project's impact on any endangered species. They also have not shown that they are the object of any action taken under the ESA consultation process, nor that they are the object of any other challenged agency action under the ESA connected to the Project. Nor do they have a demonstrated interest in the direct agency action related to the ESA.[19]

---

[19] Defendants argue that if the Seafreeze Plaintiffs have standing to assert their 9th and 10th Claims for Relief challenging NMFS' actions as part of the 2020 BiOp process, such challenge would still be moot. See 1:22-cv-11091, Fed. Defs.' Reply 38-39, Doc. No. 93. The court agrees

Similarly, although the Alliance alleges that both BOEM and the Corps permitted actions without satisfying the requirements of the ESA, see 1:22-cv-11172, Plaintiff's Opposition 24-25, Doc. No. 77, the Alliance has only offered evidence to support that their members may lose some revenue as a result of the construction and operation of the Project.

The relationship between the unquantified economic harm Plaintiffs will suffer as a result of the Project's possible physical impacts on Plaintiffs' preferred trawl fishing area, and the agency actions Plaintiffs are challenging—which are general procedural aspects of the 2020 biological consultation process undertaken pursuant the ESA—is too attenuated to support either that Plaintiffs have demonstrated an appropriately particularized injury-in-fact or causation under Article III's standing requirements.

"Establishing causation in the context of a procedural injury requires a showing of two causal links: one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury."

---

where Plaintiffs challenge procedural defects in the 2020 BiOp, and seek declaratory and injunctive relief, but do not raise those challenges to the operative 2021 BiOp. Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (courts cannot "'declare principles or rules of law which cannot affect the matter in issue in the case before it'" (quoting Mills v. Green 159 U.S. 651, 653 (1895)); Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1114 (10th Cir. 2010) (concluding that environmental challenge was moot where complaint did not challenge superseding biological opinion). Defendants likewise challenges the Alliance's remaining ESA claim as moot where the Alliance likewise seeks declaratory relief in conjunction with its challenge that BOEM and the Corps improperly proceeded with approval of the COP and issuance of the Section 404 Permit without a valid biological opinion given the agency issued a superseding biological opinion shortly thereafter, which Plaintiffs do not challenge. The court agrees with Defendants as to the Alliance's remaining ESA claim as well. Accordingly, if the mootness inquiry should occur first, the court lacks jurisdiction to decide Plaintiffs' pending ESA claims where they are moot.

See Ctr. for Bio. Div. v. EPA, 861 F.3d 174, 184 (D.C. Cir. 2017) (quotations omitted). An agency's procedural omission is necessary but not sufficient to establish standing. Cf. Ctr. for Bio. Div., 861 F.3d at 183-86 (holding association had established standing where it demonstrated that the EPA's failure to conduct an "effects determination" or ESA Section 7 consultation created a demonstrable risk to the endangered species in which the association's member established a demonstrable interest). Instead, a plaintiff must also show the procedural step was connected to the substantive result.

Here, Plaintiffs have not shown their alleged procedural deficiencies were connected to (i) their alleged injuries or (ii) any substantive result, where they challenge only decisions undertaken during the 2020 biological consultation process and not the 2021 BiOp from which all agency actions flowed.[20]

Accordingly, where Plaintiffs lack standing to assert the remaining ESA claims, Plaintiffs' Motions are denied and Defendants' and Vineyard Wind's Motions are granted.

---

[20] The Alliance's claims suffer from additional defects that would prevent consideration on the merits. First, the Alliance's claim requires the court to accept the unsupported fact that the 2020 BiOp was "inadequate," and thus, could not be relied upon for any purpose, resulting in BOEM and the Corps adopting actions without having conducted consultation as required under ESA Section 7. See 1:22-cv-11172, Pl.'s Opp'n 24-25, Doc. No. 77. But the Record demonstrates instead that (1) the 2020 BiOp was not deemed inadequate, invalid, or otherwise unreliable for any purpose, (2) reinitation of consultation was limited to discrete issues, (3) BOEM approved the COP on July 15, 2021, under numerous express conditions, including any terms and conditions and reasonable and prudent measures stemming from the reinitiated consultation, see COP Approval Letter, BOEM_077150 at -7152; see also 1:22-cv-11172, Memorandum and Order 15-19, Doc. No. 104, and (4) the Corps also imposed conditions on its approval, including adherence to the then-in-effect biological opinion and any subsequently issued biological opinion. See 2021 BiOp, BOEM_0077276 at -7282; Joint ROD, BOEM_ 0076799 at -6844. Accordingly, the Alliance has not pointed to some procedural requirement that was left unsatisfied where BOEM approved the COP and the Corps issued a Section 404 Permit pending the results of a reinitiated biological consultation.

C.      **Zone of Interest**

*1.      Relevant Law*

For Plaintiffs to establish standing under the APA, they must demonstrate they have been "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; see also CSL Plasma Inc. v. U.S. Customs and Border Prot., 33 F.4th 584, 588 (D.C. Cir. 2022). The "zone of interests" test is "a limitation on the cause of action for judicial review conferred by the [APA.]" Lexmark Int'l., Inc. v. Static Control Components, Inc., 572 U.S. 118, 129 (2014). As such, a court "ask[s] whether [plaintiff] has a cause of action under the statute." Id. at 128. "'The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision.'" Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 29 (1st Cir. 2007) (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987)). "[T]he test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke, 479 U.S. at 399.

*2.      National Environmental Policy Act (Seafreeze, 23rd, 24th, 25th, 26th, 27th, 28th, 29th, 30th, 31st, 32nd, 33rd Claims for Relief, Responsible, Count 4)*

Defendants and Vineyard Wind assert that the NEPA claims cannot survive where Plaintiffs' only asserted interests are economic. See 1:22-cv-11091, Fed. Defs.' Reply 1-3, Doc. No. 93; 1:22-cv-11172, Fed. Defs.' Reply 2-3, Doc. No. 92; 1:22-cv-11091, Intervenor's Reply, Doc. No. 94; 1:22-cv-11172, Intervenor Reply 2-4, Doc. No. 92. NEPA was enacted "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321; see also Nev. Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993). Numerous courts have thus concluded that a

plaintiff who asserts purely economic injuries does not come within NEPA's zone of interests. Nev. Land Action Ass'n, 8 F.3d at 716; see also Gunpowder Riverkeeper v. FERC, 807 F.3d 267, 274 (D.C. Cir. 2015); Am. Waterways Operators v. U.S. Coast Guard, 613 F. Supp. 3d 475, 486-87 (D. Mass. 2020) (collecting cases).

Such is the case here for the Commercial Fishing Entities and Seafreeze Shoreside, who each only asserts economic injuries. Similarly, where each of the Plaintiff Associations predicate injuries on the economic impact of the Project to their members, the Plaintiff Associations likewise lack statutory standing for their NEPA claims.

Plaintiffs argue that they have stated environmental injuries that will have economic impact, including that the Project will make Old Squaw Fisheries unable to fish in the Lease Area, and that this is sufficient to come within NEPA's zone of interests. 1:22-cv-11091, Pls.' Opp'n 3-4, Doc. No. 90. They contend that Defendants rely on case law involving purely economic injuries, see 1:22-cv-11091, Pls.' Opp'n 3-4, Doc. No. 90 (discussing Am. Waterways Operators, 613 F. Supp. 3d at 486-87 and Gunpowder Riverkeeper, 807 F.3d at 274), and that such cases are inapplicable here, where Plaintiffs have asserted environmental harms that will cause economic injury, id. (citing Monsanto, 561 U.S. at 155). However, the plaintiff farmers in Monsanto based their standing on a claim that an environmental harm (a potential genetic mutation from the defendant's products) could harm their alfalfa crop and ultimately impact their livelihoods. The Court left undisturbed the district court's unchallenged conclusion that plaintiffs fell within NEPA's zone of interests because the risk the genetically modified gene at issue would "infect conventional and organic alfalfa is a significant environmental effect within the meaning of NEPA." Monsanto, 561 U.S. at 155.

Here, by contrast, Plaintiffs have not put forth competent evidence as to an environmental injury, or even an environmental harm that would impact their fishing. Instead, where the gist of their claim is that the physical impediment the Project poses will limit their trawling, Plaintiffs' argument fails.

Accordingly, the court denies the Seafreeze and Responsible Plaintiffs' Motions and grants Defendants and Intervenor's Motions as to Plaintiffs' NEPA claims.

3.   *Marine Mammal Protection Act (Seafreeze, 22nd Claim for Relief; Responsible Count 5)*

Vineyard Wind challenges Plaintiffs' ability to bring claims challenging the Incidental Harassment Authorization permit issued by NMFS under the MMPA where Plaintiffs have not asserted any environmental injuries. The MMPA was adopted by Congress to promote marine mammal conservation. See 16 U.S.C. § 1361; City of Sausalito v. O'Neill, 386 F.3d 1186, 1202-03 (9th Cir. 2004).

Here, Plaintiffs assert violations of the APA and MMPA pertaining to the issuance of the IHA to Vineyard Wind for taking by harassment of right whales. But Plaintiffs have not asserted any cognizable interest in right whales, or any marine mammals for that matter. While the test for prudential standing is not "especially demanding," Lexmark, 572 U.S. at 130 (quotations omitted), Plaintiffs have not demonstrated any interests that fall within the most generous reading of the zone of interests for the MMPA. Accordingly, Plaintiffs' claims fall outside of the zone of interests of the MMPA and cannot proceed. Thus, as to Plaintiffs' MMPA claims, the court denies the Seafreeze and Responsible Plaintiffs' Motions for Summary Judgment and grants Defendants and Intervenor's Motions.

IV.    **Plaintiffs' Clean Water Act Claims (Seafreeze, 17th Claim for Relief; Responsible, Count 2)**

Plaintiffs assert that the Corps' issuance of Section 404 Permit under the CWA was arbitrary and capricious where it violated CWA regulations.[21] Both complaints allege that the Corps' failed to analyze alternatives to the Project. 1:22-cv-11172, Compl. Counts 2.2, 2.3, Doc. No. 1; 1:22-cv-11091, Compl. 17th Claim for Relief, Doc. No. 1. The Alliance additionally claims that the Corps failed to consider the cumulative impact of the Project and future similar Projects. 1:22-cv-11172, Compl. Counts 2.4, Doc. No. 1; 1:22-cv-11172, Pl.'s Opening Mem. 27-33, Doc. No. 53.[22]

A.  **Practicable Alternatives – (Responsible, Counts 2.2, 2.3, Seafreeze, 17th Claim for Relief[23])**

The Alliance claims that in issuing the Section 404 Permit, Defendants violated their own regulations concerning practicable alternatives by failing to analyze less damaging alternatives to the Vineyard Wind Project. 1:22-cv-11172, Pl.'s Opening Mem. 28-29, Doc. No. 53.

Section § 230.10(a) prohibits (except in circumstances not at issue here) the discharge of dredged or fill materials "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not

---

[21] Section 404 Permits allow for the discharge of dredged or fill materials into navigable waters at specified disposal sites. 33 U.S.C. § 1344.

[22] The Parties debate whether Plaintiffs waived their argument that the Section 404 Permit was flawed where the notice and Permit application reflected a corridor length of 23.3 miles, not the actual 39.4 mile length of the corridor. 1:22-cv-11172, Fed. Defs.' Opening Mem. 33-34, Doc. No. 60; 1:22-cv-11172, Pl.'s Opening Mem. 24-25, Doc. No. 53. However, where that alleged error was raised by the Alliance only in its summary judgment briefing, and not in its Complaint, the claim is not properly before the court.

[23] The Seafreeze Plaintiffs do not independently brief this issue, instead incorporating the Alliance's briefing by reference.

have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Defendants

assert that the Corps considered various other alternatives, "including: (a) the no-action

alternative; (b) a largely land-based alternative; (c) alternatives that would bring the cable on

shore in a different location; (d) two off-site alternatives in other zones of the ocean; and (e)

seven different on-site alternatives." 1:22-cv-11172, Fed. Defs.' Opening Mem. 39, Doc. No. 60

(citing USACE AR 011451-52, 011471-73). The Alliance acknowledges that the Corps did

consider other alternatives and it does not argue that any of these alternatives should have been

selected. 1:22-cv-11172, Pl.'s Opp'n 23, Doc. No. 77.

Instead, the Alliance argues that the Corps' analysis violated its regulations. Id. at 24. The

Alliance's arguments do not withstand scrutiny. First, the Alliance contends that there is a three-

step analysis that the Corps must conduct: it must assess off-site alternatives; then, if none are

available, it must try to modify the project to minimize impacts; finally, if the project cannot be

modified to avoid impacts, it must determine mitigation measures. 1:22-cv-11172, Pl.'s Opening

Mem. 29, Doc. No. 53 (citing 40 C.F.R. §§ 230.10(a)(2)). But the cited regulation says no such

thing.

Then the Alliance contends that 40 C.F.R. § 230.10(a)(3) requires "the Corps to presume

that practicable alternatives exist[.]" 1:22-cv-11172, Pl.'s Opening Mem. 29, Doc. No. 53. The

Alliance reasons that the Project "is not water dependent" because it does not require "access or

proximity to . . . the special aquatic site in question to fulfill its basic purpose," and argues that

"when a project does not require any access or proximity to an aquatic site," the Corps must

"rebut the presumption that there are less practicable alternatives with less adverse

environmental impact." Id. (citing 40 C.F.R. §§ 230.10(a)(3)). But as Defendants point out, the

Alliance's argument relies on a misreading of the regulations, including failing to recognize that

§ 230.10(a)(3)'s presumption applies only to "special aquatic sites,"[24] and that where the Vineyard Wind Project will not be placed in a "special aquatic site," the presumption is inapplicable, and the Alliance's claim must fail. 1:22-cv-11172, Fed. Defs.' Opening Mem. 37-38, Doc. No. 60.

Consequently, Plaintiffs have failed to demonstrate how the regulation purportedly requiring consideration of alternatives and a presumption that practicable alternatives exist was violated here. Nor have they made other arguments, independent of the cited regulation, that would have obligated Defendants to consider other alternatives beyond what was done.

As a result, Plaintiffs' claims that Defendants failed to consider practicable alternatives fails.

### B.  Cumulative Impacts (Responsible, Count 2.4)

The Alliance claims that the Corps failed to consider the cumulative impacts of the Vineyard Wind Project and other future projects under 40 C.F.R. § 230.11(g),[25] where discussion of cumulative impacts from this Project and similar future projects is absent from the Joint ROD. 1:22-cv-11172, Pl.'s Opening Mem. 31-32, Doc. No. 53. The Alliance argues further that the Corps cannot rely on the EIS for its cumulative effects analysis, on the ground that the Final EIS is also deficient and fails to provide this discussion. Id. at 32.

---

[24] As summarized by Defendants, "[s]pecial aquatic sites are sanctuaries, refuges, wetlands, mud flats, vegetated shallows, coral reefs and riffle pools." 1:22-cv-11172, Fed. Defs.' Opening Mem. 38, Doc. No. 60 (citing 40 C.F.R. §§ 230.40 to 230.45; 40 C.F.R. § 230.3(m)).

[25] Under 40 C.F.R. § 230.11(g)(2), "cumulative effects attributable to the discharge of dredged or fill material in the waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem."

35

Defendants respond first that, under 40 C.F.R. § 230.11(g), the Corps' required cumulative impact analysis is limited to the 23.3 miles of cable corridor[26] covered by the CWA permit. Where the regulations at issue apply only to the length of corridor permitted under the CWA regulations (i.e. the 23.3 mile corridor), Defendants are correct.

Defendants argue next, that the Alliance has not explained how future projects would cause impacts along the 23.3 mile corridor that Defendants failed to consider, and that the Corps complied with § 230.11(g) in considering cumulative impacts to the 23.3 mile corridor. Defendants detail that the Corps both relied on cumulative impacts analysis performed as part of the NEPA review and independently considered cumulative impacts that other wind projects in the area would cause. 1:22-cv-11172, Fed. Defs.' Opening Mem. 42-44, Doc. No. 60 (citing USACE AR 011471 ("reasonably foreseeable activities within the larger overall wind lease area were considered to account for potential cumulative effects.")); Fed. Defs.' Reply 11, Doc. No. 92. Where the Alliance has not pointed to (i) authority suggesting that the Corps cannot rely on analysis performed during NEPA review or (ii) specific cumulative impacts not considered as part of the NEPA or CWA review, Defendants' arguments are well-taken.

At its core, the Alliance is contending that the Corps should have done more to satisfy its own regulations. The Alliance must meet a high bar to challenge an agency's interpretation of its own regulations. See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658

---

[26] There are also two disputes concerning this figure: first, Plaintiffs appear to challenge impacts beyond the 23.3 miles considered under the CWA. Where those challenges are not based on any agency action or lack of action (i.e. Plaintiffs are not challenging the Rivers and Harbors Permit, nor are they arguing the CWA considered an overly narrow area) they fail. Second, Plaintiffs raise, for the first time, that in two public notices, the Corps improperly omitted the total corridor length. This argument is entirely without merit as the Corps detailed the area to be considered under the CWA, and other documents connected to the Project review detailed total figures.

(2007) (vacatur is proper only where the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). The Alliance has failed to make this showing.

Accordingly, Plaintiffs' Motions for Summary Judgment as to the CWA claims are denied and Defendants' and Vineyard Wind's Motions are granted where certain claims were waived, and as to those remaining claims, Plaintiffs have not shown show any actions on the part of Defendants were arbitrary, capricious, or otherwise unlawful.

## V.  Plaintiffs' Outer Continental Shelf Lands Act Claims[27]

### A.  Smart from the Start (Seafreeze, 1st, 2nd, and 3rd Claims for Relief)

#### 1.  Background

On November 23, 2010, the Department of Interior issued a press release which announced the "Smart from the Start" Initiative, designed to "speed offshore wind energy development." 1:22-cv-11091, Joint SOF ¶ 18, Doc. No. 106 (citing U.S. Dep't of Interior Press Release). In the press release, BOEM announced that it was "proposing a revision to its regulations that will simplify the leasing process of offshore wind in situations where there is only one qualified and interested developer." Id. at 19. On May 16, 2011, BOEM adopted a final rule pertaining to non-competitive leases on the Outer Continental Shelf that may utilize pre-

---

[27] In their summary judgment briefing, the Seafreeze Plaintiffs assert for the first time that BOEM violated OCSLA in approving the Vineyard Wind Site Assessment Plan. Where this claim is absent from the Complaints, it is not properly before the court, and Plaintiffs' Motions for Summary Judgment fail as to that previously unasserted claim.

existing facilities. 76 Fed. Reg. 28,178 (May 16, 2011). On February 6, 2012, in addition to publishing a Call for Information and Nominations for wind energy projects on the Outer Continental Shelf, BOEM published a notice concerning ongoing efforts to develop wind energy consistent with the "Smart from the Start" Initiative. 77 Fed. Reg. 5830 (Feb. 6, 2012).

### 2.  *Plaintiffs' Challenge*

The Seafreeze Plaintiffs allege the "Smart from the Start" Initiative was a change in regulatory policy which violates the APA and OCSLA for various reasons, including that (1) the Initiative was not promulgated through notice-and-comment rulemaking, and (2) the subsequent application of the Initiative was impermissible, because of the lack of notice-and-comment at various stages of the Vineyard Wind review process.[28]

Defendants respond that the "Smart from the Start" Initiative–which Plaintiffs define as a "policy" adopted in 2010 and 2011 press releases–is not a reviewable agency action. They argue further that, in any event, even if the 2011 press release and initiative could be challenged as an agency action, such challenge would be time barred. 1:22-cv-11091, Fed. Defs.' Opening Mem. 8-9, Doc. No. 73; 1:22-cv-11091, Fed. Defs.' Reply 21, Doc. No. 93. Vineyard Wind additionally asserts that (i) Plaintiffs' Complaint ¶ 55, 1:22-cv-11091, Doc. No. 1, challenges only 76 Fed. Reg. 28,178, a regulation pertaining to non-competitive leasing (which the process for OCS-A 0501 was not), and (ii) nothing in the Record demonstrates that the "Smart from the Start" Initiative was applied to the relevant Environmental Assessment or the EIS prepared in

---

[28] The Seafreeze Plaintiffs also brought a claim pertaining to the "Smart from the Start" Initiative under the APA and NEPA. See 1:22-cv-11091, Compl. 24th Claim for Relief, ¶¶ 286-293, Doc. No. 1. Where Plaintiffs lack standing to bring claims under NEPA, the court does not reach this claim.

connection with the Vineyard Wind Project. 1:22-cv-11091, Intervenor's Reply 7-8, Doc. No. 94.[29] The court need not reach whether the "Smart from the Start" Initiative was a final agency action where Plaintiffs' challenges are time barred.

Under 28 U.S.C. § 2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Here, the "Smart from the Start" Initiative was announced in 2010; a final rule pertaining to non-competitive leaves was issued in 2011; and BOEM published a notice concerning ongoing efforts to develop wind energy consistent with the "Smart from the Start" Initiative in 2012. The two actions here were filed more than nine years later, in December 2021 and January 2022.

Plaintiffs contend the statute of limitations does not apply to *ultra vires* actions. 1:22-cv-11091, Pls.' Opening Mem. 19-20, Doc. No. 67 (citing La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)). To the extent Plaintiffs are arguing that there is no statute of limitations applicable to such actions, they are incorrect. Louisiana Public Service Commission does not instruct otherwise.

Next, Plaintiffs contend their challenge is not time barred where it "'arises in response to application of the [agency action] to the challenger[.]'" 1:22-cv-11091, Pls.' Opp'n 33-34, Doc. No. 90 (quoting Rodriguez v. United States, 852 F.3d 67, 82 (1st Cir. 2017)). The statute of limitations to challenge illegal agency actions may be tolled until it is applied to a challenger.

---

[29] Vineyard Wind also challenges the Seafreeze Plaintiffs' standing to bring claims concerning the "Smart from the Start" Initiative. 1:22-cv-11091, Intervenor's Reply 7-8, Doc. No. 94. Where the Seafreeze Plaintiffs have asserted economic injuries caused by the application of the "Smart from the Start" Initiative to BOEM's subsequent leasing and approval decisions under OCSLA, the court considers the statute of limitations defense first.

See Aguayo v. Jewell, 827 F.3d 1213, 1226 (9th Cir. 2016). However, Plaintiffs have not demonstrated that the "Smart from the Start" Initiative was applied to any aspect of the Vineyard Wind Project, let alone that it was applied to Plaintiffs. Although Plaintiffs contend BOEM's issuance of the Vineyard Wind Lease, publication of the Final EIS, issuance of the ROD, and approval of the COP were each "later" applications of the "Smart from the Start" Initiative, some of which they contend make their challenge timely, Plaintiffs offer no evidence to demonstrate the "Smart from the Start" Initiative was applied in any of those phases of the Project review process. Where they have not offered evidence that the "Smart from the Start" Initiative was applied to the Vineyard Wind Project, their tolling argument fails.

Accordingly, the Seafreeze Plaintiffs' challenge to the "Smart from the Start" Initiative is time-barred.[30] As to the Seafreeze Plaintiffs' First, Second,[31] and Third Claims for Relief, the Seafreeze Plaintiffs' Motion for Summary Judgment is denied and Defendants' and Vineyard Wind's Motions for Summary Judgment are granted.

### B.  Violations of 43 U.S.C. § 1337(p)(4)

Both the Seafreeze Plaintiffs and the Alliance assert that BOEM violated OCSLA in numerous phases of the Vineyard Wind Project by failing to ensure it met the majority of the twelve goals enumerated under § 1337(p)(4). 1:22-cv-11091, Pls.' Opening Mem. 25-26, Doc.

---

[30] Although Plaintiffs assert that their claims challenging the application of the "Smart from the Start" Initiative implicates the major questions doctrine, where their APA/OCSLA claims pertaining to the "Smart from the Start" Initiative are time-barred, and their NEPA claims have been dismissed for want of standing, the court is without jurisdiction to consider Plaintiffs' further arguments as to these claims.

[31] The Seafreeze Plaintiffs' Second Claim for Relief as it pertains to their claim that BOEM did not consider the requisite factors under 43 U.S.C. § 1337(p)(4) in issuing the Lease is addressed below.

No. 67; 1:22-cv-11172, Pl.'s Opening Mem. 13, Doc. No. 53 (incorporating the Seafreeze

Plaintiffs' arguments pertaining to OCSLA by reference). Defendants contend that Plaintiffs'

claims are deficient in numerous respects and that, in any event, Defendants' actions are entitled

to deference. The court considers each of the challenged actions in turn below.

      1.  *Vineyard Wind Lease (Seafreeze 2nd Claim for Relief)*

Plaintiffs contend that BOEM's issuance of the Lease violated OCSLA's substantive

requirements under § 1337 and EPA's procedural requirements under 40 C.F.R. § 1501.3(a)

where BOEM prepared an Environmental Assessment but failed to prepare an Environmental

Impact Statement for the Lease issuance; and BOEM did not otherwise consider the factors

enumerated in § 1337 when issuing the Vineyard Wind Lease. 1:22-cv-11091, Pls.' Opening

Mem. 19-26, Doc. No. 67.

Defendants assert that challenges to the issuance of the Vineyard Wind Lease and the

Environmental Assessment BOEM prepared in connection with the Lease issuance are time

barred. The court agrees. Under 28 U.S.C. § 2401(a), except in the case of contract disputes not

at issue here, "every civil action commenced against the United States shall be barred unless the

complaint is filed within six years after the right of action first accrues." The Lease was effective

April 1, 2015. The first of these actions was not commenced until December 15, 2021. As

discussed <u>supra</u>, Plaintiffs' sole argument that the action is not time barred–that actions which

are "*ultra vires*" can be challenged at any time – has no legal support. Accordingly, the Seafreeze

Plaintiffs' Motion for Summary Judgment is denied and Defendants' and Vineyard Wind's

Motions for Summary Judgment are granted as to the Seafreeze Plaintiffs' challenges to the

issuance of the Vineyard Wind Lease as violating the OCSLA.

2.  *Approval of the COP (Seafreeze, 5th Claim for Relief; Responsible, Count 1.1, 1.2, and 1.7)*

Plaintiffs argue that, as a matter of statutory construction, 43 U.S.C. § 1337(p)(4) imposes certain non-negotiable requirements that Defendants failed to provide for in consideration of the Vineyard Wind COP. 1:22-cv-11091, Pls.' Opening Mem. 25-27, Doc. No. 67; 1:22-cv-11172, Pl.'s Opening Mem. 13-15, Doc. No. 53 (adopting the Seafreeze Plaintiffs' arguments); Pl.'s Opp'n 17-19, Doc. No. 77 . Defendants respond that § 1337 commits discretion to the Secretary of the Interior to ensure these criteria are appropriately balanced, and that, as a result, the Secretary's determinations are entitled to deference, and, in any event, that Defendants complied with OCSLA in approving the COP. 1:22-cv-11091, Fed. Defs.' Opening Mem. 35-36, Doc. No. 73.

Under OCSLA, the Secretary of the Interior may, in consultation with other agencies, grant leases, easements, or other rights of way on the Outer Continental Shelf for the purpose of renewable energy production. 43 U.S.C. § 1337(p)(1)(c). Section 1337(p)(4), entitled "Requirements," provides:

> The Secretary [of the Interior] shall ensure that any activity under this subsection is carried out in a manner that provides for–
>
> (A)   safety;
>
> (B)   protection of the environment;
>
> (C)   prevention of waste;
>
> (D)   conservation of the natural resources of the outer Continental Shelf;
>
> (E)   coordination with relevant Federal agencies;
>
> (F)   protection of national security interests of the United States;
>
> (G)   protection of correlative rights in the outer Continental Shelf;
>
> (H)   a fair return to the United States for any lease, easement, or right-of-way under this subsection;

42

(I)     prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;

(J)     consideration of—

     i.     the location of, and any schedule relating to, a lease, easement, or right-of-way for an area of the outer Continental Shelf; and

     ii.    any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;

(K)    public notice and comment on any proposal submitted for a lease, easement, or right-of-way under this subsection; and

(L)    oversight, inspection, research, monitoring, and enforcement relating to a lease, easement, or right-of-way under this subsection.

43 U.S.C. § 1337(p)(4).

Plaintiffs argue that where this Section is titled "Requirements" and states that the Secretary "shall ensure" that activity is carried out in a manner that provides for the twelve enumerated grounds, Defendants are required to ensure that each of those criteria are met. Plaintiffs argue that in approving the COP Defendants did not provide for (A) safety, and (I) interference with reasonable uses of the OCS, specifically, fisheries' use.[32] See 1:22-cv-11091, Pls.' Opp'n 20, Doc. No. 90. Plaintiffs rely on Almendarez-Torres v. United States, 523 U.S. 224 (1998) and National Association of Home Builders v. Defs. of Wildlife, 551 U.S. 644 (2007), however, neither Almendarez-Torres nor National Association of Home Builders directs the result Plaintiffs seek.

---

[32] Plaintiffs also asserted challenges as to (B) protection of the environment; (D) conservation of natural resources; and (F) protection of national security. 1:22-cv-11091, Compl. 5th Claim for Relief, Doc. No. 1; 1:22-cv-11172, Compl. Count 1, Doc. No. 1. However, Plaintiffs have not established standing as to these challenges. Specifically, as discussed supra, Plaintiffs offer no evidence to support their standing to bring claims on behalf of marine species, natural resources, or national security issues.

43

First, it is true that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." Almendarez-Torres, 523 U.S. at 234 (internal citations omitted). But consideration of the section heading does not resolve the dispute here which centers on how the agency determines whether each of the enumerated "Requirements" is satisfied, not whether they are requirements at all.

Second, although Plaintiffs are correct that "shall" should be construed as mandatory, Plaintiffs are incorrect that the word mandates their preferred outcome here. While National Association of Home Builders certainly dictates that "shall" means the statutory directive is not discretionary, it also recognizes that, in considering whether the enumerated factors have been satisfied in the statute at issue, the agency must necessarily exercise some discretion. 511 U.S. at 671 ("While the EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out § 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list."). The Secretary still retains some discretion in considering whether the enumerated statutory criteria have been satisfied, even where the statute does not state so expressly.

Such is the case here. Plaintiffs advocate that each enumerated criterion must be satisfied to its absolute maximum, without the discretion functionally necessary for the Secretary to determine what each criterion requires, both generally and as to a given proposal, and how to ensure each criterion is met, and not to the detriment of the other criteria.

Commonwealth of Massachusetts v. Andrus, 594 F.2d 872 (1st Cir. 1979), cuts directly against Plaintiffs' argument (despite their contention otherwise). In Andrus, the First Circuit considered the following language:

44

**Add. 00044**

> [T]his subchapter shall be construed in such a manner that the character of the
> waters above the outer Continental Shelf as high seas and the right to
> navigation and fishing therein shall not be affected.

43 U.S.C. § 1332(2). The plaintiffs in Andrus argued that this language "imposes a duty on the

Secretary to see that mining and drilling are conducted absolutely without harm to fisheries." 594

F.2d at 888. However, prior interpretations of the provision concluded that it was "directed at the

legal right to fish rather than at prohibiting physical impediments." Id. at 889. Against this

backdrop, the First Circuit concluded that Section 1332(2) placed on the Secretary a duty to see

that offshore drilling activities were conducted "without unreasonable risk to the fisheries." Id.

Moreover, the First Circuit recognized in Andrus that Congress knew that oil and gas

development would have an impact on fisheries, but that "the concept of balance rules out a

policy based on sacrificing one interest to the other." Id. at 889. Balance is similarly required

here, where Congress has recognized the importance of leasing on the Outer Continental Shelf in

support of energy projects, and, specifically enumerated twelve factors to be provided for,

including the "prevention of interference with reasonable uses (as determined by the Secretary)

of the exclusive economic zone, the high seas, and the territorial seas[.]" 43 U.S.C.

§ 1337(p)(4)(I).

Plaintiffs contend that Andrus rejected the wholesale destruction of a fishery, which they

claim is the case here, 1:22-cv-11091, Pls.' Opp'n 22, Doc. No. 90 (citing Joint ROD,

BOEM_0076837 reflecting that the area will "likely…be abandoned by commercial fisheries"),

but, as the court held in its Memorandum and Order, 1:22-cv-11091, Doc. No. 137, on Plaintiffs'

motions to strike, the language on which Plaintiffs rely for the proposition that the Area will be

abandoned is a mere clerical error in the Administrative Record that has since been corrected by

the Corps. Where Plaintiffs do not offer other evidence of the complete destruction of fisheries in the OCS, their argument fails.

Beyond their statutory challenge, Plaintiffs contend that the Secretary, in fact, did not provide for safety or prevention of interference with reasonable uses as required by 43 U.S.C. § 1337(p)(4) in approving the COP. However, where Plaintiffs point only to the impact to fishing operations as reflected in since-corrected misstatements to the Record that the court has since concluded were clerical errors, Plaintiffs' challenges to the COP approval as arbitrary and capricious and in violation of OCSLA are entirely without merit.

Accordingly, as to Plaintiffs' challenge to the approval of the COP as violating OCSLA, Plaintiffs' Motions for Summary Judgment are denied and Defendants' and Vineyard Wind's Motions for Summary Judgment are granted.

### 3. Temporary Withdrawal and Resumption of COP Review (Seafreeze Plaintiffs' 4th Claim for Relief)

Plaintiffs alleges that BOEM lacked authority to restart review of the COP after suspending it at Vineyard Wind's request, and that BOEM's decision to restart review was *ultra vires*. 1:22-cv-11091, Pls.' Opening Mem. 33-34, Doc. No. 67. Plaintiffs further contend that, once BOEM resumed review of the COP, BOEM did not independently confirm Vineyard Wind's technical review of the newly selected turbines, and BOEM failed to provide a notice-and-comment period for the resumed review process, as required under NEPA and OCSLA. Id. Defendants respond that the decisions to suspend and resume review were lawful. 1:22-cv-11091, Fed. Defs.' Opening Mem. 17-18, Doc. No. 73. Defendants further note that the requisite notice-and-comment periods were previously satisfied under both NEPA and OCSLA, and Vineyard Wind's technical review of the newly proposed turbines reflected that the turbine fit within the parameters and design envelope previously considered in the Supplemental Draft EIS

so no substantive re-review was required by the agencies. 1:22-cv-11091, Fed. Defs.' Opening Mem. 17-18, Doc. No. 73 (citing BOEM_0067698-701, 0067703-04; BOEM_0067665).

The court finds Plaintiffs' arguments unpersuasive where Plaintiffs offer no authority (i) to suggest that resumption of review was subject to notice and comment, or (ii) that BOEM was without authority to suspend review and resume it. Nor have Plaintiffs shown that, even if there were some technical violation, how that violation was anything beyond harmless error where the changes made by Vineyard Wind were within the parameters already contemplated and reviewed as part of the NEPA process. See 1:22-cv-11091, Joint SOF ¶ 50, Doc. No. 106. Accordingly, Plaintiffs' Motion for Summary Judgment is denied, and Defendants' and Vineyard Wind's Motions are granted, as to the Seafreeze Plaintiffs' 4th Claim for Relief.

## VI.    Conclusion

For the foregoing reasons, Plaintiffs have not shown that Defendants acted arbitrarily, capriciously, or otherwise unlawfully. Accordingly, Defendants and Vineyard Wind's Motions for Summary Judgment, 1:22-cv-11091, Doc. Nos. 72, 86; 1:22-cv-11172, Doc. Nos. 59, 73, are GRANTED and Plaintiffs' Motions for Summary Judgment, 1:22-cv-11091, Doc. No. 66; 1:22-cv-11172, Doc. No. 52, are DENIED.

IT IS SO ORDERED

October 12, 2023                                          /s/ Indira Talwani
                                                         United States District Judge

Add. 00047

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SEAFREEZE SHORESIDE, INC., et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No. 1:22-cv-11091-IT |
| | * | |
| THE UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR, et al., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| VINEYARD WIND 1, LLC, | * | |
| | * | |
| Intervenor-Defendant. | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | * | |
| RESPONSIBLE OFFSHORE | * | |
| DEVELOPMENT ALLIANCE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 1:22-cv-11172-IT |
| v. | * | |
| | * | |
| UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR, et al., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| VINEYARD WIND 1, LLC, | * | |
| | * | |
| Intervenor-Defendant. | * | |

JUDGMENT

October 12, 2023

TALWANI, D.J.

Add. 00048

Pursuant to the court's <u>Memorandum and Order</u>, 1:22-cv-11091, Doc. No. 138; 1:22-cv-11172, Doc. No. 105, on the parties' cross-<u>Motions for Summary Judgment</u> 1:22-cv-11091, Doc. Nos. 66, 72, 86; 1:22-cv-11172, Doc. Nos. 52, 59, 73, JUDGMENT IS HEREBY ENTERED in favor of Defendants and Intervenor-Defendant and against Plaintiffs. All parties shall bear their own costs and fees. The above consolidated action CLOSED.

IT IS SO ORDERED

October 12, 2023

/s/ Indira Talwani
United States District Judge

**Add. 00049**

# 5 USCS § 701

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service > TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146) > Part I. The Agencies Generally (Chs. 1 — 10) > CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 701. Application; definitions

**(a)** This chapter [5 USCS §§ 701 et seq.] applies, according to the provisions thereof, except to the extent that—

**(1)** statutes preclude judicial review; or

**(2)** agency action is committed to agency discretion by law.

**(b)** For the purpose of this chapter [5 USCS §§ 701 et seq.]—

**(1)** "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

**(A)** the Congress;

**(B)** the courts of the United States;

**(C)** the governments of the territories or possessions of the United States;

**(D)** the government of the District of Columbia;

**(E)** agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

**(F)** courts martial and military commissions;

**(G)** military authority exercised in the field in time of war or in occupied territory; or

**(H)** functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49 [49 USCS §§ 47151 et seq.]; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix, and

**(2)** "person," "rule," "order," "license," "sanction," "relief," and "agency action" have the meanings given them by section 551 of this title [5 USCS § 551].

## History

**HISTORY:**

Sept. 6, 1966, P. L. 89-554, § 1, 80 Stat. 392; July 5, 1994, P. L. 103-272, § 5(a), 108 Stat. 1373; Jan. 4, 2011, P. L. 111-350, § 5(a)(3), 124 Stat. 3841.

# 5 USCS § 702

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service > TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146) > Part I. The Agencies Generally (Chs. 1 — 10) > CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

## History

**HISTORY:**

Sept. 6, 1966, P. L. 89-554, § 1, 80 Stat. 392; Oct. 21, 1976, P. L. 94-574, § 1, 90 Stat. 2721.

United States Code Service
Copyright © 2023 All rights reserved.

# 5 USCS § 703

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service* > *TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146)* > *Part I. The Agencies Generally (Chs. 1 — 10)* > *CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

## History

**HISTORY:**

Sept. 6, 1966, P. L. 89-554, § 1, 80 Stat. 392; Oct. 21, 1976, P. L. 94-574, § 1, 90 Stat. 2721.

United States Code Service
Copyright © 2023 All rights reserved.

# 5 USCS § 704

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146)  >  Part I. The Agencies Generally (Chs. 1 — 10)  >  CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## History

**HISTORY:**

Sept. 6, 1966, P. L. 89-554, § 1, 80 Stat. 392.

United States Code Service
Copyright © 2023 All rights reserved.

# 5 USCS § 705

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service > TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146) > Part I. The Agencies Generally (Chs. 1 — 10) > CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

## History

**HISTORY:**

Sept. 6, 1966, P. L. 89-554, § 1, 80 Stat. 393.

United States Code Service
Copyright © 2023 All rights reserved.

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service > TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146) > Part I. The Agencies Generally (Chs. 1 — 10) > CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## History

**HISTORY:**

Sept. 6, 1966, P. L. 89-554, § 1, 80 Stat. 393.

United States Code Service
Copyright © 2023 All rights reserved.

# 16 USCS § 1536

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 16. CONSERVATION (Chs. 1 — 101)  >  CHAPTER 35. ENDANGERED SPECIES (§§ 1531 — 1544)*

## § 1536. Interagency cooperation

**(a) Federal agency actions and consultations.**

**(1)**  The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this Act. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 4 of this Act [16 USCS § 1533].

**(2)**  Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

**(3)**  Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

**(4)**  Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 4 [16 USCS § 1533] or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

**(b) Opinion of Secretary.**

**(1)**

**(A)**  Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or,

subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

**(B)** In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)—

**(i)** if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth—

**(I)** the reasons why a longer period is required,

**(II)** the information that is required to complete the consultation, and

**(III)** the estimated date on which consultation will be completed; or

**(ii)** if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

**(2)** Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

**(3)**

**(A)** Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

**(B)** Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

**(4)** If after consultation under subsection (a)(2), the Secretary concludes that—

**(A)** the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

**(B)** the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

**(C)** if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972 [16 USCS §§ 1361 et seq.]

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

**(i)** specifies the impact of such incidental taking on the species,

**(ii)** specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

**(iii)** in the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 [16 USCS §§ 1361 et seq.] with regard to such taking, and

**(iv)** sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

**(c) Biological assessment.**

**(1)** To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on the date of enactment of the Endangered Species Act Amendments of 1978 [enacted Nov. 10, 1978], request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332) [42 USCS § 4332].

**(2)** Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such

action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

**(d) Limitation on commitment of resources.** After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2).

**(e) Endangered Species Committee.**

**(1)** There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

**(2)** The Committee shall review any application submitted to it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

**(3)** The Committee shall be composed of seven members as follows:

**(A)** The Secretary of Agriculture.

**(B)** The Secretary of the Army.

**(C)** The Chairman of the Council of Economic Advisors.

**(D)** The Administrator of the Environmental Protection Agency.

**(E)** The Secretary of the Interior.

**(F)** The Administrator of the National Oceanic and Atmospheric Administration.

**(G)** The President, after consideration of any recommendations received pursuant to subsection (g)(2)(B) shall appoint one individual from each affected State, as determined by the Secretary, to be a member of the Committee for the consideration of the application for exemption for an agency action with respect to which such recommendations are made, not later than 30 days after an application is submitted pursuant to this section.

**(4)**

**(A)** Members of the Committee shall receive no additional pay on account of their service on the Committee.

**(B)** While away from their homes or regular places of business in the performance of services for the Committee, members of the Committee shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in the Government service are allowed expenses under section 5703 of title 5 of the United States Code [5 USCS § 5703].

**(5)**

**(A)** Five members of the Committee or their representatives shall constitute a quorum for the transaction of any function of the Committee, except that, in no case shall any representative be considered in determining the existence of a

quorum for the transaction of any function of the Committee if that function involves a vote by the Committee on any matter before the Committee.

**(B)**  The Secretary of the Interior shall be the Chairman of the Committee.

**(C)**  The Committee shall meet at the call of the Chairman or five of its members.

**(D)**  All meetings and records of the Committee shall be open to the public.

**(6)**  Upon request of the Committee, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Committee to assist it in carrying out its duties under this section.

**(7)**

**(A)**  The Committee may for the purpose of carrying out its duties under this section hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Committee deems advisable.

**(B)**  When so authorized by the Committee, any member or agent of the Committee may take any action which the Committee is authorized to take by this paragraph.

**(C)**  Subject to the Privacy Act [5 USCS § 552a and note], the Committee may secure directly from any Federal agency information necessary to enable it to carry out its duties under this section. Upon request of the Chairman of the Committee, the head of such Federal agency shall furnish such information to the Committee.

**(D)**  The Committee may use the United States mails in the same manner and upon the same conditions as a Federal agency.

**(E)**  The Administrator of General Services shall provide to the Committee on a reimbursable basis such administrative support services as the Committee may request.

**(8)**  In carrying out its duties under this section, the Committee may promulgate and amend such rules, regulations, and procedures, and issue and amend such orders as it deems necessary.

**(9)**  For the purpose of obtaining information necessary for the consideration of an application for an exemption under this section the Committee may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents.

**(10)**  In no case shall any representative, including a representative of a member designated pursuant to paragraph (3)(G) of this subsection, be eligible to cast a vote on behalf of any member.

**(f) Promulgation of regulations; form and contents of exemption application.**  Not later than 90 days after the date of enactment of the Endangered Species Act Amendments of 1978 [enacted Nov. 10, 1978], the Secretary shall promulgate regulations which set forth the form and manner in which applications for exemption shall be submitted to the Secretary and the information to be contained in such applications.

Such regulations shall require that information submitted in an application by the head of any Federal agency with respect to any agency action include, but not be limited to—

**(1)** a description of the consultation process carried out pursuant to subsection (a)(2) of this section between the head of the Federal agency and the Secretary; and

**(2)** a statement describing why such action cannot be altered or modified to conform with the requirements of subsection (a)(2) of this section.

**(g) Application for exemption; report to Committee.**

**(1)** A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action would violate subsection (a)(2). An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5). The applicant for an exemption shall be referred to as the "exemption applicant" in this section.

**(2)**

**(A)** An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license. For purposes of the preceding sentence, the term "final agency action" means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review. Such application shall set forth the reasons why the exemption applicant considers that the agency action meets the requirements for an exemption under this subsection.

**(B)** Upon receipt of an application for exemption for an agency action under paragraph (1), the Secretary shall promptly (i) notify the Governor of each affected State, if any, as determined by the Secretary, and request the Governors so notified to recommend individuals to be appointed to the Endangered Species Committee for consideration of such application; and (ii) publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed.

**(3)** The Secretary shall within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary—

**(A)** determine that the Federal agency concerned and the exemption applicant have—

**(i)** carried out the consultation responsibilities described in subsection (a) in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2);

**(ii)** conducted any biological assessment required by subsection (c); and

**(iii)** to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d); or

**(B)** deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii).

The denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of title 5, United States Code [5 USCS §§ 701 et seq.].

**(4)** If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of title 5, United States Code [5 USCS §§ 554, 555, 556], and prepare the report to be submitted pursuant to paragraph (5).

**(5)** Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit to the Committee a report discussing—

**(A)** the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

**(B)** a summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance;

**(C)** appropriate reasonable mitigation and enhancement measures which should be considered by the Committee; and

**(D)** whether the Federal agency concerned and the exemption applicant refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

**(6)** To the extent practicable within the time required for action under subsection (g) of this section, and except to the extent inconsistent with the requirements of this section, the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of title 5, United States Code.

**(7)** Upon request of the Secretary, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Secretary to assist him in carrying out his duties under this section.

**(8)** All meetings and records resulting from activities pursuant to this subsection shall be open to the public.

**(h) Grant of exemption.**

**(1)** The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—

**(A)** it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—

**(i)** there are no reasonable and prudent alternatives to the agency action;

**(ii)** the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

**(iii)** the action is of regional or national significance; and

**(iv)** neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

**(B)** it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.

Any final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of title 5 of the United States Code [5 USCS §§ 701 et seq.].

**(2)**

**(A)** Except as provided in subparagraph (B), an exemption for an agency action granted under paragraph (1) shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action—

**(i)** regardless whether the species was identified in the biological assessment; and

**(ii)** only if a biological assessment has been conducted under subsection (c) with respect to such agency action.

**(B)** An exemption shall be permanent under subparagraph (A) unless—

**(i)** the Secretary finds, based on the best scientific and commercial data available, that such exemption would result in the extinction of a species that was not the subject of consultation under subsection (a)(2) or was not identified in any biological assessment conducted under subsection (c), and

**(ii)** the Committee determines within 60 days after the date of the Secretary's finding that the exemption should not be permanent.

If the Secretary makes a finding described in clause (i), the Committee shall meet with respect to the matter within 30 days after the date of the finding.

**(i) Review by Secretary of State; violation of international treaty or other international obligation of United States.** Notwithstanding any other provision of this Act, the Committee shall be prohibited from considering for exemption any application made to it, if the Secretary of State, after a review of the proposed agency action and its potential implications, and after hearing, certifies, in writing, to the Committee within 60 days of any application made under this section that the granting of any such exemption and the carrying out of such action would be in violation of an international treaty obligation or other international obligation of the United States. The Secretary of State shall, at the time of such certification, publish a copy thereof in the Federal Register.

**(j) Exemption for national security reasons.** Notwithstanding any other provision of this Act, the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security.

**(k) Exemption decision not considered major Federal action; environmental impact statement.** An exemption decision by the Committee under this section shall not be a major Federal action for purposes of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.): *Provided,* That an environmental impact statement which discusses the impacts upon endangered species or threatened species or their critical habitats shall have been previously prepared with respect to any agency action exempted by such order.

**(l) Committee order granting exemption; cost of mitigation and enhancement measures; report by applicant to Council on Environmental Quality.**

**(1)** If the Committee determines under subsection (h) that an exemption should be granted with respect to any agency action, the Committee shall issue an order granting the exemption and specifying the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out and paid for by the exemption applicant in implementing the agency action. All necessary mitigation and enhancement measures shall be authorized prior to the implementing of the agency action and funded concurrently with all other project features.

**(2)** The applicant receiving such exemption shall include the costs of such mitigation and enhancement measures within the overall costs of continuing the proposed action. Notwithstanding the preceding sentence the costs of such measures shall not be treated as project costs for the purpose of computing benefit-cost or other ratios for the proposed action. Any applicant may request the Secretary to carry out such mitigation and enhancement measures. The costs incurred by the Secretary in carrying out any such measures shall be paid by the applicant receiving the

exemption. No later than one year after the granting of an exemption, the exemption applicant shall submit to the Council on Environmental Quality a report describing its compliance with the mitigation and enhancement measures prescribed by this section. Such a report shall be submitted annually until all such mitigation and enhancement measures have been completed. Notice of the public availability of such reports shall be published in the Federal Register by the Council on Environmental Quality.

**(m) Notice requirement for citizen suits not applicable.**  The 60-day notice requirement of section 11(g) of this Act [16 USCS § 1540(g)] shall not apply with respect to review of any final determination of the Committee under subsection (h) of this section granting an exemption from the requirements of subsection (a)(2) of this section.

**(n) Judicial review.**  Any person, as defined by section 3(13) of this Act [16 USCS § 1532(13)], may obtain judicial review, under chapter 7 of title 5 of the United States Code, of any decision of the Endangered Species Committee under subsection (h) in the United States Court of Appeals for (1) any circuit wherein the agency action concerned will be, or is being, carried out, or (2) in any case in which the agency action will be, or is being, carried out outside of any circuit, the District of Columbia, by filing in such court within 90 days after the date of issuance of the decision, a written petition for review. A copy of such petition shall be transmitted by the clerk of the court to the Committee and the Committee shall file in the court the record in the proceeding, as provided in section 2112, of title 28, United States Code. Attorneys designated by the Endangered Species Committee may appear for, and represent the Committee in any action for review under this subsection.

**(o) Exemption as providing exception on taking of endangered species.**
Notwithstanding sections 4(d) and 9(a)(1)(B) and (C) [16 USCS §§ 1533(d), 1538(a)(1)(B), (C)], sections 101 and 102 of the Marine Mammal Protection Act of 1972 [16 USCS §§ 1361 et seq.], or any regulation promulgated to implement any such section—

   **(1)** any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

   **(2)** any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

**(p) Exemptions in Presidentially declared disaster areas.**  In any area which has been declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act, the President is authorized to make the determinations required by subsections (g) and (h) of this section for any project for the repair or replacement of a public facility substantially as it existed prior to the disaster under section 405 or 406 of the Disaster Relief and Emergency Assistance Act [42 USCS § 5171 or § 5172], and which the President determines (1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of this

section to be followed. Notwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection.

## History

**HISTORY:**

Dec. 28, 1973, P. L. 93-205, § 7, 87 Stat. 892; Nov. 10, 1978, P. L. 95-632, § 3, 92 Stat. 3752; Dec. 28, 1979, P. L. 96-159, § 4, 93 Stat. 1226; Oct. 13, 1982, P. L. 97-304, §§ 4(a), 8(b), 96 Stat. 1417, 1426; Nov. 14, 1986, P. L. 99-659, Title IV, § 411(b), 100 Stat. 3741, 3742; Nov. 23, 1988, P. L. 100-707, Title I, § 109(g), 102 Stat. 4709.

United States Code Service
Copyright © 2023 All rights reserved.

# 16 USCS § 1540

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 16. CONSERVATION (Chs. 1 — 101)  >  CHAPTER 35. ENDANGERED SPECIES (§§ 1531 — 1544)*

## § 1540. Penalties and enforcement

### (a) Civil penalties.

**(1)**  Any person who knowingly violates, and any person engaged in business as an importer or exporter of fish, wildlife, or plants who violates, any provision of this Act, or any provision of any permit or certificate issued hereunder, or any regulation issued in order to implement subsection (a)(1)(A), (B), (C), (D), (E), or (F), (a)(2)(A), (B), (C), or (D), (c), (d) (other than regulation relating to recordkeeping or filing of reports), (f) or (g) of section 9 of this Act [16 USCS § 1538(a)(1)(A), (B), (C), (D), (E), or (F), (2)(A), (B), (C), or (D), (c), (d), (f), or (g)], may be assessed a civil penalty by the Secretary of not more than $25,000 for each violation. Any person who knowingly violates, and any person engaged in business as an importer or exporter of fish, wildlife, or plants who violates, any provision of any other regulation issued under this Act may be assessed a civil penalty by the Secretary of not more than $12,000 for each such violation. Any person who otherwise violates any provision of this Act, or any regulation, permit, or certificate issued hereunder, may be assessed a civil penalty by the Secretary of not more than $500 for each such violation. No penalty may be assessed under this subsection unless such person is given notice and opportunity for a hearing with respect to such violation. Each violation shall be a separate offense. Any such civil penalty may be remitted or mitigated by the Secretary. Upon any failure to pay a penalty assessed under this subsection, the Secretary may request the Attorney General to institute a civil action in a district court of the United States for any district in which such person is found, resides, or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. The court shall hear such action on the record made before the Secretary and shall sustain his action if it is supported by substantial evidence on the record considered as a whole.

**(2)**  Hearings held during proceedings for the assessment of civil penalties authorized by paragraph (1) of this subsection shall be conducted in accordance with section 554 of title 5, United States Code [5 USCS § 554]. The Secretary may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer oaths. Witnesses summoned shall be paid the same fees and mileage that are paid to witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person pursuant to this paragraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order

requiring such person to appear and give testimony before the Secretary or to appear and produce documents before the Secretary, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(3)** Notwithstanding any other provision of this Act, no civil penalty shall be imposed if it can be shown by a preponderance of the evidence that the defendant committed an act based on a good faith belief that he was acting to protect himself or herself, a member of his or her family, or any other individual from bodily harm, from any endangered or threatened species.

**(b) Criminal violations.**

**(1)** Any person who knowingly violates any provision of this Act, of any permit or certificate issued hereunder, or of any regulation issued in order to implement subsection (a)(1)(A), (B), (C), (D), (E), or (F); (a)(2)(A), (B), (C), or (D), (c), (d) (other than a regulation relating to recordkeeping, or filing of reports), (f), or (g) of section 9 of this Act [16 USCS § 1538(a)(1)(A), (B), (C), (D), (E), or (F), (2)(A), (B), (C), or (D), (c), (d), (f), or (g)] shall, upon conviction, be fined not more than $50,000 or imprisoned for not more than one year, or both. Any person who knowingly violates any provision of any other regulation issued under this Act shall, upon conviction, be fined not more than $25,000 or imprisoned for not more than six months, or both.

**(2)** The head of any Federal agency which has issued a lease, license, permit, or other agreement authorizing a person to import or export fish, wildlife, or plants, or to operate a quarantine station for imported wildlife, or authorizing the use of Federal lands, including grazing of domestic livestock, to any person who is convicted of a criminal violation of this Act or any regulation, permit, or certificate issued hereunder may immediately modify, suspend, or revoke each lease, license, permit, or other agreement. The Secretary shall also suspend for a period of up to one year, or cancel, any Federal hunting or fishing permits or stamps issued to any person who is convicted of a criminal violation of any provision of this Act or any regulation, permit, or certificate issued hereunder. The United States shall not be liable for the payments of any compensation, reimbursement, or damages in connection with the modification, suspension, or revocation of any leases, licenses, permits, stamps, or other agreements pursuant to this section.

**(3)** Notwithstanding any other provision of this Act, it shall be a defense to prosecution under this subsection if the defendant committed the offense based on a good faith belief that he was acting to protect himself or herself, a member of his or her family, or any other individual, from bodily harm from any endangered or threatened species.

**(c) District court jurisdiction.**   The several district courts of the United States, including the courts enumerated in section 460 of title 28, United States Code [28 USCS § 460], shall have jurisdiction over any actions arising under this Act. For the purpose of this Act, American Samoa shall be included within the judicial district of the District Court of the United States for the District of Hawaii.

**(d) Rewards and certain incidental expenses.**   The Secretary or the Secretary of the Treasury shall pay, from sums received as penalties, fines, or forfeitures of property for

any violation of this Act or any regulation issued hereunder (1) a reward to any person who furnishes information which leads to an arrest, a criminal conviction, civil penalty assessment, or forfeiture of property for any violation of this Act or any regulation issued hereunder, and (2) the reasonable and necessary costs incurred by any person in providing temporary care for any fish, wildlife, or plant pending the disposition of any civil or criminal proceeding alleging a violation of this Act with respect to that fish, wildlife, or plant. The amount of the reward, if any, is to be designated by the Secretary or the Secretary of the Treasury, as appropriate. Any officer or employee of the United States or any State or local government who furnishes information or renders service in the performance of his official duties is ineligible for payment under this subsection. Whenever the balance of sums received under this section and section 6(d) of the Act of November 16, 1981 (16 U.S.C. 3375(d)), as penalties or fines, or from forfeitures of property, exceed $500,000, the Secretary of the Treasury shall deposit an amount equal to such excess balance in the cooperative endangered species conservation fund established under section 6(i) of this Act [16 USCS § 1535(i)].

**(e) Enforcement.**

**(1)** The provisions of this Act and any regulations or permits issued pursuant thereto shall be enforced by the Secretary, the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating, or all such Secretaries. Each such Secretary may utilize by agreement, with or without reimbursement, the personnel, services, and facilities of any other Federal agency or any State agency for purposes of enforcing this Act.

**(2)** The judges of the district courts of the United States and the United States magistrates [magistrate judges] may, within their respective jurisdictions, upon proper oath or affirmation showing probable cause, issue such warrants or other process as may be required for enforcement of this Act and any regulation issued thereunder.

**(3)** Any person authorized by the Secretary, the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating, to enforce this Act may detain for inspection and inspect any package, crate, or other container, including its contents, and all accompanying documents, upon importation or exportation. Such person may make arrests without a warrant for any violation of this Act if he has reasonable grounds to believe that the person to be arrested is committing the violation in his presence or view, and may execute and serve any arrest warrant, search warrant, or other warrant or civil or criminal process issued by any officer or court of competent jurisdiction for enforcement of this Act. Such person so authorized may search and seize, with or without a warrant, as authorized by law. Any fish, wildlife, property, or item so seized shall be held by any person authorized by the Secretary, the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating pending disposition of civil or criminal proceedings, or the institution of an action in rem for forfeiture of such fish, wildlife, property, or item pursuant to paragraph (4) of this subsection; except that the Secretary may, in lieu of holding such fish, wildlife, property, or item, permit the owner or consignee to post a bond or other surety satisfactory to the Secretary, but upon forfeiture of any such property to the United States, or the abandonment or waiver of any claim to any such

property, it shall be disposed of (other than by sale to the general public) by the Secretary in such a manner, consistent with the purposes of this Act, as the Secretary shall by regulation prescribe.

**(4)**

**(A)** All fish or wildlife or plants taken, possessed, sold, purchased, offered for sale or purchase, transported, delivered, received, carried, shipped, exported, or imported contrary to the provisions of this Act, any regulation made pursuant thereto, or any permit or certificate issued hereunder shall be subject to forfeiture to the United States.

**(B)** All guns, traps, nets, and other equipment, vessels, vehicles, aircraft, and other means of transportation used to aid the taking, possessing, selling, purchasing, offering for sale or purchase, transporting, delivering, receiving, carrying, shipping, exporting, or importing of any fish or wildlife or plants in violation of this Act, any regulation made pursuant thereto, or any permit or certificate issued thereunder shall be subject to forfeiture to the United States upon conviction of a criminal violation pursuant to section 11(b)(1) of this Act [subsec. (b)(1) of this section].

**(5)** All provisions of law relating to the seizure, forfeiture, and condemnation of a vessel for violation of the customs laws, the disposition of such vessel or the proceeds from the sale thereof, and the remission or mitigation of such forfeiture, shall apply to the seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this Act, insofar as such provisions of law are applicable and not inconsistent with the provisions of this Act; except that all powers, rights, and duties conferred or imposed by the customs laws upon any officer or employee of the Treasury Department shall, for the purposes of this Act, be exercised or performed by the Secretary or by such persons as he may designate.

**(6)** The Attorney General of the United States may seek to enjoin any person who is alleged to be in violation of any provision of this Act or regulation issued under authority thereof.

**(f) Regulations.** The Secretary, the Secretary of the Treasury, and the Secretary of the Department in which the Coast Guard is operating, are authorized to promulgate such regulations as may be appropriate to enforce this Act, and charge reasonable fees for expenses to the Government connected with permits or certificates authorized by this Act including processing applications and reasonable inspections, and with the transfer, board, handling, or storage of fish or wildlife or plants and evidentiary items seized and forfeited under this Act. All such fees collected pursuant to this subsection shall be deposited in the Treasury to the credit of the appropriation which is current and chargeable for the cost of furnishing the services. Appropriated funds may be expended pending reimbursement from parties in interest.

**(g) Citizen suits.**

**(1)** Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

**(A)** to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof; or

**(B)** to compel the Secretary to apply, pursuant to section 6(g)(2)(B)(ii) of this Act [16 USCS § 1535(g)(2)(B)(ii)], the prohibitions set forth in or authorized pursuant to section 4(d) or section 9(a)(1)(B) of this Act [16 USCS §§ 1533(d), 1538(a)(1)(B)] with respect to the taking of any resident endangered species or threatened species within any State; or

**(C)** against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 4 [16 USCS § 1533] which is not discretionary with the Secretary.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence.

**(2)**

**(A)** No action may be commenced under subparagraph (1)(A) of this section—

**(i)** prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

**(ii)** if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or

**(iii)** if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

**(B)** No action may be commenced under subparagraph (1)(B) of this section—

**(i)** prior to sixty days after written notice has been given to the Secretary setting forth the reasons why an emergency is thought to exist with respect to an endangered species or a threatened species in the State concerned; or

**(ii)** if the Secretary has commenced and is diligently prosecuting action under section 6(g)(2)(B)(ii) of this Act [16 USCS § 1535(g)(2)(B)(ii)] to determine whether any such emergency exists.

**(C)** No action may be commenced under subparagraph (1)(C) of this section prior to sixty days after written notice has been given to the Secretary; except that such action may be brought immediately after such notification in the case of an action under this section respecting an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants.

**(3)**

**(A)** Any suit under this subsection may be brought in the judicial district in which the violation occurs.

**(B)** In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

**(4)** The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

**(5)** The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Secretary or a State agency).

**(h) Coordination with other laws.** The Secretary of Agriculture and the Secretary shall provide for appropriate coordination of the administration of this Act with the administration of the animal quarantine laws (as defined in section 2509(f) of the Food, Agriculture, Conservation, and Trade Act of 1990 (21 U.S.C. 136a(f)) and section 306 of the Tariff Act of 1930 (19 U.S.C. 1306). Nothing in this Act or any amendment made by this Act shall be construed as superseding or limiting in any manner the functions of the Secretary of Agriculture under any other law relating to prohibited or restricted importations or possession of animals and other articles and no proceeding or determination under this Act shall preclude any proceeding or be considered determinative of any issue of fact or law in any proceeding under any Act administered by the Secretary of Agriculture. Nothing in this Act shall be construed as superseding or limiting in any manner the functions and responsibilities of the Secretary of the Treasury under the Tariff Act of 1930, including, without limitation, section 527 of that Act (19 U.S.C. 1527), relating to the importation of wildlife taken, killed, possessed, or exported to the United States in violation of the laws or regulations of a foreign country.

## History

**HISTORY:**

Dec. 28, 1973, P. L. 93-205, § 11, 87 Stat. 897; July 12, 1976, P. L. 94-359, § 4, 90 Stat. 913; Nov. 10, 1978, P. L. 95-632, §§ 6–8, 92 Stat. 3761; Nov. 16, 1981, P. L. 97-79, § 9(e), 95 Stat. 1079; Oct. 13, 1982, P. L. 97-304, §§ 7, 9(c), 96 Stat. 1425, 1427; June 25, 1984, P. L. 98-327, § 4, in part, 98 Stat. 271; Oct. 7, 1988, P. L. 100-478, Title I, § 1007, 102 Stat. 2309; May 13, 2002, P. L. 107-171, Title X, Subtitle E, § 10418(b)(3), 116 Stat. 508.

United States Code Service
Copyright © 2023 All rights reserved.

Add. 00072

# 28 USCS § 1291, Part 1 of 3

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service* > *TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE (§§ 1 — 5001)* > *Part IV. Jurisdiction and Venue (Chs. 81 — 99)* > *CHAPTER 83. Courts of Appeals (§§ 1291 — 1296)*

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title [28 USCS §§ 1292(c) and (d) and 1295].

## History

**HISTORY:**

June 25, 1948, ch 646, 62 Stat. 929; Oct. 31, 1951, ch 655, § 48, 65 Stat. 726; July 7, 1958, P. L. 85-508, § 12(e), 72 Stat. 348; April 2, 1982, P. L. 97-164, Title I, Part A, § 124, 96 Stat. 36.

United States Code Service
Copyright © 2023 All rights reserved.

# 28 USCS § 2201, Part 1 of 2

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 28. JUDICIARY AND JUDICIAL PROCEDURE (§§ 1 — 5001) > Part VI. Particular Proceedings (Chs. 151 — 190)  >  CHAPTER 151. Declaratory Judgments (§§ 2201 — 2240)*

## § 2201. Creation of remedy

**(a)**  In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986 [26 USCS § 7428], a proceeding under section 505 or 1146 of title 11 [11 USCS § 505 or 1146], or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(9) of the Tariff Act of 1930 [19 USCS § 1516a(f)(9)]), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

**(b)**  For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act [21 USCS §§ 355 or 360b], or section 351 of the Public Health Service Act [42 USCS § 262].

## History

**HISTORY:**

June 25, 1948, ch 646, 62 Stat. 964; May 24, 1949, ch 139, § 111, 63 Stat. 105; Aug. 28, 1954, ch 1033, 68 Stat. 890; July 7, 1958, P. L. 85-508, § 12(p), 72 Stat. 349; Oct. 4, 1976, P. L. 94-455, Title XIII, § 1306(b)(8), 90 Stat. 1719; Nov. 6, 1978, P. L. 95-598, Title II, § 249, 92 Stat. 2672; Sept. 24, 1984, P. L. 98-417, Title I, § 106, 98 Stat. 1597; Sept. 28, 1988, P. L. 100-449, Title IV, § 402(c), 102 Stat. 1884; Nov. 16, 1988, P. L. 100-670, Title I, § 107(b), 102 Stat. 3984; Dec. 8, 1993, P. L. 103-182, Title IV, Subtitle B, § 414(b), 107 Stat. 2147; March 23, 2010, P. L. 111-148, Title VII, Subtitle A, § 7002(c)(2), 124 Stat. 816; Jan. 29, 2020, P.L. 116-113, Title IV, Subtitle C, § 423(b), 134 Stat. 66.

United States Code Service
Copyright © 2023 All rights reserved.

# 43 USCS § 1332

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 43. PUBLIC LANDS (Chs. 1 — 50)  >  CHAPTER 29. SUBMERGED LANDS (§§ 1301 — 1356c)  >  OUTER CONTINENTAL SHELF LANDS (§§ 1331 — 1356c)*

## § 1332. Congressional declaration of policy

It is hereby declared to be the policy of the United States that—

**(1)**  the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this Act;

**(2)**  this Act shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected;

**(3)**  the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs;

**(4)**  since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments—

**(A)**  such States and their affected local governments may require assistance in protecting their coastal zones and other affected areas from any temporary or permanent adverse effects of such impacts;

**(B)**  the distribution of a portion of the receipts from the leasing of mineral resources of the outer Continental Shelf adjacent to State lands, as provided under section 8(g) [43 USCS § 1337(g)], will provide affected coastal States and localities with funds which may be used for the mitigation of adverse economic and environmental effects related to the development of such resources; and

**(C)**  such States, and through such States, affected local governments, are entitled to an opportunity to participate, to the extent consistent with the national interest, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf[.][;]

**(5)**  the rights and responsibilities of all States and, where appropriate, local governments, to preserve and protect their marine, human, and coastal environments

through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized; and

**(6)** operations in the outer Continental Shelf should be conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health.

## History

**HISTORY:**

Aug. 7, 1953, ch 345, § 3, 67 Stat. 462; Sept. 18, 1978, P. L. 95-372, Title II, § 202, 92 Stat. 634; April 7, 1986, P. L. 99-272, Title VIII, § 8002, 100 Stat. 148.

United States Code Service
Copyright © 2023 All rights reserved.

**End of Document**

Add. 00076

**43 USCS § 1337**

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 43. PUBLIC LANDS (Chs. 1 — 50)  >  CHAPTER 29. SUBMERGED LANDS (§§ 1301 — 1356c)  >  OUTER CONTINENTAL SHELF LANDS (§§ 1331 — 1356c)*

## § 1337. Leases, easements, and rights-of-way on the outer Continental Shelf

**(a) Oil and gas leases; award to highest responsible qualified bidder; method of bidding; Congressional consideration of bidding system; notice; annual report to Congress.**

**(1)**  The Secretary is authorized to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas lease on submerged lands of the outer Continental Shelf which are not covered by leases meeting the requirements of subsection (a) of section 6 of this Act [43 USCS § 1335(a)]. Such regulations may provide for the deposit of cash bids in an interest-bearing account until the Secretary announces his decision on whether to accept the bids, with the interest earned thereon to be paid to the Treasury as to bids that are accepted and to the unsuccessful bidders as to bids that are rejected. The bidding shall be by sealed bid and, at the discretion of the Secretary, on the basis of—

**(A)**  cash bonus bid with a royalty at not less than $16^2/_3$ percent, but not more than $18^3/_4$ percent, during the 10-year period beginning on the date of enactment of the Act titled "An Act to provide for reconciliation pursuant to title II of S. Con. Res. 14" [enacted Aug. 16, 2022], and not less than $16^2/_3$ percent thereafter, fixed by the Secretary in amount or value of the production saved, removed, or sold;

**(B)**  variable royalty bid based on a per centum in amount or value of the production saved, removed, or sold, with either a fixed work commitment based on dollar amount for exploration or a fixed cash bonus as determined by the Secretary, or both;

**(C)**  cash bonus bid, or work commitment bid based on a dollar amount for exploration with a fixed cash bonus, and a diminishing or sliding royalty based on such formulae as the Secretary shall determine as equitable to encourage continued production from the lease area as resources diminish, but not less than $16^2/_3$ percent, but not more than $18^3/_4$ percent, during the 10-year period beginning on the date of enactment of the Act titled "An Act to provide for reconciliation pursuant to title II of S. Con. Res. 14" [enacted Aug. 16, 2022], and not less than $16^2/_3$ percent thereafter, at the beginning of the lease period in amount or value of the production saved, removed, or sold;

**(D)**  cash bonus bid with a fixed share of the net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area;

**(E)** fixed cash bonus with the net profit share reserved as the bid variable;

**(F)** cash bonus bid with a royalty at not less than $16^2/_3$ percent, but not more than $18^3/_4$ percent, during the 10-year period beginning on the date of enactment of the Act titled "An Act to provide for reconciliation pursuant to title II of S. Con. Res. 14" [enacted Aug. 16, 2022], and not less than $16^2/_3$ percent thereafter, fixed by the Secretary in amount or value of the production saved, removed, or sold and a fixed per centum share of net profits of no less than 30 per centum to be derived from the production of oil and gas from the lease area;

**(G)** work commitment bid based on a dollar amount for exploration with a fixed cash bonus and a fixed royalty in amount or value of the production saved, removed, or sold;

**(H)** cash bonus bid with royalty at not less than $16^2/_3$ percent, but not more than $18^3/_4$ percent, during the 10-year period beginning on the date of enactment of the Act titled "An Act to provide for reconciliation pursuant to title II of S. Con. Res. 14" [enacted Aug. 16, 2022], and not less than $16^2/_3$ percent thereafter, fixed by the Secretary in amount or value of production saved, removed, or sold, and with suspension of royalties for a period, volume, or value of production determined by the Secretary, which suspensions may vary based on the price of production from the lease; or

**(I)** subject to the requirements of paragraph (4) of this subsection, any modification of bidding systems authorized in subparagraphs (A) through (G), or any other systems of bid variables, terms, and conditions which the Secretary determines to be useful to accomplish the purposes and policies of this Act, except that no such bidding system or modification shall have more than one bid variable.

**(2)** The Secretary may, in his discretion, defer any part of the payment of the cash bonus, as authorized in paragraph (1) of this subsection, according to a schedule announced at the time of the announcement of the lease sale, but such payment shall be made in total no later than five years after the date of the lease sale.

**(3)**

**(A)** The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.

**(B)** In the Western and Central Planning Areas of the Gulf of Mexico and the portion of the Eastern Planning Area of the Gulf of Mexico encompassing whole lease blocks lying west of 87 degrees, 30 minutes West longitude and in the Planning Areas offshore Alaska, the Secretary may, in order to—

**(i)** promote development or increased production on producing or non-producing leases; or

**(ii)** encourage production of marginal resources on producing or non-producing leases;

through primary, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease(s). With the lessee's consent, the Secretary may make other modifications to the royalty or net profit share terms of the lease in order to achieve these purposes.

**(C)**

**(i)** Notwithstanding the provisions of this Act other than this subparagraph, with respect to any lease or unit in existence on the date of enactment of the Outer Continental Shelf Deep Water Royalty Relief Act [enacted Nov. 28, 1995] meeting the requirements of this subparagraph, no royalty payments shall be due on new production, as defined in clause (iv) of this subparagraph, from any lease or unit located in water depths of 200 meters or greater in the Western and Central Planning Areas of the Gulf of Mexico, including that portion of the Eastern Planning Area of the Gulf of Mexico encompassing whole lease blocks lying west of 87 degrees, 30 minutes West longitude, until such volume of production as determined pursuant to clause (ii) has been produced by the lessee.

**(ii)** Upon submission of a complete application by the lessee, the Secretary shall determine within 180 days of such application whether new production from such lease or unit would be economic in the absence of the relief from the requirement to pay royalties provided for by clause (i) of this subparagraph. In making such determination, the Secretary shall consider the increased technological and financial risk of deep water development and all costs associated with exploring, developing, and producing from the lease. The lessee shall provide information required for a complete application to the Secretary prior to such determination. The Secretary shall clearly define the information required for a complete application under this section. Such application may be made on the basis of an individual lease or unit. If the Secretary determines that such new production would be economic in the absence of the relief from the requirement to pay royalties provided for by clause (i) of this subparagraph, the provisions of clause (i) shall not apply to such production. If the Secretary determines that such new production would not be economic in the absence of the relief from the requirement to pay royalties provided for by clause (i), the Secretary must determine the volume of production from the lease or unit on which no royalties would be due in order to make such new production economically viable; except that for new production as defined in clause (iv)(I), in no case will that volume be less than 17.5 million barrels of oil equivalent in water depths of 200 to 400 meters, 52.5 million barrels of oil equivalent in 400–800 meters of water, and 87.5 million barrels of oil equivalent in water depths greater than 800 meters. Redetermination of the applicability of clause (i) shall be undertaken by the Secretary when requested by the lessee prior to the commencement of the new production and upon significant change in the factors upon which the original determination was made. The Secretary shall make such redetermination within 120 days of submission of a complete application. The Secretary may extend the time period for making any determination or redetermination under this clause for 30

days, or longer if agreed to by the applicant, if circumstances so warrant. The lessee shall be notified in writing of any determination or redetermination and the reasons for and assumptions used for such determination. Any determination or redetermination under this clause shall be a final agency action. The Secretary's determination or redetermination shall be judicially reviewable under section 10(a) of the Administrative Procedures Act (5 U.S.C. 702), only for actions filed within 30 days of the Secretary's determination or redetermination.

**(iii)**  In the event that the Secretary fails to make the determination or redetermination called for in clause (ii) upon application by the lessee within the time period, together with any extension thereof, provided for by clause (ii), no royalty payments shall be due on new production as follows:

**(I)**  For new production, as defined in clause (iv)(I) of this subparagraph, no royalty shall be due on such production according to the schedule of minimum volumes specified in clause (ii) of this subparagraph.

**(II)**  For new production, as defined in clause (iv)(II) of this subparagraph, no royalty shall be due on such production for one year following the start of such production.

**(iv)**  For purposes of this subparagraph, the term "new production" is—

**(I)**  any production from a lease from which no royalties are due on production, other than test production, prior to the date of enactment of the Outer Continental Shelf Deep Water Royalty Relief Act [enacted Nov. 28, 1995]; or

**(II)**  any production resulting from lease development activities pursuant to a Development Operations Coordination Document, or supplement thereto that would expand production significantly beyond the level anticipated in the Development Operations Coordination Document, approved by the Secretary after the date of enactment of the Outer Continental Shelf Deep Water Royalty Relief Act [enacted Nov. 28, 1995].

**(v)**  During the production of volumes determined pursuant to clauses (ii) or (iii) of this subparagraph, in any year during which the arithmetic average of the closing prices on the New York Mercantile Exchange for light sweet crude oil exceeds $28.00 per barrel, any production of oil will be subject to royalties at the lease stipulated royalty rate. Any production subject to this clause shall be counted toward the production volume determined pursuant to clause (ii) or (iii). Estimated royalty payments will be made if such average of the closing prices for the previous year exceeds $28.00. After the end of the calendar year, when the new average price can be calculated, lessees will pay any royalties due, with interest but without penalty, or can apply for a refund, with interest, of any overpayment.

**(vi)**  During the production of volumes determined pursuant to clause (ii) or (iii) of this subparagraph, in any year during which the arithmetic average of the

Add. 00080

closing prices on the New York Mercantile Exchange for natural gas exceeds $3.50 per million British thermal units, any production of natural gas will be subject to royalties at the lease stipulated royalty rate. Any production subject to this clause shall be counted toward the production volume determined pursuant to clauses (ii) or (iii). Estimated royalty payments will be made if such average of the closing prices for the previous year exceeds $3.50. After the end of the calendar year, when the new average price can be calculated, lessees will pay any royalties due, with interest but without penalty, or can apply for a refund, with interest, of any overpayment.

**(vii)** The prices referred to in clauses (v) and (vi) of this subparagraph shall be changed during any calendar year after 1994 by the percentage, if any, by which the implicit price deflator for the gross domestic product changed during the preceding calendar year.

**(4)**

**(A)** The Secretary of Energy shall submit any bidding system authorized in subparagraph (H) of paragraph (1) to the Senate and House of Representatives. The Secretary may institute such bidding system unless either the Senate or the House of Representatives passes a resolution of disapproval within thirty days after receipt of the bidding system.

**(B)** Subparagraphs (C) through (J) of this paragraph are enacted by Congress—

**(i)** as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but they are applicable only with respect to the procedures to be followed in that House in the case of resolutions described by this paragraph, and they supersede other rules only to the extent that they are inconsistent therewith; and

**(ii)** with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House.

**(C)** A resolution disapproving a bidding system submitted pursuant to this paragraph shall immediately be referred to a committee (and all resolutions with respect to the same request shall be referred to the same committee) by the President of the Senate or the Speaker of the House of Representatives, as the case may be.

**(D)** If the committee to which has been referred any resolution disapproving the bidding system of the Secretary has not reported the resolution at the end of ten calendar days after its referral, it shall be in order to move either to discharge the committee from further consideration of the resolution or to discharge the committee from further consideration of any other resolution with respect to the same bidding system which has been referred to the committee.

**(E)** A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported a resolution with respect to the same recommendation), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

**(F)** If the motion to discharge is agreed to or disagreed to, the motion may not be renewed, nor may another motion to discharge the committee be made with respect to any other resolution with respect to the same bidding system.

**(G)** When the committee has reported, or has been discharged from further consideration of, a resolution as provided in this paragraph, it shall be at any time thereafter in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

**(H)** Debate on the resolution is limited to not more than two hours, to be divided equally between those favoring and those opposing the resolution. A motion further to limit debate is not debatable. An amendment to, or motion to recommit, the resolution is not in order, and it is not in order to move to reconsider the vote by which the resolution is agreed to or disagreed to.

**(I)** Motions to postpone, made with respect to the discharge from the committee, or the consideration of a resolution with respect to a bidding system, and motions to proceed to the consideration of other business, shall be decided without debate.

**(J)** Appeals from the decisions of the Chair relating to the application of the rules of the Senate or the House of Representatives, as the case may be, to the procedure relating to a resolution with respect to a bidding system shall be decided without debate.

**(5)**

**(A)** During the five-year period commencing on the date of enactment of this subsection [enacted Sept. 18, 1978], the Secretary may, in order to obtain statistical information to determine which bidding alternatives will best accomplish the purposes and policies of this Act, require, as to no more than 10 per centum of the tracts offered each year, each bidder to submit bids for any area of the outer Continental Shelf in accordance with more than one of the bidding systems set forth in paragraph (1) of this subsection. For such statistical purposes, leases may be awarded using a bidding alternative selected at random for the acquisition of valid statistical data if such bidding alternative is otherwise consistent with the provisions of this Act.

**(B)** The bidding systems authorized by paragraph (1) of this subsection, other than the system authorized by subparagraph (A), shall be applied to not less than 20 per centum and not more than 60 per centum of the total area offered for

leasing each year during the five-year period beginning on the date of enactment of this subsection, unless the Secretary determines that the requirements set forth in this subparagraph are inconsistent with the purposes and policies of this Act.

**(6)** At least ninety days prior to notice of any lease sale under subparagraph (D), (E), (F), or, if appropriate, (H) of paragraph (1), the Secretary shall by regulation establish rules to govern the calculation of net profits. In the event of any dispute between the United States and a lessee concerning the calculation of the net profits under the regulation issued pursuant to this paragraph, the burden of proof shall be on the lessee.

**(7)** After an oil and gas lease is granted pursuant to any of the work commitment options of paragraph (1) of this subsection—

**(A)** the lessee, at its option, shall deliver to the Secretary upon issuance of the lease either (i) a cash deposit for the full amount of the exploration work commitment, or (ii) a performance bond in form and substance and with a surety satisfactory to the Secretary, in the principal amount of such exploration work commitment assuring the Secretary that such commitment shall be faithfully discharged in accordance with this section, regulations, and the lease; and for purposes of this subparagraph, the principal amount of such cash deposit or bond may, in accordance with regulations, be periodically reduced upon proof, satisfactory to the Secretary, that a portion of the exploration work commitment has been satisfied;

**(B)** 50 per centum of all exploration expenditures on, or directly related to, the lease, including, but not limited to (i) geological investigations and related activities, (ii) geophysical investigations including seismic, geomagnetic, and gravity surveys, data processing and interpretation, and (iii) exploratory drilling, core drilling, redrilling, and well completion or abandonment, including the drilling of wells sufficient to determine the size and areal extent of any newly discovered field, and including the cost of mobilization and demobilization of drilling equipment, shall be included in satisfaction of the commitment, except that the lessee's general overhead cost shall not be so included against the work commitment, but its cost (including employee benefits) of employees directly assigned to such exploration work shall be so included; and

**(C)** if at the end of the primary term of the lease, including any extension thereof, the full dollar amount of the exploration work commitment has not been satisfied, the balance shall then be paid in cash to the Secretary.

**(8)** Not later than thirty days before any lease sale, the Secretary shall submit to the Congress and publish in the Federal Register a notice—

**(A)** identifying any bidding system which will be utilized for such lease sale and the reasons for the utilization of such bidding system; and

**(B)** designating the lease tracts selected which are to be offered in such sale under the bidding system authorized by subparagraph (A) of paragraph (1) and the lease tracts selected which are to be offered under any one or more of the bidding

systems authorized by subparagraphs (B) through (H) of paragraph (1), and the reasons such lease tracts are to be offered under a particular bidding system.

**(9)** [Deleted]

**(b) Terms and provisions of oil and gas leases.**   An oil and gas lease issued pursuant to this section shall—

**(1)**  be for a tract consisting of a compact area not exceeding five thousand seven hundred and sixty acres, as the Secretary may determine, unless the Secretary finds that a larger area is necessary to comprise a reasonable economic production unit;

**(2)**  be for an initial period of—

**(A)**  five years; or

**(B)**  not to exceed ten years where the Secretary finds that such longer period is necessary to encourage exploration and development in areas because of unusually deep water or other unusually adverse conditions,

and as long after such initial period as oil or gas is produced from the area in paying quantities, or drilling or well reworking operations as approved by the Secretary are conducted thereon;

**(3)**  require the payment of amount or value as determined by one of the bidding systems set forth in subsection (a) of this section;

**(4)**  entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area, conditioned upon due diligence requirements and the approval of the development and production plan required by this Act;

**(5)**  provide for suspension or cancellation of the lease during the initial lease term or thereafter pursuant to section 5 of this Act [43 USCS § 1334];

**(6)**  contain such rental and other provisions as the Secretary may prescribe at the time of offering the area for lease; and

**(7)**  provide a requirement that the lessee offer 20 per centum of the crude oil, condensate, and natural gas liquids produced on such lease, at the market value and point of delivery applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

**(c) Antitrust review of lease sales.**

**(1)**  Following each notice of a proposed lease sale and before the acceptance of bids and the issuance of leases based on such bids, the Secretary shall allow the Attorney General, in consultation with the Federal Trade Commission, thirty days to review the results of such lease sale, except that the Attorney General, after consultation with the Federal Trade Commission, may agree to a shorter review period.

**(2)**  The Attorney General may, in consultation with the Federal Trade Commission, conduct such antitrust review on the likely effects the issuance of such leases would have on competition as the Attorney General, after consultation with the Federal Trade Commission, deems appropriate and shall advise the Secretary with respect to such review. The Secretary shall provide such information as the Attorney General,

after consultation with the Federal Trade Commission, may require in order to conduct any antitrust review pursuant to this paragraph and to make recommendations pursuant to paragraph (3) of this subsection.

**(3)** The Attorney General, after consultation with the Federal Trade Commission, may make such recommendations to the Secretary, including the nonacceptance of any bid, as may be appropriate to prevent any situation inconsistent with the antitrust laws. If the Secretary determines, or if the Attorney General advises the Secretary, after consultation with the Federal Trade Commission and prior to the issuance of any lease, that such lease may create or maintain a situation inconsistent with the antitrust laws, the Secretary may—

   **(A)** refuse (i) to accept an otherwise qualified bid for such lease, or (ii) to issue such lease, notwithstanding subsection (a) of this section; or

   **(B)** issue such lease, and notify the lessee and the Attorney General of the reason for such decision.

**(4)**

   **(A)** Nothing in this subsection shall restrict the power under any other Act or the common law of the Attorney General, the Federal Trade Commission, or any other Federal department or agency to secure information, conduct reviews, make recommendations, or seek appropriate relief.

   **(B)** Neither the issuance of a lease nor anything in this subsection shall modify or abridge any private right of action under the antitrust laws.

**(d) Due diligence.**   No bid for a lease may be submitted if the Secretary finds, after notice and hearing, that the bidder is not meeting due diligence requirements on other leases.

**(e) Secretary's approval for sale, exchange, assignment, or other transfer of leases.** No lease issued under this Act may be sold, exchanged, assigned, or otherwise transferred except with the approval of the Secretary. Prior to any such approval, the Secretary shall consult with and give due consideration to the views of the Attorney General.

**(f) Antitrust immunity or defense.**   Nothing in this Act shall be deemed to convey to any person, association, corporation, or other business organization immunity from civil or criminal liability, or to create defenses to actions, under any antitrust law.

**(g) Leasing of lands within three miles of seaward boundaries of coastal States; deposit of revenues; distribution of revenues.**

   **(1)** At the time of soliciting nominations for the leasing of lands containing tracts wholly or partially within three nautical miles of the seaward boundary of any coastal State, and subsequently as new information is obtained or developed by the Secretary, the Secretary shall, in addition to the information required by section 26 of this Act [43 USCS § 1352], provide the Governor of such State—

   **(A)** an identification and schedule of the areas and regions proposed to be offered for leasing;

Add. 00085

**(B)** at the request of the Governor of such State, all information from all sources concerning the geographical, geological, and ecological characteristics of such tracts;

**(C)** an estimate of the oil and gas reserves in the areas proposed for leasing; and

**(D)** at the request of the Governor of such State, an identification of any field, geological structure, or trap located wholly or partially within three nautical miles of the seaward boundary of such coastal State, including all information relating to the entire field, geological structure, or trap.

The provisions of the first sentence of subsection (c) and the provisions of subsections (e)–(h) of section 26 of this Act [43 USCS § 1352(c) and (e)–(h)] shall be applicable to the release by the Secretary of any information to any coastal State under this paragraph. In addition, the provisions of subsections (c) and (e)–(h) of section 26 of this Act [43 USCS § 1352(c) and (e)–(h)] shall apply in their entirety to the release by the Secretary to any coastal State of any information relating to Federal lands beyond three nautical miles of the seaward boundary of such coastal State.

**(2)** Notwithstanding any other provision of this Act, the Secretary shall deposit into a separate account in the Treasury of the United States all bonuses, rents, and royalties, and other revenues (derived from any bidding system authorized under subsection (a)(1)), excluding Federal income and windfall profits taxes, and derived from any lease issued after September 18, 1978 of any Federal tract which lies wholly (or, in the case of Alaska, partially until seven years from the date of settlement of any boundary dispute that is the subject of an agreement under section 7 of this Act [43 USCS § 1336] entered into prior to January 1, 1986 or until April 15, 1993 with respect to any other tract) within three nautical miles of the seaward boundary of any coastal State, or, (except as provided above for Alaska) in the case where a Federal tract lies partially within three nautical miles of the seaward boundary, a percentage of bonuses, rents, royalties, and other revenues (derived from any bidding system authorized under subsection (a)(1)), excluding Federal income and windfall profits taxes, and derived from any lease issued after September 18, 1978 of such tract equal to the percentage of surface acreage of the tract that lies within such three nautical miles. Except as provided in paragraph (5) of this subsection, not later than the last business day of the month following the month in which those revenues are deposited in the Treasury, the Secretary shall transmit to such coastal State 27 percent of those revenues, together with all accrued interest thereon. The remaining balance of such revenues shall be transmitted simultaneously to the miscellaneous receipts account of the Treasury of the United States.

**(3)** Whenever the Secretary or the Governor of a coastal State determines that a common potentially hydrocarbon-bearing area may underlie the Federal and State boundary, the Secretary or the Governor shall notify the other party in writing of his determination and the Secretary shall provide to the Governor notice of the current and projected status of the tract or tracts containing the common potentially hydrocarbon-bearing area. If the Secretary has leased or intends to lease such tract or tracts, the Secretary and the Governor of the coastal State may enter into an agreement to divide the revenues from production of any common potentially

Add. 00086

hydrocarbon-bearing area, by unitization or other royalty sharing agreement, pursuant to existing law. If the Secretary and the Governor do not enter into an agreement, the Secretary may nevertheless proceed with the leasing of the tract or tracts. Any revenues received by the United States under such an agreement shall be subject to the requirements of paragraph (2).

**(4)** The deposits in the Treasury account described in this section shall be invested by the Secretary of the Treasury in securities backed by the full faith and credit of the United States having maturities suitable to the needs of the account and yielding the highest reasonably available interest rates as determined by the Secretary of the Treasury.

**(5)**

**(A)** When there is a boundary dispute between the United States and a State which is subject to an agreement under section 7 of this Act [43 USCS § 1336], the Secretary shall credit to the account established pursuant to such agreement all bonuses, rents, and royalties, and other revenues (derived from any bidding system authorized under subsection (a)(1)), excluding Federal income and windfall profits taxes, and derived from any lease issued after September 18, 1978 of any Federal tract which lies wholly or partially within three nautical miles of the seaward boundary asserted by the State, if that money has not otherwise been deposited in such account. Proceeds of an escrow account established pursuant to an agreement under section 7 [43 USCS § 1336] shall be distributed as follows:

**(i)** Twenty-seven percent of all bonuses, rents, and royalties, and other revenues (derived from any bidding system authorized under subsection (a)(1)), excluding Federal income and windfall profits taxes, and derived from any lease issued after September 18, 1978, of any tract which lies wholly within three nautical miles of the seaward boundary asserted by the Federal Government in the boundary dispute, together with all accrued interest thereon, shall be paid to the State either—

**(I)** within thirty days of December 1, 1987, or

**(II)** by the last business day of the month following the month in which those revenues are deposited in the Treasury, whichever date is later.

**(ii)** Upon the settlement of a boundary dispute which is subject to a section 7 [43 USCS § 1336] agreement between the United States and a State, the Secretary shall pay to such State any additional moneys due such State from amounts deposited in or credited to the escrow account. If there is insufficient money deposited in the escrow account, the Secretary shall transmit, from any revenues derived from any lease of Federal lands under this Act, the remaining balance due such State in accordance with the formula set forth in section 8004(b)(1)(B) of the Outer Continental Shelf Lands Act Amendments of 1985 [note to this section].

**(B)** This paragraph applies to all Federal oil and gas lease sales, under this Act, including joint lease sales, occurring after September 18, 1978.

**(6)** This section shall be deemed to take effect on October 1, 1985, for purposes of determining the amounts to be deposited in the separate account and the States' shares described in paragraph (2).

**(7)** When the Secretary leases any tract which lies wholly or partially within three miles of the seaward boundary of two or more States, the revenues from such tract shall be distributed as otherwise provided by this section, except that the State's share of such revenues that would otherwise result under this section shall be divided equally among such States.

**(h) State claims to jurisdiction over submerged lands.**  Nothing contained in this section shall be construed to alter, limit, or modify any claim of any State to any jurisdiction over, or any right, title, or interest in, any submerged lands.

**(i) Sulphur leases; award to highest bidder; method of bidding.**   In order to meet the urgent need for further exploration and development of the sulphur deposits in the submerged lands of the outer Continental Shelf, the Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competitive bidding sulphur leases on submerged lands of the outer Continental Shelf, which are not covered by leases which include sulphur and meet the requirements of subsection (a) of section 6 of this Act [43 USCS § 1335(a)], and which sulphur leases shall be offered for bid by sealed bids and granted on separate leases from oil and gas leases, and for a separate consideration, and without priority or preference accorded to oil and gas lessees on the same area.

**(j) Terms and provisions of sulphur leases.**   A sulphur lease issued by the Secretary pursuant to this section shall (1) cover an area of such size and dimensions as the Secretary may determine, (2) be for a period of not more than ten years and so long thereafter as sulphur may be produced from the area in paying quantities or drilling, well reworking, plant construction, or other operations for the production of sulphur, as approved by the Secretary, are conducted thereon, (3) require the payment to the United States of such royalty as may be specified in the lease but not less than 5 per centum of the gross production or value of the sulphur at the wellhead, and (4) contain such rental provisions and such other terms and provisions as the Secretary may by regulation prescribe at the time of offering the area for lease.

**(k) Other mineral leases; award to highest bidder; terms and conditions.**

**(1)**  The Secretary is authorized to grant to the qualified persons offering the highest cash bonuses on a basis of competitive bidding leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf not then under lease for such mineral upon such royalty, rental, and other terms and conditions as the Secretary may prescribe at the time of offering the area for lease.

**(2)**

**(A)**  Notwithstanding paragraph (1), the Secretary may negotiate with any person an agreement for the use of Outer Continental Shelf sand, gravel and shell resources—

**(i)** for use in a program of, or project for, shore protection, beach restoration, or coastal wetlands restoration undertaken by a Federal, State, or local government agency; or

**(ii)** for use in a construction project, other than a project described in clause (i), that is funded in whole or in part by or authorized by the Federal Government.

**(B)** In carrying out a negotiation under this paragraph, the Secretary may assess a fee based on an assessment of the value of the resources and the public interest served by promoting development of the resources. No fee shall be assessed directly or indirectly under this subparagraph against a Federal, State, or local government agency.

**(C)** The Secretary may, through this paragraph and in consultation with the Secretary of Commerce, seek to facilitate projects in the coastal zone, as such term is defined in section 304 of the Coastal Zone Management Act of 1972 (16 U.S.C. 1453), that promote the policy set forth in section 303 of that Act (16 U.S.C. 1452).

**(D)** Any Federal agency which proposes to make use of sand, gravel and shell resources subject to the provisions of this Act shall enter into a Memorandum of Agreement with the Secretary concerning the potential use of those resources. The Secretary shall notify the Committee on Merchant Marine and Fisheries and the Committee on Natural Resources of the House of Representatives and the Committee on Energy and Natural Resources of the Senate on any proposed project for the use of those resources prior to the use of those resources.

**(l) Publication of notices of sale and terms of bidding.** Notice of sale of leases, and the terms of bidding, authorized by this section shall be published at least thirty days before the date of sale in accordance with rules and regulations promulgated by the Secretary.

**(m) Disposition of revenues.** All moneys paid to the Secretary for or under leases granted pursuant to this section shall be deposited in the Treasury in accordance with section 9 of this Act [43 USCS § 1338].

**(n) Issuance of lease as nonprejudicial to ultimate settlement or adjudication of controversies.** The issuance of any lease by the Secretary pursuant to this Act, or the making of any interim arrangements by the Secretary pursuant to section 7 of this Act [43 USCS § 1336] shall not prejudice the ultimate settlement or adjudication of the question as to whether or not the area involved is in the outer Continental Shelf.

**(o) Cancellation of leases for fraud.** The Secretary may cancel any lease obtained by fraud or misrepresentation.

**(p) Leases, easements, or rights-of-way for energy and related purposes.**

**(1)** In general. The Secretary, in consultation with the Secretary of the Department in which the Coast Guard is operating and other relevant departments and agencies of the Federal Government, may grant a lease, easement, or right-of-way on the outer Continental Shelf for activities not otherwise authorized in this Act, the Deepwater Port

Act of 1974 (33 U.S.C. 1501 et seq.), the Ocean Thermal Energy Conversion Act of 1980 (42 U.S.C. 9101 et seq.), or other applicable law, if those activities—

**(A)** support exploration, development, production, or storage of oil or natural gas, except that a lease, easement, or right-of-way shall not be granted in an area in which oil and gas preleasing, leasing, and related activities are prohibited by a moratorium;

**(B)** support transportation of oil or natural gas, excluding shipping activities;

**(C)** produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas;

**(D)** use, for energy-related purposes or for other authorized marine-related purposes, facilities currently or previously used for activities authorized under this Act, except that any oil and gas energy-related uses shall not be authorized in areas in which oil and gas preleasing, leasing, and related activities are prohibited by a moratorium; or

**(E)** provide for, support, or are directly related to the injection of a carbon dioxide stream into sub-seabed geologic formations for the purpose of long-term carbon sequestration.

**(2)** Payments and revenues.

**(A)** The Secretary shall establish royalties, fees, rentals, bonuses, or other payments to ensure a fair return to the United States for any lease, easement, or right-of-way granted under this subsection.

**(B)** The Secretary shall provide for the payment of 27 percent of the revenues received by the Federal Government as a result of payments under this section from projects that are located wholly or partially within the area extending three nautical miles seaward of State submerged lands. Payments shall be made based on a formula established by the Secretary by rulemaking no later than 180 days after the date of enactment of this section that provides for equitable distribution, based on proximity to the project, among coastal states that have a coastline that is located within 15 miles of the geographic center of the project.

**(3)** Competitive or noncompetitive basis. Except with respect to projects that meet the criteria established under section 388(d) of the Energy Policy Act of 2005 [note to this section], the Secretary shall issue a lease, easement, or right-of-way under paragraph (1) on a competitive basis unless the Secretary determines after public notice of a proposed lease, easement, or right-of-way that there is no competitive interest.

**(4)** Requirements. The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for—

**(A)** safety;

**(B)** protection of the environment;

**(C)** prevention of waste;

**(D)** conservation of the natural resources of the outer Continental Shelf;

**(E)** coordination with relevant Federal agencies;

**(F)** protection of national security interests of the United States;

**(G)** protection of correlative rights in the outer Continental Shelf;

**(H)** a fair return to the United States for any lease, easement, or right-of-way under this subsection;

**(I)** prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;

**(J)** consideration of—

    **(i)** the location of, and any schedule relating to, a lease, easement, or right-of-way for an area of the outer Continental Shelf; and

    **(ii)** any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;

**(K)** public notice and comment on any proposal submitted for a lease, easement, or right-of-way under this subsection; and

**(L)** oversight, inspection, research, monitoring, and enforcement relating to a lease, easement, or right-of-way under this subsection.

**(5)** Lease duration, suspension, and cancellation. The Secretary shall provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under this subsection.

**(6)** Security. The Secretary shall require the holder of a lease, easement, or right-of-way granted under this subsection to—

**(A)** furnish a surety bond or other form of security, as prescribed by the Secretary;

**(B)** comply with such other requirements as the Secretary considers necessary to protect the interests of the public and the United States; and

**(C)** provide for the restoration of the lease, easement, or right-of-way.

**(7)** Coordination and consultation with affected State and local governments. The Secretary shall provide for coordination and consultation with the Governor of any State or the executive of any local government that may be affected by a lease, easement, or right-of-way under this subsection.

**(8)** Regulations. Not later than 270 days after the date of enactment of the Energy Policy Act of 2005 [enacted Aug. 8, 2005], the Secretary, in consultation with the Secretary of Defense, the Secretary of the Department in which the Coast Guard is operating, the Secretary of Commerce, heads of other relevant departments and agencies of the Federal Government, and the Governor of any affected State, shall issue any necessary regulations to carry out this subsection.

**(9)** Effect of subsection. Nothing in this subsection displaces, supersedes, limits, or modifies the jurisdiction, responsibility, or authority of any Federal or State agency under any other Federal law.

**(10)** Applicability. This subsection does not apply to any area on the outer Continental Shelf within the exterior boundaries of any unit of the National Park System, National Wildlife Refuge System, or National Marine Sanctuary System, or any National Monument.

## History

**HISTORY:**

Aug. 7, 1953, ch 345, § 8, 67 Stat. 468; Sept. 18, 1978, P. L. 95-372, Title II, § 205(a), (b), 92 Stat. 640; April 7, 1986, P. L. 99-272, Title VIII, § 8003, 100 Stat. 148; Dec. 22, 1987, P. L. 100-202, § 101(g) [Title I, § 1], 101 Stat. 1329-225; Oct. 31, 1994, P. L. 103-426, § 1(a), 108 Stat. 4371; Nov. 28, 1995, P. L. 104-58, Title III, §§ 302, 303, 109 Stat. 563, 565; Nov. 10, 1998, P. L. 105-362, Title IX, § 901(k), 112 Stat. 3290; Aug. 17, 1999, P. L. 106-53, Title II, § 215(b)(1), 113 Stat. 292; Aug. 8, 2005, P. L. 109-58, Title III, Subtitle E, § 346, Subtitle G, § 388(a), (c), 119 Stat. 704, 744, 747; Nov. 15, 2021, P.L. 117-58, Div D, Title III, Subtitle A, § 40307(b), Subtitle E, § 40343, 135 Stat. 1003, 1033; Aug. 16, 2022, P.L. 117-169, Title V, Subtitle B, Part 6, § 50261, 136 Stat. 2056.

United States Code Service
Copyright © 2023 All rights reserved.

Add. 00092

# 43 USCS § 1349

Current through Public Law 118-22, approved November 17, 2023.

*United States Code Service  >  TITLE 43. PUBLIC LANDS (Chs. 1 — 50)  >  CHAPTER 29. SUBMERGED LANDS (§§ 1301 — 1356c)  >  OUTER CONTINENTAL SHELF LANDS (§§ 1331 — 1356c)*

## § 1349. Citizens suits, jurisdiction and judicial review

**(a) Persons who may bring actions; persons against whom action may be brought; time of action; intervention by Attorney General; costs and fees; security.**

**(1)** Except as provided in this section, any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this Act against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this Act or any regulation promulgated under this Act, or of the terms of any permit or lease issued by the Secretary under this Act.

**(2)** Except as provided in paragraph (3) of this subsection, no action may be commenced under subsection (a)(1) of this section—

**(A)** prior to sixty days after the plaintiff has given notice of the alleged violation, in writing under oath, to the Secretary and any other appropriate Federal official, to the State in which the violation allegedly occurred or is occurring, and to any alleged violator; or

**(B)** if the Attorney General has commenced and is diligently prosecuting a civil action in a court of the United States or a State with respect to such matter, but in any such action in a court of the United States any person having a legal interest which is or may be adversely affected may intervene as a matter of right.

**(3)** An action may be brought under this subsection immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff.

**(4)** In any action commenced pursuant to this section, the Attorney General, upon the request of the Secretary or any other appropriate Federal official, may intervene as a matter of right.

**(5)** A court, in issuing any final order in any action brought pursuant to subsection (a)(1) or subsection (c) of this section, may award costs of litigation, including reasonable attorney and expert witness fees, to any party, whenever such court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in

a sufficient amount to compensate for any loss or damage suffered, in accordance with the Federal Rules of Civil Procedure.

**(6)** Except as provided in subsection (c) of this section, all suits challenging actions or decisions allegedly in violation of, or seeking enforcement of, the provisions of this Act, or any regulation promulgated under this Act, or the terms of any permit or lease issued by the Secretary under this Act, shall be undertaken in accordance with the procedures described in this subsection. Nothing in this section shall restrict any right which any person or class of persons may have under any other Act or common law to seek appropriate relief.

**(b) Jurisdiction and venue of actions.**

**(1)** Except as provided in subsection (c) of this section, the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals, or (B) the cancellation, suspension, or termination of a lease or permit under this Act. Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.

**(2)** Any resident of the United States who is injured in any manner through the failure of any operator to comply with any rule, regulation, order, or permit issued pursuant to this Act may bring an action for damages (including reasonable attorney and expert witness fees) only in the judicial district having jurisdiction under paragraph (1) of this subsection.

**(c) Review of Secretary's approval of leasing program; review of approval, modification or disapproval of exploration or production plan; persons who may seek review; scope of review; certiorari to Supreme Court.**

**(1)** Any action of the Secretary to approve a leasing program pursuant to section 18 [43 USCS § 1344] of this Act shall be subject to judicial review only in the United States Court of Appeal [Appeals] for the District of Columbia.

**(2)** Any action of the Secretary to approve, require modification of, or disapprove any exploration plan or any development and production plan under this Act shall be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located.

**(3)** The judicial review specified in paragraphs (1) and (2) of this subsection shall be available only to a person who (A) participated in the administrative proceedings related to the actions specified in such paragraphs, (B) is adversely affected or aggrieved by such action, (C) files a petition for review of the Secretary's action within sixty days after the date of such action, and (D) promptly transmits copies of the petition to the Secretary and to the Attorney General.

**(4)** Any action of the Secretary specified in paragraph (1) or (2) shall only be subject to review pursuant to the provisions of this subsection, and shall be specifically

Add. 00094

excluded from citizen suits which are permitted pursuant to subsection (a) of this section.

**(5)**  The Secretary shall file in the appropriate court the record of any public hearings required by this Act and any additional information upon which the Secretary based his decision, as required by section 2112 of title 28, United States Code. Specific objections to the action of the Secretary shall be considered by the court only if the issues upon which such objections are based have been submitted to the Secretary during the administrative proceedings related to the actions involved.

**(6)**  The court of appeals conducting a proceeding pursuant to this subsection shall consider the matter under review solely on the record made before the Secretary. The findings of the Secretary, if supported by substantial evidence on the record considered as a whole, shall be conclusive. The court may affirm, vacate, or modify any order or decision or may remand the proceedings to the Secretary for such further action as it may direct.

**(7)**  Upon the filing of the record with the court, pursuant to paragraph (5), the jurisdiction of the court shall be exclusive and its judgment shall be final, except that such judgment shall be subject to review by the Supreme Court of the United States upon writ of certiorari.

**(d) [Repealed]**

## History

**HISTORY:**

Aug. 7, 1953, ch 345, § 23, as added Sept. 18, 1978, P. L. 95-372, Title II, § 208, 92 Stat. 657; Nov. 8, 1984, P. L. 98-620, Title IV, Subtitle A, § 402(44), 98 Stat. 3360.

United States Code Service
Copyright © 2023 All rights reserved.

**End of Document**

Add. 00095

(d) We may begin the appropriate NEPA analysis and other relevant consultations when we determine that a proposed revision could:

(1) Result in a significant change in the impacts previously identified and evaluated;

(2) Require any additional Federal authorizations; or

(3) Involve activities not previously identified and evaluated.

(e) When you propose a revision, we may approve the revision if we determine that the revision is:

(1) Designed not to cause undue harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance; and

(2) Otherwise consistent with the provisions of subsection 8(p) of the OCS Lands Act.

**§585.618  What must I do upon completion of approved site assessment activities?**

(a) If, prior to the expiration of your site assessment term, you timely submit a COP meeting the requirements of this subpart, or a complete FERC license application, that describes the continued use of existing facilities approved in your SAP, you may keep such facilities in place on your lease during the time that BOEM reviews your COP for approval or FERC reviews your license application for approval.

(b) You are not required to initiate the decommissioning process for facilities that are authorized to remain in place under your approved COP or approved FERC license.

(c) If, following the technical and environmental review of your submitted COP, BOEM determines that such facilities may not remain in place, you must initiate the decommissioning process, as provided in subpart I of this part.

(d) If FERC determines that such facilities may not remain in place, you must initiate the decommissioning process as provided in subpart I of this part.

(e) You must initiate the decommissioning process, as set forth in subpart I of this part, upon the termination of your lease.

**§585.619  [Reserved]**

CONSTRUCTION AND OPERATIONS PLAN FOR COMMERCIAL LEASES

**§585.620  What is a Construction and Operations Plan (COP)?**

The COP describes your construction, operations, and conceptual decommissioning plans under your commercial lease, including your project easement. BOEM will withhold trade secrets and commercial or financial information that is privileged or confidential from public disclosure under exemption 4 of the FOIA and in accordance with the terms of §585.113.

(a) Your COP must describe all planned facilities that you will construct and use for your project, including onshore and support facilities and all anticipated project easements.

(b) Your COP must describe all proposed activities including your proposed construction activities, commercial operations, and conceptual decommissioning plans for all planned facilities, including onshore and support facilities.

(c) You must receive BOEM approval of your COP before you can begin any of the approved activities on your lease.

**§585.621  What must I demonstrate in my COP?**

Your COP must demonstrate that you have planned and are prepared to conduct the proposed activities in a manner that conforms to your responsibilities listed in §585.105(a) and:

(a) Conforms to all applicable laws, implementing regulations, lease provisions, and stipulations or conditions of your commercial lease;

(b) Is safe;

(c) Does not unreasonably interfere with other uses of the OCS, including those involved with National security or defense;

(d) Does not cause undue harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance;

599

Add. 00096

(e) Uses best available and safest technology;

(f) Uses best management practices; and

(g) Uses properly trained personnel.

### § 585.622  How do I submit my COP?

(a) You must submit one paper copy and one electronic version of your COP to BOEM at the address listed in § 585.110(a).

(b) You may submit information and a request for any project easement as part of your original COP submission or as a revision to your COP.

### §§ 585.623–585.625  [Reserved]

CONTENTS OF THE CONSTRUCTION AND OPERATIONS PLAN

### § 585.626  What must I include in my COP?

(a) You must submit the results of the following surveys for the proposed site(s) of your facility(ies). Your COP must include the following information:

| Information: | Report contents: | Including: |
|---|---|---|
| (1) Shallow hazards ........ | The results of the shallow hazards survey with supporting data. | Information sufficient to determine the presence of the following features and their likely effects on your proposed facility, including: (i) Shallow faults; (ii) Gas seeps or shallow gas; (iii) Slump blocks or slump sediments; (iv) Hydrates; or (v) Ice scour of seabed sediments. |
| (2) Geological survey relevant to the design and siting of your facility. | The results of the geological survey with supporting data. | Assessment of: (i) Seismic activity at your proposed site; (ii) Fault zones; (iii) The possibility and effects of seabed subsidence; and (iv) The extent and geometry of faulting attenuation effects of geologic conditions near your site. |
| (3) Biological .................... | The results of the biological survey with supporting data. | A description of the results of biological surveys used to determine the presence of live bottoms, hard bottoms, and topographic features, and surveys of other marine resources such as fish populations (including migratory populations), marine mammals, sea turtles, and sea birds. |
| (4) Geotechnical survey .. | The results of your sediment testing program with supporting data, the various field and laboratory test methods employed, and the applicability of these methods as they pertain to the quality of the samples, the type of sediment, and the anticipated design application. You must explain how the engineering properties of each sediment stratum affect the design of your facility. In your explanation, you must describe the uncertainties inherent in your overall testing program, and the reliability and applicability of each test method. | (i) The results of a testing program used to investigate the stratigraphic and engineering properties of the sediment that may affect the foundations or anchoring systems for your facility. (ii) The results of adequate *in situ* testing, boring, and sampling at each foundation location, to examine all important sediment and rock strata to determine its strength classification, deformation properties, and dynamic characteristics. (iii) The results of a minimum of one deep boring (with soil sampling and testing) at each edge of the project area and within the project area as needed to determine the vertical and lateral variation in seabed conditions and to provide the relevant geotechnical data required for design. |
| (5) Archaeological resources. | The results of the archaeological resource survey with supporting data. | A description of the historic and prehistoric archaeological resources, as required by the NHPA (16 U.S.C. 470 *et. seq.*), as amended. |
| (6) Overall site investigation. | An overall site investigation report for your facility that integrates the findings of your shallow hazards surveys and geologic surveys, and, if required, your subsurface surveys with supporting data. | An analysis of the potential for: (i) Scouring of the seabed; (ii) Hydraulic instability; (iii) The occurrence of sand waves; (iv) Instability of slopes at the facility location; (v) Liquefaction, or possible reduction of sediment strength due to increased pore pressures; (vi) Degradation of subsea permafrost layers; |

(e) Uses best available and safest technology;

(f) Uses best management practices; and

(g) Uses properly trained personnel.

## § 585.622  How do I submit my COP?

(a) You must submit one paper copy and one electronic version of your COP to BOEM at the address listed in § 585.110(a).

(b) You may submit information and a request for any project easement as part of your original COP submission or as a revision to your COP.

## §§ 585.623–585.625  [Reserved]

CONTENTS OF THE CONSTRUCTION AND OPERATIONS PLAN

## § 585.626  What must I include in my COP?

(a) You must submit the results of the following surveys for the proposed site(s) of your facility(ies). Your COP must include the following information:

| Information: | Report contents: | Including: |
|---|---|---|
| (1) Shallow hazards ........ | The results of the shallow hazards survey with supporting data. | Information sufficient to determine the presence of the following features and their likely effects on your proposed facility, including:<br>(i) Shallow faults;<br>(ii) Gas seeps or shallow gas;<br>(iii) Slump blocks or slump sediments;<br>(iv) Hydrates; or<br>(v) Ice scour of seabed sediments. |
| (2) Geological survey relevant to the design and siting of your facility. | The results of the geological survey with supporting data. | Assessment of:<br>(i) Seismic activity at your proposed site;<br>(ii) Fault zones;<br>(iii) The possibility and effects of seabed subsidence; and<br>(iv) The extent and geometry of faulting attenuation effects of geologic conditions near your site. |
| (3) Biological .................... | The results of the biological survey with supporting data. | A description of the results of biological surveys used to determine the presence of live bottoms, hard bottoms, and topographic features, and surveys of other marine resources such as fish populations (including migratory populations), marine mammals, sea turtles, and sea birds. |
| (4) Geotechnical survey .. | The results of your sediment testing program with supporting data, the various field and laboratory test methods employed, and the applicability of these methods as they pertain to the quality of the samples, the type of sediment, and the anticipated design application. You must explain how the engineering properties of each sediment stratum affect the design of your facility. In your explanation, you must describe the uncertainties inherent in your overall testing program, and the reliability and applicability of each test method. | (i) The results of a testing program used to investigate the stratigraphic and engineering properties of the sediment that may affect the foundations or anchoring systems for your facility.<br>(ii) The results of adequate *in situ* testing, boring, and sampling at each foundation location, to examine all important sediment and rock strata to determine its strength classification, deformation properties, and dynamic characteristics.<br>(iii) The results of a minimum of one deep boring (with soil sampling and testing) at each edge of the project area and within the project area as needed to determine the vertical and lateral variation in seabed conditions and to provide the relevant geotechnical data required for design. |
| (5) Archaeological resources. | The results of the archaeological resource survey with supporting data. | A description of the historic and prehistoric archaeological resources, as required by the NHPA (16 U.S.C. 470 *et. seq.*), as amended. |
| (6) Overall site investigation. | An overall site investigation report for your facility that integrates the findings of your shallow hazards surveys and geologic surveys, and, if required, your subsurface surveys with supporting data. | An analysis of the potential for:<br>(i) Scouring of the seabed;<br>(ii) Hydraulic instability;<br>(iii) The occurrence of sand waves;<br>(iv) Instability of slopes at the facility location;<br>(v) Liquefaction, or possible reduction of sediment strength due to increased pore pressures;<br>(vi) Degradation of subsea permafrost layers; |

Add. 00098

| Information: | Report contents: | Including: |
|---|---|---|
| | | (vii) Cyclic loading; |
| | | (viii) Lateral loading; |
| | | (ix) Dynamic loading; |
| | | (x) Settlements and displacements; |
| | | (xi) Plastic deformation and formation collapse mechanisms; and |
| | | (xii) Sediment reactions on the facility foundations or anchoring systems. |

(b) Your COP must include the following project-specific information, as applicable.

| Project information: | Including: |
|---|---|
| (1) Contact information ................................................ | The name, address, e-mail address, and phone number of an authorized representative. |
| (2) Designation of operator, if applicable .................... | As provided in §585.405. |
| (3) The construction and operation concept ................ | A discussion of the objectives, description of the proposed activities, tentative schedule from start to completion, and plans for phased development, as provided in §585.629. |
| (4) Commercial lease stipulations and compliance ...... | A description of the measures you took, or will take, to satisfy the conditions of any lease stipulations related to your proposed activities. |
| (5) A location plat ...................................................... | The surface location and water depth for all proposed and existing structures, facilities, and appurtenances located both offshore and onshore, including all anchor/mooring data. |
| (6) General structural and project design, fabrication, and installation. | Information for each type of structure associated with your project and, unless BOEM provides otherwise, how you will use a CVA to review and verify each stage of the project. |
| (7) All cables and pipelines, including cables on project easements. | Location, design and installation methods, testing, maintenance, repair, safety devices, exterior corrosion protection, inspections, and decommissioning. |
| (8) A description of the deployment activities .............. | Safety, prevention, and environmental protection features or measures that you will use. |
| (9) A list of solid and liquid wastes generated ............ | Disposal methods and locations. |
| (10) A listing of chemical products used (if stored volume exceeds Environmental Protection Agency (EPA) Reportable Quantities). | A list of chemical products used; the volume stored on location; their treatment, discharge, or disposal methods used; and the name and location of the onshore waste receiving, treatment, and/or disposal facility. A description of how these products would be brought onsite, the number of transfers that may take place, and the quantity that will be transferred each time. |
| (11) A description of any vessels, vehicles, and aircraft you will use to support your activities. | An estimate of the frequency and duration of vessel/vehicle/aircraft traffic. |
| (12) A general description of the operating procedures and systems. | (i) Under normal conditions. |
| | (ii) In the case of accidents or emergencies, including those that are natural or manmade. |
| (13) Decommissioning and site clearance procedures ...... | A discussion of general concepts and methodologies. |
| (14) A listing of all Federal, State, and local authorizations, approvals, or permits that are required to conduct the proposed activities, including commercial operations. | (i) The U.S. Coast Guard, U.S. Army Corps Of Engineers, and any other applicable authorizations, approvals, or permits, including any Federal, State or local authorizations pertaining to energy gathering, transmission or distribution (e.g., interconnection authorizations). |
| | (ii) A statement indicating whether you have applied for or obtained such authorization, approval, or permit. |
| (15) Your proposed measures for avoiding, minimizing, reducing, eliminating, and monitoring environmental impacts. | A description of the measures you will use to avoid or minimize adverse effects and any potential incidental take before you conduct activities on your lease, and how you will mitigate environmental impacts from your proposed activities, including a description of the measures you will use as required by subpart H of this part. |
| (16) Information you incorporate by reference ............... | A listing of the documents you referenced. |
| (17) A list of agencies and persons with whom you have communicated, or with whom you will communicate, regarding potential impacts associated with your proposed activities. | Contact information and issues discussed. |
| (18) Reference .......................................................... | A list of any document or published source that you cite as part of your plan. You may reference information and data discussed in other plans you previously submitted or that are otherwise readily available to BOEM. |
| (19) Financial assurance ........................................... | Statements attesting that the activities and facilities proposed in your COP are or will be covered by an appropriate bond or security, as required by §§585.515 and 585.516. |

Add. 00099

| Project information: | Including: |
|---|---|
| (20) CVA nominations for reports required in subpart G of this part. | CVA nominations for reports in subpart G of this part, as required by § 585.706, or a request for a waiver under § 585.705(c). |
| (21) Construction schedule ........................................................ | A reasonable schedule of construction activity showing significant milestones leading to the commencement of commercial operations. |
| (22) Air quality information ...................................................... | As described in § 585.659 of this section. |
| (23) Other information ............................................................. | Additional information as required by BOEM. |

§ 585.627  What information and certifications must I submit with my COP to assist the BOEM in complying with NEPA and other relevant laws?

(a) You must submit with your COP detailed information to assist BOEM in complying with NEPA and other relevant laws. Your COP must describe those resources, conditions, and activities listed in the following table that could be affected by your proposed activities, or that could affect the activities proposed in your COP, including:

| Type of information: | Including: |
|---|---|
| (1) Hazard information .............. | Meteorology, oceanography, sediment transport, geology, and shallow geological or manmade hazards. |
| (2) Water quality ....................... | Turbidity and total suspended solids from construction. |
| (3) Biological resources ............ | Benthic communities, marine mammals, sea turtles, coastal and marine birds, fish and shellfish, plankton, seagrasses, and plant life. |
| (4) Threatened or endangered species. | As defined by the ESA (16 U.S.C. 1531 *et seq.*). |
| (5) Sensitive biological resources or habitats. | Essential fish habitat, refuges, preserves, special management areas identified in coastal management programs, sanctuaries, rookeries, hard bottom habitat, chemosynthetic communities, calving grounds, barrier islands, beaches, dunes, and wetlands. |
| (6) Archaeological resources .... | As required by the NHPA (16 U.S.C. 470 *et seq.*), as amended. |
| (7) Social and economic resources. | Employment, existing offshore and coastal infrastructure (including major sources of supplies, services, energy, and water), land use, subsistence resources and harvest practices, recreation, recreational and commercial fishing (including typical fishing seasons, location, and type), minority and lower income groups, coastal zone management programs, and viewshed. |
| (8) Coastal and marine uses .... | Military activities, vessel traffic, and energy and nonenergy mineral exploration or development. |
| (9) Consistency Certification .... | As required by the CZMA regulations:<br>(i) 15 CFR part 930, subpart D, if your COP is submitted before lease issuance.<br>(ii) 15 CFR part 930, subpart E, if your COP is submitted after lease issuance. |
| (10) Other resources, conditions, and activities. | As identified by BOEM. |

(b) You must submit one paper copy and one electronic copy of your consistency certification. Your consistency certification must include:

(1) One copy of your consistency certification under either subsection 307(c)(3)(B) of the CZMA (16 U.S.C. 1456(c)(3)(B)) and 15 CFR 930.76 or subsection 307(c)(3)(A) of the CZMA (16 U.S.C. 1456(c)(3)(A)) and 15 CFR 930.57, stating that the proposed activities described in detail in your plans comply with the State(s) approved coastal management program(s) and will be conducted in a manner that is consistent with such program(s); and

(2) ''Necessary data and information,'' as required by 15 CFR 930.58.

(c) You must submit your oil spill response plan, as required by 30 CFR part 254.

(d) You must submit your Safety Management System as required by § 585.810.

[76 FR 64623, Oct. 18, 2011, as amended at 79 FR 21624, Apr. 17, 2014]

§ 585.628  How will BOEM process my COP?

(a) BOEM will review your submitted COP, and the information provided pursuant to § 585.627, to determine if it contains all the required information necessary to conduct our technical and environmental reviews. We will notify you if your submitted COP lacks any necessary information.

Add. 00100

# PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1   Purpose.
1500.2   Policy.
1500.3   Mandate.
1500.4   Reducing paperwork.
1500.5   Reducing delay.
1500.6   Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55990, Nov. 28, 1978, unless otherwise noted.

## § 1500.1   Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## § 1500.2   Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

## § 1500.3   Mandate.

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act)

467

Add. 00101

This content is from the eCFR and is authoritative but unofficial.

📅 Displaying the eCFR in effect on 9/14/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**
**Subchapter A - National Environmental Policy Act Implementing Regulations**
**Part 1501 - NEPA and Agency Planning**

⊙ **§ 1501.3 Determine the appropriate level of NEPA review.**

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:

(1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions consistent with § 1501.9(e)(1).

(1) In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

(2) In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) Effects on public health and safety.

(iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

This content is from the eCFR and is authoritative but unofficial.

📅 Displaying the eCFR in effect on 9/14/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**
**Subchapter A - National Environmental Policy Act Implementing Regulations**
**Part 1502 - Environmental Impact Statement**

◉ **§ 1502.2 Implementation.**

(a) Environmental impact statements shall not be encyclopedic.

(b) Environmental impact statements shall discuss impacts in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be analytic, concise, and no longer than necessary to comply with NEPA and with the regulations in this subchapter. Length should be proportional to potential environmental effects and project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of NEPA as interpreted in the regulations in this subchapter and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the decision maker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (*see also* § 1506.1 of this chapter).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

Add. 00103

This content is from the eCFR and is authoritative but unofficial.

📅 Displaying the eCFR in effect on 9/14/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**
**Subchapter A - National Environmental Policy Act Implementing Regulations**
**Part 1502 - Environmental Impact Statement**

◉ **§ 1502.14 Alternatives including the proposed action.**

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

### § 1508.6 Council.

*Council* means the Council on Environmental Quality established by title II of the Act.

### § 1508.7 Cumulative impact.

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

### § 1508.8 Effects.

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

### § 1508.9 Environmental assessment.

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

### § 1508.10 Environmental document.

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

### § 1508.11 Environmental impact statement.

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

### § 1508.12 Federal agency.

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

### § 1508.13 Finding of no significant impact.

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

### § 1508.20  Mitigation.

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

### § 1508.21  NEPA process.

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

### § 1508.22  Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

### § 1508.23  Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative

means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

### § 1508.24  Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

### § 1508.25  Scope.

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental

consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

## § 1508.26 Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

## § 1508.27 Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity.

(a) *Context*. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity*. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

## § 1508.28 Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement

495

This document is current through the Dec. 1, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 83508, 88 FR 83509, 88 FR 83726, 88 FR 83467, and 88 FR 83830.

*Code of Federal Regulations  >  Title 50 Wildlife and Fisheries  >  Chapter IV — Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations  >  Subchapter A —  >  Part 402 — Interagency Cooperation — Endangered Species Act of 1973, as Amended  >  Subpart B — Consultation Procedures*

## § 402.14 Formal consultation.

**(a)** Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

**(b)** Exceptions.

**(1)** A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

**(2)** A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

**(c)** Initiation of formal consultation. (1) A written request to initiate formal consultation shall be submitted to the Director and shall include:

**(i)** A description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action. Consistent with the nature and scope of the proposed action, the description shall provide sufficient detail to assess the effects of the action on listed species and critical habitat, including:

**(A)** The purpose of the action;

**(B)** The duration and timing of the action;

**(C)** The location of the action;

**(D)** The specific components of the action and how they will be carried out;

**(E)** Maps, drawings, blueprints, or similar schematics of the action; and

**(F)** Any other available information related to the nature and scope of the proposed action relevant to its effects on listed species or designated critical habitat.

**(ii)** A map or description of all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (i.e., the action area as defined at § 402.02).

**(iii)** Information obtained by or in the possession of the Federal agency and any applicant on the listed species and designated critical habitat in the action area (as required by paragraph (c)(1)(ii) of this section), including available information such as the presence, abundance, density, or periodic occurrence of listed species and the condition and location of the species' habitat, including any critical habitat.

**(iv)** A description of the effects of the action and an analysis of any cumulative effects.

**(v)** A summary of any relevant information provided by the applicant, if available.

**(vi)** Any other relevant available information on the effects of the proposed action on listed species or designated critical habitat, including any relevant reports such as environmental impact statements and environmental assessments.

**(2)** A Federal agency may submit existing documents prepared for the proposed action such as NEPA analyses or other reports in substitution for the initiation package outlined in this paragraph (c). However, any such substitution shall be accompanied by a written summary specifying the location of the information that satisfies the elements above in the submitted document(s).

**(3)** Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with § 402.12.

**(4)** Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan. The provision in this paragraph (c)(4) does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole.

**(d)** Responsibility to provide best scientific and commercial data available. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

**(e)** Duration and extension of formal consultation. Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually

agree to extend the consultation provided that the Service submits to the applicant, before the close of the 90 days, a written statement setting forth:

> **(1)** The reasons why a longer period is required,

> **(2)** The information that is required to complete the consultation, and

> **(3)** The estimated date on which the consultation will be completed.

> A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

**(f)** Additional data. When the Service determines that additional data would provide a better information base from which to formulate a biological opinion, the Director may request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species or critical habitat. If formal consultation is extended by mutual agreement according to § 402.14(e), the Federal agency shall obtain, to the extent practicable, that data which can be developed within the scope of the extension. The responsibility for conducting and funding any studies belongs to the Federal agency and the applicant, not the Service. The Service's request for additional data is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act. If no extension of formal consultation is agreed to, the Director will issue a biological opinion using the best scientific and commercial data available.

**(g)** Service responsibilities. Service responsibilities during formal consultation are as follows:

> **(1)** Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

> **(2)** Evaluate the current status and environmental baseline of the listed species or critical habitat.

> **(3)** Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

> **(4)** Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

> **(5)** Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g)(1) through (3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45-day period

in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45-day or extended deadline while the draft is under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10-day extension on the deadline.

**(6)** Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

**(7)** Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

**(8)** In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.

**(h)** Biological opinions. (1) The biological opinion shall include:

**(i)** A summary of the information on which the opinion is based;

**(ii)** A detailed discussion of the environmental baseline of the listed species and critical habitat;

**(iii)** A detailed discussion of the effects of the action on listed species or critical habitat; and

**(iv)** The Service's opinion on whether the action is:

**(A)** Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy" biological opinion); or

**(B)** Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion).

**(2)** A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, the Service will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

**(3)** The Service may adopt all or part of:

Add. 00111

**(i)** A Federal agency's initiation package; or

**(ii)** The Service's analysis required to issue a permit under section 10(a) of the Act in its biological opinion.

**(4)** A Federal agency and the Service may agree to follow an optional collaborative process that would further the ability of the Service to adopt the information and analysis provided by the Federal agency during consultation in the development of the Service's biological opinion to improve efficiency in the consultation process and reduce duplicative efforts. The Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat, and other relevant factors to determine whether an action or a class of actions is appropriate for this process. The Federal agency and the Service may develop coordination procedures that would facilitate adoption of the initiation package with any necessary supplementary analyses and incidental take statement to be added by the Service, if appropriate, as the Service's biological opinion in fulfillment of section 7(b) of the Act.

**(i)** Incidental take.

**(1)** In those cases where the Service concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, the Service will provide with the biological opinion a statement concerning incidental take that:

**(i)** Specifies the impact, i.e., the amount or extent, of such incidental taking on the species (A surrogate (e.g., similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceeded.);

**(ii)** Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact;

**(iii)** In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;

**(iv)** Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (i)(1)(iii) of this section; and

**(v)** Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

**(2)** Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes.

**(3)** In order to monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. The reporting requirements will be established in accordance with 50 CFR 13.45 and 18.27 for FWS and 50 CFR 216.105 and 222.301(h) for NMFS.

**(4)** If during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is exceeded, the Federal agency must reinitiate consultation immediately.

**(5)** Any taking which is subject to a statement as specified in paragraph (i)(1) of this section and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required.

**(6)** For a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate. For a mixed programmatic action, an incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation.

**(j)** Conservation recommendations. The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

**(k)** Incremental steps. When the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the Service shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action. Upon the issuance of such a biological opinion, the Federal agency may proceed with or authorize the incremental steps of the action if:

**(1)** The biological opinion does not conclude that the incremental step would violate section 7(a)(2);

**(2)** The Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step;

**(3)** The Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action;

**(4)** The incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and

**(5)** There is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

**(l)** Expedited consultations. Expedited consultation is an optional formal consultation process that a Federal agency and the Service may enter into upon mutual agreement. To determine whether an action or a class of actions is appropriate for this type of consultation, the Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat and other relevant factors. Conservation actions whose primary purpose is to have beneficial effects on listed species will likely be considered appropriate for expedited consultation.

> **(1)** Expedited timelines. Upon agreement to use this expedited consultation process, the Federal agency and the Service shall establish the expedited timelines for the completion of this consultation process.

> **(2)** Federal agency responsibilities. To request initiation of expedited consultation, the Federal agency shall provide all the information required to initiate consultation under paragraph (c) of this section. To maximize efficiency and ensure that it develops the appropriate level of information, the Federal agency is encouraged to develop its initiation package in coordination with the Service.

> **(3)** Service responsibilities. In addition to the Service's responsibilities under the provisions of this section, the Service will:

>> **(i)** Provide relevant species information to the Federal agency and guidance to assist the Federal agency in completing its effects analysis in the initiation package; and

>> **(ii)** Conclude the consultation and issue a biological opinion within the agreed-upon timeframes.

**(m)** Termination of consultation.

> **(1)** Formal consultation is terminated with the issuance of the biological opinion.

> **(2)** If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service.

> **(3)** If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to adversely affect any listed species or critical habitat, the consultation is terminated.

## Statutory Authority

16 U.S.C. 1531 et seq.

## History

[51 FR 19957, June 3, 1986, as amended at 54 FR 40350, Sept. 29, 1989; 73 FR 76272, 76287, Dec. 16, 2008; 74 FR 20421, 20423, May 4, 2009; 80 FR 26832, 26844, May 11, 2015; 84 FR 44976, 45016, Aug. 27, 2019; 84 FR 50333, Sept. 25, 2019]

This document is current through the Dec. 1, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 83508, 88 FR 83509, 88 FR 83726, 88 FR 83467, and 88 FR 83830.

*Code of Federal Regulations  >  Title 50 Wildlife and Fisheries  >  Chapter IV — Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations  >  Subchapter A —  >  Part 402 — Interagency Cooperation — Endangered Species Act of 1973, as Amended  >  Subpart B — Consultation Procedures*

## § 402.16 Reinitiation of consultation.

**(a)** Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

**(1)** If the amount or extent of taking specified in the incidental take statement is exceeded;

**(2)** If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

**(3)** If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or

**(4)** If a new species is listed or critical habitat designated that may be affected by the identified action.

**(b)** An agency shall not be required to reinitiate consultation after the approval of a land management plan prepared pursuant to 43 U.S.C. 1712 or 16 U.S.C. 1604 upon listing of a new species or designation of new critical habitat if the land management plan has been adopted by the agency as of the date of listing or designation, provided that any authorized actions that may affect the newly listed species or designated critical habitat will be addressed through a separate action-specific consultation. This exception to reinitiation of consultation shall not apply to those land management plans prepared pursuant to 16 U.S.C. 1604 if:

**(1)** Fifteen years have passed since the date the agency adopted the land management plan prepared pursuant to 16 U.S.C. 1604; and

**(2)** Five years have passed since the enactment of Public Law 115-141 [March 23, 2018] or the date of the listing of a species or the designation of critical habitat, whichever is later.

## Statutory Authority

16 U.S.C. 1531 et seq.

## History

[51 FR 19957, June 3, 1986; 84 FR 44976, 45017, Aug. 27, 2019; 84 FR 50333, Sept. 25, 2019]

Annotations

## Notes

[PUBLISHER'S NOTE:

FEDERAL CASES CITING THIS SECTION — Greenpeace Found. v. Daley, 122 F. Supp. 2d 1110].

[EFFECTIVE DATE NOTE:

84 FR 44976, 45017, Aug. 27, 2019, amended this section, effective Sept. 26, 2019; 84 FR 50333, Sept. 25, 2019, delayed the effective date of the amendment appearing at 84 FR 44976, 45016 until Oct. 28, 2019.]

Notes to Decisions

Administrative Law: Agency Rulemaking: Rule Application & Interpretation: General Overview

Administrative Law: Judicial Review: Administrative Record: General Overview

Administrative Law: Judicial Review: Standards of Review: Arbitrary & Capricious Review

Business & Corporate Law: Agency Relationships: Terminations: General Overview

Civil Procedure: Justiciability: Mootness: General Overview

Constitutional Law: The Judiciary: Case or Controversy: Mootness: General Overview

Environmental Law: Litigation & Administrative Proceedings

Environmental Law: Litigation & Administrative Proceedings: Judicial Review

Environmental Law: National Environmental Policy Act: General Overview

Environmental Law: National Environmental Policy Act: Environmental Assessments

*USCS Federal Rules Annotated  >  Federal Rules of Appellate Procedure  >  II. Appeal from a Judgment or Order of a District Court*

## Rule 4. Appeal as of Right—When Taken [Effective December 1, 2023]

**(a) Appeal in a Civil Case.**

**(1)** *Time for Filing a Notice of Appeal.*

**(A)**  In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

**(B)**  The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

**(i)**  the United States;

**(ii)**  a United States agency;

**(iii)**  a United States officer or employee sued in an official capacity; or

**(iv)**  a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf—including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

**(C)**  An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

**(2)**  *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order — but before the entry of the judgment or order — is treated as filed on the date of and after the entry.

**(3)**  *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

**(4)**  *Effect of a Motion on a Notice of Appeal.*

**(A)**  If a party files in the district court any of the following motions under the Federal Rules of Civil Procedure—and does so within the time allowed by those rules—the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

**(i)**  for judgment under Rule 50(b);

**(ii)** to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

**(iii)** for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

**(iv)** to alter or amend the judgment under Rule 59;

**(v)** for a new trial under Rule 59; or

**(vi)** for relief under Rule 60 if the motion is filed within the time allowed for filing a motion under Rule 59.

**(B)**

**(i)** If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

**(ii)** A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

**(iii)** No additional fee is required to file an amended notice.

**(5)** *Motion for Extension of Time.*

**(A)** The district court may extend the time to file a notice of appeal if:

**(i)** a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

**(ii)** regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

**(B)** A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

**(C)** No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

**(6)** *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

**(A)** the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77(d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

**(B)** the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77(d) of the entry, whichever is earlier; and

**(C)** the court finds that no party would be prejudiced.

**(7)** *Entry Defined.*

**(A)** A judgment or order is entered for purposes of this Rule 4(a):

**(i)** if Federal Rule of Civil Procedure 58(a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a); or

**(ii)** if Federal Rule of Civil Procedure 58(a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

- the judgment or order is set forth on a separate document, or

- 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79(a).

**(B)** A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order.

**(b) Appeal in a Criminal Case.**

**(1)** *Time for Filing a Notice of Appeal.*

**(A)** In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of:

**(i)** the entry of either the judgment or the order being appealed; or

**(ii)** the filing of the government's notice of appeal.

**(B)** When the government is entitled to appeal, its notice of appeal must be filed in the district court within 30 days after the later of:

**(i)** the entry of the judgment or order being appealed; or

**(ii)** the filing of a notice of appeal by any defendant.

**(2)** *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision, sentence, or order — but before the entry of the judgment or order — is treated as filed on the date of and after the entry.

**(3)** *Effect of a Motion on a Notice of Appeal.*

**(A)** If a defendant timely makes any of the following motions under the Federal Rules of Criminal Procedure, the notice of appeal from a judgment of conviction must be filed within 14 days after the entry of the order disposing of the last such remaining motion, or within 14 days after the entry of the judgment of conviction, whichever period ends later. This provision applies to a timely motion:

**(i)** for judgment of acquittal under Rule 29;

Add. 00119

**(ii)** for a new trial under Rule 33, but if based on newly discovered evidence, only if the motion is made no later than 14 days after the entry of the judgment; or

**(iii)** for arrest of judgment under Rule 34.

**(B)** A notice of appeal filed after the court announces a decision, sentence, or order — but before it disposes of any of the motions referred to in Rule 4(b)(3)(A) — becomes effective upon the later of the following:

**(i)** the entry of the order disposing of the last such remaining motion; or

**(ii)** the entry of the judgment of conviction.

**(C)** A valid notice of appeal is effective — without amendment — to appeal from an order disposing of any of the motions referred to in Rule 4(b)(3)(A).

**(4)** *Motion for Extension of Time.* Upon a finding of excusable neglect or good cause, the district court may — before or after the time has expired, with or without motion and notice — extend the time to file a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this Rule 4(b).

**(5)** *Jurisdiction.* The filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a), nor does the filing of a motion under 35(a) affect the validity of a notice of appeal filed before entry of the order disposing of the motion. The filing of a motion under Federal Rule of Criminal Procedure 35(a) does not suspend the time for filing a notice of appeal from a judgment of conviction.

**(6)** *Entry Defined.* A judgment or order is entered for purposes of this Rule 4(b) when it is entered on the criminal docket.

**(c) Appeal by an Inmate Confined in an Institution.**

**(1)** If an institution has a system designed for legal mail, an inmate confined there must use that system to receive the benefit of this Rule 4(c)(1). If an inmate files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing and:

**(A)** it is accompanied by:

**(i)** a declaration in compliance with 28 U.S.C. § 1746—or a notarized statement—setting out the date of deposit and stating that first-class postage is being prepaid; or

**(ii)** evidence (such as a postmark or date stamp) showing that the notice was so deposited and that postage was prepaid; or

**(B)** the court of appeals exercises its discretion to permit the later filing of a declaration or notarized statement that satisfies Rule 4(c)(1)(A)(i).

**(2)** If an inmate files the first notice of appeal in a civil case under this Rule 4(c), the 14-day period provided in Rule 4(a)(3) for another party to file a notice of appeal runs from the date when the district court dockets the first notice.

Add. 00120

**(3)** When a defendant in a criminal case files a notice of appeal under this Rule 4(c), the 30-day period for the government to file its notice of appeal runs from the entry of the judgment or order appealed from or from the district court's docketing of the defendant's notice of appeal, whichever is later.

**(d) Mistaken Filing in the Court of Appeals.** If a notice of appeal in either a civil or a criminal case is mistakenly filed in the court of appeals, the clerk of that court must note on the notice the date when it was received and send it to the district clerk. The notice is then considered filed in the district court on the date so noted.

## History

Amended April 30, 1979, effective Aug. 1, 1979; Nov. 18, 1988, P. L. 100-690, Title VII, Subtitle C, § 7111, 102 Stat. 4419; April 30, 1991, eff. Dec. 1, 1991; April 22, 1993, eff. Dec. 1, 1993; April 27, 1995, eff. Dec. 1, 1995; April 24, 1998, eff. Dec. 1, 1998; April 29, 2002, eff. Dec. 1, 2002; April 25, 2005, eff. Dec. 1, 2005; March 26, 2009, eff. Dec. 1, 2009; April 28, 2010, eff. Dec. 1, 2010; April 26, 2011, eff. Dec. 1, 2011; April 28, 2016, eff. Dec. 1, 2016; April 27, 2017, eff. Dec. 1, 2017; April 24, 2023, eff. Dec. 1, 2023.

USCS Federal Rules Annotated
Copyright © 2023 All rights reserved.

Add. 00121

*USCS Federal Rules Annotated* **>** *Federal Rules of Civil Procedure* **>** *Title III. Pleadings and Motions*

## Rule 12. Defenses and Objections: when and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing

**(a) Time to Serve a Responsive Pleading.**

**(1)** *In General.* Unless another time is specified by this rule or a federal statute, the time for serving a responsive pleading is as follows:

**(A)** A defendant must serve an answer:

**(i)** within 21 days after being served with the summons and complaint; or

**(ii)** if it has timely waived service under Rule 4(d), within 60 days after the request for a waiver was sent, or within 90 days after it was sent to the defendant outside any judicial district of the United States.

**(B)** A party must serve an answer to a counterclaim or crossclaim within 21 days after being served with the pleading that states the counterclaim or crossclaim.

**(C)** A party must serve a reply to an answer within 21 days after being served with an order to reply, unless the order specifies a different time.

**(2)** *United States and Its Agencies, Officers, or Employees Sued in an Official Capacity.* The United States, a United States agency, or a United States officer or employee sued only in an official capacity must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the United States attorney.

**(3)** *United States Officers or Employees Sued in an Individual Capacity.* A United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the officer or employee or service on the United States attorney, whichever is later.

**(4)** *Effect of a Motion.* Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

**(A)** if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or

**(B)** if the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

**(b) How to Present Defenses.** Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

**(1)** lack of subject-matter jurisdiction;

**(2)** lack of personal jurisdiction;

**(3)** improper venue;

**(4)** insufficient process;

**(5)** insufficient service of process;

**(6)** failure to state a claim upon which relief can be granted; and

**(7)** failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

**(c) Motion for Judgment on the Pleadings.** After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

**(d) Result of Presenting Matters Outside the Pleadings.** If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

**(e) Motion for a More Definite Statement.** A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

**(f) Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

**(1)** on its own; or

**(2)** on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

**(g) Joining Motions.**

Add. 00123

**(1)** *Right to Join.* A motion under this rule may be joined with any other motion allowed by this rule.

**(2)** *Limitation on Further Motions.* Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

**(h) Waiving and Preserving Certain Defenses.**

**(1)** *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)–(5) by:

**(A)** omitting it from a motion in the circumstances described in Rule 12(g)(2); or

**(B)** failing to either:

**(i)** make it by motion under this rule; or

**(ii)** include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

**(2)** *When to Raise Others.* Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:

**(A)** in any pleading allowed or ordered under Rule 7(a);

**(B)** by a motion under Rule 12(c); or

**(C)** at trial.

**(3)** *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

**(i) Hearing Before Trial.** If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

## History

Amended March 19, 1948; July 1, 1963; July 1, 1966; Aug. 1, 1987; Dec. 1, 1993; Dec. 1, 2000; Dec. 1, 2007; Dec. 1, 2009.

USCS Federal Rules Annotated
Copyright © 2023 All rights reserved.

Add. 00124

# USCS Fed Rules Evid R 201

Current through changes received November 21, 2023.

## Rule 201. Judicial Notice of Adjudicative Facts

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b) Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:

**(1)** is generally known within the trial court's territorial jurisdiction; or

**(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c) Taking Notice.** The court:

**(1)** may take judicial notice on its own; or

**(2)** must take judicial notice if a party requests it and the court is supplied with the necessary information.

**(d) Timing.** The court may take judicial notice at any stage of the proceeding.

**(e) Opportunity to Be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

**(f) Instructing the Jury.** In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

## History

Jan. 2, 1975, P. L. 93-595, § 1, 88 Stat. 1930; April 26, 2011, eff. Dec. 1, 2011.

USCS Federal Rules Annotated
Copyright © 2023 All rights reserved.

## 86 FR 12495

Vol. 86, No. 040, Wednesday, March 3, 2021

Notices

**Reporter**
86 FR 12495 *

*Federal Register > 2021 > March > Wednesday, March 3, 2021 > Notices > U.S. International Trade Commission.*

**Title: Notice of a Commission Determination To Issue a Limited Exclusion Order Against the Defaulting Respondent; Termination of the Investigation; Certain Rolled-Edge Rigid Plastic Food Trays**

**Action:**  Notice.

## Agency

U.S. International Trade Commission.

**Identifier: [Investigation No. 337-TA-1203]**

## Synopsis

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission ("Commission") has determined to issue a limited exclusion order against defaulted respondent Ningbo Linhua Plastic Co., Ltd. ("Ningbo"), the last remaining respondent. The Commission has also determined to impose a bond equal to one hundred percent (100%) of the entered value of the infringing products imported during the period of Presidential review. The investigation is hereby terminated.

## Text

**SUPPLEMENTARY INFORMATION:**

The Commission instituted this investigation on June 23, 2020, based on a complaint filed by Clearly Clean Products, LLC of South Windsor, Connecticut and Converter Manufacturing, LLC of Orwigsburg, Pennsylvania ("Complainants"). 85 FR 37689-90 (June 23, 2020). The complaint alleges a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337 ("section 337"), by reason of infringement of certain claims of U.S. Patent Nos. 9,908,281 and 10,562,680. The notice of investigation named the following respondents: Eco Food Pak (USA), Inc. of Chino, California ("Eco") and Ningbo Linhua Plastic Co., Ltd. of Fenghua, China ("Ningbo"). The Commission's Office of Unfair Import Investigations ("OUII") also was named as a party.

Eco was terminated from the investigation on October 20, 2020, on the basis of a consent order and consent order stipulation. Comm'n Notice (Oct. 20, 2020).

Also on October 20, 2020, the Commission determined not to review an initial determination ("ID") (Order No. 7) granting Complainants' unopposed motion to find respondent Ningbo in default. Order No. 7 (Oct. 6, 2020), *unreviewed,* Comm'n Notice (Oct. 20, 2020). At that time, the Commission requested briefing on the issues of remedy, bonding, and the public interest with respect to Ningbo. 85 FR 67566-67 (Oct. 23, 2020).

On November 3, 2020, Complainants and OUII filed responses to the Commission's request for briefing. Both parties also filed reply submissions on November 10, 2020. No other submissions were received.

Upon review of the record, and in the absence of any response from Ningbo or from other interested persons or government agencies, and having concluded that it would not be contrary to the public interest to do so, the Commission has determined to issue a limited exclusion order against Ningbo pursuant to Section 337(g)(1), 19 U.S.C. 1337(g)(1). However, the Commission declines to issue the requested cease and desist order against Ningbo because Complainants have not established that Ningbo maintains a commercially significant inventory in the U.S. or engages in significant commercial business operations in the United States, taking the allegations in the complaint as true, and as supported by the available circumstantial evidence. *See Certain Arrowheads with Deploying Blades and Components Thereof and Packaging Therefor,* Inv. 337-TA-997, Comm'n Op. at 16, 17-20 (Apr. 28, 2017). Exhibits 19 and 20 to the Complaint reflect shipments of "trays" to terminated Respondent Eco, which has entered into a consent order in this investigation, and thus do not suggest ongoing commercial operations necessitating a CDO. Even assuming the shipments to non-parties reflected in Exhibit 19 included infringing products, the latest arrival of said shipments occurred in May 2018, and likewise do not support the inference that Ningbo or its agents *maintain* any, much less commercially significant, inventory in the U.S. *See* Compl., Ex. 19 at 9; *cf. Certain Electric Skin Care Devices, Brushes and Chargers Therefor, and Kits Containing the Same,* Inv. No. 337-TA-959, Comm'n Op. at 32 (Feb. 13, 2017) (evidence of "short lead times between order placement and delivery" and low shipping costs supported the inference that "U.S. purchases of the foreign respondents' infringing products were made from U.S. inventories"). The Commission has determined to set a bond in the amount of one hundred percent (100%) of the entered value of the covered products.

Commissioner Karpel and Commissioner Schmidtlein would issue both an LEO and a CDO directed to defaulting respondent Ningbo pursuant to Section 337(g)(1) because all requirements of this provision are met. Ningbo was named in the complaint and was served with the complaint and notice of investigation. *See* Order No. 7 (Oct. 6, 2020), *unreviewed,* Comm'n Notice (Oct. 20, 2020). The ALJ issued a show cause order ordering Ningbo to show cause why it should not be held in default for failing to respond to the [*12496] complaint and notice of investigation. *See id.* Ningbo did not file a response to the show cause order. *Id.* These findings satisfy subsections 337(g)(1)(A)-(D). Complainants requested an LEO and a CDO limited to Ningbo thus satisfying subsection 337(g)(1)(E). Given that subsections 337(g)(1)(A)-(E) are satisfied and Complainants requested these remedies, the statute directs the Commission to issue the requested LEO and CDO, subject to consideration of the public interest.

Commissioner Karpel and Commissioner Schmidtlein find that the public interest factors set forth in Section 337(g)(1) do not support a finding that these remedies would be contrary to the public interest.

The investigation is hereby terminated.

The Commission vote for this determination took place on February 25, 2021.

While temporary remote operating procedures are in place in response to COVID-19, the Office of the Secretary is not able to serve parties that have not retained counsel or otherwise provided a point of contact for electronic service. Accordingly, pursuant to Commission Rules 201.16(a) and 210.7(a)(1) (19 CFR 201.16(a), 210.7(a)(1)), the Commission orders that the Complainants complete service for any party/parties without a method of electronic service noted on the attached Certificate of Service and shall file proof of service on the Electronic Document Information System (EDIS).

The authority for the Commission's determination is contained in Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR part 210).

By order of the Commission.

Issued: February 25, 2021.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2021-04312 Filed 3-2-21; 8:45 am]

BILLING CODE 7020-02-P

## Contacts

**FOR FURTHER INFORMATION CONTACT:** Amanda Fisherow, Office of the General Counsel, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 205-2737. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.* General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov.* Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone 202-205-1810.

FEDERAL REGISTER

# 88 FR 27839

Vol. 88, No. 085, Wednesday, May 3, 2023

Proposed Rules

**Reporter**
88 FR 27839 *

*Federal Register > 2023 > May > Wednesday, May 3, 2023 > Proposed Rules > DEPARTMENT OF HOMELAND SECURITY - Coast Guard*

**Title: Safety Zone; Vineyard Wind 1 Wind Farm Project Area, Outer Continental Shelf, Lease OCS-A 0501, Offshore Massachusetts, Atlantic Ocean**

Action:                                    Notice of proposed rulemaking.

## Agency

Coast Guard, DHS.

**Identifier: [Docket Number USCG-2023-0277] > RIN 1625-AA00**

## Administrative Code Citation

**33 CFR Part 147**

## Synopsis

**SUMMARY:** The Coast Guard is proposing to establish 63 temporary 500-meter safety zones around the construction of 62 wind turbine generators (WTGs) and one electrical service platform (ESP) located in the Vineyard Wind 1 Wind Farm (VW1WF) project area within federal waters on the Outer Continental Shelf (OCS), specifically in the northern portion of Bureau of Ocean Energy Management (BOEM) Renewable Energy Lease Area OCS-A 0501, approximately 12 nautical miles (NM) offshore of Martha's Vineyard, Massachusetts and 12 NM offshore Nantucket, Massachusetts. This action is necessary to provide for the safety of life, property, and the environment during the planned construction of each facility's monopile type foundation and subsequent installation of the WTGs turbines and ESP platform from June 15, 2023, to May 31, 2024. When enforced, only attending vessels and those vessels specifically authorized by the First Coast Guard District Commander, or a designated representative, are permitted to enter or remain in the temporary safety zones. We invite your comments on this proposed rulemaking.

## Text

**SUPPLEMENTARY INFORMATION:**

**I. Table of Abbreviations**

BOEM   Bureau of Ocean Energy Management

CFR   Code of Federal Regulations

DD   Degrees Decimal

DHS   Department of Homeland Security

FR   Federal Register

NPRM   Notice of Proposed Rulemaking

OCS   Outer Continental Shelf

OSS   Offshore Substation

NAD   83 North American Datum of 1983

NM   Nautical Mile

§   Section

U.S.C.   United States Code

WTG   Wind Turbine Generator

VW1WF   Vineyard Wind 1 Wind Farm

**II. Background, Purpose, and Legal Basis**

On March 15, 2023, Vineyard Wind, LLC, an offshore wind farm developer, notified the Coast Guard that they plan to begin construction of facilities in the VW1WF project area within federal waters on the OCS, specifically in the northern portion of BOEM Renewable Energy Lease Area OCS-A 0501, approximately 12 NM offshore Martha's Vineyard, Massachusetts and 12 NM offshore Nantucket, Massachusetts in June 2023.

The extremely complex offshore construction of these OCS facilities presents many unusually hazardous conditions including hydraulic pile driving hammer operations, heavy lift operations, overhead cutting operations, potential falling debris, increased vessel traffic, and stationary barges in close proximity to the facilities and each other.

Based on these circumstances, the First Coast Guard District Commander has determined that establishment of 63 temporary safety zones through rulemaking is warranted to ensure the safety of life, property, and the environment within a 500-meter radius of each of the 63 facilities during their construction.

The Coast Guard is proposing this rule under the authorities provided in 14 U.S.C. 544, 43 U.S.C. 1333, and Department of Homeland Security (DHS) Delegation No. 00170.1,

Revision No. 01.3. As an implementing regulation of this authority, 33 CFR part 147 permits the establishment of safety zones for non-mineral energy resource permanent or temporary structures located on the OCS for the purpose of protecting life and property on the facilities, appurtenances and attending vessels, and on the adjacent waters within the safety zone (see 33 CFR 147.10). Accordingly, a safety zone established under 33 CFR part 147 may also include provisions to restrict, prevent, or control certain activities, including access by vessels or persons to maintain safety of life, property, and the environment. If, as we anticipate, we issue a temporary final rule and make it effective less than 30 days after publication in the **Federal Register**, we will explain in that publication, as required by 5 U.S.C. (d)(3), our good cause for doing so.

## III. Discussion of Proposed Rule

The District Commander is proposing to establish 63 temporary 500-meter safety zones around the construction of 62 WTGs and one ESP on the OCS from June 15, 2023, through 11:59 p.m. on May 31, 2024.

The construction of these facilities is expected to take place in mixed phases alternating between the installation of several monopile type foundations followed by the installation of the upper structures then repeating this process throughout the project area until all 63 facilities have been completed. The 63 temporary safety zones would be enforced individually as construction progresses from one structure location to the next throughout the entire process for a period lasting approximately 48 hours. The Coast Guard would make [*27840] notice of each enforcement period via the Local Notice to Mariners and issue a Broadcast Notice to Mariners via marine channel 16 (VHF-FM) as soon as practicable in response to an emergency or hazardous condition. The Coast Guard is publishing this rulemaking to be effective, and enforceable, through May 31, 2024, to encompass any construction delays due to weather or other unforeseen circumstances. If the project is completed before May 31, 2024, enforcement of the safety zones would be suspended, and notice given via Local Notice to Mariners.

Additional information about the construction process of the VW1WF can be found at *https://www.boem.gov/vineyard-wind*.

The 63 temporary 500-meter safety zones around the construction of 62 WTGs and one ESP are in the VW1WF project area, specifically in the northern portion of BOEM Renewable Energy Lease Area OCS-A 0501, approximately 12 NM offshore of Martha's Vineyard, Massachusetts and 12 NM offshore Nantucket, Massachusetts, within federal waters on the OCS.

The positions of each individual safety zone proposed by this rulemaking will be referred to using a unique alpha-numeric naming convention outlined in the "Rhode Island and Massachusetts Structure Labeling Plot (West)." [1]

---

[1] The Rhode Island and Massachusetts Structure Labeling Plot (West) is an attachment to the Conditions of Construction and Operations Plan Approval Lease Number OCS-A 0517 ( *boem.gov* ) and can be found at *https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SFWF-COP-Terms-and-Conditions.pdf.*

Aligning with authorities under 33 CFR 147.15, the proposed safety zones would include the area within 500-meters of the center point of the positions provided in the following table expressed in Decimal Degrees (DD) based on North American Datum 1983 (NAD 83).

| Name | Facility type | Latitude | Longitude |
|---|---|---|---|
| AL38 | WTG | 41.13701611 | −70.4638911 |
| AM37 | ESP | 41.12006116 | −70.4851682 |
| AM38 | WTG | 41.1203387 | −70.46335204 |
| AM39 | WTG | 41.1206168 | −70.441466 |

3

| AN36 | WTG | 41.10309271 | -70.507246 |
| AN37 | WTG | 41.10337912 | -70.485198 |
| AN38 | WTG | 41.10366120 | -70.463150 |
| AN39 | WTG | 41.10393924 | -70.441101 |
| AP35 | WTG | 41.08612519 | -70.528906 |

| | | | |
|---|---|---|---|
| AP36 | WTG | 41.0864155 | −70.5068649 |
| AP37 | WTG | 41.0867017 | −70.4848226 |
| AP38 | WTG | 41.0869837 | −70.4627799 |
| AP39 | WTG | 41.0872615 | −70.4407369 |
| AP40 | WTG | 41.0875351 | −70.4186937 |
| AP41 | WTG | 4 | − |

| | | Latitude | Longitude |
|---|---|---|---|
| | | 1.0878044 | 70.3966501 |
| AQ34 | WTG | 41.0691535 | –70.5505566 |
| AQ35 | WTG | 41.0694480 | –70.5285205 |
| AQ36 | WTG | 41.0697382 | –70.5064840 |
| AQ37 | WTG | 41.0700243 | –70.4844472 |
| AQ38 | WTG | 41 | –7 |

| ID | | Latitude | Longitude |
|------|-----|-------------|--------------|
| | | .0703061 | 0.4624101 |
| AQ39 | WTG | 41.0705837 | -70.4403727 |
| AQ40 | WTG | 41.0708571 | -70.4183350 |
| AQ41 | WTG | 41.0711263 | -70.3962970 |
| AQ42 | WTG | 41.0713913 | -70.3742587 |
| AR33 | WTG | 41.0 | -70 |

| ID | Type | Latitude | Longitude |
|---|---|---|---|
|  |  | 0521781 | .5721951 |
| AR34 | WTG | 41.0524766 | -70.5501649 |
| AR35 | WTG | 41.0527709 | -70.5281343 |
| AR36 | WTG | 41.0530609 | -70.5061034 |
| AR37 | WTG | 41.0533468 | -70.4840722 |
| AR38 | WTG | 41.0 | -70.0 |

| ID | Type | Latitude | Longitude |
|----|------|----------|-----------|
|  |  | ...53628 57 | ...46204 0 |
| AR39 | WTG | 41.05390598 | -70.4400088 |
| AR40 | WTG | 41.05417927 | -70.4179 76 |
| AR41 | WTG | 41.05444822 | -70.3959 44 |
| AR42 | WTG | 41.05471305 | -70.3739 11 |
| AS32 | WTG | 41.03... | -70.5... |

| | | | |
|---|---|---|---|
| | | 51987 | 938225 |
| AS33 | WTG | 41.0355012 | -70.5717982 |
| AS34 | WTG | 41.0357995 | -70.5497735 |
| AS35 | WTG | 41.0360937 | -70.5277485 |
| AS36 | WTG | 41.0363836 | -70.5057231 |
| AS37 | WTG | 41.036 | -70.48 |

| Point | Type | Latitude | Longitude |
|---|---|---|---|
| | | 6693<br>5 | 3697 |
| AS38 | WTG | 41.0369508 | -170.4616715 |
| AS39 | WTG | 41.0372281 | -170.4396452 |
| AS40 | WTG | 41.0375012 | -170.4176186 |
| AS41 | WTG | 41.0377501 | -170.3955918 |
| AS42 | WTG | 41.0380 | -170.373 |

| | | |
|---|---|---|
| | | ...347 | ...5646 |

| Name | Type | | |
|---|---|---|---|
| | | 3 | 5 |
| | | 4 | 6 |
| | | 7 | 4 |
| | | | 6 |
| AT33 | WTG | 41.0188243 | –70.1574016 |
| AT34 | WTG | 41.0191225 | –70.5493824 |
| AT35 | WTG | 41.0194164 | –70.5273630 |
| AT36 | WTG | 41.0197062 | –70.5053432 |
| AT37 | WTG | 41.01999... | –70.4833... |

| | | Latitude | Longitude |
|---|---|---|---|
| | | ...17 | ...231 |
| AT38 | WTG | 41.0202731 | -70.4613027 |
| AT39 | WTG | 41.0205502 | -70.4392819 |
| AT40 | WTG | 41.0208231 | -70.4172609 |
| [*27841] AT41 | WTG | 41.0210918 | -70.3952396 |
| AU36 | WTG | 41.0030288 | -70.50496 |

| Designation | Type | Latitude | Longitude |
|---|---|---|---|
| | | ...7 | ...36 |
| AU37 | WTG | 41.0033141 | -70.4829490 |
| AU38 | WTG | 41.0035953 | -70.4600941 |
| AU39 | WTG | 41.0038722 | -70.4389190 |
| AU40 | WTG | 41.0041450 | -70.4169035 |
| AV37 | WTG | 40.9866364 | -70.4825755 |

**Add. 00143**

|  |  | 2 |  |
| --- | --- | --- | --- |
| AV38 | WTG | 40.9869174 | -70.4605659 |
| AV39 | WTG | 40.9871942 | -70.4385563 |
| AW38 | WTG | 40.9702395 | -70.4601980 |

The positions of the 63 proposed safety zones are shown on the following chartlets. For scaling purposes, there is approximately one NM spacing between each position.

BILLING CODE 9110-04-P

Add. 00144

88 FR 27839, *27840



(Small scale chartlet showing the positions of the proposed safety zones.)

[*27842]



(Large scale chartlet showing the positions of the proposed safety zones.)

(Chartlet showing turbine positions using unique alpha-numeric naming convention.)

[*27843]

BILLING CODE 9110-04-C

Navigation in the vicinity of the proposed safety zones consists of large commercial shipping vessels, fishing vessels, cruise ships, tugs with tows, and recreational vessels.

When enforced, no unauthorized vessel or person would be permitted to enter the safety zone without obtaining permission from the First Coast Guard District Commander or a designated representative. Requests for entry into the safety zone would be considered and reviewed on a case-by-case basis. Persons or vessels seeking to enter the safety zone must request authorization from the First Coast Guard District Commander or designated representative via VHF-FM channel 16 or by phone at 617-603-1560 (First Coast Guard District Command Center). If permission is granted, all persons and vessels shall comply with the instructions of the First Coast Guard District Commander or designated representative.

The proposed regulatory text appears at the end of this document.

**IV. Regulatory Analyses**

We developed this proposed rule after considering numerous statutes and Executive Orders related to rulemaking. A summary of our analyses based on these statutes and Executive Orders follows.

## A. Regulatory Planning and Review

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. This NPRM has not been designated a "significant regulatory action," under Executive Order 12866. Accordingly, the NPRM has not been reviewed by the Office of Management and Budget (OMB).

Aligning with 33 CFR 147.15, the safety zones established would extend to a maximum distance of 500-meters around the OCS facility measured from its center point. Vessel traffic would be able to safely transit around the proposed safety zones, which would impact a small, designated area in the Atlantic Ocean, without significant impediment to their voyage. This safety zone would provide for the safety of life, property, and the environment during the construction of each structure, in accordance with Coast Guard maritime safety missions.

## B. Impact on Small Entities

The Regulatory Flexibility Act of 1980, 5 U.S.C. 601-612, as amended, requires Federal agencies to consider the potential impact of regulations on small entities during rulemaking. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. The Coast Guard certifies under 5 U.S.C. 605(b) that this proposed rule would not have a significant economic impact on a substantial number of small entities.

This rule may affect owners or operators of vessels intending to transit or anchor in the VW1WF, some of which might be small entities. However, these safety zones would not have a significant economic impact on a substantial number of these entities because they are temporarily enforced, allow for deviation requests, and do not impact vessel transit significantly. Regarding the enforcement period, although these safety zones would be in effect from June 15, 2023, through May 31, 2024, vessels would only be prohibited from the regulated zone during periods of actual construction activity in correspondence to the period of enforcement. We expect the enforcement period at each location to last approximately 48 hours as construction progresses from one structure location to the next throughout the mixed phases. Additionally, vessel traffic could pass safely around each safety zone using an alternate route. Use of an alternate route likely will cause minimal delay for the vessel in reaching their destination depending on other traffic in the area and vessel speed. Vessels would also be able to request deviation from this rule to transit through a safety zone. Such requests would be considered on a case by-case basis and may be authorized by the First Coast Guard District Commander or a designated representative. For these reasons, the Coast Guard expects any impact of this rulemaking establishing a temporary safety zone around these OCS facilities to be minimal and have no significant economic impact on small entities.

If you think that your business, organization, or governmental jurisdiction qualifies as a small entity and that this proposed rule would have a significant economic impact on it, please submit a comment (see **ADDRESSES**) explaining why you think it qualifies and how and to what degree this rule would economically affect it.

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104-121), we want to assist small entities in understanding this proposed rule. If the proposed rule would affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please call or email the person listed in the **FOR FURTHER INFORMATION CONTACT** section. The Coast Guard will not retaliate against small entities that question or complain about this proposed rule or any policy or action of the Coast Guard.

## C. Collection of Information

This proposed rule would not call for a new collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520).

## D. Federalism and Indian Tribal Governments

A rule has implications for federalism under Executive Order 13132 (Federalism), if it has a substantial direct effect on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. We have analyzed this proposed rule under that Order and have determined that it is consistent with the fundamental federalism principles and preemption requirements described in Executive Order 13132.

Also, this proposed rule does not have tribal implications under Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments) because it would not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. If you believe this proposed rule has implications for federalism or Indian tribes, please call or email the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

## E. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531-1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the private sector of $100,000,000 (adjusted for inflation) or more in any one year. Though this proposed rule would not result in such an expenditure, we do discuss the potential effects of this proposed rule elsewhere in this preamble. [*27844]

## F. Environment

We have analyzed this proposed rule under Department of Homeland Security Directive 023-01, Rev. 1, associated implementing instructions, and Environmental Planning COMDTINST 5090.1 (series), which guide the Coast Guard in complying with the National

Environmental Policy Act of 1969 (42 U.S.C. 4321-4370f), and have made a preliminary determination that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This proposed rule involves the establishment of a safety zone around an OCS facility to protect life, property, and the marine environment. Normally such actions are categorically excluded from further review under paragraph L60 of Appendix A, Table 1 of DHS Instruction Manual 023-01-001-01, Rev. 1. A preliminary Record of Environmental Consideration supporting this determination is available in the docket. For instructions on locating the docket, see the **ADDRESSES** section of this preamble. We seek any comments or information that may lead to the discovery of a significant environmental impact from this proposed rule.

### G. Protest Activities

The Coast Guard respects the First Amendment rights of protesters. Protesters are asked to call or email the person listed in the **FOR FURTHER INFORMATION CONTACT** section to coordinate protest activities so that your message can be received without jeopardizing the safety or security of people, places, or vessels.

### V. Public Participation and Request for Comments

We view public participation as essential to effective rulemaking and will consider all comments and material received during the comment period. Your comment can help shape the outcome of this rulemaking. If you submit a comment, please include the docket number for this rulemaking, indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation.

*Submitting comments.* We encourage you to submit comments through the Federal Decision-Making Portal at *https://www.regulations.gov.* To do so, go to *https://www.regulations.gov,* type USCG-2023-0277 in the search box and click "Search." Next, look for this document in the Search Results column, and click on it. Then click on the Comment option. If you cannot submit your material by using *https://www.regulations.gov,* call or email the person in the **FOR FURTHER INFORMATION CONTACT** section of this proposed rule for alternate instructions.

*Viewing material in docket.* To view documents mentioned in this proposed rule as being available in the docket, find the docket as described in the previous paragraph, and then select "Supporting & Related Material" in the Document Type column. Public comments will also be placed in our online docket and can be viewed by following instructions on the *https://www.regulations.gov* Frequently Asked Questions web page. We review all comments received, but we will only post comments that address the topic of the proposed rule. We may choose not to post off-topic, inappropriate, or duplicate comments that we receive.

*Personal information.* We accept anonymous comments. Comments we post to *https://www.regulations.gov* will include any personal information you have provided. For more about privacy and submissions to the docket in

Add. 00150

response to this document, see DHS's eRulemaking System of Records notice (85 FR 14226, March 11, 2020).

## Regulations

**List of Subjects in 33 CFR Part 147**

Continental shelf, Marine safety, Navigation (waters).

For the reasons discussed in the preamble, the Coast Guard is proposing to amend 33 CFR part 147 as follows:

**PART 147 — SAFETY ZONES**

1. The authority citation for part 147 continues to read as follows:

**Authority:** 14 U.S.C. 544; 43 U.S.C. 1333; 33 CFR 1.05-1; Department of Homeland Security Delegation No. 00170.1, Revision No. 01.3.

2. Add § 147.T01-0277 to read as follows:

**§ 147.T01-0277 Safety Zones; Vineyard Wind 1 Wind Farm Project Area, Outer Continental Shelf, Lease OCS-A 0501, Offshore Massachusetts, Atlantic Ocean.**

(a)                    *Description.*                    The area within 500-meters of the center point of the positions provided in the table 1 is a safety zone:

| Table 1 to Paragraph (a) | |
|---|---|
| Name | Facility type |
| AL38 | WTG |
| AM37 | ESP |

88 FR 27839, *27844

**Table 1 to
Paragraph
(a)**

A     W
M     T
3     G
8

A     W
M     T
3     G
9

A     W
N     T
3     G
6

A     W
N     T
3     G
7

A     W
N     T
3     G

**Table 1 to
Paragraph
(a)
8**

A    W
N    T
3    G
9

A    W
P    T
3    G
5

A    W
P    T
3    G
6

A    W
P    T
3    G
7

A    W

| Table 1 to Paragraph (a) | |
|---|---|
| P 3 8 | T G |
| A P 3 9 | W T G |
| A P 4 0 | W T G |
| A P 4 1 | W T G |
| A Q 3 4 | W T G |

88 FR 27839, *27844

**Table 1 to
Paragraph
(a)**

A    W
Q    T
3    G
5

A    W
Q    T
3    G
6

A    W
Q    T
3    G
7

A    W
Q    T
3    G
8

A    W
Q    T
3    G
9

**Table 1 to
Paragraph
(a)**

A   W
Q   T
4   G
0

A   W
Q   T
4   G
1

A   W
Q   T
4   G
2

   W
   T
[  G
*
2
7
8
4
5
]

A
R
3
3

A   W
R   T
3   G
4

**Add. 00156**

88 FR 27839, *27844

**Table 1 to
Paragraph
(a)**

A W
R T
3 G
5

A W
R T
3 G
6

A W
R T
3 G
7

A W
R T
3 G
8

A W
R T

**Add. 00157**

**Table 1 to Paragraph (a)**

| | |
|---|---|
| 3 9 | G |
| | |
| A R 4 0 | W T G |
| | |
| A R 4 1 | W T G |
| | |
| A R 4 2 | W T G |
| | |
| A S 3 2 | W T G |

**Table 1 to
Paragraph
(a)**

A    W
S    T
3    G
3

A    W
S    T
3    G
4

A    W
S    T
3    G
5

A    W
S    T
3    G
6

A    W
S    T
3    G
7

88 FR 27839, *27844

**Table 1 to
Paragraph
(a)**

A         W
S         T
3         G
8

A         W
S         T
3         G
9

A         W
S         T
4         G
0

A         W
S         T
4         G
1

A         W
S         T
4         G
2

**Table 1 to Paragraph (a)**

A W
T T
3 G
3

A W
T T
3 G
4

A W
T T
3 G
5

A W
T T
3 G
6

A W
T T
3 G
7

88 FR 27839, *27844

**Table 1 to
Paragraph
(a)**

A       W
T       T
3       G
8

A       W
T       T
3       G
9

A       W
T       T
4       G
0

A       W
T       T
4       G
1

A       W
U       T
3       G

**Table 1 to
Paragraph
(a)**

6

| A | W |
| U | T |
| 3 | G |
| 7 | |

| A | W |
| U | T |
| 3 | G |
| 8 | |

| A | W |
| U | T |
| 3 | G |
| 9 | |

| A | W |
| U | T |
| 4 | G |
| 0 | |

| A | W |

| Table 1 to Paragraph (a) | |
|---|---|
| V | T |
| 3 | G |
| 7 | |
| A | W |
| V | T |
| 3 | G |
| 8 | |
| A | W |
| V | T |
| 3 | G |
| 9 | |
| A | W |
| W | T |
| 3 | G |
| 8 | |

(b) *Definitions.* As used in this section, *designated representative* means a Coast Guard Patrol Commander, including a Coast Guard coxswain, petty officer, or other officer operating a Coast Guard vessel and a Federal, State, and local officer designated by or assisting the First Coast Guard District Commander in the enforcement of the safety zones.

**Add. 00164**

(c) *Regulations.* No vessel may enter or remain in the safety zones described in paragraph (a) of this section except for the following:

(1) An attending vessel as defined in 33 CFR 147.20;

(2) A vessel authorized by the First Coast Guard District Commander or a designated representative.

(d) *Request for Permission.* Persons or vessels seeking to enter the safety zone must request authorization from the First Coast Guard District Commander or a designated representative. If permission is granted, all persons and vessels must comply with lawful instructions of the First Coast Guard District Commander or designated representative via VHF-FM channel 16 or by phone at 617-223-1560 (First Coast Guard District Command Center).

(e) *Effective and enforcement periods.* This section will be effective from June 15, 2023, through 11:59 p.m. on May 31, 2024. It will only be enforced during active construction or other instances which may cause a hazard to navigation deemed necessary by the First Coast Guard District Commander. The First Coast Guard District Commander will make notification of the exact dates and times in advance of each enforcement period for the locations above in paragraph (a) of this section to the local maritime community through the Local Notice to Mariners and will issue a Broadcast Notice to Mariners via marine channel 16 (VHF-FM) as soon as practicable in response to an emergency. If the project is completed before May 31, 2024, enforcement of the safety zones will be suspended, and notice given via Local Notice to Mariners. The First Coast Guard District Local Notice to Mariners can be found at: *http://www.navcen.uscg.gov.*

Dated: April 27, 2023.

**J.W. Mauger,**

*Rear Admiral, U.S. Coast Guard, Commander, First Coast Guard District.*

Dated: April 27, 2023.

**J.W. Mauger,**

*Rear Admiral, U.S. Coast Guard, Commander, First Coast Guard District.*

[FR Doc. 2023-09415 Filed 5-2-23; 8:45 am]

BILLING CODE 9110-04-P

## Dates

**DATES:** Comments and related material must be received by the Coast Guard on or before June 2, 2023.

**en·sky** \in-ˈskī, en-\ *vt* (1603) : EXALT ⟨I hold you as a thing *enskied* and sainted —Shak.⟩

**en·slave** \in-ˈslāv, en-\ *vt* (1628) : to reduce to or as if to slavery : SUBJUGATE — **en·slave·ment** \-mənt\ *n* — **en·slav·er** *n*

**en·snare** \in-ˈsner, en-\ *vt* (1576) : to take or as if in a snare *syn* see CATCH

**en·snarl** \in-ˈsnär(-ə)l, en-\ *vt* (15c) : to involve in a snarl

**en·sor·cell** or **en·sor·cel** \in-ˈsȯr-səl\ *vt* **-celled** or **-celed; -cell·ing** or **-cel·ing** [MF *ensorceler*, alter. of OF *ensorcerer*, fr. *en-* + *sorcerer*, fr. *sorcier, sorcerer* sorcerer — more at SORCERY] (ca. 1541) : BEWITCH, ENCHANT — **en·sor·cell·ment** \-mənt\ *n*

**en·soul** \in-ˈsōl, en-\ *vt* (1605) : to endow or imbue with a soul — **en·soul·ment** \-mənt\ *n*

**en·sphere** \in-ˈsfir, en-\ *vt* (1612) : to enclose in or as if in a sphere

**en·sue** \in-ˈsü, en-\ *vb* **en·sued; en·su·ing** [ME, fr. AF *ensivre* (3d sing. *ensiut*), fr. *en-* + *sivre* to follow — more at SUE] *vi* (14c) : to strive to attain : PURSUE ⟨I wander, seeking peace, and *ensuing* it —Rupert Brooke⟩ ~ *vt* : to take place afterward or as a result *syn* see FOLLOW

**en suite** \äⁿ-ˈswēt\ *adv or adj* [F] (1812) : so as to form a suite : CONNECTED ⟨bathroom *en suite*⟩; *also* : so as to make a matching set

**en·sure** \in-ˈshu̇r\ *vt* **en·sured; en·sur·ing** [ME, fr. AF *ensurer*, alter. of *assurer* — more at ASSURE] (1660) : to make sure, certain, or safe : GUARANTEE

*syn* ENSURE, INSURE, ASSURE, SECURE mean to make a thing or person sure. ENSURE, INSURE, and ASSURE are interchangeable in many contexts where they indicate the making certain or inevitable of an outcome, but ENSURE may imply a virtual guarantee ⟨the government has *ensured* the safety of the refugees⟩, while INSURE sometimes stresses the taking of necessary measures beforehand ⟨careful planning should *insure* the success of the party⟩, and ASSURE distinctively implies the removal of doubt and suspense from a person's mind ⟨I assure you that no harm will be done⟩. SECURE implies action taken to guard against attack or loss ⟨sent reinforcements to secure their position⟩.

**en·swathe** \in-ˈswäth, -ˈswȯth, -ˈswath, en-\ *vt* (1597) : to enfold or enclose with or as if with a covering : SWATHE

**ENT** *abbr* ear, nose, and throat

**ent-** or **ento-** *comb form* [NL, fr. Gk *entos* within; akin to L *intus* within, Gk *en* in — more at IN] : inner : within ⟨*entoderm*⟩

**en·tab·la·ture** \in-ˈta-blə-ˌchu̇r, -chər, -ˌtyu̇r\ *n* [obs. F, modif. of It *intavolatura*, fr. *intavolare* to put on a board or table, fr. *in-* (fr. L *in*) + *tavola* board, table, fr. L *tabula*] (1611) : a horizontal part in classical architecture that rests on the columns and consists of architrave, frieze, and cornice — see COLUMN illustration

**en·tail** \in-ˈtāl, en-\ *vt* [ME *entailen, entaillen*, fr. *en-* + *taile, taille* limitation — more at TAIL] (14c) **1** : to restrict (property) by limiting the inheritance to the owner's lineal descendants or to a particular class thereof **2 a** : to confer, assign, or transmit as if by entail : FASTEN ⟨~ed on them indelible disgrace —Robert Browning⟩ **b** : to fix (a person) permanently in some condition or status ⟨~ him and his heirs unto the crown —Shak.⟩ **3** : to impose, involve, or imply as a necessary accompaniment or result ⟨their project will ~ considerable expense⟩ — **en·tail·ment** \-ˈtāl-mənt\ *n* — **en·tail·er** *n*

**en·tail** \ˈen-ˌtāl, in-ˈtāl\ *n* (14c) **1 a** : an entailing esp. of lands **b** : an entailed estate **2** : something transmitted as if by entail

**ent·amoe·ba** \ˌen-tə-ˈmē-bə, n [NL] (1914) : any of a genus (*Entamoeba*) of amoebas parasitic in vertebrates and including one (*E. histolytica*) that causes amebic dysentery in humans

**en·tan·gle** \in-ˈtaŋ-gəl, en-\ *vt* [ME, fr. AF *entangler* — more at TANGLE] (15c) **1 a** : to wrap or twist together : INTERWEAVE **b** : to involve in a perplexing or troublesome situation ⟨became *entangled* in a lawsuit⟩ **c** : to make complicated ⟨the story is *entangled* with legends⟩ — **en·tan·gler** \-g(ə-)lər\ *n*

**en·tan·gle·ment** \in-ˈtaŋ-gəl-mənt, en-\ *n* (1535) **1 a** : the action of entangling : the state of being entangled **b** : something that entangles, confuses, or ensnares ⟨a project delayed by legal ~s⟩ **2** : the condition of being deeply involved ⟨their ~ in politics⟩

**en·ta·sis** \ˈen-tə-səs\ *n, pl* **-ta·ses** \-tə-ˌsēz\ [Gk, lit., distension, stretching, fr. *enteinen* to stretch tight, fr. *en-* + *ten-* + *teinein* to stretch — more at THIN] (1664) : a slight convexity esp. in the shaft of a column

**en·tel·e·chy** \en-ˈte-lə-kē, in-\ *n, pl* **-chies** [LL *entelechia*, fr. Gk *entelecheia*, fr. *enteles* complete (fr. *en-* + *telos* end) + *echein* to have — more at TELOS, SCHEME] (1593) **1** : the actualization of form giving cause as contrasted with potential existence **2** : a hypothetical agency not demonstrable by scientific methods that in some vitalist doctrines is considered an inherent regulating and directing force in the development and functioning of an organism

**en·tente** \äⁿ-ˈtäⁿt\ *n* [F, fr. OF, intent, understanding — more at INTENT] (1854) **1** : an international understanding providing for a common course of action **2** [F *entente cordiale*] : a coalition of parties to an entente

**en·tente cor·diale** \(ˌ)äⁿ-ˌtäⁿt-ˌkȯr-ˈdyäl\ *n* [F, lit., cordial understanding] (1844) **1** : ENTENTE **2** : a friendly agreement or working relationship

**en·ter** \ˈen-tər\ *vb* **en·tered; en·ter·ing** \ˈen-t(ə-)riŋ\ [ME *entren*, fr. AF *entrer*, fr. L *intrare*, fr. *intra* within; akin to L *inter* between — more at INTER] *vi* (13c) **1** : to go or come in **2 a** : to come or gain admission into a group : JOIN — often used with *into* **3 a** : to make a beginning ⟨~*ing* upon a career⟩ **b** : to begin to consider a subject — usu. used with *into* or *upon* **4** : to go upon land for the purpose of taking possession **5 a** : to come onstage — usu. used in the subjunctive as a stage direction ⟨~ Hamlet reading⟩ **b** : to come into existence ⟨disillusionment or context like an actor coming onstage — usu. used in the subjunctive ⟨~ the new principal with her radical ideas⟩ **6** : to play a part : be a factor ⟨other considerations ~ when money is involved⟩ ~ *vt* **1** : to come or go into ⟨~ a room⟩ **2** : INSCRIBE, REGISTER ⟨~ the names of qualified voters⟩ **3 a** : to cause to be received or admitted ⟨~ a child at a school⟩ **b** : to put in : INSERT ⟨~ the new data into the computer⟩ **5 a** : to make a beginning in ⟨~ politics⟩ **b** : to go into (a particular period of time) ⟨~ middle age⟩ **6** : to become a member of or an active participant in ⟨~ the university⟩ ⟨~ a race⟩ **7** : to make report of (a ship or its cargo) to customs authorities **8** : to place in proper form before a court of law or upon record ⟨~ a writ⟩ **9** : to go into or upon and take actual possession of (as land) **10** : to

**put** formally on record ⟨~*ing* a complaint⟩ — **en·ter·able** \-t(ə-)rə-bəl\ *adj* — **enter into** **1** : to make oneself a party to or in ⟨*enter into* an agreement⟩ **2** : to take an active part in ⟨your problems shouldn't *enter into* it⟩ **3** : to participate or share in ⟨*enter into* the spirit of the occasion⟩ — **enter the lists** : to engage in a fight or struggle

*syn* ENTER, PENETRATE, PIERCE, PROBE mean to make way into something. ENTER is the most general of these and may imply either going in or forcing a way in ⟨*entered* the city in triumph⟩. PENETRATE carries a strong implication of an impelling force or compelling power that achieves entrance ⟨the enemy *penetrated* the fortress⟩. PIERCE means an entering or cutting through with a sharp pointed instrument ⟨*pierced* the boil with a lancet⟩. PROBE implies penetration to investigate or explore something hidden from sight or knowledge ⟨*probed* the depths of the sea⟩.

**enter-** or **entero-** *comb form* [Gk, fr. *enteron* — more at INTER-] : intestine ⟨*enteritis*⟩

**en·ter·al** \ˈen-tə-rəl\ *adj* (1903) : ENTERIC — **en·ter·al·ly** \-ē\ *adv*

**en·ter·ic** \en-ˈter-ik, in-\ *adj* (1833) **1** : of, relating to, or affecting the intestines; *broadly* : ALIMENTARY **2** : being or having a coating designed to pass through the stomach unaltered and disintegrate in the intestines ⟨~ aspirin⟩

**enteric fever** *n* (1862) : TYPHOID FEVER; *also* : PARATYPHOID

**en·ter·i·tis** \ˌen-tə-ˈrī-təs\ *n, pl* **en·ter·it·i·des** \-ˈri-tə-ˌdēz\ *also* **en·ter·i·tis·es** (1808) **1** : inflammation of the intestines and esp. of the human ileum **2** : a disease of domestic animals (as panleukopenia of cats) marked by enteritis and diarrhea

**en·tero·bac·te·ri·um** \ˌen-tə-rō-bak-ˈtir-ē-əm\ *n* (1957) : any of a family (Enterobacteriaceae) of gram-negative straight rod bacteria (as a salmonella, a shigella, or E. coli) that ferment glucose and include saprophytes as well as some serious plant and animal pathogens — **en·tero·bac·te·ri·al** \-ē-əl\ *adj*

**en·tero·bi·a·sis** \-ˈbī-ə-səs\ *n, pl* **-a·ses** \-ˌsēz\ [NL, fr. *Enterobius*, genus name (fr. Gk *enter-* + *bios* mode of life) + *-iasis*] (ca. 1927) : infestation with or disease caused by pinworms (genus *Enterobius*, esp. *E. vermicularis*) that occurs esp. in children

**en·tero·chro·maf·fin** \-ˈkrō-mə-fən\ *adj* (ca. 1941) : of or relating to epithelial cells of the intestinal mucosa that stain esp. with chromium salts and usu. contain serotonin



enterobacterium 1,
E. coli, 2 shigella

**en·tero·coc·cus** \-ˈkä-kəs\ *n, pl* **-coc·ci** \-ˈkäk-ˌ(s)ī, -ˈkäk-(ˌ)sē\ [NL, genus name] (1903) : any of a genus (*Enterococcus*) of gram-positive bacteria that resemble streptococci and were formerly classified with them; *esp* : a bacterium (*E. faecalis*) normally present in the intestine — **en·tero·coc·cal** \-kəl\ *adj*

**en·tero·coele** or **en·tero·coel** \ˈen-tə-rō-ˌsēl\ *n* (1877) : a coelom originating by outgrowth from the archenteron — **en·tero·coe·lous** \ˌen-tə-rō-ˈsē-ləs\ *adj* — **en·tero·coe·ly** \ˈen-tə-rō-ˌsē-lē\ *n*

**en·tero·co·li·tis** \ˌen-tə-rō-kə-ˈlī-təs\ *n* [NL] (ca. 1900) : enteritis affecting both the large and small intestine

**en·tero·gas·trone** \-ˈgas-ˌtrōn\ *n* [*enter-* + *gastr-* + *-one* (as in *hormone*)] (ca. 1930) : a hormone that is produced by the duodenal mucosa and has an inhibitory action on gastric motility and secretion

**en·tero·ki·nase** \ˌen-tə-rō-ˈkī-ˌnās, -ˈkin-ˌās\ *n* [ISV] (ca. 1902) : an enzyme esp. of the duodenal mucosa that activates trypsinogen by converting it to trypsin

**en·ter·on** \ˈen-tə-ˌrän, -rən\ *n* [NL, fr. Gk, intestine — more at INTER-] (ca. 1842) : the alimentary canal or system — used esp. of the embryo

**en·tero·patho·gen·ic** \ˌen-tə-rō-ˌpa-thə-ˈje-nik\ *adj* (1961) : tending to produce disease in the intestinal tract ⟨~ bacteria⟩

**en·ter·op·a·thy** \ˌen-tə-ˈrä-pə-thē\ *n* (ca. 1889) : a disease of the intestinal tract

**en·tero·os·to·my** \ˌen-tə-ˈräs-tə-mē\ *n, pl* **-mies** [ISV] (1878) : a surgical formation of an opening into the intestine through the abdominal wall — **en·ter·os·to·mal** \-tə-mal\ *adj*

**en·tero·toxi·gen·ic** \ˌen-tə-rō-ˌtäk-sə-ˈjen-ik\ *adj* (1946) : producing enterotoxin ⟨~ strains of E. coli⟩

**en·tero·tox·in** \ˌen-tə-rō-ˈtäk-sən\ *n* (ca. 1928) : a toxin that is produced by microorganisms (as some staphylococci) and causes gastrointestinal symptoms (as in some forms of food poisoning or colitis)

**en·tero·vi·rus** \-ˈvī-rəs\ *n* [NL] (1957) : any of a genus (*Enterovirus*) of picornaviruses that occur esp. in the gastrointestinal tract but may infect other tissues (as nerve and muscle) and that include the poliovirus and several species with numerous serotypes named as Coxsackie viruses and echoviruses — **en·tero·vi·ral** \-rəl\ *adj*

**en·ter·prise** \ˈen-tə(r)-ˌprīz\ *n* [ME, fr. AF, fr. *entreprendre* to undertake, fr. *entre-* inter- + *prendre* to take — more at PRIZE] (15c) **1 a** : a project or undertaking that is esp. difficult, complicated, or risky **2** : readiness to engage in daring or difficult action : INITIATIVE ⟨showed great ~ in dealing with the crisis⟩ **3 a** : a unit of economic organization or activity; *esp* : a business organization **b** : a systematic purposeful activity ⟨agriculture is the main economic ~ among these people⟩ — **en·ter·pris·er** \-ˌprī-zər\ *n* (1523) : ENTREPRENEUR

**enterprise zone** *n* (1978) : an economically depressed area in which business growth is encouraged by the government through tax relief and financial concessions

**en·ter·pris·ing** \-ˌprī-ziŋ\ *adj* (1611) : marked by an independent energetic spirit and by readiness to act ⟨an ~ young reporter⟩

**en·ter·tain** \ˌen-tər-ˈtān\ *vb* [ME *entertinen*, fr. MF *entretenir*, fr. *entre-* inter + *tenir* to hold — more at TENABLE] *vt* (15c) **1 a** *archaic* : MAINTAIN **b** *obs* : RECEIVE **2** : to show hospitality to ⟨~ guests⟩ **3 a** : to keep, hold, or maintain in the mind ⟨~ grave doubts about her sincerity⟩ **b** : to receive and take into consideration ⟨refused to ~ our plea⟩ **4** : to provide entertainment for **5** : to play against (an opposing team) on one's home field or court ~ *vi* : to provide entertainment esp. for guests *syn* see AMUSE — **en·ter·tain·er** *n*

**en·ter·tain·ing** \-ˈtā-niŋ\ *adj* (1670) : providing entertainment : DIVERTING ⟨an ~ book⟩ ⟨an ~ speaker⟩ — **en·ter·tain·ing·ly** \-ˈtā-niŋ-lē\ *adv*



Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-541
Phone: (202) 372-1566
Fax: (202) 372-1930
Email: George.H.Detweiler@uscg.mil

16670
13 January 2009

Dr. Walter D. Cruickshank, Ph.D.
Deputy Director, Minerals Management Service
1849 C Street, NW
Washington, DC 20240

Dear Dr. Cruickshank:

On November 14, 2008, the Coast Guard forwarded a package to Minerals Management Service (MMS) to advise that we had reviewed the Cape Wind Energy Project Draft Environmental Impact Statement (DEIS) and its associated public comments that addressed either safety of navigation, impacts to Coast Guard missions, or the Coast Guard's Terms and Conditions. That package contained the Coast Guard's assessment of the DEIS and our responses to public comments that addressed the potential impacts the proposed project may have on navigation safety. The assessment found that the proposed project would: (1) have a moderate impact on navigation safety, but sufficient mitigation measures are available to reduce risk to an acceptable level, and (2) have a negligible or no adverse impact on Coast Guard missions, and may in some circumstances actually facilitate the prosecution of certain missions.

Our letter indicated that one issue involving mitigation measures remained outstanding. Several comments to the DEIS docket expressed concern that the wind turbine generators may impact marine radars on vessels operating in the vicinity of the wind farm. In order to better address and understand potential wind farm impacts on marine radar the Coast Guard contracted with an independent third party, Technology Service Corporation (TSC), to evaluate and report on the impact of wind turbine generators on typical marine radars in navigation scenarios that would likely occur in Nantucket Sound. TSC delivered their report to the Coast Guard on December 16, 2008. A copy has been sent for inclusion in your Final EIS.

Enclosure (1) to this letter provides our assessment of the potential impacts to marine radar from the proposed Cape Wind energy project. This document is available for inclusion in the Final EIS. We recommend that the impacts to marine radar from the proposed energy project be categorized as "moderate" per the impact categories set forth in your DEIS.

We understand that after publication of the FEIS there will be a period during which time the public may comment on the contents and findings. As a cooperating agency, the Coast Guard would like to review and respond to comments submitted to the docket that address either safety of navigation, impacts to Coast Guard missions, or the Terms and Conditions. Based on our review, the Coast Guard will provide MMS with any updates to our Terms and Conditions if deemed appropriate.

**Add. 00167**

Thank you, and thanks to your staff as well, for the cooperation they have provided throughout this project. I trust that our fruitful partnership will continue throughout the Nantucket Sound Project, and look forward to working with you and your staff on future projects.

Sincerely,

Brian M. Salerno
Rear Admiral, U. S. Coast Guard
Assistant Commandant for Safety, Security
and Stewardship

Enclosure:    Assessment of Potential Impacts to Marine Radar

Copy:    The Honorable Dick Kempthorne
Secretary of the Interior

**Add. 00168**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

1. <u>Background</u>:  The Coast Guard, serving as a cooperating agency providing input in our areas of expertise to the lead Federal permitting agency, the Minerals Management Service (MMS), reviewed the Draft Environmental Impact Statement (DEIS) and applicable public comments submitted to the docket.  The Coast Guard submits this assessment which discusses the potential impacts to marine radar as it relates to navigation safety from the Nantucket Sound Wind Farm (NSWF).  The following references were used in the development of this assessment:

   (a)   Commandant (CG-ACO) ltr of 2Aug07, Cape Wind Navigation Terms and Conditions
   (b)   Cape Wind Revised Navigational Risk Assessment dtd 16Nov06
   (c)   Commandant Instruction M16672.2 (series), Navigation Rules, International-Inland
   (d)   Minerals Management Service's (MMS) Cape Wind Energy Project Draft Environmental Impact Statement (DEIS), January 2008

2. <u>Statistics</u>:  The following Nantucket Sound Wind Facility statistics were used in the development of this assessment:

| | |
|---|---|
| • 130 turbines | • 24 square miles:  Area of wind facility |
| • 277.5':  Height of towers above sea level | • 16.75':   Diameter of tower at sea level in water less than 40' deep<br>• 18':  Diameter of tower at sea level in water 40' deep or greater |
| • 341':     Blade diameter | • 75':  Lowest point of blade to sea level |
| • 440':     Highest point of blade above sea level | • Visibility in fog <2NM 10-18% of the time |
| • 5.6 miles:  Closest point of land (Cotuit, MA) | • .34 x .54 nautical miles:   Spacing between turbines |
| • 1166 yards:  Closest point of wind farm to the centerline of a marked channel (Tower I-16 & Cross Rip Shoals Federal Channel) | • 214:  Gallons of oil in each Wind Turbine Generator (WTG)<br>• 27,820:  Total gallons of oil in all WTGs combined |
| | • 42,000:  Maximum number of gallons, oil, stored in tanks at the Electrical Service Platform (ESP) |

3. <u>Potential impacts of the proposed wind farm to marine radar in Nantucket Sound</u>:   The proposed wind farm of 130 steel towers within a 24 square mile water sheet will impact marine radar.  The question before the Coast Guard is to determine the severity of that impact, the subsequent effect if any, on safe navigation, and if sufficient measures can be

Add. 00169

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

brought to bear to mitigate any adverse impacts such that navigation safety is maintained. Should those mitigation measures themselves have an adverse impact on some other component of maritime operations, that impact must also be assessed.

4. <u>Risk Assessment Methodology</u>:  The Coast Guard Southeastern New England Captain of the Port's (COTP) initial direction to the applicant in 2002 was to prepare a qualitative risk assessment, and that approach has been reviewed—and affirmed—by subsequent COTPs. When analyzing as wide, varied, and complex an issue as navigation safety, even a quantitative risk assessment would require subjective assignment of numerical values to various risk and mitigation factors.  Given the numerous variables of both risks and mitigations, a quantitative risk assessment would be of doubtful value.  Given the abundance of professional expertise among the Coast Guard and maritime community, a qualitative risk assessment provided a thorough and comprehensive method of evaluating risk.

5. <u>Discussion on the use of Marine Radar and Automatic Radar Plotting Aid (ARPA), and on Navigation and Navigation Rules</u>:  The use of available radar technology remains one of many tools employed by prudent mariners.  In general terms, radar displays on a screen the range, bearing, and relative motion of moving as well as stationary objects that are within range.  It began to be used regularly on marine vessels near the end of World War II.  It has become one of the more important instruments, particularly when visibility is restricted, in aiding a mariner to navigate safely and to avoid collisions.  Radar is required on many vessels (see the table below), and its proper use is mandated.

**Add. 00170**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

| Type of Vessel | Radar Required? (General Answer) | Common Exception | Cite |
|---|---|---|---|
| Fishing Vessel | No | Yes, if employing 16 people or more | 46 CFR 29.3 |
| Recreational Vessel | No | Yes, if over 1600 GT | 33 CFR 164 |
| Foreign Mega-Yacht | No | Yes, if carrying 12 or more passengers | 33 CFR 164 |
| Ferry | Yes | No, if carrying 49 passengers or less | 46 CFR Parts T & K |
| Towing Vessels | Yes | No, if vessel is less than 12 meters (39 feet) | 33 CFR 164 |
| Research Vessels | Yes | No, if vessel is less than 1600 GT | 33 CFR 164 |

a. An ARPA is a tool that enhances the radar display. ARPA calculates, among other things, a tracked object's course, speed and closest point of approach (CPA) thereby helping a mariner determine if there is a danger of collision with another vessel or landmass. Development of ARPA started after the accident in which the SS ANDREA DORIA collided with the freight ship STOCKHOLM in dense fog and sank south of Martha's Vineyard. ARPA-enabled radars are now available even for small vessels. A typical ARPA gives a presentation of the current situation and uses computer technology to predict future situations. It computes relative movement between one's own vessel and a radar contact (or contacts), and enables an operator to see proposed maneuvers by one's own ship. ARPA is required on even fewer vessels than radar, and is typically required on larger commercial vessels. The ferries that operate between Cape Cod and the islands are equipped with ARPA.

To the extent the proposed wind farm would affect marine radar, it may also affect the performance of installed ARPA systems, and consequently the ARPA's potential usefulness to operators. Like radar, though, ARPA is one of many tools utilized by prudent mariners to ensure safe navigation.

**Add. 00171**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

b.  Navigation is the process of directing the movement of a vessel, expeditiously and safely, from one point to another.  Navigation involves art, math and science, and the tools and methods available for navigating continue to evolve.  Regardless of navigation requirements, all vessel operators are expected to be prudent in navigating their vessel.  Navigation safety is aimed at ensuring a vessel operator does not run aground, collide with another vessel(s), or allide with a fixed object.

c.  The Navigation Rules (also known as the "Rules of the Road") are the rules a vessel operator is required to abide by to avoid a collision with another vessel.  The Convention on the International Regulations for Preventing Collisions at Sea, 1972, (COLREGS) as ratified by Congress and proclaimed by the President, *see* 33 U.S.C. 1601 *et. seq*., and contained in reference (c), sets forth the navigation rules applicable to where the wind farm is proposed.  The applicability of a given rule is dependent on the type of vessel, or the activity it is engaged in, and the circumstances surrounding a vessel at a given time.  This may include other vessel traffic and their activities, weather, geography and proximity to designated channels to name a few.  Radar and ARPA-enhanced radars are some of the many tools used in complying with the Navigation Rules, but should not be relied upon solely.  (*See* Rule 6 (noting that, in determining safe speed, vessels with radar must consider the characteristics, efficiency and limitations of radar); and Rule 7 (cautioning that, when assessing risk of collision, assumptions "shall not be made on the basis of scanty information, especially scanty radar information")).

d.  The Coast Guard, in its analysis of the impact on navigation safety the proposed wind farm may have on radar, has the expectation that vessel operators will comply with the COLREGS and all other applicable laws and regulations.  Further, the Coast Guard performed its analysis with the expectation that mariners will be prudent in their vessel operation to include the proper and accepted practices of radar and ARPA use.

6.  <u>Waterway Users and their Concerns</u>:  The following is a summary of the comments submitted to the MMS public docket concerning impacts on marine radar as it relates to navigation safety, categorized by waterway user groups.  These comments, which include descriptions of various waterway users in Nantucket Sound, and their respective characteristics and concerns regarding any impact on radar and navigation safety, were also considered for the type and behavior of waterway traffic a radar operator may expect to discern using radar as a collision avoidance tool.  Coast Guard responses are incorporated within some of the comments below, where appropriate.

a.  **<u>Commercial Fishing and Research Vessels</u>**:  Currently, due to various economic reasons commercial fishing on Horseshoe Shoal (which is limited to certain times of the year, and certain species) is frequently conducted by a single vessel operator who both navigates from the pilothouse and operates fishing gear from the stern.  That is, the single

**Add. 00172**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

vessel operator leaves the pilothouse unattended for periods of time to tend to fishing gear behind the vessel, making it difficult if not impossible to properly monitor the vessel's radar. Although this practice does not conform to the COLREGS, it is common among certain segments of the commercial fishing community. Commercial fishing interest commenters were primarily opposed to the proposed wind farm because of the following:

(1) The presence of the towers will affect the manner in which they fish, not necessarily their ability to fish. Said another way, the proposed wind farm will most affect commercial fishing in terms of economics, not safety. Clarifying comments from commercial fishermen to the Coast Guard after the Southeastern Massachusetts Port Safety and Security Forum's radar workshop suggested that commercial fishing could continue within the proposed wind farm but, to ensure navigation safety among the 130 towers, a second person would have to be on the vessel and in the pilothouse at all times (in conformance with the COLREGS). Having a second hired hand onboard may render commercial fishing in Horseshoe Shoal unprofitable. Economic impacts are outside the purview of the Coast Guard's review of the proposal.

(2) There was also a concern that fishermen using towed gear amongst the towers would be impacted from a safety perspective due to the possibility of gear snags on the bottom resulting in their vessel being pulled into a tower, an obstruction that did not exist before. Although this could be linked to the use of radar the avoidance of a tower should be no different than avoiding vessels in the area at anchor, aids to navigation or other fixed objects.

b. **Recreational Boaters**: Comments from, or pertaining to, recreational boaters were centered around one of two notions:

(1) As a group, recreational boaters are too incompetent, reckless, or both, to be able to safely navigate through the proposed wind farm, or
(2) The average recreational boater will be able to effectively navigate through the proposed wind farm without significant difficulty.

One argument made by some regarding recreational boaters is that the proposed wind farm would make it less convenient to navigate within the Horseshoe Shoal area of Nantucket Sound, and some recreational boaters may decide to avoid the wind farm footprint altogether and use existing channels and travel lanes around the Shoal.

c. **Passenger Ferries**: Both high-speed and traditional ferries frequent Nantucket Sound. There are (uncharted) ferry routes on each side of the triangle-shaped proposed wind

**Add. 00173**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

farm for transits between Hyannis on the mainland and the islands of Martha's Vineyard and Nantucket. The two major ferry operators are the Woods Hole, Martha's Vineyard and Nantucket Steamship Authority (Steamship Authority), a quasi-State-governmental organization, and its licensee, Hy-Line Ferry, which operates high speed ferries only.

(1) One concern of the ferry operators is the ability to detect, by radar, vessels transiting on the other side of the proposed wind farm. The TSC study, consistent with data in other existing studies, showed that radar detection of vessels outside the proposed wind farm was not severely impacted.

(2) Ferry operators were also concerned about small vessels, undetected on ferry radars, exiting the proposed wind farm and crossing one of the ferry routes adjacent to the proposed wind farm. The TSC study showed that vessels outside the proposed wind farm (such as ferries) could detect small vessels within the proposed wind farm, but discerning such vessels would require greater operator attention.

(3) Similarly, ferry operators expressed concern that the proximity of their frequent transit routes to the wind farm would make already difficult to detect (small) targets, more difficult to discern or track within or as they exit the proposed wind farm.

  (a) The Coast Guard finds that the distance of the ferry routes to the east are sufficiently separated from the proposed wind farm to result in few radar impacts.

  (b) Similarly, the Coast Guard finds that the distance of the ferry routes to the south are sufficient even in the main channel (adjacent to the proposed wind farm). Through interviews of ferry captains operating between Martha's Vineyard and Nantucket it was learned that many ferries operate outside and to the south of the main channel to avoid Horseshoe Shoal altogether.

  (c) The distance of the ferry routes to the northwest of the proposed wind farm is also considered sufficient, especially when considering that only highly-maneuverable high-speed ferries operate on this route and the proposed wind farm in that vicinity is in the shallowest area of Horseshoe Shoal where ferries already take precautions to remain a safe distance away.

(4) Another closely related, stated concern of ferry operators was that in poor weather, with winds from due west or due east, ferries transiting between Hyannis and Nantucket must "tack" into or against the prevailing wind to provide a safer and more comfortable ride. These tacking maneuvers purportedly require ferries to transit close to, if not within, the proposed wind farm, thus potentially lessening reaction times for

Add. 00174

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

collision avoidance with any contact operating within or exiting the proposed wind farm should the presence of the wind turbines themselves limit the ability to use radar to detect and track contacts operating therein.

Track-lines provided from ferry operators did show that the ferries on occasion may make a tack into the wind farm; however, the greatest intrusion was approximately a half mile. Considering the space available to the east for tacking, and the half mile intrusion into the proposed wind farm area is only a small portion of any leg of a tack, ferry operators should be able to adjust their tacks with minimal impact. The wind towers may also provide a visual reference to aid in ensuring a ferry stays well clear of the shoals during such maneuvers. Prior to receiving the above information, the Coast Guard reviewed two years of written logs from six individual ferries and could not find a single indication of a ferry tacking. In interviews of ferry captains, one claimed that he did tack frequently in poor weather and his tacking track line would take him into the area of the proposed wind farm. Other ferry captains were familiar with the tacking maneuver, but one said he had tacked only once in the past two years, and no other ferry captain claimed the tacking maneuver would take him into the area of the proposed wind farm. One retired ferry captain indicated his awareness of the tacking maneuver during poor weather, but claimed that even when tacking, the ferry did not approach the area of the proposed wind farm.

d. **Tug and Barge Operators:** The tug boat and barge operators, as well as research ships that operate regularly out of Woods Hole, did not express specific concerns.

e. **Cruise Ships:** Large cruise ships did not express specific concerns. These ships do enter the area, but generally do not enter the channels adjacent to the proposed wind farm. Cruise ships typically enter from the southwest along Vineyard Sound between the Elizabeth Islands and Martha's Vineyard, anchoring north of Martha's Vineyard. They depart the area along a reverse route.

f. **Other Deep Draft Ships**: No deep draft shipping interests outside the cruise ship industry commented on the proposed wind farm. No known such interests operate in Nantucket Sound itself.

7. The Radar Studies:

a. The documents used in determining the impact of the proposed wind farm on marine radars included, but were not limited to, the following:

   (1) *Report of the Effect on Radar Performance of the Proposed Cape Wind Project* dated December 16, 2008. Developed by Technology Service Corporation (TSC)

**Add. 00175**

**U.S. COAST GUARD
ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR
AS IT RELATES TO MARINE NAVIGATION SAFETY
FROM THE NANTUCKET SOUND WIND FARM
AS PROPOSED BY CAPE WIND, LLC
JANUARY 2009**

under contract by the U.S. Coast Guard.

(2) _Assessment of Likely Effects on Marine Radar Close to the Proposed Nantucket Sound Offshore Wind Farm_ prepared for Cape Wind Associates LLC, Ref. No: 08-656 dated August 2008 by Marico Marine.  (The "MARICO report")

(3) _Results of the Electromagnetic Investigations and Assessments of Marine Radar, Communications and Positioning Systems Undertaken at the North Hoyle Wind Farm_ by QuinetiQ and the Maritime and Coast Guard Agency (of the United Kingdom) dated November 22, 2004.

(4) _Deleterious Effects of Cape Cod Proposed Wind Farm on Marine Radars_ dated March 22, 2008, by Dr. Eli Brookner.  (The "Brookner report")

b.  The research into the impacts of wind farms on marine radars is fairly consistent in finding that the radar observer will be presented with a more complicated and, at times, confusing navigational picture.  There are three primary contributors to this more complicated picture: (1) beam width expansion; (2) side lobes; and (3) false echoes; all of which are also experienced without the presence of a wind farm.[1]  The vertical extent of the tower, the shape and complexity of the nacelle, the orientation of the nacelle, and the orientation of the blades, all contribute to a changing, but generally large, radar cross section (RCS).  This results in strong radar target reflections.

c.  As described in the TSC report, all radar antennas have a beam width that causes a target to expand in azimuth as the range from the antenna increases.  Generally, smaller antennas have wider beam widths and greater target expansion.  All of the referenced studies show radar presentations that demonstrate this effect.

d.  Side lobe reflections, also a function of radar antenna design, become more of an issue when the RCS of a target is large.  They add to the width of the target presentation because they are perpendicular to the radar beam.  As described in the TSC report, side lobe reflections are relatively small for modern radar antennas, even for the low-end radar sets modeled by TSC.  The TSC and MARICO studies consider side lobe reflections to be a relatively small contributor to the overall challenge of navigating in and around a wind farm, while the Brookner report argues that side lobes will have a much greater impact.

---

[1] The phenomena of "shadowing" (or "blind spots"), involving a target being undetected behind a wind turbine, is discussed in the referenced reports.  For moving targets and moving observing vessels, shadowing is considered to be transitory and generally less of a problem than false echoes, beam width expansion, and side lobes.

**Add. 00176**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

e.  According to the TSC report, false echoes are produced when the radar beam bounces off the initial target to another target (or targets), is reflected back to the antenna, and then shows up as a spurious echo or echoes beyond the initial target. Depending on the geometry of the wind farm or other strong targets such as a large vessel, these spurious echoes may present numerous "blips" to be evaluated. Fortunately, these false echoes are transient and tend to disappear or move as the observing vessel or target vessel moves. This makes the observer's task of evaluating targets easier.

f.  The referenced radar studies all show some radar presentations with a combination of beam width expansion, side lobes, and false echoes that are difficult to interpret. Actual targets may be temporarily lost in the beam width and side lobes, especially as the range to the target increases. Fortunately, the targets of greatest concern are generally those that are closest, where the beam width and side lobes are smaller.

g.  The MARICO assessment argues that the false echoes presented near a wind farm are often a result of shipboard structures that reflect strong radar returns, either from a wind farm, another vessel, or another offshore structure such as the WW II fort in the Kentish Flats area. This report further supports this argument with the observation that approximately 30% of the vessels studied did not experience a large number of false echoes. The TSC study did not model shipboard interfering structures, but found that false echoes occur due to reflections from one turbine to another. There is no disagreement, however, that false echoes do occur and that they may be more numerous when there are a number of targets with large RCSs.

h.  The TSC study report indicated the following:

   (1)  The proposed wind farm would not adversely impact the ability of a vessel outside the wind farm to detect, by radar, another vessel outside the wind farm, even if portions of the wind farm are between the two vessels.

   (2)  The proposed wind farm would not adversely impact the ability of a vessel inside the wind farm to detect, by radar, a vessel outside the wind farm.

   (3)  The proposed wind farm would impact a vessel outside the wind farm in its ability to detect, by radar, a vessel within the wind farm. Vessels within the wind farm are generally discernible, but the radar operator will likely have to pay closer attention to the radar scope to distinguish between a valid and false radar return.

   (4)  The proposed wind farm would likely impact a vessel's ability, when inside the wind farm, to detect, by radar, another vessel within the wind farm. Again, vessels within

**Add. 00177**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

the wind farm are discernible, but the radar operator will need to pay close attention to the radar scope to distinguish between a valid and false radar return.

(5) Of particular note is the finding in the TSC report that the primary radar reflector (or radar cross-section) of a WTG is not the 277.5-foot tower, nor the 341-foot diameter blades, but the sharp-edged, multi-faceted nacelle that sits atop the turbine. Interestingly, the TSC study showed that as a vessel moves closer to a WTG its radar picture improves around those towers closest to it, i.e., the radar picture in the immediate vicinity of a vessel, even within the wind farm, is clear. As a vessel gets closer to a tower (or towers), the nacelles of the adjacent towers are too high to be reflected by the vessel's radar signal, and so cannot return as strong a reflection. It is the towers that are further away (and whose nacelles are within the radar signal) that cause greater beam width spread and provide more spurious echoes due to having more WTGs to reflect from as the radar "looks" deeper into the wind farm.

8. <u>The Coast Guard Findings:</u>

a. The Coast Guard concurs with the findings of the TSC modeling study as stated in paragraph 7.h above. After considering these findings, the Coast Guard considered how the wind farm impacts to radar would affect a vessel operator in making navigation and collision avoidance decisions. The Coast Guard finds that vessels would be able to navigate safely within and in the vicinity of the proposed wind farm, and that the impact of the proposed wind farm on navigation safety is "moderate." This assessment assumed a vessel operator is in a restricted visibility situation and is complying with the COLREGS as well as operating his/her vessel prudently. The Coast Guard recognizes that the human factors involved with respect to an operator/radar observer performing multiple tasks, at times may present target detection challenges along with an "eyes-busy" and "hands-busy" situation. These findings take into account the reality of short-handed or single-handed operation and the fact that certain vessel operators will be more challenged than others when navigating under conditions of reduced visibility. The following findings from the TSC study and associated principles were considered important:

(1) Since side lobes and target expansion tend to be more of a problem at some distance from the radar than close in, vessels in the vicinity of the radar may be detected more easily than vessels some distance away. Operators in the vicinity of the proposed wind farm should have little problem identifying vessels nearby that could pose a threat of collision in time to react to that contact. Contacts located where target expansion and side lobes become problematic are generally at a distance so as not to be of significant concern.

**Add. 00178**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

(2) Although the radars on vessels within the proposed wind farm should detect other targets within the proposed wind in time for an operator to take action to avoid a collision, it is recognized that the combination of multiple vessel contacts with the returns of multiple towers appearing for 360 degrees on the radar screen would likely impact a operator's ability to notice and track targets of concern. In other words, it would require a level of attention from operators inside the proposed wind farm that is problematic for the radar to be as effective a collision avoidance tool as would normally be expected under external wind farm navigation in restricted visibility.

b. Keeping the findings of the TSC report (impact on marine radar itself) and the potential impacts on waterways users described above in mind, the Coast Guard finds the following:

(1) The proposed wind farm would not significantly adversely impact the ability to safely navigate a vessel outside the wind farm or to detect, by radar, another vessel outside the wind farm, even if the wind farm is between the two vessels.

(2) The proposed wind farm would not significantly adversely impact the ability of a vessel inside the wind farm to detect, by radar, a vessel outside the wind farm.

(3) The proposed wind farm would significantly adversely impact the ability of a vessel, while outside the wind farm, to detect, by radar, a vessel within the wind farm. Vessels within the wind farm would be discernible, but the radar operator will likely have to pay closer attention to the radar scope to distinguish between a valid and false radar return. Mitigations to aid in avoiding collisions would be needed to offset this impact.

(4) The proposed wind farm would significantly adversely impact the ability of a vessel, while inside the wind farm, to detect, by radar, another vessel within the wind farm. Again, vessels within the wind farm would be discernible, but the radar operator would need to pay closer attention to the radar scope to distinguish between a valid and false radar return. Mitigations to aid the mariner in avoiding collisions would be needed to offset this impact were the wind farm to be approved by MMS.

9. <u>Potential Mitigations:</u>

a. With the foregoing radar analysis and findings as background, the Coast Guard next examined what mitigation measures, if any, might reduce risks to the safety of navigation. Various documents already require or propose measures to mitigate adverse impacts, including impacts to marine radar. The Coast Guard's Terms and Conditions

**Add. 00179**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

developed for this proposed wind farm allow for an adaptive management approach, recognizing that many of the mitigations and specific application of mitigations would be best determined during or after construction. Thus, our assessment and recommendation to MMS as to the proposed wind farm's impact on radar and subsequently on safe navigation was limited to identifying if reasonable mitigations are available to reduce the risks of any impacts. The Coast Guard has determined that there are reasonable mitigations available.

b.  It would be premature to discuss detailed and finite mitigation measures at this point in the permitting process for the proposed wind farm. However, in developing the foregoing assessment and recommendation, the Coast Guard considered the following:

(1)  Reference (a) contains a number of mitigation measures, primarily requirements for Cape Wind to maintain certain operational oversight, communications, and monitoring capabilities, including the capability to "monitor in real time marine traffic within and in the vicinity of the Nantucket Sound Wind Farm." Plans for achieving these capabilities must be submitted by Cape Wind LLC before beginning construction of its proposed wind farm, and those plans must be approved by MMS after consultation with the Coast Guard.

(2)  Reference (c), which includes the International Regulations for Preventing Collisions at Sea (COLREGS), commonly referred to as the "Rules of the Road," sets forth Federal requirements governing vessel operation, movement, and collision avoidance in both international and inland waters. (The site of the proposed wind farm is in international waters.) The COLREGs contain a variety of required measures to mitigate hazards to navigation, such as proceeding at safe speed for the prevailing circumstances, maintaining a proper continuous lookout, etc. Full compliance with the COLREGS is expected, and the COLREGS are considered a valid, and primary, measure to mitigate potential radar impacts within and in the vicinity of the proposed wind farm.

(3)  The Coast Guard has several regulatory and non-regulatory avenues available to enhance and protect navigation safety. Possibilities include creation of a specially marked channel (or channels) through the proposed wind farm, creation of routing measures such as the two way route currently in use in Buzzards Bay, and/or creation of a Regulated Navigation Area (RNA) to govern, or a voluntary system to help manage, speed, traffic patterns, communications, etc. within and in the vicinity of the proposed wind farm, particularly under conditions of reduced visibility. One potential application of Coast Guard authorities would be to implement an RNA that proscribes something similar to Rule 9's requirements for narrow channels, whereby vessels operating within any wind farm "shall not

**Add. 00180**

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

impede" the passage of vessels operating in the vicinity of, but outside of, the wind farm. It is anticipated that if the proposed wind farm is approved by MMS, the precise details of any such mitigation strategies would be further developed and refined with continued input from waterway users, through venues such as the Southeastern Massachusetts Port Safety and Security Forum, and potentially, through the Coast Guard using standard regulatory (rulemaking) processes, or other Coast Guard procedures.

c.  The Coast Guard has reviewed over two dozen potential mitigation measures that were identified as possibly applicable in the course of this assessment, ranging from the COLREGS to general education of Federal navigation safety requirements, and has determined that this mitigation "toolbox" – including those requirements set forth in the Coast Guard's Terms and Conditions – provides the Coast Guard sufficient means to reduce risk to navigation safety substantially. Affected waterways users may need to adjust somewhat to account for navigating within, and in the vicinity of, the proposed wind farm. Nevertheless, vessels operating within or near the proposed wind farm should be able to do so safely even in restricted visibility. Although there may be degradation in the effectiveness in the use of radar, radar is not the only measure a mariner has at his/her disposal or should be using. Due to the unique operating environment that the wind farm presents, all of the possible mitigations available will be assessed and, if deemed appropriate, required of Cape Wind in accordance with the Terms and Conditions. Some of the mitigations associated with the proposed wind farm include 13 specific mitigation measures proposed by Cape Wind LLC in Section 7.0 of reference (b). Those related to navigation safety were focused primarily on aids to navigation (light, signals, etc.) and public education and outreach. Cape Wind's proposed aids-to-navigation system is graphically displayed in Figure 4-17 to reference (b).

d.  Given the risk mitigation strategies and tools discussed above, and the characteristics of the waterway users in Nantucket Sound, buffer zones are not needed. This is significant in determining the impact on navigational safety for this project because of the channels that exist along the borders of the proposed wind farm and the associated obstructions, many marked by aids-to-navigation that are near the edges of these channels. Two factors came into play in making the determination that buffer zones are not needed. First, for vessels transiting in the vicinity of the proposed wind farm, the impact on radar was minimal for the distances an operator would need to track and make navigational decisions. The other factor is that deep draft vessels do not operate in the vicinity of the proposed wind farm. Unlike the vessels that do operate in the vicinity of the proposed wind farm, which need relatively short distances to maneuver, deep draft vessels need significantly greater areas to maneuver due to stopping distances, turning radius, etc. This circumstance does not exist in Nantucket Sound.

**U.S. COAST GUARD**
**ASSESSMENT OF POTENTIAL IMPACTS TO MARINE RADAR**
**AS IT RELATES TO MARINE NAVIGATION SAFETY**
**FROM THE NANTUCKET SOUND WIND FARM**
**AS PROPOSED BY CAPE WIND, LLC**
**JANUARY 2009**

e. It is important to keep in mind that a key component to any potential future mitigation measure —perhaps <u>the</u> key component—is waterway user input. It is difficult, if not impossible, to engage waterway users in a constructive dialogue regarding potential mitigation measures and their expected effectiveness before knowing whether or not the proposed wind farm is approved. The lead Federal permitting agency, MMS, advocates an "adaptive management" approach to the permitting process. Between issuing an initial lease/permit and actual construction of the proposed wind farm, technical, economic, or other factors may change the complexion of the proposed wind farm and/or the character of mitigations. The Coast Guard stands ready to continue its dialogue with the public, waterway stakeholders, and cooperating agencies should MMS grant any lease, easement, or right of way for the wind farm proposed by Cape Wind.

10. <u>Recommended changes to Coast Guard Terms and Conditions</u>:

The Coast Guard's assessment of impact on navigation safety falls within the "moderate" impact level as defined in reference (d). Based on this assessment, no substantive changes to the terms and conditions are recommended at this time. The Coast Guard still reserves the right to amend its terms and conditions as necessary.

**Add. 00182**