No. 23-1853

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

SEAFREEZE SHORESIDE, INC.; LONG ISLAND COMMERCIAL FISHING
ASSOC., INC.; XIII NORTHEAST FISHERY SECTOR, INC.; HERITAGE
FISHERIES, INC.; NAT. W. INC.; OLD SQUAW FISHERIES, INC.,
*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; HONORABLE
DEBRA HAALAND, in her official capacity as Secretary of the Department of the
Interior; BUREAU OF OCEAN ENERGY MANAGEMENT;
*Defendants-Appellees,*

(caption continued on following page)

Appeal from the United States District Court for the District of Massachusetts
No. 1:22-CV-11091 (Hon. Indira Talwani)

**ANSWERING BRIEF FOR THE FEDERAL DEFENDANTS-APPELLEES**

*Of Counsel:*
STEPHEN R. VORKOPER
Office of the Solicitor
U.S. Department of the Interior

(Additional counsel on following page)

TODD KIM
*Assistant Attorney General*
LUTHER L. HAJEK
PERRY ROSEN
MARK ARTHUR BROWN
ANGELA ELLIS
KEVIN W. MCARDLE
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

LIZ KLEIN, in her official capacity as the Director of the Bureau of Ocean Energy Management; LAURA DANIEL-DAVID, in her official capacity as Principal Deputy Assistant Secretary, Land and Minerals Management; UNITED STATES DEPARTMENT OF COMMERCE; HONORABLE GINA M. RAIMONDO, in her official capacity as the Secretary of the Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE; CATHERINE MARZIN, in her official capacity as the Deputy Director of the National Oceanic and Atmospheric Administration; UNITED STATES DEPARTMENT OF DEFENSE; HONORABLE LLOYD J. AUSTIN, III, in his official capacity as the Secretary of the Department of Defense; UNITED STATES ARMY CORPS OF ENGINEERS; LT. GEN. SCOTT A. SPELLMON, in his official capacity as the Commander and Chief of Engineers of the U.S. Army Corps of Engineers; COLONEL JOHN A. ATILANO, II, in his official capacity as the District Engineer of the New England District of the U.S. Army Corps of Engineers; VINEYARD WIND 1 LLC,
*Defendants-Appellees.*

---

*Of Counsel (continued):*

LEA TYHACH
SCOTT FARLEY
National Oceanic and Atmospheric Administration
Office of General Counsel

MATTHEW J. HARRIS
U.S. Army Corps of Engineers

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION................................................................................................. 1

STATEMENT OF JURISDICTION ..................................................................... 1

STATEMENT OF THE ISSUES ......................................................................... 2

STATEMENT OF THE CASE ............................................................................. 3

    A.    Statutory Background ........................................................................ 3

        1.    Outer Continental Shelf Lands Act ...................................... 3

        2.    National Environmental Policy Act .................................... 4

        3.    Endangered Species Act....................................................... 4

    B.    Factual background ........................................................................... 6

        1.    The Vineyard Wind project ................................................ 6

        2.    BOEM's analysis in the FEIS............................................... 8

        3.    BOEM's approval of the plan........................................... 11

        4.    BOEM and NMFS's consultation process under the ESA.................................................................................... 12

    C.    Procedural history ......................................................................... 14

SUMMARY OF ARGUMENT ........................................................................... 15

LEGAL STANDARDS AND STANDARD OF REVIEW ...................................... 17

ARGUMENT...................................................................................................... 17

I.    BOEM complied with OCSLA when it approved the construction and operations plan.................................................................................... 17

A.      BOEM properly interpreted OCSLA. ...................................................... 18

B.      BOEM ensured that the project would be conducted safely.................. 22

C.      BOEM ensured that the project would protect the environment. ............................................................................... 25

D.      BOEM ensured that the project would not unduly impact fishing........................................................................................... 27

E.      BOEM ensured the project would protect national security interests. ...................................................................................... 28

F.      Seafreeze's citations to extra-record materials must be disregarded. ................................................................................. 29

II.      This Court should affirm the dismissal of Seafreeze's NEPA claims or else reject those claims as unfounded.................................... 30

A.      Seafreeze lacks an APA right of action for its NEPA claims........................................................................................... 30

B.      Even if Seafreeze could state a claim, BOEM complied with NEPA.................................................................................... 36

1.      The FEIS analyzes a reasonable range of alternatives.................. 36

2.      The temporary withdrawal of the plan and subsequent resumption of the review process did not violate NEPA. ................................................................. 38

3.      BOEM's cumulative impact analysis complied with NEPA............................................................................. 40

III.      The district court correctly dismissed Seafreeze's ESA claims. ......................... 41

A.      Seafreeze lacks Article III standing to pursue its ESA claims........................................................................................... 42

B.      Seafreeze forfeited most of its ESA claims................................. 44

C.      The agencies complied with the ESA....................................... 45

IV.    Should this Court find fault with the federal defendants' analysis,
       it should instruct the district court to remand to the agencies
       without vacatur...................................................................................... 47

CONCLUSION ................................................................................................ 49

CERTIFICATE OF COMPLIANCE .......................................................... 51

# TABLE OF AUTHORITIES

## Cases

*Am. Waterways Operators v. U.S. Coast Guard*,
No. 18-cv-12070-DJC, 613 F. Supp. 3d 475 (D. Mass. 2020) ................................... 31

*Beyond Nuclear v. U.S. NRC*,
704 F.3d 12 (1st Cir. 2013) ......................................................................................... 4, 36

*Camp v. Pitts*,
411 U.S. 138 (1973) ......................................................................................................... 29

*Cassidy v. Chertoff*,
471 F.3d 67 (2d Cir. 2006) ............................................................................................. 24

*Central Maine Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001) ............................................................................................ 47

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991) .................................................................................. 36, 37

*Citizens Awareness Network, Inc. v. U.S. NRC*,
59 F.3d 284 (1st Cir. 1995) ............................................................................................ 17

*Collins v. Nat'l Transp. Safety Bd.*,
351 F.3d 1246 (D.C. Cir. 2003) ..................................................................................... 24

*Ctr. for Biological Diversity v. Jewell*,
563 F.3d 466 (D.C. Cir. 2009) ........................................................................................ 3

*Ctr. for Biological Diversity v. Regan*,
--- F. Supp. 3d ---, 2023 WL 5437496 (D.D.C. Aug. 23, 2023) ................................. 49

*Dominion Energy Brayton Point, LLC v. Johnson*,
443 F.3d 12 (1st Cir. 2006) ............................................................................................ 17

*Exec. Leasing Corp. v. Banco Popular de Puerto Rico*,
48 F.3d 66 (1st Cir. 1995) ................................................................................... 27, 45, 48

*Gonzalez-Rivera v. Centro Medico Del Turabo, Inc.*,
931 F.3d 23 (1st Cir. 2019) ................................................................. 35

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
45 F.4th 306 (D.C. Cir. 2022) ............................................................. 22

*Gunpowder Riverkeeper v. FERC*,
807 F.3d 267 (D.C. Cir. 2015) ............................................................. 32

*Hochendoner v. Genzyme Corp.*,
823 F.3d 724 (1st Cir. 2016) ............................................................... 34

*Humane Soc. of the U.S. v. Hodel*,
840 F.2d 45 (D.C. Cir. 1988) ............................................................... 35

*Lexmark Intern., Inc.. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................................ 31

*Lovgren v. Locke*,
701 F.3d 5 (1st Cir. 2012) ................................................................... 20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................ 42

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) ...................................................................... 30, 34

*Maiden Creek Assocs., L.P. v. U.S. Dept. of Transp.*,
823 F.3d 184 (3d Cir. 2016) .................................................... 31, 33, 36

*Marasco & Nesselbush, LLP v. Collins*,
6 F.4th 150 (1st Cir. 2021) ................................................................. 17

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ............................................................................ 17

*Massachusetts v. Andrus*,
594 F.2d 872 (1979) .................................................... 20, 21, 26, 27

*Millipore Corp. v. Travelers Indem. Co.*,
115 F.3d 21 (1st Cir. 1997) ................................................................. 48

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)................................................................. 32

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ................................................. 31

*National Association of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)................................................................. 22

*National Wildlife Federation v. NMFS*,
    524 F.3d 917 (9th Cir. 2008) ................................................... 20

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ................................................... 40

*New Hamp. Hosp. Ass'n v. Azar*,
    887 F.3d 62 (1st Cir. 2018)...................................................... 19

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................. 49

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004)................................................................... 19

*Pacific Northwest Generating Co-op v. Brown*,
    38 F.3d 1058 (9th Cir. 1994) ................................................... 33

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)................................................................. 17

*Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este And Sara Lopez, M.D.*,
    456 F.3d 272 (1st Cir. 2006) ................................................... 34

*Save Our Heritage, Inc. v. FAA*,
    269 F.3d 49 (1st Cir. 2001)...................................................... 40

*Sig Sauer, Inc. v. Brandon*,
    826 F.3d 598 (1st Cir. 2016) ................................................... 17

*Theodore Roosevelt Conservation P'ship v. Salazar,*
  661 F.3d 66 (D.C. Cir. 2011) ............................................................ 44

*Town of Winthrop v. FAA,*
  535 F.3d 1 (1st Cir. 2008) ................................................................. 4

*United States v. AVX Corp.,*
  962 F.2d 108 (1st Cir. 1992) ............................................................ 33

*United States v. Zannino,*
  895 F.2d 1 (1st Cir. 1990) ...................................................... 17, 41, 45

*Valley Citizens for a Safe Env't v. Aldridge,*
  886 F.2d 458 (1st Cir. 1989) ........................................................... 29

*Watt v. Energy Action Education Foundation,*
  454 U.S. 151 (1981) ....................................................................... 20

## Statutes

Administrative Procedure Act
  5 U.S.C. § 705 ................................................................... 14, 48, 49

  5 U.S.C. § 706 ......................................................................... 1, 17

  5 U.S.C. §§ 701-706 .................................................................... 17

Coast Guard Act, 14 U.S.C. § 102(1) ................................................ 24

Endangered Species Act
  16 U.S.C. § 1532(19) ................................................................... 5

  16 U.S.C. § 1536 ...................................................... 4, 5, 6, 46, 47

  16 U.S.C. § 1538(a)(1)(B) ............................................................ 5

28 U.S.C. § 1291 .......................................................................... 2

28 U.S.C. § 1331 ....................................................................... 1, 2

National Environmental Policy Act,
  42 U.S.C. § 4321 ......................................................................... 1, 31

Outer Continental Shelf Land Act,
  43 U.S.C. § 1331 ............................................................................ 2, 3

  43 U.S.C. § 1332(2) .................................................................20, 21, 37

  43 U.S.C. § 1337 ..................................................... 3, 18, 19, 21, 22

  43 U.S.C. § 1782(c) ......................................................................... 19

Ports and Waterways Security Act, 46 U.S.C. § 70001 et seq. ........................................ 24

Maritime Transportation Security Act of 2002,
  Pub. L. 107-295, 116 Stat. 2064 (2002) ................................................. 24

## Other Authorities

*United States v. Texas*, No. 22-58 (S. Ct.), Gov't Op. Br., 2022 WL 4278395 ............... 57

*United States v. Texas*, No. 22-58 (S. Ct.), Gov't Reply Br., 2022 WL 17170668 .......... 57

## Rules

Fed. R. App. P. 4(a)(1)(B) ...................................................................... 2

Fed. R. E. 201(d) ...................................................................................... 34

## Regulations

30 C.F.R.
  § 585.102(a) ................................................................................. 3, 18

  § 585.200(a)(2) ................................................................................. 3

  § 585.203 ......................................................................................... 3

  § 585.206(a) ................................................................................... 3

§ 585.210 ..................................................................................................... 3

§ 585.211 ..................................................................................................... 3

§ 585.215 ..................................................................................................... 3

§ 585.216 ..................................................................................................... 3

§ 585.605–585.613 ....................................................................................... 4

§ 585.620 ..................................................................................................... 7

§ 585.620–585.629 ....................................................................................... 4

§ 585.621 .............................................................................................. 18, 19

§ 585.628 ..................................................................................................... 4

§ 585.600 ..................................................................................................... 4

40 C.F.R. §§ 1500-1508 ............................................................................... 4

§ 1502.13 ................................................................................................... 36

§ 1502.14(a) .............................................................................................. 36

§ 1502.9(c)(1) ........................................................................................... 39

43 C.F.R. § 46.420(a)(2) ............................................................................ 36

50 C.F.R

§ 402.02 ..................................................................................................... 46

§ 402.14 ............................................................................................... 4, 5, 6

§ 402.15 ..................................................................................................... 43

74 Fed. Reg. 19,638-01 (April 29, 2009) ................................................... 18

75 Fed. Reg. 82,055-01 (Dec. 29, 2010) ...................................................... 6

77 Fed. Reg. 5,820-02 (Feb. 6, 2021) ........................................................................... 6

79 Fed. Reg. 34,771-01 (June 18, 2014) ...................................................................... 6

79 Fed. Reg. 70,545-01 (Nov. 26, 2014) ................................................................. 6, 10

83 Fed. Reg. 13,777-01 (Mar. 30, 2018) ...................................................................... 7

83 Fed. Reg. 63,184-02 (Dec. 7, 2018) ......................................................................... 7

85 Fed. Reg. 35,952-01 (June 12, 2020) ...................................................................... 8

85 Fed. Reg. 81,486-01 (Dec. 16, 2020) ...................................................................... 8

86 Fed. Reg. 12,494-01 (Mar. 3, 2021) .............................................................. 8, 39, 48

86 Fed. Reg. 14,153-01 (Mar. 12, 2021) ...................................................................... 8

## INTRODUCTION

In July 2021, the Bureau of Ocean Energy Management ("BOEM") approved a plan submitted by Defendant-Intervenor Vineyard Wind 1, LLC ("Vineyard Wind"), to construct and operate an offshore wind energy facility on the Outer Continental Shelf, over 14 miles southeast of Martha's Vineyard. Once finished, the Vineyard Wind project will have the capacity to supply power to 400,000 homes with renewable energy. Before approving the plan, BOEM and other federal agencies coordinated with the public and conducted an extensive environmental review in compliance with the Outer Continental Shelf Land Act ("OCSLA"), the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and other federal statutes.

Plaintiffs here brought 33 scattershot claims under OSCLA, NEPA, the ESA, and other statutes. The district court properly rejected all of them. The court rejected the OCSLA claims on the merits, determining that BOEM complied with OCSLA's requirements. The court rejected the NEPA and ESA claims for various threshold reasons. This Court should affirm the district court's judgment.

## STATEMENT OF JURISDICTION

Plaintiffs (collectively "Seafreeze") sued BOEM under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; OCSLA, 43 U.S.C. § 1331 et seq.; the ESA, 16 U.S.C. § 1531 et seq.; NEPA, 42 U.S.C. § 4321 et seq, and other statutes. Appendix ("App.") 24-108. The district court had subject matter jurisdiction under 28 U.S.C.

1

§ 1331. This Court has jurisdiction under 28 U.S.C. § 1291 because the plaintiffs appealed the district court's order granting summary judgment to the defendants-appellees on all claims. Addendum ("Add.") 1-47. Judgment was entered on October 12, 2023. Add. 48-49 Seafreeze timely filed its notice of appeal on October 16, 2023. App. 23; *cf.* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.      Whether BOEM complied with OCSLA when it approved the project after determining that the project would further the statute's enumerated goals.

2.      Whether Seafreeze lacked an APA right of action for its NEPA claims because Seafreeze's alleged economic injuries do not fall within the zone of environmental interests that NEPA protects; alternatively, whether BOEM complied with NEPA when it approved the project.

3.      Whether Seafreeze lacked Article III standing to pursue its ESA claims, which effectively challenge an inoperative biological opinion that had been superseded before the complaint was filed; alternatively, whether BOEM complied with NEPA when it approved the project.

4.      Whether, if this Court reverses the judgment in any respect, it should instruct the district court to remand without vacatur.

## STATEMENT OF THE CASE

### A.      Statutory Background

#### 1.      Outer Continental Shelf Lands Act

The Outer Continental Shelf consists of the submerged lands beneath the ocean, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. Jewell*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under OCSLA, the United States holds these lands as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards." *Id.* § 1332(3).

To that end, Interior, in consultation with other federal agencies, may grant a lease on the Outer Continental Shelf for the purpose of renewable wind energy production, including other things. *Id.* § 1337(p)(1)(C); 30 C.F.R. §§ 585.203, 585.206(a), 585.210, 585.211, 585.215, 585.216. OCSLA also requires BOEM to ensure that "any activity" that it authorizes is "carried out in a manner that provides for" 12 enumerated goals, including: safety; protection of the environment; conservation of natural resources; "prevention of interference with reasonable uses (as determined by the Secretary)" of the outer continental shelf; and consideration of other uses of the sea and seabed, including the use of the area for fishing and marine navigation. 43 U.S.C. § 1337(p)(4)(A)-(L); 30 C.F.R. § 585.102(a).

Under BOEM's renewable energy program, a lease issued under OCSLA does not itself authorize development. 30 C.F.R. § 585.200(a)(2); SA_97-98. A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain

BOEM's approval of a construction and operations plan. 30 C.F.R. §§ 585.600, 585.605-585.613, 585.620-585.629.

### 2. National Environmental Policy Act

Before approving a plan, BOEM must comply with NEPA. *Id.* § 585.628. NEPA is a procedural statute that requires agencies to take a hard look at the environmental impacts of and alternatives to their proposed actions, *Beyond Nuclear v. U.S. NRC*, 704 F.3d 12, 19 (1st Cir. 2013), generally in a document called an environmental impact statement ("EIS"), 42 U.S.C. § 4332(2)(C). NEPA does not mandate particular results; it instead prescribes the process for preventing uninformed agency action. *Town of Winthrop v. FAA*, 535 F.3d 1, 4 (1st Cir. 2008).[1]

### 3. Endangered Species Act.

Prior to approving a construction and operations plan, BOEM must also comply with the ESA. ESA Section 7 mandates that agencies ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Agencies must accordingly consult NMFS whenever their actions "may affect" a listed threatened or endangered marine species. 50 C.F.R. § 402.14(a); *see* 16 U.S.C. § 1536(a)(2); *see generally* 50 C.F.R. Pt. 402.[2]

---

[1] Council on Environmental Quality ("CEQ") regulations guide NEPA implementation. 40 C.F.R. §§ 1500-1508. The claims in this case arise under the 1978 regulations, as amended in 1986. SA_946.

[2] Where, as here, more than one agency's actions regarding the same project "may affect" a listed species, each agency must consult. However, consultations may be led by a "lead action agency." BOEM was the lead here. NMFS's Office of Protected

As relevant here, if an agency proposes an action that "may affect listed species or critical habitat," the action agency and consulting agency must engage in formal consultation, which culminates in the consulting agency issuing a biological opinion. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.14(a), 402.14(h). A biological opinion evaluates the effects of the action on ESA listed species and designated critical habitat, in the context of the environmental baseline and cumulative effects from other activities impacting species and their habitat, among other things. 50 C.F.R. § 402.14(g)(2)-(4). It also includes NMFS's opinion on whether the proposal is "likely to jeopardize the continued existence" of any listed species or result in destruction or adverse modification of designated critical habitat, and, if so, whether "reasonable and prudent alternatives" exist to avoid such outcomes. 50 C.F.R § 402.14(g)-(h). NMFS must use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

ESA Section 9 prohibits the "take" of endangered species, and this prohibition can be extended to threatened species. 16 U.S.C. §§ 1538(a)(1)(B), 1533(d). "Take" is defined to include harassment or harm. *Id.* § 1532(19). During consultation, NMFS may determine that the action is not likely to jeopardize a listed species but is reasonably certain to incidentally take members of that species. If so, NMFS issues along with its biological opinion an "incidental take statement" that specifies the

Resources is also an action agency because it issued an incidental harassment authorization under the Marine Mammal Protection Act, which is not under at issue here. NMFS's Greater Atlantic Regional Office served as the consulting agency and addressed all federal actions in the 2020 biological opinion and in a superseding 2021 biological opinion. Unless delineation between the two NMFS components is necessary, "NMFS" will be used herein to refer to the consulting agency.

extent of anticipated take, reasonable and prudent measures to minimize and monitor

the take, and terms and conditions to implement those measures. *Id.* § 1536(b)(4); 50

C.F.R § 402.14(h). Any take in compliance with the incidental take statement is

exempt from the ESA's take prohibition. 16 U.S.C. § 1536(o). An agency may request

reinitiation of consultation following issuance of a biological opinion if it retains

discretionary control or involvement in the action and certain conditions are met. 50

C.F.R. § 402.16(a).

## B.    Factual background

### 1.    The Vineyard Wind project

In 2009, BOEM began evaluating the possibility of developing wind energy in

the Outer Continental Shelf offshore of Massachusetts. Supplemental Appendix

("SA") SA_1676. After years of extensive review and public coordination, BOEM

identified an area to make available for leasing. SA_1676; 75 Fed. Reg. 82,055-01,

82,056 (Dec. 29, 2010). BOEM twice reduced the area's size in response to public

interest concerns, including navigation and commercial fishery concerns. SA_1676; 75

Fed. Reg. at 82055; 77 Fed. Reg. 5,820-02, 5,821 (Feb. 6, 2021); 79 Fed. Reg. 34,771-

01 (June 18, 2014).

BOEM held a lease auction in the identified area in 2015, and Vineyard Wind

(then called Offshore MW LLC) obtained a 166,886-acre lease that includes the

project area. 79 Fed. Reg. 70,545-01 (Nov. 26, 2014); SA_1677; SA_99. The lease

granted Vineyard Wind the right to submit to BOEM for potential approval a construction and operations plan to build a wind energy project. SA_98.

In December 2017, Vineyard Wind submitted a proposed construction and operations plan. SA_103-04. The project would consist of the development of wind energy infrastructure that could generate approximately 800 megawatts of electricity. *Id.*; SA_1985. The project would be constructed in the "wind development area," a roughly 70,000-acre portion of the lease area located approximately 14 miles southeast of Martha's Vineyard. SA_2246; SA_1990.

BOEM extensively reviewed the plan to determine whether it complied with OCSLA and BOEM's regulations, 30 C.F.R. §§ 585.620, 621. SA_2104-34. BOEM also conducted extensive NEPA analysis. In March 2018, BOEM published a notice of intent to prepare an EIS and held numerous public scoping meetings. 83 Fed. Reg. 13,777-01 (Mar. 30, 2018); SA_1676-77.

In December 2018, BOEM issued a draft environmental impact statement ("DEIS"). SA_242-69; 83 Fed. Reg. 63,184-02 (Dec. 7, 2018). The DEIS studied the environmental impacts of the proposal and various alternatives that could satisfy the project's purpose and need, including a different cable landfall location, a reduction in the project size, and modified wind turbine layouts. 83 Fed. Reg. at 63,184-02; SA_246, 258-62. The DEIS also considered mitigation measures and cumulative impacts. SA_254-55, 261-64; 83 Fed. Reg. at 63,185. BOEM received extensive public feedback on the draft. SA_265-69; SA_1676-77; SA_1934-44.

BOEM supplemented its DEIS ("SDEIS") in June 2020 to respond to this feedback. 86 Fed. Reg. 12,494-01 (Mar. 3, 2021). The SDEIS included an expanded cumulative impacts analysis due to additional offshore wind development, a new transit lane alternative, and previously unavailable fishing data, among other things. SA_369-788. BOEM again received extensive public feedback. 85 Fed. Reg. 35,952-01 (June 12, 2020); SA_1677.

In December 2020, Vineyard Wind withdrew its proposal so it could conduct additional technical and logistical reviews of the wind turbine generator it decided to use in the final project design. 86 Fed. Reg. at 12494. Vineyard Wind planned to review updated project parameters to confirm that they fell within the project's original scope (or "design envelope") that was considered in the existing NEPA analysis. *Id.* Shortly after, BOEM published a Federal Register notice stating that preparation of an EIS for the plan was no longer necessary because the plan had been withdrawn. 86 Fed. Reg. at 12,495; 85 Fed. Reg. 81,486-01 (Dec. 16, 2020).

In January 2021, Vineyard Wind notified BOEM that it had completed its review and had concluded that its selected turbines did not require plan modifications. Vineyard Wind stated that it was rescinding its temporary withdrawal of the plan and requested BOEM to resume its review. 86 Fed. Reg. at 12495. BOEM did so.

## 2. BOEM's analysis in the FEIS

BOEM issued a Final EIS ("FEIS") in March 2021. 86 Fed. Reg. 14,153-01 (Mar. 12, 2021); SA_1688. The FEIS includes four volumes of extensive

environmental analysis. SA_962-65. BOEM explained the project's purpose and need, SA_946-47; SA_952, and considered seven alternatives in detail, including the no action alternative. SA_948-54; SA_978-99. The FEIS also included a complete assessment of the potential effects (including cumulative impacts) of the project and alternatives on all aspects of the natural and human environment, including benthic resources, fish and fish habitat, marine mammals, sea turtles, commercial and recreational fishing, marine navigation and vessel traffic, and military and national security uses of the affected area. SA_1010-1289 (FEIS Chapter 3).

As relevant here, BOEM analyzed potential impacts to fishing and navigation. BOEM analyzed vessel traffic and fishing landings information to assess the scope of impacts, SA_1207-13, and to ensure the project's location would avoid areas that were historically, and on average, the most heavily fished. *See* SA_1206-13; SA_1640-41 (Appendix B figures showing fishing revenue intensity).

BOEM nevertheless determined that the project would affect fishing. SA_1220-35. The placement of cable and maintenance activities, for example, could temporarily prevent fishing. SA_1221-22. Project infrastructure would create navigational complexity and a risk that fishing gear could become entangled in the protection placed over undersea cables and turbine foundations. SA_1223-24. There could also be cumulative impacts on fishing resulting from the combined effects of the project and other offshore wind activities. SA_1213-20; SA_1234 (discussing cumulative impacts of Alternative A); SA_1235 (same for Alternative C); SA_1237

(same for Alternative D); SA_1237-38 (same for Alternative E); SA_1239 (same for Alternative F).

Project infrastructure could also impact vessels' ability to use navigational radar, particularly in certain weather conditions, such as heavy fog. SA_1223. But training and properly placing radar equipment would mitigate these impacts. SA_1245; SA_1250; SA_354. Various mitigation measures, including charting turbines and equipping them with navigational aids (marking, lighting, and electronic signaling devices known as automatic identification system, or "AIS", transponders), would also enable safe navigation. SA_1250; SA_1731-33; SA_2072-77; SA_2155-59; SA_2123-25.

During the comment process, fishing groups also indicated that the turbines would need to be 1 nautical mile ("nm") apart to allow safe vessel operations. SA_1224. BOEM adopted this spacing recommendation after consulting with the Coast Guard, SA_326-68; SA_2124; SA_2004-06, and concluded that navigation would remain feasible (albeit more difficult) in the project area. SA_1224.

BOEM estimated that the project could result in the loss of up to $14 million in fishing revenue over thirty years (the project's life plus decommissioning). SA_1227. Any potential losses, however, would be offset by funds that Vineyard Wind set aside to compensate fishermen for lost gear or revenue attributable to the project. SA_1225. These funds total $23.4 million for Rhode Island and Massachusetts, and $3.3 million for other states. SA_1225-27. Vineyard Wind

committed additional funds to support the Rhode Island and Massachusetts fishing industries ($12.5 million and $1.75 million, respectively). SA_1227; SA_1234.

### 3. BOEM's approval of the plan.

On May 10, 2021, BOEM and other federal agencies issuing approvals for the project issued a joint Record of Decision ("ROD") based on the FEIS. SA_1981-2080. This document memorialized the selection of the preferred alternative studied in the FEIS and the approval of the plan. SA_1983. The preferred alternative would allow up to 84 wind turbines to be installed in sites selected from 100 of the 106 locations proposed by Vineyard Wind; installation of the turbines in six of the proposed locations in the northern-most portion of the project area was prohibited. SA_2003. The preferred alternative also required that turbines be arranged in an east-west orientation, with a gridded spacing of 1 nautical mile. *Id.*; SA_326-68. Plan approval was subject to mitigation and monitoring measures and technical, navigational, and safety conditions. SA_2002-03; SA_2009.

BOEM attached to the ROD a memorandum explaining why the preferred alternative satisfied the requirements of OCSLA and BOEM's regulations. SA_2104-33; SA_1950-51; SA_2081-2103. Among other things, the memorandum explained that, although the turbine "layout does not maximize the potential wind energy produced," the preferred alternative "strikes a rational balance between the conservation of natural resources and the prevention of interference with reasonable uses of the [outer continental shelf]." SA_2119; SA_2134. BOEM concluded that the

project would protect the environment and national security interests and prevent undue harm or damage to natural resources. SA_2118-21. BOEM also noted the compensation funds that would be established by Vineyard Wind to mitigate losses and support the fishing industry. SA_2127-28; SA_1225-27; SA_1234.

On July 15, 2021, BOEM issued its final approval of the construction and operations plan, subject to a 115-page list of terms and conditions. SA_2135-2250.

### 4. BOEM and NMFS's consultation process under the ESA.

On December 6, 2018, BOEM requested ESA Section 7 consultation with NMFS on the project's potential effects on listed species. SA_106-241. As the lead agency, BOEM made the request on behalf of itself and other federal agencies preparing project-related approvals, including the Army Corps of Engineers ("Corps"), which responded to Vineyard Wind's request for a permit under the Clean Water Act and Rivers and Harbors Act, and NMFS's Office of Protected Resources, which responded to Vineyard Wind's request for an incidental harassment authorization under the MMPA. SA_120. On May 1, 2019, NMFS agreed to initiate formal consultation. SA_2265-66.

NMFS issued a biological opinion in September 2020, which concluded that the proposed project "may adversely affect but is not likely to jeopardize the continued existence of" several listed marine species, including the North Atlantic right whale. SA_2267-68; SA_2269-2594. BOEM relied on that conclusion and its

underlying analysis when analyzing the potential effects of the project on listed species in its March 2021 FEIS. SA_1096.

However, in May 2021, before issuing the record of decision, BOEM requested reinitiation of consultation and provided NMFS with a supplement to its initial 2019 biological assessment. SA_2595-2596; SA_2597-98; SA_1952-80; *see also* 50 C.F.R. § 402.16. BOEM wanted to consult on potential impacts of fishery monitoring surveys, which BOEM had proposed as a condition of plan approval. SA_1952-80. The supplement also assessed a January 2021 publication that reduced the estimated right whale population by four animals between 2020 and 2021 and included newly-available models of right whale densities in the wind development area. *Id.* BOEM determined that this information did not change its prior conclusions about the project's impacts on right whales and sought NMFS's concurrence. *Id.*; SA_2253-64. BOEM nevertheless conditioned its plan approval on "any terms and conditions and reasonable and prudent measures resulting from" the reinitiated consultation. SA_2137.

In October 2021, NMFS issued a new biological opinion, SA_2599-3160, which BOEM adopted, SA_2251-52. The 2021 biological opinion entirely replaced the previous opinion. SA_2599. The 2021 opinion contained an updated analysis of the direct and indirect effects of the approved plan and the modifications proposed by BOEM, as well as updated analysis reflecting the best available information concerning right whales. SA_2614-28. The 2021 opinion concluded that the project was not likely to jeopardize the continued existence of any listed species. SA_2987.

## C. Procedural history

Seafreeze filed this action in December 2021 against BOEM and other federal agencies and officials, App. 24-108, challenging the plan approval under the APA, OCSLA, NEPA, the ESA, and other statutes. App. 27, 61-104. Vineyard Wind intervened as a defendant. App. 10-11. The parties filed cross-motions for summary judgment, and briefing was completed in March 2023. App. 18.

In May 2023, long after Vineyard Wind had started construction, Seafreeze filed a motion to stay BOEM's plan approval under 5 U.S.C. § 705 or, alternatively, to enjoin BOEM's action pending resolution of the summary judgment motions, App. 20, which the district court denied, App. 21-22. Seafreeze appealed (First Cir. No. 23-1473), App. 22, but, on October 12, 2023, while that appeal was pending, the district court entered summary judgment for the federal defendants and Vineyard Wind on all 33 of Seafreeze's claims. Add. 1-49; App. 23.

As relevant here, the district court found that Seafreeze lacked standing to pursue its ESA claims because no plaintiff had suffered an environmental injury traceable to the superseded 2020 biological opinion. Add. 26-32. The district court alternatively held that the ESA challenges were moot and that Seafreeze had waived many of its claims by failing to adequately address them.

The district court further held that Seafreeze lacked an APA cause of action for its NEPA claims because Seafreeze's alleged economic injuries did not fall within the zone of environmental interests that NEPA is designed to protect. App. 31. The district court rejected Seafreeze's remaining claims on the merits.

Seafreeze appealed the district court's final judgment and dismissed its preliminary appeal. App. 23. Seafreeze also moved for an injunction pending appeal in the district court, App. 1045, which the court denied, ECF No. 146, 148. Seafreeze did not seek similar relief on appeal. Seafreeze's appeal raises OCSLA, NEPA, and ESA claims.

## SUMMARY OF ARGUMENT

The district court correctly granted summary judgment to the federal defendants and Vineyard Wind. The extensive record shows that BOEM and other federal agencies thoroughly studied the project's potential impacts and complied with all applicable statutes. Seafreeze raises well over a dozen claims on appeal, all of which should be rejected either for threshold reasons or on the merits.

1.     BOEM fulfilled its obligations under OCSLA. BOEM conducted an extensive review of the project and prescribed measures to ensure the safety and ability of vessels to fish in the project area, to protect the natural environment, and to avoid risks to national security. In doing so, BOEM ensured that the project achieves OCSLA's enumerated goals, which is all that the statute and its implementing regulations require.

2.     The district court correctly held that Seafreeze lacks an APA right of action for its NEPA claims because the plaintiffs' purely economic injuries are not within the zone of environmental interests that NEPA is designed to protect. Although certain individuals who own the plaintiff fishing companies asserted environmental and aesthetic interests that could fall within NEPA's zone of interests, those individuals are not parties to this case, and their asserted environmental interests

15

are not germane to the purposes of any of the named plaintiffs, all of which are businesses or trade associations.

Regardless, Seafreeze's NEPA claims fail on the merits because the four-volume EIS shows that BOEM complied with NEPA.

3.    The district court also correctly rejected the ESA claims for threshold reasons. Seafreeze lacks Article III standing to pursue its ESA claims because all those claims challenge the 2020 biological opinion. That inoperative agency action was not causing Seafreeze any present or threatened injury when the complaint was filed because it had been superseded by the 2021 biological opinion, which Seafreeze elected not to challenge. Moreover, Seafreeze waived or forfeited most of its ESA claims by failing to adequately develop them in summary judgment briefing.

Regardless, the record shows that BOEM and NMFS complied with their duties under the ESA. BOEM and other agencies properly consulted with NMFS to ensure that their approvals would not cause jeopardy and NMFS thoroughly analyzed the potential effects of all actions related to the project and issued a thorough, science-based biological opinion concluding that those actions would not result in jeopardy to any listed species.

4.    As the record shows, the federal agencies fully satisfied their statutory obligations. Nevertheless, if the Court finds any error, it should remand to the district court with instructions to remand without vacatur, or to consider remedy in the first instance after additional briefing on relevant equitable considerations.

## LEGAL STANDARDS AND STANDARD OF REVIEW

This Court reviews a district court's entry of summary judgment de novo, applying the APA's highly deferential standard to review the challenged agency decision. 5 U.S.C. §§ 701-706; *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601 (1st Cir. 2016). Under the APA, a reviewing court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion," "otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). A court should not substitute its judgment for that of the agency, *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989), and instead "should uphold an agency determination if it is supported by any rational view of the record." *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 172 (1st Cir. 2021) (cleaned up). Review is particularly deferential when considering "technical or scientific matters within the agency's area of expertise," such as those presented here. *Citizens Awareness Network, Inc. v. U.S. NRC*, 59 F.3d 284, 290 (1st Cir. 1995) (cleaned up). When reviewing the grant of summary judgment, this Court may affirm on any ground properly raised and supported by the record. *Dominion Energy Brayton Point, LLC v. Johnson*, 443 F.3d 12, 16 (1st Cir. 2006).

## ARGUMENT

## I.     BOEM complied with OCSLA when it approved the construction and operations plan.

Seafreeze presents a multitude of complaints concerning BOEM's plan. Most of these assertions are inadequately presented, as they are mentioned only in passing, and they should be rejected on that basis alone. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Regardless, the record shows that Seafreeze's allegations lack merit.

BOEM thoroughly documented its compliance with OCSLA in a 31-page memorandum attached to the ROD, which shows that BOEM met its obligations through a lengthy and comprehensive process. SA_2104-33.

## A. BOEM properly interpreted OCSLA.

Seafreeze contends, pp. 42-49, that Interior (and the district court) misinterpreted OCSLA, which directs BOEM to "ensure" that "any activity" it authorizes under that section "is carried out in a manner that provides for" twelve enumerated goals, including safety, protection of the environment, and the prevention of interference with reasonable uses (as determined by Interior) of the exclusive economic zone. 43 U.S.C. § 1337(p)(4); *see also* 30 C.F.R. § 585.102(a). Seafreeze contends that the statute leaves BOEM without discretion to decide how to ensure to provide for these goals. That contention fails because it is inconsistent with the statutory language and with the precedent of the Supreme Court and this Court.

OCSLA directs BOEM to ensure that a project "provides for" twelve enumerated goals, but it does not specifically direct BOEM how to achieve those goals; nor does it specify the degree to which each goal should be met or how to resolve conflicts among competing goals. Interior thus has properly interpreted the statute as imposing "mandatory" goals, while leaving the agency "a great deal of discretion in deciding how to achieve" the goals and how "to determine the appropriate balance between" conflicting goals. SA_1947-49; 30 C.F.R. § 585.621; *see also* 74 Fed. Reg. 19,638-01, 19,643 (April 29, 2009).

Seafreeze contends, pp. 44-45, that the "mandatory" nature of the statutory phrase "shall ensure" eliminates BOEM's discretion to determine how to achieve or

balance conflicting goals. That is wrong. The twelve goals are broad and open-ended, and maximum pursuit of some may foreclose maximum pursuit of others. The statutory phrase, "in a manner that provides for," gives Interior the discretion to determine the appropriate method of furthering and balancing conflicting goals.

Interior's interpretation is consistent with other language in 43 U.S.C. § 1337(p)(4), which also requires the "prevention of interference with *reasonable* uses (*as determined by [Interior]*) of the exclusive economic zone, the high seas, and the territorial seas." 43 U.S.C. § 1337(p)(4)(I) (emphases added). The "as determined by [Interior]" language evinces Congress's intent to provide Interior with discretion to determine how to further the goal of "prevention of interference with reasonable uses." *New Hamp. Hosp. Ass'n v. Azar*, 887 F.3d 62, 71 (1st Cir. 2018).[3]

Interior's interpretation also accords with well-established case law recognizing that this type of statute—a general requirement that an agency further one or more broadly defined goals—does not constrain the agency's discretion in deciding how to accomplish or balance those goals. *See* SA_1945-47. *See, e.g.*, *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*") 542 U.S. 55, 65 (2004) (holding that 43 U.S.C. § 1782(c), which requires Interior to manage certain land "in a manner so as not to impair the suitability of such areas for preservation as wilderness" did not impose any discrete

---

[3] BOEM's regulations require that a project "not unreasonably interfere with other uses of the [Outer Continental Shelf]," 30 C.F.R. § 585.621(c). Seafreeze contends, p. 46, that the regulation is inconsistent with the statutory language because it adds the modifier "unreasonably," but that contention ignores the fact that the *statute itself* includes the term "reasonable," *i.e.*, it instructs Interior to provide for the "prevention of interference with *reasonable* uses." 43 U.S.C. § 1337(p)(4)(I) (emphasis added). The regulation thus is in accord with the plain statutory language.

duties on Interior, instead preserving the agency's "discretion" to resolve "policy disagreements" in making "day-to-day" decisions and recognizing that statutes establishing broad goals typically provide discretion to agencies to achieve them); *Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012) ("Compliance with [applicable] standards requires balancing by the agency and the exercise of discretion and judgment."); *National Wildlife Federation v. NMFS*, 524 F.3d 917, 928-29 (9th Cir. 2008) (where a statute identified broad project goals without specifying "the manner in which the agencies must fulfill them," the agencies "retain considerable discretion in choosing what specific actions to take in order to implement" the goals).

Both the Supreme Court and this Court have interpreted other provisions of OCSLA as providing such discretion. In *Watt v. Energy Action Education Foundation*, the Supreme Court explained that while OCSLA broadly required Interior to take certain actions, it "le[ft] the details to the [agency's] discretion." 454 U.S. 151, 164-65 (1981). In *Massachusetts v. Andrus*, 594 F.2d 872, 888-90 (1979), this Court considered similar language in a different OCSLA provision, 43 U.S.C. § 1332(2). That provision declared it to be the policy of the United States that "this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected." 43 U.S.C. § 1332(2). Despite the mandatory language, the statute did not obligate Interior to conduct oil and gas development "absolutely without harm to fisheries." 594 F.2d at 888. Congress did not assign "overriding priority" to either development or fishing, but instead endorsed "the concept of balance," which "rules out a policy based on sacrificing one interest to the other." *Id.* at 889. The statute left

Interior with discretion "to harmonize the interests of the various resources wherever they impinge upon one another" and to "achieve a proper balance." *Id.*

Seafreeze asserts, p. 47, that *Andrus* is distinguishable because 43 U.S.C. § 1332(2) directed Interior to achieve a proper balance. But 43 U.S.C. § 1332(2) does not state that Interior should achieve a balance—it instead uses the same mandatory term "shall" that appears in § 1337.[4] The language quoted by Seafreeze instead comes from this Court's interpretation of OCSLA as directing Interior to balance relevant interests. 594 F.2d at 889.

Seafreeze also cites, pp. 43-44, to cases that it asserts demonstrate that the use of the word "shall" in 43 U.S.C. § 1337(p) makes the enumerated goals mandatory. But BOEM has not taken the position that providing for the goals is discretionary, only that BOEM has discretion in determining how to satisfy those goals, especially where satisfying one goal is in tension with the agency's ability to satisfy another. As the district court correctly explained, the cases cited by Seafreeze have nothing to do

---

[4] Seafreeze further contends, pp. 47-48, that *Andrus* did not permit the "destruction of a fishery," which it erroneously asserts will happen here. In support of its contention, Seafreeze cites a portion of the ROD prepared by the Corps stating that fishermen are likely to abandon the area. SA_2019. The Corps corrected the statement in the ROD, explaining that its statement was "based solely upon comments of interested parties submitted to BOEM during the public comment period for the [DEIS]" and does not represent an independent analysis or conclusion of the Corps itself. SA_3176-77. The district court rejected Seafreeze's motion to strike. App. 1283-87; App. 1038; SA_74-96. Seafreeze does not allege on appeal that the denial of its motion was an abuse of discretion, suggesting only that the Corps' error was not ministerial. Op. Br. 53. Nevertheless, the record shows that the change was consistent with the agencies' determination that the project would have only "minor long-term effects on recreational and commercial fishing," and that there would be "neutral impacts to navigation." SA_2016; SA_2023. In fact, the Corps found that portions of the project will have beneficial impacts on recreational fisheries. SA_2016; SA_2024.

with resolving the dispute here, "which centers on how the agency determines whether each of the enumerated '[r]equirements' is satisfied." Add. 43-44. Moreover, one of the cases that Seafreeze cites, p. 43, 49, recognized that, although an agency may not add language to enumerated statutory criteria, it nevertheless exercises some discretion in determining whether such criteria are satisfied. Add. 44 (citing *National Association of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 671 (2007)). Seafreeze cannot show that BOEM lacks discretion to decide how to achieve and balance the listed goals.

In sum, BOEM's interpretation of OCSLA is the best interpretation that accords with both the statutory language and applicable precedent. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 313 (D.C. Cir. 2022) (deciding what deference is owed is unnecessary where a court "can conclude that the agency's interpretation of the statute is the best one").

**B.**     **BOEM ensured that the project would be conducted safely.**

Seafreeze next contends that BOEM violated OCSLA by failing to ensure the Vineyard Wind project will be carried out safely. *See generally* Op. Br. 50-57. The record shows, however, that BOEM ensured that the project would be carried out safely in compliance with OCSLA, 43 U.S.C. § 1337(p)(4)(A).

BOEM engineers reviewed geophysical and geotechnical information and determined that the project can be safely constructed and operated. SA_2113. BOEM also consulted with other agencies regarding safety issues. SA_2113-14. The agencies required Vineyard Wind to comply with numerous conditions to ensure that the project meets or exceeds industry standards. SA_2083-2103; SA_2013; SA_2015. And

BOEM, and its sister agency, the Bureau of Safety and Environmental Enforcement, would oversee aspects of the project to ensure it is carried out safely. *See* SA_120; SA_2009.

Seafreeze claims, pp. 9, 50, 53-54, that the project is unsafe because vessels will face an increased collision risk. Not so. Primary vessel traffic and commercial shipping lanes are located outside of the project area. SA_2123. BOEM also adopted requirements in consultation with the Coast Guard concerning the width, spacing, and orientation of turbines that reduced impacts on navigation and fishing and responded to the concerns of fishing interests. *See supra* p. 11. BOEM further required Vineyard Wind to incorporate various mitigation measures to further reduce the risk of collisions, including the appropriate lighting, marking, and charting of structures and enabling shutdown in the event of an emergency. *See supra* p. 11. BOEM thus reasonably determined that vessels would be able to safely navigate within the turbine array, and that the alternative recommended by the Coast Guard (which BOEM adopted) would improve the ability of fishing vessels to maneuver within the project area and minimize user conflicts. SA_1224; SA_1236; SA_1249; *see supra* pp. 10-11.

Seafreeze also erroneously claims, pp. 9, 50, 56, that turbines will interfere with navigational radar. While the single FEIS page that Seafreeze cites acknowledged that using radar in the area might be more difficult in poor weather, SA_1223, the record shows that any potential radar interference would be mitigated through proper training of radar operators, proper placement of radar equipment on vessels, marked turbines, and the use of AIS transponders to aid in locating turbines. SA_1250;

SA_354; SA_1239. This mitigation would also help enable safe navigation. SA_1250; SA_1731-33.

Seafreeze cites the SDEIS stating that alternatives could result in major navigation impacts and alleges that BOEM arbitrarily deleted references to these impacts in the FEIS. Op. Br. 50-51 (citing SA_509, SA_633, SA_639, SA_645). That is also incorrect. While it is true that BOEM initially anticipated major impacts to navigation, the preferred alternative that BOEM adopted incorporated mitigation measures and recommendations from the Coast Guard that rendered impacts on navigation minor to moderate. SA_1258-59. The Coast Guard is the expert agency charged by multiple statutes with promoting navigational safety on the nation's waterways. *See Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003); Coast Guard Act, 14 U.S.C. § 102(1); Ports and Waterways Security Act, 46 U.S.C. § 70001 et seq.; Maritime Transportation Security Act of 2002, Pub. L. 107-295, 116 Stat. 2064 (2002). Its determinations regarding navigational safety would be entitled to a high degree of deference, making BOEM's reliance on those conclusions reasonable. *See Cassidy v. Chertoff*, 471 F.3d 67, 84 (2d Cir. 2006).

Seafreeze relatedly complains, pp. 9, 50, that turbines will not be able to withstand high winds. But the FEIS citation that Seafreeze references explains that the project will withstand sustained winds up to 112 miles per hour ("mph") and gusts up to 157 mph, and that the turbines will shut down if wind speeds exceed 69 mph. SA_1003-04.[5] The turbines will also be able to withstand waves over sixty feet high.

---

[5] Seafreeze also string cites three other record pages that are entirely unrelated to wind speeds and should be disregarded. Op. Br. 50 (citing SA_998, SA1090, SA_1228).

*Id.* Seafreeze suggests that the turbines should withstand even more severe conditions, but the project design parameters are in accordance with well-accepted standards. SA_105. Given the ability of the turbines to withstand weather conditions described above, it is highly unlikely that the turbines would collapse during extreme weather. SA_1003-04.

### C. BOEM ensured that the project would protect the environment.

Seafreeze contends, pp. 9, 50, 57-58, that BOEM did not ensure adequate environmental protections. This contention also lacks merit.

BOEM thoroughly studied the project's environmental impacts through the NEPA process. *See supra* pp. 8-11; SA_2110-12. The FEIS analyzed potential impacts on the environment across various topics, including potential impacts to benthic resources, fish, marine mammals, and marine ecosystems. SA_1025-1130. Potential impacts to the marine environment and particular species of fish and marine mammals ranged from negligible to moderate with some potentially beneficial impacts. SA_2110; SA_958-59. BOEM required mitigation to avoid and minimize impacts. SA_2116; SA_1698-1737; SA_2036-69; SA_2162-2206. BOEM also consulted with NMFS regarding ESA-listed species and NMFS concluded that the project is not likely to jeopardize any listed species. SA_2116-17; *see supra* pp. 12-13. Considering the foregoing, BOEM reasonably concluded that the project design and mitigation will adequately protect the environment. Seafreeze's belief that OCSLA categorically prohibits *any* impact on the environment is not supported by the statute

or any other authority. *Cf. Andrus*, 594 F.2d at 889-90 (rejecting argument that Interior was required to conduct oil development without any fisheries impacts).

Citing four pages from the FEIS, SA_1089-90, SA_1098, SA_1123, Seafreeze asserts that pile driving will harm marine species. Those pages, however, discuss only the potential impacts of pile driving on marine mammals and explain that such impacts would be negligible to moderate. Various avoidance and mitigation measures, such as seasonal restrictions and the use of protected species observers, will also minimize those impacts. SA_1086-87; SA_89-90; SA_1098.

As another purported example of environmental harm, Seafreeze asserts, p. 50, that "construction will disturb horseshoe crab habitat." But the single page in the FEIS that Seafreeze cites merely identifies a potential for work occurring at Covell's Beach in May that would overlap with horseshoe crab spawning season. SA_1037. Any such impacts, however, would be negligible because work was designed to avoid the beach itself where spawning occurs. *Id.*

Finally, Seafreeze asserts that the project would harm fish and endangered species, but as with its other claims, its string citations do not support its assertion. Op. Br. 50 (citing SA_1052, SA_1055, SA_1084-94, SA_1112; SA_1114). Nothing in the statute requires that BOEM eliminate all potential adverse environmental impacts before approving a project. And while it is true the FEIS anticipated that there could be some impacts to various species, it also concludes that most would be only negligible to moderate. *See, e.g.,* SA_1086-87; SA_1052; SA_1055. BOEM also required Vineyard Wind to adopt mitigation to further reduce impacts. *See, e.g.,* SA_1093 *and* SA_2176 (requiring vessels to travel at slow speeds to minimize risk of

collisions with marine mammals); SA_1052 *and* SA_2148 (requiring power cables to be installed at an appropriate depth to reduce potential electro-magnetic interference with finfish and invertebrates). If anything, Seafreeze's string citations to the record confirm that BOEM took seriously its obligation under OCSLA to protect the environment.

## D. BOEM ensured that the project would not unduly impact fishing.

Seafreeze also complains that the project will have moderate to major impacts on fishermen, who they claim will likely abandon the area due to navigational difficulties. Op. Br. 9, 51 (citing SA_1235-39 and SA_2019).[6] The mere fact that the project will impact fishing to some degree, however, does not mean that BOEM failed to comply with OCSLA.

As discussed above, pp. 18-22, not all interference with fishing is prohibited by OCSLA. *Andrus*, 594 F.2d at 889-90. BOEM extensively analyzed and took steps to reduce any potential fishing impacts. SA_1206-41; SA_1224; SA_2124-26. For example, BOEM located the project to avoid more densely fished areas. *See* SA_1640-42; SA_2003-05; SA_1236-37; SA_1224. BOEM eliminated six proposed turbine locations in an area used by commercial fishermen for scallop, surf clam, and ocean quahog fishing. SA_2126. This was in addition to the roughly 50% reduction in the

---

[6] Seafreeze again cites, pp. 51-53, the statement in the ROD prepared by the Corps that fishermen will likely abandon the area, but as explained above, n. 4, that statement does not reflect the views of the Corps. Seafreeze also cites, p. 53, to pages included in its district court briefing, but issues are not properly presented via references to documents filed in the district court, *Exec. Leasing Corp. v. Banco Popular de Puerto Rico*, 48 F.3d 66, 67 (1st Cir. 1995).

wind energy area prior to BOEM's issuance of the lease. SA_2123. BOEM limited

construction to certain times of year to further reduce impacts on fishing. SA_2127.

And as noted above, p. 11, BOEM adopted the recommendations of the Coast

Guard, including establishment of 1 nm wide, east-west fishing lanes and extensive

mitigation to enable fishing operations within the area. Notwithstanding these efforts,

BOEM anticipated that, due to the potential risks of navigating within the turbine

array, some fishing vessels may still avoid the project area. SA_2126; SA_1249. But

the establishment of the $26.7 million compensation fund combined with an

additional $14.25 million in aid would be used to mitigate potential economic impacts

on fishermen. SA_2128.

Seafreeze contends, p. 55, that structures on the seafloor will make it hard to

fish, but the FEIS page it cites, SA_1017, states that the presence of structures would

not meaningfully reduce the amount of soft-bottom habitat and may in fact create a

beneficial artificial reef effect. Regardless, BOEM elsewhere acknowledged that these

structures would increase the risk of gear loss and damage by entanglement, SA_1223-

32, but found that impacts would be moderate with the adoption of mitigation and

the availability of the compensation fund, SA_1226-28. BOEM reasonably

determined that plan would not unduly impact fishing.

E.     **BOEM ensured the project would protect national security
       interests.**

Seafreeze asserts, p. 9, that BOEM failed to ensure that the project will protect

national security interests, citing two pages from the administrative record, SA_1261-

62, which it claims show that the project will interfere with military radar. That

28

citation does not support Seafreeze's conclusory argument, and instead notes that turbines may interfere with military radar systems *if* placed in extremely close proximity to those systems or within their direct line-of-sight. SA_1262.

That is not a concern here. A portion of the wind energy area is within areas that are used by the military and navy. SA_2020-21. BOEM accordingly consulted extensively with the Department of Defense, SA_2020; SA_1274, and took steps to ensure that the project would minimize and mitigate any potential interference with military radar. Agencies within the Department of Defense concluded that any potential issues could be addressed through mitigation and requested that BOEM require certain mitigation measures. SA_2021. BOEM did so, thus ensuring that the project will be carried out in a manner that provides for protection of national security interests. *Id.*; SA_1271-75; SA_789-90; SA_2160. BOEM

### F. Seafreeze's citations to extra-record materials must be disregarded.

In a final attempt to demonstrate that BOEM failed to comply with OCSLA, Seafreeze cites, pp. 54-56, to extra-administrative record materials. These post-decisional materials cannot be used to attack the validity of BOEM's decision, which must be judged upon the "administrative record already in existence, not some new record made initially in the reviewing court." *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). Although that well-established principle is subject to certain exceptions, *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 460 (1st Cir. 1989), Seafreeze has not argued (much less demonstrated) that any of those narrow exceptions apply here, and

Seafreeze may not attempt to do so in its reply brief, *see Small Justice LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 323 n.11 (1st Cir. 2017).

* * * *

In sum, BOEM complied with OCSLA when approving the project.

## II. This Court should affirm the dismissal of Seafreeze's NEPA claims or else reject those claims as unfounded.

NEPA is an environmental statute that ensures that federal agencies consider the environmental impacts of major federal actions. *See supra* p. 4. Seafreeze asserts several NEPA challenges, which the district court correctly declined to address because Seafreeze's interests—which are purely economic—do not fall within NEPA's zone of interests. This ruling was correct. Regardless, Seafreeze's NEPA claims should be rejected because BOEM complied with NEPA.

### A. Seafreeze lacks an APA right of action for its NEPA claims.

Because NEPA does not provide for a private right of action, a plaintiff challenging agency action under NEPA must bring its claims under the APA. *See Scarborough Citizens Protecting Resources v. U.S. Fish and Wildlife Service*, 674 F.3d 97, 102 (1st Cir. 2012). The APA provides a cause of action to a person who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To "be adversely affected or aggrieved" "within the meaning of a statute, the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990) (cleaned up); *see*

*also Lexmark Intern., Inc.. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). NEPA is an environmental law that Congress enacted to promote environmental interests, 42 U.S.C. § 4321, and so purely economic interests fall outside the zone of interests that NEPA protects. *Am. Waterways Operators v. U.S. Coast Guard*, No. 18-cv-12070-DJC, 613 F. Supp. 3d 475, at *6 (D. Mass. 2020) (collecting cases); *see also Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235-36 (D.C. Cir. 1996).

The plaintiffs here are a shoreside seafood processing company, commercial fishing companies, and two trade associations representing their interests. App. 27-31. Its declarations focus primarily on claims that the plaintiffs will be unable to fish in the project area due to navigational difficulties posed by the project. *See* App. 250; App. 254; App. 258; App. 260; App. 267. Seafreeze does not dispute that the plaintiffs have an interest in averting economic injuries. Op. Br. 32. But concerns relating to safety, navigation, and economic loss are not environmental and therefore fall outside of NEPA's zone of interests. *See, e.g., Maiden Creek Assocs., L.P. v. U.S. Dept. of Transp.*, 823 F.3d 184, 191 (3d Cir. 2016) (safety-related concerns do not fall within NEPA's zone of interest).

Seafreeze nevertheless asserts that the plaintiffs fall within NEPA's zone of interests because their economic harms are attributable to environmental harms caused by the project. Seafreeze points to portions of declarations from several owners of the plaintiff companies that generally allege that the project will "throw the local marine ecosystem out of balance," App. 279, "further impacting [their] abilities to fish," App. 251. Seafreeze contends, pp. 32-33, that under *Monsanto Co. v. Geertson*

*Seed Farms*, 561 U.S. 139 (2010), no more is required to satisfy the zone-of-interest test.

Seafreeze misunderstands *Monsanto*. There, the plaintiff alfalfa farmers argued that their alfalfa crops could be infected by genetically engineered alfalfa genes, which would in turn cause additional costs (such as testing for the presence of genetically engineered alfalfa). 561 U.S. at 154-55. The Supreme Court held that the farmers could assert NEPA violations because they sought to "avert the risk of gene flow to their crops," which the district court had "determined to be a significant environmental concern" in and of itself, separate from any economic injuries. *Id.* at 156. Because the farmers would suffer an environmental injury, it did not matter if the injury also had an "economic component" that fell outside NEPA's zone of interest. *Id.* at 155; *see also Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015).

By contrast, here Seafreeze's bare allegations, pp. 6-8, 33, that the plaintiffs' ability to generate revenue from fishing will be adversely impacted by fish fleeing the area are unsupported and contradicted by the administrative record. *See, e.g.,* SA_1228 (stating that while some habitat for certain fish species will be lost, other species will benefit and that "it is highly unlikely that seafood processors would see a measurable loss of available product."); SA_1092 (noting that the structures may result in increased invertebrate and fish species due to what is referred to as a "reef effect"). None of Seafreeze's citations, pp. 8-9, support its assertion that the project will make the area "unfishable." The district court also correctly found that Seafreeze's declarants were not competent to testify to these alleged environmental impacts. *See* Add. 12-13, 16 n.12-n.13, n.15, n.16.

In any event, simply citing to potential environmental impacts—even if they might coincidentally overlap to some extent with a plaintiff's interests—is not sufficient for a plaintiff to establish an APA right of action to bring a NEPA claim. "To accept NEPA litigants whose interests accidentally overlap with the statute's intended purpose would not only create a class of plaintiffs far larger than Congress originally intended, it also would serve to distort the effect of NEPA itself." *Maiden Creek*, 823 F.3d at 195.

Seafreeze's declarants' also state that the project will diminish their aesthetic fishing experiences. *See* Op. Br. 8, 22, 54 (citing App. 240-46). But the declarants, including David Aripotch, are not parties to this litigation; they own the plaintiff companies or are members of the trade associations that are named plaintiffs. Therefore, even if the declarants could assert environmental injuries in their own right, their aesthetic interests are not "environmental interest[s] which" the plaintiff companies "as businesses enjoy" and which could bring the companies themselves within NEPA's zone of interests. *Pacific Northwest Generating Co-op v. Brown*, 38 F.3d 1058, 1063 (9th Cir. 1994) (corporations could not assert aesthetic or environmental interests of employees because those interests were not germane to corporate purpose); *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992) (to show associational standing on behalf of its members, an organization must show that the interests it seeks to protect are germane to its purpose); Add. 17, 19.

To try to show one of the plaintiffs suffered an environmental injury, Seafreeze cites the articles of incorporation of the plaintiff Long Island Commercial Fishing Association. Seafreeze submitted the articles for the first time with its motion

requesting judicial notice that was belatedly filed in March 2023, *after* summary judgment briefing had concluded. Op. Br. 19-22, 31-33; Add. 23. The district court declined to consider the articles as untimely, holding that the document should have been filed in November 2022 in connection with Seafreeze's motion for summary judgment or, at the latest, in January 2023 with its opposition to the defendants' cross-motion for summary judgment. App. 775-76; App. 18-19. That holding was correct. BOEM argued in its December 2022 summary judgment motion that Seafreeze lacked APA standing to pursue its NEPA claim. It was therefore incumbent on Seafreeze to set forth in its opposition brief facts and evidence demonstrating that it satisfied the APA's requirements. *Lujan*, 497 U.S. at 884-85; *see also Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730-31 (1st Cir. 2016) (explaining that it is a plaintiff's burden to support its standing with the manner and degree of evidence required at the successive stages of litigation). Seafreeze failed to timely satisfy that requirement.

Seafreeze asserts, pp. 21-22, 31-32, that there is no timeliness requirement for matters of judicial notice pertaining to standing, but its citations only show that the "absence" of standing may be challenged at any time, *Hochendonr*, 823 F.3d at 730, and that a court may also take judicial notice of evidence at any stage, Fed. R. E. 201(d). Neither of those points excuses Seafreeze's delay or shows that the court abused its discretion in declining to consider the eleventh-hour information. Courts are "entitled to take sensible measures"—such as the one taken by the district court here—to manage their dockets and to guard against disruptions caused by untimely filings. *Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este And Sara Lopez, M.D.*, 456 F.3d 272, 277 (1st Cir. 2006). Appellate courts afford great deference to such case

management decisions. *Gonzalez-Rivera v. Centro Medico Del Turabo, Inc.*, 931 F.3d 23, 28 (1st Cir. 2019).

Regardless, the articles do not show that the Association has APA standing based on Aripotch's asserted environmental harms. The articles state that, among other things, the *Long Island* Commercial Fishing Association's purpose is to protect the environment and "saltwater fisheries *in Suffolk County* [located on Long Island] and its environs." App. 763 (emphasis added). While it is true that the germaneness requirement is not meant to be particularly burdensome, it does require that a relationship exist between an organization's purpose and the litigation's goals. *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). No such relationship exists here. The articles by themselves fail to establish that the waters offshore Massachusetts and Rhode Island are within the "environs" of Suffolk County, New York, where the project is in federal waters 14 miles south of Martha's Vineyard, Massachusetts, SA_1296, and 65 miles away from Suffolk County. App. 772; SA_324 (map showing 35-mile radius around the wind development area); *see also* SA_1200 (explaining that geographic study area for visual impacts was 38.4 miles from the borders of the wind development area). And simply because the Association's members may fish in the project area does not mean that a trade association dedicated to the protection of fishing in New York waters is also dedicated to preserving the waters there. Add. 26.

In sum, to be among those that Congress intended to bring suit under NEPA, a plaintiff's interests must substantially align with environmental protection. *See*

*Maiden Creek*, 823 F.3d at 191. The plaintiffs' true interests are purely economic, and they accordingly lack APA standing to pursue their NEPA claim.

**B.    Even if Seafreeze could state a claim, BOEM complied with NEPA.**

This Court may alternatively reject Seafreeze's NEPA claims because BOEM complied with NEPA.

### 1.    The FEIS analyzes a reasonable range of alternatives.

Seafreeze contends, pp. 34-37, that the FEIS impermissibly adopted Vineyard Wind's purpose and that this led BOEM to consider too few alternatives. This assertion fails. Applicable regulations require an agency to "briefly specify the underlying purpose and need to which the agency is responding," 40 C.F.R. § 1502.13, and to "[r]igorously explore and objectively evaluate all reasonable alternatives," *Id.* § 1502.14(a). BOEM's NEPA regulations also require consideration of "the needs and goals of the parties involved in the application or permit as well as the public interest." 43 C.F.R. § 46.420(a)(2); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Consistent with these regulations and contrary to Seafreeze's contentions, pp. 36-37, caselaw makes clear that where an "agency is not itself the project's sponsor, consideration of alternatives may accord substantial weight to the preferences of the applicant." *Beyond Nuclear*, 704 F.3d at 19 (cleaned up). That principle is grounded in the well-settled NEPA concept that "alternatives must be bounded by some notion of feasibility, which includes alternatives that are technically and economically practical or feasible." *Id.* (cleaned up); *Busey*, 938 F.2d at 195.

BOEM complied with these requirements. The purpose and need as explained in the FEIS was "to determine whether to approve, approve with modifications, or disapprove the COP" submitted by Vineyard Wind. SA_972. This statement was appropriately framed around (1) BOEM's NEPA regulations requiring BOEM to consider the goals of a project proponent; and (2) BOEM's OCLSA duties to make the outer continental shelf "available for expeditious and orderly development, subject to environmental safeguards," SA_972; 43 U.S.C. §§ 1332(3), 1337(p).

BOEM considered 20 alternatives and carried forward six for detailed analysis (plus a no-action alternative) in the FEIS, including alternatives designed to reduce fisheries impacts. SA_1991-2006. Seafreeze asserts, pp. 36-37, that BOEM should have further considered an alternative that would have required construction outside of the lease area. Such an alternative would have been infeasible, however, as Vineyard Wind could not develop a project outside of its lease area. BOEM was accordingly not required to consider it, *Busey*, 938 F.2d at 195, and reasonably explained that it would consider proposals on other leases through separate regulatory processes, SA_740.

Seafreeze also complains that BOEM did not consider in greater detail an alternative with increased space between turbines, but BOEM reasonably rejected this alternative because increasing spacing would result in turbines outside the lease area and increased environmental impacts. SA_261; SA_740.[7] Seafreeze further wishes, p.

---

[7] NMFS's concerns relating to BOEM's alternatives analysis in the DEIS that are cited by Seafreeze, p. 35 (citing SA_282), were addressed by BOEM in its additional analysis of fishing and cumulative impacts. *See, e.g.,* SA_396-569; SA_740. And NMFS concurred in the FEIS. SA_800. Seafreeze also alleges, pp. 34-35, that BOEM's

35, that BOEM considered a vessel transit lane alternative (alternative F) in greater detail, but BOEM explained that more than 12,000 comments opposed a vessel transit lane and that the greater cable lengths that would be required for that alternative would significantly increase electrical transmission losses. SA_2005 Further, although BOEM found that the transit lane alternative would reduce impacts to navigation and fishing, such impacts would be reduced further by adopting alternative D2 (the alternative with 1 nm spacing recommended by the Coast Guard), which BOEM adopted. SA_2006. BOEM's analysis was reasonable.

> ### 2. The temporary withdrawal of the plan and subsequent resumption of the review process did not violate NEPA.

Seafreeze also takes issue, pp. 37-40, with BOEM's temporary suspension of the review of the plan and subsequent resumption of the review process. But BOEM's process was lawful. Vineyard Wind requested that BOEM suspend its review because it had selected certain turbines and wanted to ensure that the technical aspects of those turbines did not require further analysis beyond that in the SDEIS. SA_801-02; SA_806. Vineyard Wind conducted an internal technical review and found that the specifications of the turbines fit within the parameters that were previously analyzed. SA_807-10.

BOEM reviewed the new technical specifications and also determined that they

---

alternatives analysis was driven by pressure from Vineyard Wind to approve the plan by 2019 but fails to show that BOEM was motivated by any alleged pressure, particularly where BOEM did not approve the plan until 2021.

fell within the specifications already analyzed in the SDEIS, *i.e.*, the new turbines would not have a greater generating capacity and would fall within the range of dimensions previously analyzed. SA_812; SA_972; SA_946 n.3; SA_959-50 (setting forth the design envelope parameters). The number of turbines (62) would also be on the lower end of the number previously analyzed (57-100). *Id.* BOEM provided notice to the public that it was resuming its review of the plan under NEPA, 86 Fed. Reg. at 12,494, SA_813-14, but did not provide an additional opportunity for comment. The public was previously afforded ample opportunity to comment on updates to the design envelope disclosed in the SDEIS. SA_391; SA_1687; SA_1934-44. And NEPA did not require BOEM to provide an additional comment period here where there was no significant new information bearing on the project design or environmental impacts. 40 C.F.R. § 1502.9(c)(1). Seafreeze offers no cogent explanation as to why BOEM's pause and subsequent resumption of the review process violated NEPA (or OCSLA, for that matter). Seafreeze claims, pp. 38-39, that NEPA and OCSLA were violated "by failing to provide notice and opportunity for comment," but cites to no authority requiring public comment on the resumption of a NEPA process where the public notice and comment requirements were previously satisfied. *See, e.g.,* SA_1934-44. In any event, BOEM provided the public with notice that it was resuming the NEPA process. 86 Fed. Reg. at 12,494. And while it was under no obligation to consider comments it received after publication of the FEIS, BOEM did so anyway. *See* SA_2008-09.

Seafreeze identifies no inability on its part to participate in the process or comments that it would have made had it been provided with yet another comment opportunity; thus, any failure on BOEM's part to provide yet another opportunity to comment would be harmless error. *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006); *Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 61 (1st Cir. 2001). Finally, although Seafreeze asserts, pp. 39-40, that BOEM lacked statutory or regulatory authority to pause and resume its review of the plan, it cites to no authority that prevented BOEM from managing its administrative resources in that way where the requirements of NEPA and OCSLA were met. The district court properly rejected this claim. Add. 46.

### 3. BOEM's cumulative impact analysis complied with NEPA.

Seafreeze also alleges, pp. 40-41, that BOEM had not adequately analyzed the project's potential cumulative impacts and that BOEM segmented its analysis. These assertions lack merit. The FEIS contains an extensive analysis of cumulative impacts, including cumulative impacts on commercial fisheries. *See, e.g.,* SA_1213-20; SA_1234 (discussing cumulative impacts of Alternative A); SA_1235 (same for Alternative C); SA_1237 (same for Alternative D); SA_1237-38 (same for Alternative E); SA_1239 (same for Alternative F); SA_1302-1481; SA_1314-22.

Seafreeze ignores this discussion and instead contends, pp. 40-41, that the cumulative impacts analysis in the FEIS arbitrarily removed analysis set forth in the SDEIS. Seafreeze fails to cite to any analysis that was removed. And in fact, the record shows that the FEIS did not remove any cumulative impact analysis. The

SDEIS describes how BOEM developed its cumulative impacts analysis, beginning at SA_396; *see also* SA_633-58 (analyzing various impact producing factors associated with offshore wind facilities). That information was carried forward to the FEIS, which expressly analyzes potential cumulative effects of other reasonably foreseeable future offshore wind projects. FEIS Appendix A explains BOEM's methodology supporting its analysis of cumulative impacts. SA_1302-1481. The main body of the FEIS discusses cumulative impacts for each resource for which the project may have greater than minor impacts, including to commercial and for-hire fisheries. SA_478-83; SA_1213-20.

Seafreeze asserts in a single sentence, p. 41, that BOEM segmented its NEPA analysis by "undercounting reasonably foreseeable offshore wind development outside of the lease area," but fails to develop this bare assertion. This contention is accordingly waived. *See Zannino*, 895 F.2d at 17. It also lacks merit, as BOEM did consider other reasonably foreseeable wind projects. *See supra* p. 10, 41.

* * * *

In sum, BOEM complied with NEPA when approving the project.

## III. The district court correctly dismissed Seafreeze's ESA claims.

Seafreeze raised numerous ESA claims in its complaint, all of which challenged the sufficiency of the superseded 2020 biological opinion instead of the operative 2021 biological opinion. The district court properly rejected these claims for threshold reasons: Seafreeze lacks Article III standing to challenge the inoperative 2020 biological opinion because that superseded agency action was not causing Seafreeze any present or threatened injury at the time the complaint was filed and, in any event,

Seafreeze waived or forfeited most of its ESA claims by failing to adequately brief them at summary judgment. Regardless, Seafreeze's claims fail because the agencies properly determined that the project is not likely to jeopardize the continued existence of any listed species.

### A. Seafreeze lacks Article III standing to pursue its ESA claims.

Seafreeze's ESA claims, pp. 4-5, 25, ultimately target NMFS's 2020 biological opinion and BOEM's initial reliance on it. The district court correctly held that Seafreeze lacked Article III standing to pursue those claims because the 2020 biological opinion had been superseded in October 2021 and thus was not causing Seafreeze any "present or threatened injury" in December 2021, when this lawsuit commenced.

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. at 560. To establish standing, "a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Perez-Kudzma v. United States*, 940 F.3d 142, 144-45 (1st Cir. 2019) (cleaned up). Standing must be established "for each claim," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008), and is determined as of the filing of the complaint, *see Van Wagner Boston, LLC v. Davey*, 770 F.3d 33, 37 n.3 (1st Cir. 2014).

Here, the 2020 biological opinion was not causing Seafreeze any "present or threatened injury" at the time the complaint was filed, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998), because that agency action was no longer operative. The 2020 biological opinion instead had been "replace[d]" by NMFS's updated biological opinion issued in October 2021. SA_2599-600; *see supra* pp. 12-13. And BOEM adopted the 2021 biological opinion pursuant to 50 C.F.R. § 402.15(a), which effectively superseded its reliance on the 2020 opinion. SA_2251-52. Seafreeze therefore lacks Article III standing to pursue its claims relating to the 2020 biological opinion or BOEM's initial reliance on it. *See Defenders of Wildlife v. Everson*, 984 F.3d 918, 947 (10th Cir. 2020) (plaintiff lacked Article III standing to challenge a discrete agency action "that had expired and ceased to have any effect" before the lawsuit commenced); *cf. Grand Canyon Tr. v. United States Bureau of Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012), *as amended* (Sept. 17, 2012) (citing cases holding that "the issuance of a superseding [biological opinion] moots issues on appeal relating to the preceding [one]").[8]

Seafreeze posits, pp. 25-26, that its challenges to the 2020 opinion presented a live controversy because BOEM's plan approval relied on that opinion. While it is true that BOEM's approval relied in part on the 2020 opinion, that does not mean

---

[8] Seafreeze did not seek leave to amend its complaint to challenge the operative 2021 opinion. Seafreeze in fact declined to challenge the 2021 opinion. SA_16 (the 2021 opinion has "no bearing on this suit"); SA_5-14 (pre-suit notice filed prior to issuance of 2021 opinion).

that the court had jurisdiction over challenges to that opinion after it was superseded. Seafreeze also misunderstands the ESA, mistakenly assuming that an agency's duty to avoid jeopardy ceases upon ROD signature. Agencies have an ongoing duty under the ESA to avoid jeopardy through reinitiation of consultation as an approved action is carried out in certain circumstances. Here BOEM determined, after issuance of the 2020 opinion and signing the ROD, that the action needed to be modified to include in-water surveys related to the approved plan and that new information had emerged related to right whales such that reinitiation was necessary. The reinitiated consultation concluded with issuance of a new biological opinion in 2021 that superseded the previous opinion. When the 2020 opinion was replaced, it effectively "disappeared into the regulatory netherworld," rendering the court unable to address any challenges to it. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011).

## B.     Seafreeze forfeited most of its ESA claims.

Even assuming (counterfactually) that Seafreeze had Article III standing to bring its ESA claims, the district court correctly held that most of Seafreeze's ESA claims (set forth in the 6th, 7th, 8th, 11th, 12th, 13th, 14th, 15th, and 16th claims for relief in the complaint) were waived where it failed to adequately develop them in summary judgment briefing. Add. 5 n.3. Seafreeze repeats the same error on appeal, pp. 28-31, asserting in conclusory fashion that it briefed these claims and citing to portions of its briefs that merely incorporated its complaint by reference or mentioned its claims in passing. Such cursory references are insufficient to avoid

forfeiture. *Executive Leasing Corp. v. Banco Popular de Puerto Rico*, 48 F.3d 66, 67-68 (1st Cir. 1995); *Zannino*, 895 F.2d at 17.

In short, Seafreeze failed to articulate its claims with any specificity in the district court and again on appeal, instead relying on broad and vague assertions that the agencies ignored the ESA's mandate or followed unlawful standards. Op. Br. 28-31. This Court should affirm the district court's rejection of these claims as forfeited.

## C. The agencies complied with the ESA.

The claims that Seafreeze did not forfeit lack merit in any event. Op. Br. 25-28. It was not arbitrary for BOEM, the Corps, and NMFS's Office of Protected Resources to issue the joint ROD and to issue their respective approvals for the project in reliance on the 2020 opinion while the reinitiated consultation was ongoing. NMFS reasonably concluded in the 2020 opinion that the proposed project was not likely to jeopardize any listed species, including right whales. SA_2267-68. BOEM and the other actions agencies reasonably relied upon that determination in the analysis in the FEIS and in their decisions to issue their respective approvals for the project, SA_1096; SA_741-43; SA_745-46; SA_1048-51; SA_1078-81; sA_1986; SA_2003-32.

BOEM, as lead federal agency, reinitiated consultation on behalf of itself and other action agencies before issuing the joint ROD to evaluate the potential impacts of fisheries monitoring surveys (which BOEM had proposed as a condition of plan approval) and to consider updated information about the right whale. SA_1952-80. Neither the surveys nor the updated information, however, changed the conclusion that the project (including construction, operation, and decommissioning) would not likely jeopardize any listed species. SA_2253-64.

BOEM further explained that it would not authorize monitoring surveys during the reinitiated consultation and that commencement of any monitoring activities would be conditioned on the consultation's conclusion. SA_2262. BOEM and the Corps also issued their approvals subject to any requirements that would be imposed as a result of the reinitiated consultation process. SA_2137; SA_2171; SA_3171; Add. 28. And BOEM's decision to approve the plan with conditions was also informed and supported by BOEM's own ESA analysis and determination pursuant to 16 U.S.C. § 1536(d). *See* SA_106-241; SA_1954-1980; SA_2251-53; SA_2253-64. Therefore, BOEM complied with the ESA by ensuring that its actions will not jeopardize a listed species. *See Water Keeper All. v. U.S. Dept. of Defense,* 271 F.3d 21, 25 (1st Cir. 2001) (ESA imposes a "substantive requirement" to insure that agency action is not likely to jeopardize the continued existence of endangered species).

The 2021 biological opinion also concluded that the project was not likely to jeopardize any listed species. SA_2987. Like the 2020 opinion, the 2021 opinion thoroughly analyzed "effects of the action," including all consequences to listed species or critical habitat that are caused by the proposed action. SA_2750-2933; 50 C.F.R. § 402.02. Based on the effects analysis considered in the context of the status of the species, environmental baseline, and cumulative effects, the 2021 biological opinion reasonably concluded that the federal permits, authorizations, and approvals for the Vineyard Wind project are not likely to jeopardize the continued existence of the right whale. SA_2933-87; SA_2987-3008. In light of the foregoing, BOEM reasonably concluded that it could proceed with approving the plan without causing

jeopardy to any species pursuant to ESA Section 7(a)(2) and 7(d), 16 U.S.C.

§§ 1536(a)(2), (d), and without waiting for NMFS to issue the 2021 biological opinion.

\* \* \*

In sum, this Court should reject Seafreeze's ESA claims as jurisdictionally

precluded, but, in any event, the ESA claims should be rejected as forfeited or on the

merits, as the record shows that the agencies complied with the ESA.

## IV. Should this Court find fault with the federal defendants' analysis, it should instruct the district court to remand to the agencies without vacatur.

As the record shows, the federal defendants complied with all applicable

statutes. Nevertheless, if the Court were to find any deficiency, it should instruct the

district court to remand without vacatur.

A court's decision to remand without vacatur "depends inter alia on the

severity of the errors, the likelihood that they can be mended without altering the

order, and on the balance of equities and public interest considerations." *Central Maine

Power Co v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (citation omitted).

Seafreeze requests, pp. 58-63, remand with vacatur, to enjoin Vineyard Wind

from proceeding with construction, and to order the removal of all existing structures.

But even if Seafreeze had demonstrated that the agencies committed any legal errors,

it fails to show that any equitable relief in the form of vacatur or an injunction is

appropriate.[9] As the foregoing discussion demonstrates, pp. 17-30, 36-41, 45-47, any

---

[9] The United States' position is that that "set aside" in APA Section 706 does not mean "vacate." *See United States v. Texas*, No. 22-58 (S. Ct.), Gov't Op. Br., 2022 WL 4278395, 40-44; Gov't Reply Br., 2022 WL 17170668, 16-20. The government acknowledges, however, that Circuit precedent controls at this stage.

hypothetical errors are not fatal the agencies' decision and would likely be corrected with additional explanation on remand. *See Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). The equities and public interest in supplying renewal energy to 400,000 homes also would favor allowing this project to proceed during any remand. *See* 86 Fed. Reg. 7,619 (Jan. 27, 2021) (recognizing the climate crisis and announcing an objective to increase renewable energy production on the outer continental shelf). And Seafreeze has not established any harm that will result from remand without vacatur, especially where it waited 17 months after filing suit to seek preliminary injunctive relief and where its claimed economic harms were speculative and not irreparable in any event. SA_30-33; ECF No. 148. This Court should reject Seafreeze's attempts, p. 62, to incorporate its preliminary injunction briefing by reference. *See Executive Leasing Corpo*, 48 F.3d at 67-68. To the extent the Court has any doubts that remand without vacatur is appropriate, it should remand to the district court to consider remedy after additional briefing on these equitable considerations. *See Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 34 (1st Cir. 1997).

Seafreeze alternatively asks, pp. 61-63, this Court to postpone the effective date of BOEM's plan approval. The APA permits courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. But BOEM's approval took effect long ago. This Court thus cannot "postpone the effective date of" that approval *Ctr. for Biological Diversity v. Regan*, --- F. Supp. 3d ---, 2023 WL 5437496, at *5-*6 (D.D.C. Aug. 23, 2023). And to the extent Seafreeze asks this Court to undo the work that Vineyard Wind has already completed, that amounts

to more than a request to "preserve status." 5 U.S.C. § 705. In any event, the standard for issuing such a stay is the same as the standard for issuing an injunction, *see Nken v. Holder*, 556 U.S. 418, 434 (2009), which Seafreeze has not met as explained above.

This Court should also reject Seafreeze's contention, p. 61-62, that BOEM's waiver of a lessee's requirement to provide financial assurances for decommissioning costs somehow justifies injunctive relief. BOEM reasonably waived this requirement for Vineyard Wind where Vineyard Wind provided evidence that such waiver would not expose the government to undue financial risk, in particular, evidence of robust insurance policies that would cover costs of damages, that it would use proven wind turbine technology, and that it would obtain predictable income over the life of the project. App. 1240-41. BOEM also noted that it would evaluate this requirement annually and could require financial assurances at any time. App. 1241. Seafreeze did not challenge BOEM's waiver of this requirement in its complaint or in the district court; any request for relief on this basis has been accordingly forfeited.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to the federal defendants should be affirmed.

Respectfully submitted,

/s/ *Thekla Hansen-Young*

*Of counsel:*
STEPHEN R. VORKOPER
Office of the Solicitor
U.S. Department of the Interior

LEA TYHACH
SCOTT FARLEY
National Oceanic and Atmospheric
Administration
Office of General Counsel

MATTHEW J. HARRIS
U.S. Army Corps of Engineers

February 15, 2024
DJ # 90-8-6-08499

TODD KIM
*Assistant Attorney General*
LUTHER L. HAJEK
PERRY ROSEN
MARK ARTHUR BROWN
ANGELA ELLIS
KEVIN W. MCARDLE
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,771 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond font.

/s/ *Thekla Hansen-Young*
Thekla Hansen-Young

Counsel for Federal Appellees

February 15, 2024